1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                         LOUISVILLE DIVISION

3
UNITED STATES OF AMERICA,      )    Case No. 3:16-CR-00033-DJH
4                              )
        Plaintiff,             )
5                              )
    VS.                        )
6                              )
LOUIS CHARLTON,                )
7                              )    March 29, 2017
        Defendant.            )    Louisville, Kentucky
8

9                          *  *  *  *  *

10                            VOLUME 1
                     TRANSCRIPT OF JURY TRIAL
11             BEFORE HONORABLE DAVID J. HALE
                 UNITED STATES DISTRICT JUDGE
12
                           *  *  *  *  *
13
APPEARANCES:
14
For United States:       Jo E. Lawless
15                       U.S. Attorney's Office
                         717 West Broadway
16                       Louisville, KY 40202

17   For Defendant:      Larry D. Simon
                         239 South Fifth Street, Suite 1700
18                       Louisville, KY 40202

19

20   [Defendant present.]

21

22                   Dena Legg, RDR, CRR, CCR-KY
                       Official Court Reporter
23                     232 U.S. Courthouse
                      Louisville, KY 40202
24                       (502) 625-3778

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

 1       (REPORTER'S NOTE:  Voir dire, preliminary instructions, and

 2   Government opening statement not requested as part of this

 3   transcript.)

 4       (Begin proceedings in open court at 4:24 p.m.  Jury in.)

 5            THE COURT:  Is the United States ready to call its

 6   first witness?

 7            MS. LAWLESS:  We are, Your Honor.  United States would

 8   call Edward LaGantta.

 9       (EDWARD LAGANTTA, called by the Government, sworn.)

10                       DIRECT EXAMINATION

11   BY MS. LAWLESS:

12   Q.  All right.  Mr. LaGantta, would you introduce yourself to

13   the jury.  Tell them your first and last name.

14   A.  I'm Edward LaGantta.

15   Q.  And how do you spell your last name?

16   A.  L-A-G-A-N-T-T-A.

17   Q.  All right.  Do you have any nicknames or anything --

18   A.  "Little Ed."

19   Q.  Okay.  Anything else?  Anything besides that?  "Little

20   Edward" or just --

21   A.  Little Edward, Little Ed.

22   Q.  Okay.  Friends/family call you that?

23   A.  Yes, ma'am.

24   Q.  All right.  Now, Mr. LaGantta, do you know the defendant in

25   this case?

LaGantta - Direct

1    A.  Yes.

2    Q.  Mr. Charlton?

3    A.  Yes.

4    Q.  How long have you known him?

5    A.  All my life.

6    Q.  Okay.  Did you-all grow up in the same area?

7    A.  Yes.

8    Q.  Just tell us a little bit about how you know him.

9    A.  Since we was kids, yeah.

10   Q.  Okay.  All right.  And have you had any dealings with

11   Mr. Charlton that have to do with drug trafficking?

12   A.  Yes.

13   Q.  All right.  And have you been involved in drug trafficking

14   yourself?

15   A.  Yes.

16   Q.  All right.  Let's tell the ladies and gentlemen of the jury

17   about that.  Okay?  Do you have -- and we've talked before

18   today, haven't we?  We've met before?

19   A.  Yeah.

20   Q.  All right.  So tell the ladies and gentlemen of the jury, do

21   you have prior felony convictions for trafficking in drugs?

22   A.  Yes.

23   Q.  All right.  And do you have a prior misdemeanor conviction

24   when the police asked you your name and you gave them somebody

25   else's name?

1    A.  Yes.

2    Q.  Okay.  So you didn't tell them the truth that time?

3    A.  No.

4    Q.  All right.  But you've been sworn today and you understand

5    that you got to tell the truth?

6    A.  Yes.

7    Q.  All right.  Do you use drugs yourself?

8    A.  Yeah, I smoke weed.

9    Q.  And how often do you smoke it?

10   A.  Every day.

11   Q.  How does it -- how does it affect you?

12   A.  It don't.

13   Q.  Well, then why do you do it?  You and I have had this

14   conversation before.

15   A.  It's just a --

16           THE REPORTER:  I'm sorry.  Can you repeat that.

17   A.  A recreation, just something to do.

18   Q.  So remember when we talked about this before and I asked you

19   to tell me, does it make -- how does it make you feel?  Does it

20   make you feel more excited or does it make you feel --

21   A.  I focus better on it.

22   Q.  -- more chill?

23   A.  That's it.

24   Q.  All right.  You haven't smoked any weed today, have you?

25   A.  No.

LaGantta - Direct

```
 1   Q.  How long have you been smoking weed?

 2   A.  A lot of years.

 3   Q.  Okay.  When you do it, have you ever noticed, does it have

 4   any impact on your ability to remember things that you've done

 5   or that you haven't done, or does it impact your memory in any

 6   way?

 7   A.  No.

 8   Q.  Okay.  Not that you've ever noticed?

 9   A.  No, ma'am.

10   Q.  All right.  So we've talked about this criminal history that

11   you have.  You've got a record so you've been through the court

12   system yourself before; right?

13   A.  Yes.

14   Q.  Okay.  Now, let's go back in time to November of 2015.  So I

15   did the math in my head earlier.  I'm not quite sure I got it

16   quite right.  About 18 months ago roughly?

17   A.  Yes.

18   Q.  Before Thanksgiving of 2015.

19   A.  Yes.

20   Q.  Do you remember that?  Okay.  Did you agree to work with law

21   enforcement around that time?

22   A.  Yes.

23   Q.  All right.  And when you agreed to work with them, what

24   kinds of things were they asking you about?  What did they want

25   your help with?
```

1    A.   Drugs, guns.

2    Q.   And they thought you would have information about that?

3    A.   Yes.

4    Q.   All right.  And when you agreed to work with them, did you

5    give them any names of anybody that you thought that you would

6    be able to buy from or sell drugs to?

7    A.   Yes.

8    Q.   And who was that?

9         [Witness indicating.]

10   A.   Mr. Charlton.

11   Q.   Okay.  What did you tell them that you thought you would be

12   able to do with Mr. Charlton?

13   A.   I told them I could make a buy.

14   Q.   All right.  And why did you think you'd be able to make a

15   buy with Mr. Charlton?

16   A.   Because I knew I could.

17   Q.   Had you bought from him before?

18   A.   Yes, ma'am.

19   Q.   All right.  So tell us a little bit -- because you and I

20   have talked before.  You know what happened, but the ladies and

21   gentlemen of the jury don't.  When it first starts out and you

22   agree to work with them, you tell them that you think you can

23   buy drugs from Mr. Charlton.  Did you give them any details

24   about why you thought you'd be able to do that as far as what

25   you could buy, or what kind of quantities, or anything like

1    that?

2    A.   No.   They just asked me and I just told them I can buy

3    anything.

4    Q.   Who came up with the idea of the half ounce?  Was that --

5    A.   I don't know his name.

6    Q.   Was it you or was it one of the police officers?

7    A.   It was one of the officers.

8    Q.   Okay.  And when they talked -- threw that idea out there to

9    you, what did you think about that?  Was that something that you

10   thought you could do or, no, there's no way I can do that?

11   A.   No, I said I could do it.  I buy more than that.

12   Q.   All right.  When you had bought drugs from Mr. Charlton

13   during this time frame, where did you usually buy them from him?

14   A.   The house.

15   Q.   All right.  Had you ever bought them from him anywhere else?

16   A.   No.

17   Q.   All right.  Did you tell them anything about any firearms?

18   Had you ever seen Mr. Charlton with firearms?

19   A.   They asked me was there any in the house.  I said there was

20   one in the --

21        MR. SIMON:  Excuse me.  Just object to leading.  I

22   don't see this witness being particularly adverse to the

23   Government.

24        THE COURT:  He may answer.  It's -- well, why don't

25   you approach for a minute.

LaGantta - Direct

1       (Bench conference on the record outside the hearing of the

2   jury.)

3           THE COURT:  I think -- I understand your objection as

4   to leading.  I think as to preliminary matters, there's some

5   leniency or some leeway given for leading with respect to

6   preliminary matters.  I think most of this is in the category of

7   preliminary, but I would expect, as the testimony is developed,

8   it would not be as necessary.

9           MS. LAWLESS:  Yes, sir.  And I'm trying to keep

10  Mr. LaGantta kind of focused too.

11      And I talked to Mr. Simon on one of our breaks about a

12  potential -- I don't know what to call it -- explosive issue

13  that I specifically had talked to Mr. LaGantta to stay away

14  from, that I would not -- that he needed to be very careful in

15  the way he answered my questions, that I was going to share it

16  with Mr. Simon and not to blurt something out about it because

17  it, in my opinion, would be very prejudicial to Mr. Charlton.

18      And I'm not interested in having problems during the course

19  of my trial.  I'm trying to get us into a little bit of a groove

20  for that questioning, but I promise you, when we get to the

21  substance of it, it will be more --

22          THE COURT:  That's fine.

23          MS. LAWLESS:  -- open-ended.

24          THE COURT:  Thank you.

25      (End of bench conference.)

1    BY MS. LAWLESS:

2    Q.  All right.  Mr. LaGantta, we're going to step back to that

3    one.  I probably won't ask the question exactly the same way I

4    did, but I asked you if you said anything or if law enforcement

5    talked to you at all about whether you knew anything about

6    Mr. Charlton having guns.  That was generally my question and

7    you started to answer it.  What were you going to say?

8    A.  I said yes.

9    Q.  What did you tell them, that you knew that he had them?

10   A.  Yeah.  They asked me have he -- did he -- did I see any

11   firearms.  I said yes.

12   Q.  Okay.  That you had before?

13   A.  Yes.

14   Q.  All right.  Okay.  So we've done this sort of background

15   thing where you've agreed to work with law enforcement.  You've

16   given them this sort of preliminary information.  They asked

17   you, "Do you think you could buy a half ounce?"  So let's talk

18   specifically about November 16th.  All right?

19   A.  Yes, ma'am.

20   Q.  2015.  Can you tell us -- let's walk through it.  Where did

21   you first meet with law enforcement that day before you go to

22   buy the half ounce?

23   A.  I don't know the name of the place.  It's right there on

24   Industrial Parkway.

25   Q.  All right.  Was it in an office for --

1    A.   Yes.

2    Q.   -- the police department?   Okay.   And did you sit down with

3    them and talk to them about this is what we're going to do?   Did

4    y'all have a game plan before you went in?

5    A.   They had a game plan.   And then when I got there, they laid

6    everything out.   And I agreed with it and that's when we left.

7    Q.   Okay.   So you met over there off of Industrial Parkway at an

8    LMPD office.   They told you, "This is what we're going to do,"

9    and you said okay?

10   A.   Yes, ma'am.

11   Q.   Right?   So let's talk about how the drug transaction

12   actually happened.   You with me?

13   A.   Yes, ma'am.

14   Q.   Okay.   Do you just walk up and knock on somebody's door?   Do

15   you call them?   We're going to start at the beginning.   How does

16   it work?

17   A.   You call first.

18   Q.   Okay.   And did you call Mr. Charlton that day?

19   A.   Yes, ma'am.

20   Q.   And how did you know how to call him?   How did you know what

21   number to use?

22   A.   I went on my cell phone, dialed the number.

23   Q.   So you already had Mr. Charlton's phone number?

24   A.   Yes.

25   Q.   All right.   Were you with the police when you made that

LaGantta - Direct

1    phone call?

2    A.   Yes.

3    Q.   And so they could hear you talking about on your end of the

4    conversation what was going on?

5    A.   Yes.

6    Q.   All right.  So when you called, what did you tell him?

7    A.   I said, "I need a half, cuz."  He said, "Cool.  Give me 15

8    minutes.  I'll be -- I'm going to get it ready."

9        And then after that, in 15 minutes, I called back.  He said,

10   "Come to the back door."

11   Q.   All right.  So if you ordered up a half, half ounce, how

12   much would you expect to pay for that?

13   A.   700.

14   Q.   Where did you get -- did you have $700 to pay for it that

15   day?

16   A.   Yes, I did, but he gave me the money.

17   Q.   Do you remember who that is?

18   A.   I don't know his name, but he's the one that gave me the

19   money.

20   Q.   Special Agent Walker that's sitting here with the tie on?

21       Okay.  So you got the money from law enforcement.  They gave

22   you 700 bucks after you made the call.  How did you get to

23   Mr. Charlton's house?

24   A.   Him right there.

25   Q.   All right.  Were there other people with him?

1    A.   Yes.

2    Q.   Did they drive you a little bit of the way?

3    A.   Yes.

4    Q.   Okay.  Did they drive you right up to the front of the house

5    or was there something --

6    A.   No.  They -- right there by a volleyball place.

7            MS. LAWLESS:  All right.  Your Honor, I'm just going

8    to use a map, and if we could display it, please.

9    Q.   Okay.  Mr. LaGantta, tell us -- because we talked about this

10   before.

11   A.   Right here is the volleyball thing.  You come up the street.

12   Q.   Okay.

13   A.   Come all the way over to right here, and that's how far I

14   walked right here.

15   Q.   Okay.  So just to help -- because not everybody here is from

16   Louisville.  Can you kind of help us figure out -- what part of

17   town are we in right here?

18   A.   South Louisville.

19   Q.   Yes, sir.  All right.  So the street over here, the

20   volleyball place where you said you started out with, what

21   street is that on?

22   A.   Third Street.

23   Q.   Okay.  So this is where -- where that little green arrow and

24   you took your finger and drew the way that you went.  The police

25   dropped you off there by the green arrow?

LaGantta - Direct

1   A.  Yes, ma'am.

2   Q.  All right.  And then you walked.  And we were talking about

3   this before when we looked at this picture.  It makes it look

4   like a really, really far distance, doesn't it, because we blew

5   it up.  What would you say, how long did it take you to walk

6   from the green arrow over here?  There's a big --

7   A.  Like four minutes.

8   Q.  About four minutes?

9   A.  If that.

10  Q.  Okay.  What time of day was this that this was all going on,

11  do you remember?

12  A.  Like 7:30.

13  Q.  Okay.  So 7:30 in November.  So it's getting a little dark

14  or --

15  A.  It was already dark.

16  Q.  Okay.  So they drop you off here.  Did you have anything

17  else on you when you went to Mr. Charlton's house --

18  A.  No.

19  Q.  -- besides the $700?  Well, remember when we were talking

20  about you asked somebody for some cigarettes or something?

21  A.  Oh, yeah.

22  Q.  Did they give you some little packet?

23  A.  Yeah, I asked the -- his partner for a cigarette, and he

24  just hand me a pack and told me to keep it.

25  Q.  Okay.  You didn't know that you were being monitored with

1    that, did you?

2    A.  No.

3            MR. SIMON:  Object to the leading.

4            MS. LAWLESS:  I'll rephrase.

5    MS. LAWLESS:

6    Q.  Did you know that that was a monitoring device?

7    A.  No, ma'am.

8    Q.  Did you have a cigarette?

9    A.  Yeah, I took one out and lit it.

10   Q.  Okay.  So they give you that and the $700.  Did you have any

11   other money of your own?

12   A.  No.  They told me don't bring none of my own.

13   Q.  All right.  Did you have any drugs on you at that time?

14   A.  No.

15   Q.  Okay.  So they give you the $700 and it's the pack with the

16   cigarette, drop you off here, and you walked over there to 3937

17   South Fifth Street.  And that's where Mr. Charlton lived;

18   correct?

19   A.  Yes, ma'am.

20   Q.  Okay.  Tell us please what happened when you got there to

21   the house.

22   A.  I went to the back door, like you said, and after I went in,

23   I laid the money down.  He was still finishing up cooking it,

24   running under water.  And after he took it out, he handed it to

25   me.  I left.  I went back out the same way, except I went the

1    opposite way.

2    Q.  Okay.  So did you just walk in the house or did you knock on

3    the door?  Let's --

4    A.  No, he was on the back porch waiting on me.

5    Q.  Okay.  Who was on the back porch?

6    A.  Mr. Charlton was on the back porch waiting on me.

7    Q.  So when you saw him there, did he have anything with him or

8    on him?

9    A.  Just his gun hanging out his pocket.

10            MS. LAWLESS:  Okay.  Your Honor, may I approach the

11   witness?

12            THE COURT:  Yes.

13       Just so that the record is clear, that exhibit has been

14   examined; is that correct?

15            MS. LAWLESS:  Yes, Your Honor, and it's been rendered

16   safe.  There are -- there's no ammunition in it.  There are zip

17   ties that it's been taken apart.

18   BY MS. LAWLESS:

19   Q.  Mr. LaGantta, will you take a look at that.

20            MS. LAWLESS:  And I have one more, Judge.  I forgot to

21   take it up.

22            THE COURT:  Yes.

23            MS. LAWLESS:  If I may re-approach.

24   BY MS. LAWLESS:

25   Q.  That one is marked as Number 1 and this one is actually

 1   marked 26.

 2              MR. SIMON:  I'm sorry.  Could you tell me that again.

 3              MS. LAWLESS:  Twenty-six is a photo.

 4              MR. SIMON:  Twenty-Six is the photo.  And the firearm

 5   is what?

 6              MS. LAWLESS:  One.  I'm going to take these back over

 7   with me.  You good?

 8              THE WITNESS:  Uh-huh.

 9   BY MS. LAWLESS:

10   Q.  So that's a photo of the gun put altogether.  Would you

11   agree with that, Mr. LaGantta?

12   A.  Yes, ma'am.

13   Q.  And it looks a little bit different than the way it does

14   here, because as the judge was just asking me questions, things

15   have been taken apart.  Right?  Do you recognize the gun that's

16   in that picture, United States Exhibit 26, and the gun itself

17   that's marked as United States Exhibit 1?

18   A.  Yes, ma'am.

19   Q.  Where do you recognize that from?

20   A.  From Mr. Charlton.

21   Q.  Okay.  So you said -- tell us again.  You see him.  He's on

22   the back porch.  Where was the gun?

23   A.  It was hanging out the right pocket.

24   Q.  What was he wearing, do you remember?

25   A.  Not exactly.  It was something like light pants like.

1    Q.  All right.  So he meets you on the back porch, gun here.

2    What did the two of you do at that point?

3    A.  Shake hands, went in the house.

4    Q.  All right.  Where did you go in the house?

5    A.  In the kitchen.

6    Q.  And when you go in the back door, what room are you in in

7    the house?

8    A.  That's the kitchen area.

9    Q.  Okay.  Again, you know that.  None of us --

10   A.  Yes, ma'am.

11   Q.  -- you know, know that.  So you-all walk in the back door.

12   You're right there.  What, if anything, did Mr. Charlton do with

13   the gun when you-all went in the kitchen?

14   A.  Laid it on the counter.

15   Q.  All right.  And what did he did once you were in the kitchen

16   with him?

17   A.  Finished running the water under the stuff.

18   Q.  Okay.  Why is there -- why would you run water?  Can you

19   explain to us what was going on there?

20   A.  That's how you turn it from soft to hard.

21   Q.  All right.  How you turn what from soft to hard?

22   A.  Turn cocaine from powder to crack.

23   Q.  Okay.  We don't have to get all chemical and everything, but

24   just generally, what does that process involve?  Do you know?

25   Do you know how it gets done?

1   A.  Yeah, I know how to do it.

2   Q.  Okay.  Well, can you tell us?

3   A.  You just run hot water until it boils, dump the cocaine in

4   the pot, keep mixing the water, hot water, and stirring.  When

5   it get real milky, run it under cold water.  It forms into a

6   rock.

7   Q.  All right.  Do you use anything while that's going on?  Is

8   it just stuff in the bowl or do you use a utensil or anything

9   like that?

10  A.  You can take a butter knife, a spoon.  You can just shake

11  the jar.

12  Q.  All right.  And so that going from hot, then making it cold,

13  you said that that's what makes it kind of -- I don't want to

14  put words in your mouth.  What did you say?

15  A.  It forms into crack.

16  Q.  Okay.  All right.  Once that was finished -- so Mr. Charlton

17  wasn't finished turning the powder into the hard or the crack

18  when you got there.

19  A.  No.

20  Q.  Okay.  So he finished that up.  And where were you when that

21  was going on?

22  A.  Standing right there beside him.

23  Q.  Were you-all talking to each other, or just standing there

24  waiting, or what happened?

25  A.  I'm not for sure.

```
 1   Q.  Okay.  At some point in time did he finish cooking it up?
 2   A.  Yes.
 3   Q.  What did he do then?
 4   A.  Dried it -- threw it on the paper towel, dried it, put it in
 5   a baggie and handed it to me.
 6   Q.  All right.  Did either one of you weigh it at all or you
 7   just went on -- you knew what you ordered and he cooked stuff --
 8   A.  Yeah, he weighed it.  Everything was there.  The scale,
 9   everything was right there.  He weighed it.  I seen what I was
10   paying for and I grabbed it.  I left.
11   Q.  Okay.  So let's back that up a little bit.  You talked about
12   he was cooking it.  Then it's going under the cold water.
13   You-all might have talked or not while this was going on.  You
14   said he dried it.  Is that when you were talking about putting
15   it on a paper towel?
16   A.  Yes.
17   Q.  Okay.  Once that part is finished, then who weighed it?
18   A.  He weighed it.
19   Q.  Okay.  Whose scale did he use to weigh it?
20   A.  His own.
21   Q.  And it was right there in the kitchen with you guys as well?
22   A.  Yes.
23   Q.  All right.  What he had cooked up, did all of that go to you
24   or did he keep some of it?
25   A.  No, 14 grams came to me.  I don't know what happened to the
```

1    rest.

2    Q.  All right.  And you were supposed to pay $700 for that.  How

3    did you get the -- did you give Mr. Charlton $700?

4    A.  Yeah, I laid it on the counter.

5    Q.  All right.  Did you ever see him take the money --

6    A.  Yeah, he picked up.

7    Q.  -- or you just laid it on the counter?

8    A.  Yeah, he picked it up and stuck it -- he looked at it, stuck

9    it in his pocket.

10   Q.  All right.  Did he count it or anything like that or just

11   looked at it?

12   A.  Yeah.  When you open it up, just scan through it and stick

13   it in your pocket.

14   Q.  Okay.  About how long do you think you were there?

15   A.  Like seven minutes.

16   Q.  So you weren't there a terribly long time?

17   A.  No, ma'am.

18   Q.  Did you come into any interaction with any other people

19   besides Mr. Charlton while you were there?

20   A.  No.  When I was leaving, people was passing my by.

21   Q.  Just on the street or coming toward the house?

22   A.  I don't know.  They was either coming out or going past.

23   Q.  Okay.  But there was nobody else in the house that you

24   talked to anyway while you were there?

25   A.  No, ma'am.

1  Q.  Right?  Okay.  When you left -- and you talked about this

2  just a minute ago.  I'll put this back up.  When you left the

3  house, which way -- where did you go after that?  Let me put it

4  that way.  Where did you go after you left?

5  A.  I came out the yard.  I went right up Kenton and came back

6  to Third Street and got back in the car.

7  Q.  All right.  Do you mind doing that again.  Sometimes the

8  computers act a little funny.

9  A.  I came up right here, went up Kenton, up to Third Street,

10  and got back in the car.

11  Q.  Is that where you-all had agreed for you to be picked up

12  again?

13  A.  Yes.

14  Q.  All right.  And who picked you up there?

15  A.  Mr. -- I forgot his name.

16     [Witness indicating.]

17  Q.  Special Agent Walker?

18  A.  Mr. Walker.

19  Q.  Was there anybody else with him?  Were there other law

20  enforcement people with him?

21  A.  His partner and two LMPD officers.

22  Q.  Okay.  Now, after they picked you up, what did you do with

23  the crack cocaine?

24  A.  He told me to give it to the officer that was back there

25  with me.

1   Q.  All right.  And did you do that?

2   A.  Yes, ma'am.

3   Q.  Okay.  Do you know what happened after that?  Did you stay

4   with them a whole lot longer?  Did they keep you around for a

5   little bit?

6   A.  No, ma'am.  They searched me and let me go.

7   Q.  All right.  Did they search you before you went in?

8   A.  Yes, they searched me before I went in and searched me when

9   I came out.

10  Q.  Thank you.  I forgot to ask you that question earlier.

11      Well, when you said that they let you go, before we get to

12  that point in time, did they ask you to tell them what had gone

13  on in the house?

14  A.  Yes.

15  Q.  All right.  And did you talk to them about the things that

16  had gone on?

17  A.  Yes.

18  Q.  Did you essentially tell them the same thing that you told

19  the jury today?

20  A.  Yes, ma'am.

21  Q.  All right.  Once that was finished and you said that they

22  were going to let you go, did you just leave from there or what

23  happened?  Where did you go at that point?

24  A.  No, the LMPD officer dropped me off to my car.

25  Q.  Okay.  And where was that?  You don't have to give us an

1   address, just a general area.

2   A.   On Preston Highway.

3   Q.   Okay.  Were there any promises that were made to you that

4   day to get you to do this --

5   A.   No, ma'am.

6   Q.   -- to cooperate?  Did they pay you any money or anything

7   like that?

8   A.   No, ma'am.

9   Q.   But they did ask you to follow some of their guidelines and

10  agree to work with them?

11  A.   Yes, ma'am.

12  Q.   And you're here today because there was a subpoena issued

13  for your appearance; correct?

14  A.   Yes, ma'am.

15          MS. LAWLESS:  Just one moment, Your Honor.  Those are

16  all the questions I have.

17          THE COURT:  Mr. Simon.

18          MR. SIMON:  May we approach?

19          THE COURT:  Yes.

20     (Bench conference on the record outside the hearing of the

21  jury.)

22          MR. SIMON:  I was going to ask if there are any

23  statements under purview of Rule 29.

24          MS. LAWLESS:  No.

25          MR. SIMON:  I've seen the two -- three reports, two of

1    which I think document the police versions of what he told them.

2              MS. LAWLESS:  Right.

3              MR. SIMON:  But he does not have any oral statements?

4    He didn't make any written statements --

5              MS. LAWLESS:  No, no.

6              MR. SIMON:  -- to law enforcement?

7              MS. LAWLESS:  I'm sorry to talk over you.  No.  They

8    asked him to tell us what happened.  He told them.  They were

9    memorialized and I gave you the agent's reports that have that

10   in them.

11             MR. SIMON:  Okay.  Thank you.

12       (End of bench conference.)

13                        CROSS-EXAMINATION

14   BY MR. SIMON:

15   Q.  Mr. LaGantta, is that how you pronounce your name?

16   A.  Yes.

17   Q.  All right.  What's your date of birth?

18   A.  4-4-82.

19             MS. LAWLESS:  Your Honor, may we approach?

20             THE COURT:  Yes.

21       (Bench conference on the record outside the hearing of the

22   jury.)

23             MS. LAWLESS:  I don't think the witness should have to

24   give his date of birth.  It's personal identifying information.

25             MR. SIMON:  I want to make sure when I impeach him on

1    a prior criminal arrest that it's the same person.

2            MS. LAWLESS:  Well, if we could talk with the judge

3    about arrests or other things that you're going to impeach him

4    on, whether it's appropriate, because I may...

5            MR. SIMON:  Okay.  Well, you brought up the fact that

6    he has a prior felony conviction.  Mr. LaGantta -- I haven't

7    marked these, but I can for the purpose of this bench

8    conference.  I got to give you a copy of the citation.

9    Mr. LaGantta -- this is a *Court.net* record.  But underneath

10   that, Judge, is a citation from Louisville Metro Police

11   Department from November 5th of 2015, charging him with

12   trafficking in cocaine, possession of marijuana, trafficking in

13   synthetic drugs, and tampering with physical evidence.

14       It shows that Hannah Carroll, one of the officers on this

15   case, is the arresting officer, one of the arresting officers on

16   this case.  The defendant, Mr. LaGantta, in this particular

17   case, 11 days prior to the search of the house and according to

18   the testimony of the witness, had felony charges pending against

19   him involving the same police officer that's involved in my

20   client's indictment in this court.

21       He has denied being promised anything and he's denied

22   receiving any money.  He's denied any consideration whatsoever.

23   So apparently -- he's denied any consideration whatsoever.

24       However, the record of this case, according to the *Court.net*

25   printout -- and I would presume it to be accurate -- shows that

1  the trafficking in controlled substance charge, cocaine, was

2  dismissed.  The possession of marijuana charge was dismissed.

3  The trafficking in synthetic drugs was amended to a misdemeanor.

4  He was given a 365-day conditionally discharged sentence, and

5  the tampering with physical evidence charge, which is a felony,

6  was dismissed.  So this is a citation that was provided for this

7  individual.

8         THE COURT:  Am I looking at the right thing?  I'm

9  looking at a 2007 case.

10        MR. SIMON:  Well, I apologize.

11        MS. LAWLESS:  And I don't have the right one either.

12        THE COURT:  I wasn't following that.

13        MR. SIMON:  Well, I apologize.

14        MS. LAWLESS:  Here's the citation, Your Honor.

15        MR. SIMON:  I can't see.  I can't see this high on the

16  table.  I apologize.

17        THE COURT:  That's all right.

18        MR. SIMON:  Here we go.  I'll let you get caught up

19  with me.

20        THE COURT:  Okay.  So your point is what?

21        MR. SIMON:  My point is the witness is testifying that

22  he received no consideration whatsoever on the case.  I believe

23  that that is subject to impeachment by virtue of the fact that

24  11 days prior to his participating, which he claims without

25  consideration, he was cited, charged with felony offenses that

1    were later amended.

2              THE COURT:  And the amendments took place after the

3    search?

4              MR. SIMON:  After the search, right.

5              THE COURT:  All right.  What's the United States'

6    position on this?

7              MS. LAWLESS:  Well, it's a citation.  There's no

8    indictment.  There is a resolution here with what he was -- what

9    he pled to.  And I think Mr. Simon can ask him, again, if he

10   received some consideration, but I don't think we can get really

11   into the weeds of what every single one of these charges were

12   because they're charged.  It was never presented to a grand

13   jury.

14       And this is what I talked to Mr. Simon about in the hallway

15   and can tell you Mr. LaGantta's motivation for becoming involved

16   in this is because Mr. Charlton, according to him, was involved

17   in a home invasion with Mr. LaGantta's brother.

18       You may remember this, Judge, because that matter went to

19   trial last summer in Jefferson Circuit Court.  Mr. Charlton,

20   during one of his postarrest interviews, when they were asking

21   about a gun -- it's not one of these two guns.  It's a gun from

22   a different time -- told them that he had gotten that gun from

23   Mr. LaGantta's brother's girlfriend.  We know for a fact that it

24   was used during the home invasion because there's an NIBIN hit

25   on it is why he was called as a witness down to Jefferson

1    Circuit Court.

2        So Mr. LaGantta, the witness, knew about this involvement.

3    He will say -- this is the explosive part that I wanted to avoid

4    -- that Mr. Charlton was complicit, that he and Mr. LaGantta's

5    brother committed the home invasion together and that he ended

6    up with the gun from the girlfriend in trying to deflect any

7    attention to him.  I just think it's really dangerous to go down

8    that path because of that potential aspect.

9            THE COURT:  We're definitely not going to get into

10   discussing uncharged conduct on the basis of this witness's

11   representations of it so we need to avoid that.

12       How long do you anticipate taking to cross-examine this

13   witness?  The reason I ask is because it's five before 5:00.

14           MR. SIMON:  I would say at the least, probably about

15   20, 25 minutes.

16           THE COURT:  I think it very well may be relevant,

17   given the time frame, 11 days prior, and -- how long after?

18           MR. SIMON:  It was settled for a misdemeanor on --

19           MS. LAWLESS:  April.

20           MR. SIMON:  -- April 1st of 2016.

21           THE COURT:  A few months after.

22           MR. SIMON:  Right.  It was in bench warrant status

23   too.  And he was able in March 21st -- he didn't appear in

24   court.  They gave him a citation to appear in December.  He

25   didn't show up.  It went to a bench warrant.  His lawyer put it

1    on the docket in March.  And then about two weeks later, with

2    the police officer, Judge, Hannah, in court, the case was

3    amended to a misdemeanor on April 1st.

4           THE COURT:  Well, I think that -- I think it's

5    probably a fair area for cross-examination to inquire as to

6    whether he faced charges in advance of his cooperation and

7    whether those charges were compromised.  You can ask him about

8    that.

9       I'm not sure about the citation.  I'm not sure that that --

10   getting that into evidence really does much.  We would need to

11   redact personal identifiers from this anyway, and that is -- it

12   is just a citation, in any event.  So I would not -- I would

13   not -- I would not likely allow that into evidence as an

14   exhibit, but I think that the topic is a fair topic for

15   cross-examination.

16      I think what I am going to do, unless you tell me,

17   Ms. Lawless, that there's a problem getting him back here

18   tomorrow, I think --

19           MS. LAWLESS:  There shouldn't be, Your Honor.

20           THE COURT:  -- I think we probably need to just let

21   this jury go.  They've been through quite a bit of in and out in

22   this courtroom and had a lot of waiting the last two days.  I

23   think we probably ought to just end here.  And we'll start with

24   them -- I've asked them to be in at 8:30 in the morning.  And so

25   I'll see if we can come in at 8:15 in the morning --

1                MS. LAWLESS:  Sure.

2                THE COURT:  -- and we'll pick up there.  In the

3      meantime, perhaps we can do a little -- is that your copy of

4      that -- we can do a little bit more analysis on the scope of

5      that.  All right?

6                MR. SIMON:  Thank you.

7           (End of bench conference.)

8                THE COURT:  All right.  Members of the jury, normally

9      at this point we would proceed with the testimony of this

10     witness, but the hour is late and so the lawyers and I agree

11     that this is a good break point.  So I'm going to let you go for

12     the evening now.

13          Let me remind you of a couple of things.  First is that we

14     are going to start back at 8:30 in the morning.  So if you

15     could -- if you could plan to be in the courthouse no later than

16     about 20 after, we'll do our very best to start at 8:30 or

17     within a few minutes of 8:30.  And we'll plan to go tomorrow

18     until 5:30.  We'll take a lunch break.  If you haven't already

19     found it, there is a snack bar in the basement of this building.

20     So if it's raining, that's about the only convenient option for

21     lunch, but we'll try and start at 8:30 and go till about 5:30

22     tomorrow.

23          Remember that I have said repeatedly you can't talk about

24     the case.  So when you go home this evening, you need to refrain

25     from talking with your family and friends about anything, any of

 1   the testimony, anything to do with the case.  Everything else is

 2   fine.  And that goes for discussions amongst yourselves as well.

 3       So have a good evening.  We'll see you tomorrow morning at

 4   8:30.

 5       (Jury out 4:59 p.m.)

 6           THE COURT:  All right.  Mr. LaGantta, you may step

 7   down.  You will need to follow the instructions of the United

 8   States regarding returning tomorrow morning.  You remain under

 9   oath.

10       (Testimony concluded at 5:00 p.m.)

11       (End of transcript.)

12                   C E R T I F I C A T E

13       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

14   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15

16

17       _____s/Dena Legg_____          _September 27, 2017_
     Certified Court Reporter No. 20042A157    Date
18   Official Court Reporter

19

20

21

22

23

24

25

```
 1                              INDEX

 2    GOVERNMENT WITNESS:

 3    EDWARD LAGANTTA
          Direct Examination by Ms. Lawless          2
 4        Cross-Examination by Mr. Simon             24

 5

 6                            EXHIBITS

 7    GOVERNMENT:
      No exhibits
 8

 9    DEFENDANT:
      No exhibits
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```