```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )      Case No. 3:16-CR-00033-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
         VS.                        )
 6                                  )
     LOUIS CHARLTON,                )
 7                                  )      March 30, 2017
             Defendant.            )      Louisville, Kentucky
 8

 9                            *  *  *  *  *

10                              VOLUME 2
                        TRANSCRIPT OF JURY TRIAL
11                 BEFORE HONORABLE DAVID J. HALE
                     UNITED STATES DISTRICT JUDGE
12
                              *  *  *  *  *
13
     APPEARANCES:
14
     For United States:        Jo E. Lawless
15                             U.S. Attorney's Office
                               717 West Broadway
16                             Louisville, KY 40202

17   For Defendant:            Larry D. Simon
                               239 South Fifth Street, Suite 1700
18                             Louisville, KY 40202

19

20   [Defendant present.]

21

22                     Dena Legg, RDR, CRR, CCR-KY
                          Official Court Reporter
23                        232 U.S. Courthouse
                         Louisville, KY 40202
24                          (502) 625-3778

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

```
 1        (Begin proceedings in open court at 8:42 a.m.  Jury out.)

 2             THE COURT:  Are we ready to proceed?

 3             MR. SIMON:  Yes.

 4             MS. LAWLESS:  Your Honor, if I could just check -- the

 5   witness was parking.  He should be in the building by now.

 6             THE COURT:  All right.

 7             MS. LAWLESS:  I'll check and walk back in, if that's

 8   okay.

 9             THE COURT:  That's fine.

10        If I could see counsel at the bench just briefly, please.

11        (Bench conference on the record.)

12             THE COURT:  All right.  Just following up on where we

13   were yesterday.  I think the issue with his -- is it an arrest

14   11 days prior?

15             MR. SIMON:  Citation.

16             THE COURT:  A citation 11 days prior and his

17   subsequent resolution, I guess, of that charge is a fair area

18   for cross.

19        I don't see any value -- in fact, I see some downside under

20   Rule 403 to showing the -- to admitting the citation.  So I'll

21   let you use it to cross him, as the basis for your cross, but I

22   don't think we're going to admit that.

23             MR. SIMON:  Okay.  Well, we'll -- I may mark it just

24   for identification purposes.  Do you want me to do that?

25             THE COURT:  No.
```

```
 1              MR. SIMON:  Okay.

 2              THE COURT:  Unless we're going to admit it, I don't

 3   see any reason to do that.  So I just -- I don't see how it

 4   would help the jury.  Those things are not the easiest things to

 5   decipher for a lawyer, much less for a lay person.  So I'm

 6   concerned a little bit about confusion.  I think you'll be able

 7   to cross him on the contents effectively in any event.

 8              MR. SIMON:  So I could show him the citation and it

 9   won't be admitted?

10              THE COURT:  If you need to.

11              MR. SIMON:  Okay.

12              THE COURT:  I mean, if he --

13              MR. SIMON:  Right.

14              THE COURT:  -- if he doesn't remember it.

15              MR. SIMON:  Sure.  Thank you.

16              MS. LAWLESS:  Thank you.

17         (End of bench conference.)

18         (Jury in 8:46 a.m.)

19              THE COURT:  Good morning, members of the jury.  We're

20   about to begin again right where we left off yesterday

21   afternoon.

22         Let me remind you of a couple of things that I said to you

23   yesterday.  If at any point during the day our breaks are not

24   coming frequently enough for you, please just raise your hand

25   and let me know that you need another break, and we will stop at
```

LaGantta - Cross

```
 1    that point.  Otherwise, we will plan on breaking about every
 2    hour, hour and 15 minutes roughly.
 3        All right.  Mr. Simon, I believe this is your witness now.
 4            MR. SIMON:  Thank you, Your Honor.
 5        (EDWARD LAGANTTA, called by the Government, previously
 6    sworn.)
 7                        CROSS-EXAMINATION
 8    BY MR. SIMON (CONTINUING):
 9    Q.  Mr. LaGantta, yesterday when you testified at the end of the
10    day, you told us that you've been involved in dealing drugs for
11    a long time.  Correct?
12    A.  Yes.
13    Q.  And in November of 2015, you agreed to work with law
14    enforcement officers as a confidential informant; is that
15    correct?
16    A.  Yes, yes.
17    Q.  You told us -- well, let me ask you this:  Had you ever
18    worked for law enforcement officers before as a confidential
19    informant?
20    A.  No.
21    Q.  This is the only time?
22    A.  Yes.
23    Q.  Before or since November of 2015, this is the only time?
24    A.  Yes.
25    Q.  So these are narcotic officers; right?
```

1    A.   Yes.

2    Q.   And the narcotic officers wanted information about drugs and

3    guns, and you told them that you could make a purchase from

4    Mr. Charlton?

5    A.   Yes.

6    Q.   And you told them that you could do this because you had

7    bought cocaine from Mr. Charlton on previous occasions?

8    A.   Yes.

9    Q.   Like how many times?

10   A.   Ten, 15.

11   Q.   Okay.  Over what period of time?  Can you estimate?

12   A.   Ten, 20 years.

13   Q.   Going back 20 years?

14   A.   Yeah.

15   Q.   Okay.  So you are about -- what are -- you turn 35 next

16   month, next week?

17   A.   Yeah.

18   Q.   Is that right?

19   A.   Yeah.

20   Q.   Okay.  And you're saying for 10 or 20 years?

21   A.   I know it's been a while.

22   Q.   And when you purchase any drugs from my client, it would be

23   cocaine; right?

24   A.   Sometimes cocaine, sometimes crack.

25   Q.   All right.  Crack or powder; right?

1    A.  Yes.

2    Q.  And when that happened, it was always at his house on South

3    Fifth Street?

4    A.  Yes.

5    Q.  Now, would it be a fair statement to say that on the other

6    occasions, the 10 other occasions or so that you bought drugs

7    from my client, that was illegal; right?  That was illegal

8    conduct?

9    A.  Yeah.

10   Q.  Right.  And you haven't been charged with those instances,

11   have you?

12   A.  No.

13   Q.  And even though you're testifying under oath today, you have

14   an agreement that you wouldn't be prosecuted for those

15   instances, were you?  Isn't that true?

16   A.  No, I don't have no agreement.

17   Q.  You didn't anticipate that you might be asked today about

18   whether or not you engaged in illegal conduct with Mr. Charlton

19   on other occasions?

20   A.  No.

21   Q.  You never anticipated that?

22   A.  No.

23   Q.  When you met with -- you've met with Ms. Lawless, the

24   prosecutor on this case; right?

25   A.  Yes.

1   Q.   Okay.  And when you met with her, you were with your lawyer;

2   correct?

3   A.   Yes.

4   Q.   And she's here today, Ms. Rao, sitting in the courtroom?

5   A.   Miss who?

6   Q.   Catherine Rao?

7   A.   I know Kamenish.

8   Q.   Ms. Kamenish?  I'm sorry.

9        MS. LAWLESS:  Your Honor, may we approach?

10       (Bench conference on the record outside the hearing of the

11   jury.)

12       MS. LAWLESS:  There is no agreement not to prosecute

13   him.  We -- and I mentioned this during one of our telephonic

14   conferences -- we had some difficulty finding Mr. LaGantta, and

15   this court issued a material witness warrant.  When that

16   happens, the court appoints counsel.  And so Catherine really

17   exhibits her obligation to be here while he testifies.

18       MR. SIMON:  I'm not criticizing her for that.

19       MS. LAWLESS:  No, but I think that this -- we're going

20   down a path that leads -- that's misleading to the jury.  He

21   doesn't have an agreement.  She's not here to represent him

22   because he's got an agreement that he won't be prosecuted.

23       THE COURT:  I think he's already testified that he has

24   no agreement.  I think you'll be able to emphasize that on

25   redirect, but you know what the facts are.

1          MR. SIMON:  Thank you.

2      (End of bench conference.)

3  BY MR. SIMON:

4  Q.  When you've purchased cocaine from Mr. Charlton on previous

5  occasions, on some occasions did you just use it for your own

6  self?

7  A.  No.

8  Q.  You always sold it?

9  A.  Yes.

10 Q.  To other people?

11 A.  Yes.

12 Q.  All right.  And on occasion Mr. Charlton would front you the

13 cocaine?

14 A.  No.

15 Q.  He would never front you the cocaine?

16 A.  No.

17 Q.  Okay.  So you had to pay him at the time that you purchased

18 the cocaine?

19 A.  Yes.

20 Q.  So tell us how the agreement that took place where you

21 served as an informant for the narcotic officers on November

22 16th of 2015 came about.

23 A.  What you -- can you rephrase that?  What you mean?

24 Q.  Right.  You told us that on November 16th of 2015, you made

25 an agreement with narcotic officers.  You mentioned Detective

 1   Walker sitting at the table.

 2   A.  Yeah.

 3   Q.  Okay.  And his partner.

 4   A.  Yes.

 5   Q.  Right.  His partner.  Hannah Carroll, is that his partner,

 6   lady detective?

 7   A.  Yeah.

 8   Q.  All right.  And you made an agreement with them that you

 9   were going to do a purchase of a half ounce of cocaine from my

10   client for crack.

11   A.  Yes.

12   Q.  And you told us where you met up and how this whole thing

13   happened; correct?

14   A.  Yes.

15   Q.  And what you told us is that you did it -- you had this

16   agreement with the narcotic officers, but you had no promises

17   made to you?

18   A.  No.

19   Q.  And you were not paid any money --

20   A.  No.

21   Q.  -- for doing this purchase?

22   A.  No.

23   Q.  Do you remember being stopped by Detective Carroll and

24   another officer on November the 4th of 2015?

25   A.  Yes.

1    Q.   And where was that?

2    A.   On Dixie Highway.

3    Q.   All right.  And were you in a vehicle?  Were you in a car?

4    A.   Yes.

5    Q.   All right.  And when you were stopped, what happened?

6    A.   Nothing.

7    Q.   Nothing.  Did the police search your vehicle?

8    A.   Yes.

9    Q.   And what did they find?

10   A.   Marijuana.

11   Q.   What else?

12   A.   Some seasoning.

13   Q.   Some what?

14   A.   Seasoning.

15   Q.   Seasoning?

16   A.   Yes.

17   Q.   Okay.  Seasoning?  Like food seasoning?

18   A.   Yes.

19   Q.   They find some crack cocaine?

20   A.   No.

21   Q.   No?  All right.  Do you remember receiving a citation when

22   you got stopped that day?

23   A.   I didn't receive no citation.

24   Q.   You weren't given like a ticket?

25   A.   No.

1              MR. SIMON:  All right.  If I may I approach the

2      witness.

3              THE COURT:  Yes.

4      BY MR. SIMON:

5      Q.  I'm going to show you a document.  This is a citation.  Just

6      ask you to look at it and see if that refreshes your memory.

7      Does that refresh your memory?

8      A.  No, I didn't receive this.

9      Q.  Well, I didn't ask you if you received it.  So what you told

10     us is that you had some marijuana in the vehicle.  It was in

11     your right front pocket?

12     A.  Yeah.

13     Q.  All right.  And you had some crack cocaine in the vehicle;

14     is that correct?

15     A.  No.

16     Q.  Did you have the crack cocaine on your person?

17     A.  No.

18     Q.  When the citation says crack cocaine was found in your

19     buttocks; is that correct?

20     A.  No.

21     Q.  That's not correct?

22     A.  No.

23     Q.  When it says marijuana was found in your buttocks, that's

24     not correct either?

25     A.  No.

1    Q.  And you told the police officers that there was -- the brown

2    substance in a bag that they found were beef bouillon cubes.  Is

3    that what you told the officers?

4    A.  That's what they are, seasoning.

5    Q.  Yeah, that's the seasoning; right?

6    A.  Yes.

7    Q.  All right.  And then eventually you went to court on those

8    charges; right?

9    A.  Yes.

10   Q.  Okay.  And you were charged with trafficking in cocaine?

11   A.  Yes.

12   Q.  And you were charged with possession of marijuana?

13   A.  Yes.

14   Q.  And you were charged with trafficking in a synthetic

15   substance?

16   A.  Yes.

17   Q.  And you were charged with tampering with physical evidence?

18   A.  Yes.

19   Q.  Were you with anybody or were you by yourself?

20   A.  I was by myself.

21   Q.  After you were stopped by Detective Carroll and the other

22   officer that she was with, did you have the occasion to have a

23   little conversation with them after they seized the marijuana

24   and what they claim they seized, cocaine and the beef bouillon

25   cubes?  Did you have a little conversation with them?

1    A.   No.

2    Q.   You didn't talk to them about what had happened, the fact

3    that they found drugs or they suspected drugs on your person in

4    the vehicle?

5    A.   No.

6    Q.   You never talked to them?

7    A.   No.   They took me on Industrial Parkway.

8    Q.   Right.   So they stop you; correct?

9    A.   Yes.

10   Q.   And they get you out of the vehicle; correct?

11   A.   Yes.

12   Q.   And they search you; correct?

13   A.   Yes.

14   Q.   And they find marijuana on you; correct?

15   A.   Yes.

16   Q.   And they find what they suspect is crack cocaine on you;

17   correct?

18   A.   No.

19   Q.   You deny that?

20   A.   I didn't have it on me.

21   Q.   But you had beef bouillon cubes in your vehicle?

22   A.   Yes.

23   Q.   And eventually you went to court, because you were charged

24   with the offenses I told you about.

25   A.   Yes.

1   Q.  And you knew what your penalty ranges were for those

2   charges; correct?

3   A.  No, because I didn't have it on me.

4   Q.  Let me ask you, Mr. LaGantta, what's the penalty range for

5   trafficking in cocaine?

6   A.  One to five.

7   Q.  That's possession.  You can get one to five years in the

8   penitentiary for possessing cocaine; right?

9   A.  Yeah.

10  Q.  And you can get five to 10 years in the penitentiary for

11  trafficking in cocaine; right?

12  A.  Yeah.

13  Q.  All right.  And if you have prior felony convictions, those

14  penalties can be increased up to like 20 years; right?

15  A.  I guess.  I don't know.

16  Q.  You don't know that?

17  A.  No.

18  Q.  You have no idea that your penalties can be increased beyond

19  the penalty range for trafficking because of having prior felony

20  convictions?

21  A.  No.

22  Q.  Which you have; correct?

23  A.  Yeah.

24  Q.  And when you were stopped by the police and they recovered

25  whatever they recovered from your person, you're telling us that

1    you didn't have a conversation with them about what had

2    happened?

3    A.   No.

4    Q.   And so was there any type of discussion with these officers

5    about you working down the road with them?

6    A.   Not that day.

7    Q.   Okay.  So you had a discussion -- this conversation

8    regarding working with the officers down the road, that was on

9    another day?

10   A.   Yeah.

11   Q.   All right.  And so where did you meet up with them?

12   A.   On Industrial Parkway.

13   Q.   Okay.  Is that where their office is?

14   A.   I guess.  I don't -- it's a little building.

15   Q.   Okay.  But you met with Detective Carroll and Detective

16   Walker at an office on Industrial Parkway; correct?

17   A.   Yes.

18   Q.   And that's when you talk to them about making a purchase

19   from Mr. Charlton of crack.

20   A.   Yes.

21   Q.   And when you agreed to assist the narcotic officers on that,

22   did they tell you that they would help you out on your charges?

23   A.   No.

24   Q.   Did you tell them that you might be concerned for your

25   safety if you went to Mr. Charlton's residence?

1    A.   No.

2    Q.   All right.  Because you've been there before.  You never had

3    a problem with Mr. Charlton; right?

4    A.   Right.

5    Q.   But there was never a statement made to you by Detective

6    Carroll, Detective Walker saying they would help you get your

7    charges worked out?

8    A.   No.

9    Q.   Because you're telling us you didn't think you were charged

10   with anything?

11   A.   No.

12   Q.   I don't understand.  You're agreeing with me?  You didn't

13   believe that you were actually charged with anything as a result

14   of the search that happened of your vehicle on November 4th of

15   2015?  Is that --

16   A.   The marijuana was a misdemeanor and the seasoning was

17   seasoning.

18   Q.   Tell me that again because I didn't understand it.

19   A.   The marijuana was a misdemeanor and the seasoning was

20   seasoning.

21   Q.   And the fact that you were charged with trafficking in

22   cocaine, do you remember that?

23   A.   I didn't have it.

24   Q.   I didn't ask you that question.

25        MS. LAWLESS:  Your Honor, at this point I'm going to

LaGantta - Cross

1    object.  Asked and answered several times.

2            THE COURT:  I think he can answer the question and

3    then we'll move on.

4    BY MR. SIMON:

5    Q.  Do you remember being charged with trafficking in cocaine as

6    a result of the search of you and your vehicle on November 4th,

7    2015?

8    A.  Yes.

9    Q.  And when all is said and done, in April of 2016, you went to

10   court on these charges; right?

11   A.  Yes.

12   Q.  And when all is said and done, at the end of the day you got

13   a misdemeanor; correct?

14   A.  Yes.

15   Q.  And it was a suspended sentence.  You didn't have to serve

16   any time.

17   A.  No.

18   Q.  And wasn't on probation.  You didn't have to go to a

19   probation officer; right?

20   A.  No.

21   Q.  You just got a suspended jail sentence and you were on your

22   way?

23   A.  Yeah.

24   Q.  Right.  And when you were stopped by the police, you said

25   you didn't remember getting a citation; right?

1    A.   I didn't.

2    Q.   You did or didn't get a citation?

3    A.   I didn't get a citation.

4    Q.   You didn't get a citation.  But you didn't get locked up.

5    A.   No.

6    Q.   They said, "You can go."  Right?

7    A.   No, they held me.

8    Q.   They held you for how long?

9    A.   Two, three hours.

10   Q.   Okay.  So they held you for two or three hours.  Did they

11   talk to you during that period of time?

12   A.   No.  They was doing whatever they was doing.

13   Q.   Okay.  Where did they hold you?

14   A.   In a room.

15   Q.   Okay.  They took you to their office?

16   A.   Yeah, on Industrial Parkway.

17   Q.   All right.  And you just stayed there for two or three

18   hours, and then they came and they -- what, did they keep you in

19   a room and open the door after two or three hours and say,

20   "Okay.  Mr. LaGantta, you can go now"?

21   A.   No.  They wrote my information down.

22   Q.   What was your information?

23   A.   On my license, my name.

24   Q.   Okay.  That's where they recorded this information.  And

25   they -- is that right?  Is that where they recorded your

1    information?

2    A.   No.   They took my license, came back in there and told me

3    they'll contact me.

4    Q.   They told you they would contact you?

5    A.   Yeah.

6    Q.   Okay.   And they were going to contact you so you could make

7    some purchase -- make a purchase of cocaine?

8    A.   No, they didn't discuss that.

9    Q.   Okay.   Well, so the police were going to contact you to,

10   what, tell you when you had to be in court?

11   A.   They just said they'll contact me.

12   Q.   They said they'd contact you.   And you were okay with that?

13   A.   Yeah, I didn't --

14   Q.   And you exchanged like your cell phone numbers so they can

15   get in touch with you?

16   A.   Yeah.

17   Q.   All right.   Because they didn't have your numbers from

18   before?

19   A.   No.

20   Q.   All right.   And you got Detective Carroll's number,

21   Detective Walker's number, and they got your cell phone number?

22   A.   No, they had my number.

23   Q.   They had your number.   You didn't get their number?

24   A.   No.

25   Q.   But they called you later?

1    A.   Yes.

2    Q.   Which one?  Detective Carroll or Detective Walker?

3    A.   It wasn't neither one of them.  It was someone else.

4    Q.   All right.  And that person told you you need to come back

5    to their office on Industrial Park Drive, parkway or whatever,

6    and talk to them about making a purchase from Mr. Charlton?

7    A.   No.  He just told me to come in and talk to them.

8    Q.   Okay.  So they said come in and talk to us, and you were

9    okay with that?

10   A.   Yeah.

11   Q.   All right.  Because you agreed you would come in later and

12   talk to them if they asked you.

13   A.   No.  They said they'll contact me later.

14   Q.   All right.

15   A.   I said okay.

16   Q.   All right.  And so even though they -- well, strike that.

17   You got contacted by a police officer -- now, it was related to

18   the incident on November the 4th.  You knew it was related to

19   that; right?

20   A.   What you --

21   Q.   When you got a call from a police officer, it wasn't

22   Detective Walker.  It wasn't Detective Carroll.  But when you

23   got a call from a police officer and says you need to come to

24   our office, we want to talk to you -- right?  That's what you

25   told us; right?

1    A.   Yeah, they said come to the office.

2    Q.   You knew that they were calling you about what happened on

3    November the 4th, when you got stopped by Detective Carroll?

4    A.   Yeah.

5    Q.   All right.  And you went down and talked to them?

6    A.   Yeah.

7    Q.   Okay.  Was Detective Carroll there?

8    A.   Yeah.

9    Q.   And Detective Walker, was that person there?  Was Detective

10   Walker there?

11   A.   No.

12   Q.   All right.  Detective Carroll was there?

13   A.   Yes.

14   Q.   And Detective Carroll said, "Would you agree to purchase

15   cocaine from Mr. Charlton"?

16   A.   Yes.

17   Q.   And that's when it all got set up, this purchase?

18   A.   Yes.

19   Q.   Now, you told us that you met at their office and then they

20   explained to you how it was going to work, how the purchase was

21   going to work; right?

22       [Witness nodded.]

23   Q.   And they said they were going to take you to a location a

24   couple of blocks away from my client's residence; correct?

25   A.   Yes.

1    Q.  And they were going to give you like a wire so they can

2    monitor your conversations?

3    A.  No.

4    Q.  They just -- they did that though, didn't they?  They put a

5    wire on you?

6    A.  They didn't give me no wire.  They didn't put nothing on me.

7    Q.  Not nothing at all?

8    A.  No.

9    Q.  Okay.  Well, let's go back a little bit.  In preparation for

10   going to my client's house to purchase some crack, they search

11   you; right?

12   A.  Yes.

13   Q.  Okay.  And they search you to make sure you didn't have any

14   crack on you; right?

15   A.  Yes.

16   Q.  All right.  And they gave you $700 because that was the

17   purchase price for the half ounce of crack?

18   A.  Yes.

19   Q.  All right.  Now, other than that and maybe your ID, did you

20   have any other items on you?

21   A.  No.

22   Q.  You didn't have a gun on you or anything?

23   A.  No.

24   Q.  All right.  And you didn't have any other kind of drugs on

25   you; right?

1    A.   No.

2    Q.   All right.  Now, did they give you like a pack of

3    cigarettes?

4    A.   Yeah.

5    Q.   I thought I heard that.

6    A.   Yes.

7    Q.   Okay.  And do you know whether this pack of cigarettes had a

8    transmitter, a device where they can listen to what you said and

9    what was going on around you?

10   A.   No.

11   Q.   All right.  You had no idea that the police were monitoring

12   your conversations?

13   A.   No.

14   Q.   What was being said around you?

15   A.   No.

16   Q.   No idea whatsoever?

17   A.   No.

18   Q.   And then they -- then the agreement was you would walk a

19   couple of blocks to Mr. Charlton's house and then make the

20   purchase after calling him?

21   A.   Yeah.

22   Q.   All right.  And you called Mr. Charlton; correct?

23   A.   Yes.

24   Q.   And he said, "Meet me at my back porch in about 15 minutes."

25   A.   Yeah.

1   Q.  All right.  He didn't say come on inside.  He said, "Meet me

2   at my back porch."

3   A.  No.  He said, "Come to the back door."

4   Q.  All right.  But don't come inside.  He said, "Meet me at the

5   back door"?

6   A.  No.  When I got back there, he was already back there.

7   Q.  In the phone conversation he said, "Meet me at the back

8   door"?

9   A.  Yeah.

10  Q.  All right.  Now, on that day were you smoking any marijuana?

11  A.  Yeah.

12  Q.  All right.  And on November 4th of 2015, had you been

13  smoking marijuana that day?

14  A.  Yeah.

15  Q.  Because you had marijuana on your person that day; right?

16  A.  Yeah.

17  Q.  And what you told the ladies and gentlemen of the jury is

18  that you smoked marijuana all the time.

19  A.  Yeah.

20  Q.  Because it makes you focus better?

21  A.  Yeah.

22  Q.  And you've been doing that since, what, you were 18?  16?

23  14?  How long you been doing that?

24  A.  Eleven, 12.

25  Q.  Since you were 11 or 12 years old?

1    A.  Yeah.

2    Q.  All right.  And you're going to turn 35.  So for 20 years or

3    so, you smoked marijuana just about every day?

4    A.  Yeah.

5    Q.  To help you focus better?

6    A.  Yeah.

7    Q.  And are you employed?  Do you work anywhere right now?

8    A.  No.

9    Q.  Have you ever had a job?

10   A.  Yeah.

11   Q.  What kind of job did you have?

12   A.  Factories.

13   Q.  Okay.

14   A.  Construction.

15   Q.  All right.  And when you would go to work, you would smoke

16   marijuana?

17   A.  Yeah.

18   Q.  Because it helps you focus better?

19   A.  Yeah.

20   Q.  Now, have you smoked any weed today?

21   A.  No.

22   Q.  And were you smoking any weed yesterday?

23   A.  No.

24   Q.  You knew you were going to be testifying yesterday.

25   A.  Yeah.

1    Q.  And you knew you were going to be testifying today.

2    A.  Yeah.

3    Q.  And you didn't think, maybe because of being on the witness

4    stand in federal court here, it might be a good thing to focus

5    better?

6    A.  They told me don't use none.

7    Q.  Excuse me?

8    A.  They told me don't smoke.

9    Q.  Oh, they told you not to smoke.

10   A.  Yeah.

11   Q.  Because otherwise you would?

12   A.  Yeah.

13   Q.  Okay.  But they asked you not to yesterday and today.

14   A.  Yeah.

15   Q.  All right.  When you got to Mr. Charlton's house on November

16   16th of 2015, the police didn't follow you there, did they?

17   A.  No.

18   Q.  All right.  Well, that wouldn't have been cool, would it?

19   If you were going to make a controlled buy from Mr. Charlton,

20   the point is you don't want to tip him off that the police, you

21   know, are using you to set him up; right?  You don't want them

22   nearby so he might see them?  Does that sound right?

23   A.  What you -- what you mean?

24   Q.  All right.  Let me ask it this way.  The police give you the

25   $700, and they make sure you don't have any drugs on you.  And

1    then they say, "Okay.  Walk down the street a couple of blocks

2    and go to Mr. Charlton's house and make the purchase."  Right?

3    A.   Yeah.

4    Q.   Okay.  And when you go and you walk down the street to go to

5    Mr. Charlton's house, you don't have a police officer walking

6    with you, do you?

7    A.   No.

8    Q.   Okay.  And it wouldn't be -- it wouldn't really work that

9    well -- if you went to Mr. Charlton's, into his backyard for the

10   purpose of getting cocaine and you were accompanied by a

11   narcotics officer, that wouldn't work, would it?

12   A.   No.

13   Q.   All right.  So the point was that there wouldn't be -- it

14   wouldn't be good to have a police officer around when you were

15   making that controlled purchase from Mr. Charlton; correct?

16   A.   Right.

17   Q.   And you're aware of the fact that Mr. Charlton -- you're

18   aware, in November of 2015, Mr. Charlton had surveillance

19   cameras on the outside of his house?

20   A.   Yes.

21   Q.   All right.  On the front and on the back of the house?

22   A.   No.

23   Q.   You didn't know that?

24   A.   No.

25   Q.   You never noticed them before?

1    A.   No.

2    Q.   On the front or the back?

3    A.   The front, yeah.

4    Q.   Okay.  You didn't know he had a camera on the back?

5    A.   No.

6    Q.   When you went to his house on November 16th of 2015, he

7    handed you the dope while you're standing off to the side of the

8    porch; right?

9    A.   No.

10   Q.   Your testimony is you went inside the house?

11   A.   I did.

12   Q.   That's your -- that's what you claim to have happened;

13   right?

14   A.   Yeah.

15   Q.   And you claim that he had a gun in his pocket; right?

16   A.   Yeah.

17   Q.   And you claim that he put the gun down on the counter before

18   he paid you; right?  Before you paid him; right?

19   A.   Yeah.

20   Q.   All right.  And you're the only witness to that; correct?

21   A.   Yeah.

22   Q.   We'd have to believe you to say that Mr. Charlton carried a

23   firearm with him on that day.

24            MS. LAWLESS:  Objection, Your Honor.  Argumentative.

25            MR. SIMON:  I'll withdraw it.  May I have a moment?

```
 1              THE COURT:  Yes.

 2         (Mr. Simon conferring with defendant off the record.)

 3    BY MR. SIMON:

 4    Q.  Let me clarify something, Mr. LaGantta.  Your testimony is

 5    that you were -- you hd been purchasing crack from my client at

 6    that house for going back 10 years?

 7    A.  No, not that house.

 8    Q.  Okay.  At other locations, including that house?

 9    A.  That house and the one before.

10              MR. SIMON:  Okay.  That's all the questions I have.

11    Thank you.

12              THE COURT:  Redirect?

13              MS. LAWLESS:  Yes, Your Honor.

14                        REDIRECT EXAMINATION

15    BY MS. LAWLESS:

16    Q.  Mr. LaGantta, when was the first time that you met Detective

17    Carroll, Hannah Carroll?

18    A.  When they pulled up on me at Speedway.

19    Q.  Okay.  November 4th of 2015.  You didn't have any experience

20    with her before that, did you?

21    A.  No.

22    Q.  All right.  And Special Agent Walker, he doesn't work for

23    LMPD, does he?

24    A.  No.

25    Q.  He works for the ATF; right?
```

1    A.   Yes.

2    Q.   He's not a detective with the Louisville Metro Police

3    Department?

4    A.   No.

5    Q.   Somebody else was with her when they stopped you.  Who was

6    that?  Do you remember?

7    A.   I don't know his name.

8    Q.   Was it Special Agent Walker?

9    A.   No.

10   Q.   Okay.  So when you were asked those questions about him

11   being involved in this, it looked like you were confused.  I

12   just want to -- there were two police officers involved.  It's

13   just that Special Agent Walker wasn't involved; right?

14   A.   Right.

15   Q.   Okay.  And so after you met Detective Carroll and you talked

16   about that you agreed to work as a confidential informant and

17   they took you back to their office, that's when you told them

18   that you would work with them; right?

19   A.   Yeah.

20   Q.   Okay.  So that was on the 4th.  And then we come forward to

21   the 16th, and this is when you did the controlled purchase and

22   all of that.  Who came up with Mr. Charlton as somebody that you

23   could buy dope from?  You or the police?

24   A.   What you --

25   Q.   Did you say here are the people I can buy from or did they

1   say can you tell us -- you know, can you go buy from Louis

2   Charlton?

3   A.  Yes.

4   Q.  They came up with his name or you came up with his name?

5   A.  They had it.

6   Q.  They asked you about him?

7   A.  Yes.

8   Q.  And you said what?

9   A.  I said yes.

10   Q.  Okay.  And then we're not going to go back through all of

11   that.  You did all of the things that you testified about

12   yesterday and then were asked about this morning; right?

13   A.  Yes.

14   Q.  Anything you want to change about that at all?

15   A.  No.

16   Q.  Any doubt in your mind that you went in that house?

17   A.  I did go in the house.

18   Q.  Okay.  And all the things that you talked about before,

19   nothing that we need to change?  Because sometimes when you have

20   time to think about it -- nothing you need to change?

21       All right.  A couple of things.  You said you didn't know

22   that they could hear what was going on, that "they" being law

23   enforcement.  Now, at this point Special Agent Walker is

24   involved on November 16th and some other people; right?  You

25   said you rode --

1    A.   Yes.

2    Q.   -- over there.  You didn't know when they gave you that pack

3    that they could hear what was going on, could you?

4    A.   No.

5    Q.   Okay.  And as far as you know -- well, nobody walked with

6    you to Mr. Charlton's house after they dropped you off.

7    Mr. Simon was asking those questions.  Right?

8    A.   No.

9    Q.   Do you have any idea whether police officers were around or

10   were keeping an eye on where you were?

11   A.   Yeah.

12   Q.   Do you?  Do you think they were keeping an eye on what you

13   were doing?

14   A.   Yeah.  If I walk off with your money, yeah.

15   Q.   Okay.  They just might not have been standing right there

16   beside you, but they didn't just drop you off and say go do

17   whatever.  They're keeping control of what's going on; right?

18   A.   Yes.

19   Q.   The point was Mr. Charlton wasn't supposed to know that the

20   police were involved; right?

21   A.   Right.

22   Q.   Okay.  And after all of that, when this was going on, nobody

23   paid you any money?

24   A.   No.

25   Q.   And nobody made you any direct promises that you remember?

1    A.   No.

2    Q.   And have you been made any promises --

3    A.   No.

4    Q.   -- from the United States?  We don't have any kind of an

5    agreement, do we?

6    A.   No.

7         MS. LAWLESS:  All right.  That's all I have, Your

8    Honor.

9         THE COURT:  Anything further?

10        MR. SIMON:  Just a few.

11                    RECROSS-EXAMINATION

12   BY MR. SIMON:

13   Q.   So nobody's confused, Detective Carroll was one of the two

14   police officers that stopped you on November the 4th of 2015 --

15   A.   Yes.

16   Q.   -- at Speedway?  Detective Walker came into this later on --

17   A.   Yes.

18   Q.   -- when you did the buy from Mr. Charlton; correct?

19   A.   Yes.

20   Q.   And you would have these folks believe that you made this

21   agreement with law enforcement to do this controlled buy just

22   out of the goodness of your heart and as a service to the

23   community, is that what you're telling us?

24   A.   What you mean?

25        MS. LAWLESS:  Objection, Your Honor.  May we approach?

1              THE COURT:  Yes.

2         (Bench conference on the record outside the hearing of the

3    jury.)

4              MR. SIMON:  I know.

5              MS. LAWLESS:  So are we going to go there, because I

6    don't want the jury to be left with this impression.  I mean, he

7    has a reason that he agreed to cooperate against Mr. Charlton,

8    and it's what I talked to you-all about yesterday.

9              THE COURT:  You're getting close to opening that door.

10   If he feels compelled to say, no, it wasn't out of the goodness

11   of my heart.  It was revenge or whatever the reason may be --

12             MR. SIMON:  Sure, I know.  I understand.

13             THE COURT:  So --

14             MR. SIMON:  If that's what his answer is going to be.

15   I think he answered it, but --

16             MS. LAWLESS:  No, because that's not really the end of

17   the story.  You asked him, "Did you do it out of the goodness of

18   your heart?"

19             MR. SIMON:  Right.

20             MS. LAWLESS:  Okay.  But then he says no, are you

21   stopping there?  Are you going to let him answer you why he did

22   it?  Are you going to ask him why he did it?

23             MR. SIMON:  Yeah, I can ask him why he did it.

24             THE COURT:  So are we prepared for that answer?

25             MR. SIMON:  Uh-huh.

1          MS. LAWLESS:  Judge, you know, this is a very strange

2     position for me to be in, because I think -- I'm concerned about

3     this on appeal.  I don't know that we really want to get into --

4          THE COURT:  Well, I'm also concerned about this

5     exceeding the scope of the redirect.  This didn't -- this

6     wasn't -- I mean, I think you should have probably brought this

7     up in your original cross.  This was not a topic that came up in

8     the course of her redirect, and I'm concerned that it's -- I

9     don't know enough to know.  I mean, your representation

10    yesterday about this arrangement that he had or this -- did you

11    say it was brother?

12         MS. LAWLESS:  Mr. LaGantta's brother, Carlos LaGantta,

13    was charged with a home invasion.  There were shots fired during

14    the course of that home invasion.  Mr. Charlton has the gun from

15    that home invasion.  He was called to testify during that and

16    invoked his Fifth Amendment privilege.  That's the 20,000 foot

17    view.

18       Mr. Edward LaGantta has more information because it was his

19    brother.  He would say that the reason he agreed to cooperate

20    against Mr. Charlton is because Mr. Charlton was actually

21    complicit with his brother but then tried to put the blame on

22    his brother.  We're going to get into this whole thing about a

23    home invasion where shots were fired, which I think is

24    incredibly inflammatory.

25       He will also say, I believe, that they knew at that point in

LaGantta - Recross

1    time that Mr. Charlton was a confidential informant in a case

2    that's currently pending in this court, because that information

3    is out now as well.  People have been charged.  There was a wire

4    that went up.  That, basically, in the drug world he snitched on

5    people and made their lives bad, and he didn't have a problem

6    doing it.  But he will give specific examples especially about

7    that home invasion, and I am very concerned that we are going

8    into a path that will seriously taint.

9           THE COURT:  I don't want this trial to devolve into a

10   second or subtrial about a home invasion that I know nothing

11   about, that is not charged conduct and might be highly

12   prejudicial to your client all because of the simple question

13   about you didn't do this out of the goodness of your heart.  I

14   mean, I think you've scored all the points you can possibly

15   score from the November 4th incident.  So what is it that you

16   want to do at this point?

17          MR. SIMON:  The information that the police utilized

18   to -- where the police believed it was advantageous to call my

19   client as a witness is in the second tape-recorded statement,

20   when Detective Ruoff is -- I think we've got a thunderstorm --

21   when Detective Ruoff is interviewing my client, the second

22   tape-recorded statement.  He asks him specifically about the gun

23   that was used in the home invasion.  My client had told him,

24   told Detective Ruoff that he had got the gun that was seized

25   from him in January of 2015 from this witness's brother's

1    girlfriend.

2        They did ballistics on that gun and that gun was used in the

3    home invasion for which his brother is currently charged and

4    going to be subject to a retrial.  The first trial ended in a

5    hung jury.  So his brother is still in custody, being held in

6    custody to go to trial on the murder case.  So the facts of that

7    gun are actually going to come out in trial, in this trial.

8            THE COURT:  In that trial?

9            MR. SIMON:  In this trial, in this trial.

10           THE COURT:  Why does that fact need to come out?

11           MR. SIMON:  Because it's part of the second

12   tape-recorded statement that my client gave to --

13           THE COURT:  But why does that need -- why did the -- I

14   mean, the fact that he possessed it is really all that's at

15   issue here; right?

16           MS. LAWLESS:  No, sir.  It's not at issue.  That's not

17   one of the guns he's charged with.  In fact, that's why I was --

18   I'm not going to play that second interview.  It doesn't have

19   any relevance to the charges that Mr. Charlton is facing now.

20           THE COURT:  That's not the silver and black gun?

21           MS. LAWLESS:  No, no, sir, that's a different gun.

22           THE COURT:  Exhibit 1?

23           MS. LAWLESS:  It's not Exhibit 1.

24           THE COURT:  It's a different gun.  So the gun that

25   Mr. Simon was referring to as having come from, if I got this

 1   straight, Mr. LaGantta's brother's girlfriend, that is not

 2   Exhibit 1?

 3              MS. LAWLESS:  That is correct, Your Honor.

 4              THE COURT:  And is it otherwise part of the conduct

 5   charged in the second superseding indictment?

 6              MS. LAWLESS:  It is not.

 7              THE COURT:  Then I'm not sure how it's relevant.

 8              MR. SIMON:  Well, it's relevant if it ties into what

 9   Ms. Lawless is saying his motivation is, testifying against my

10   client.  The Government -- the Commonwealth of Kentucky in the

11   murder case against the witness's brother believes my client to

12   be telling the truth in that he bought the gun from his

13   brother's girlfriend.  That gun was used in the home invasion.

14   This witness, all he's doing is advancing his brother's defense,

15   in his upcoming trial saying, "It wasn't me.  It was

16   Mr. Charlton."

17      Okay.  My client isn't indicted along with his brother

18   committing this home invasion.  It's his brother that's

19   indicted.  The Commonwealth has subpoenaed, had subpoenaed my

20   client to testify against his brother because he had given what

21   I would assume to be in the Government's belief, the

22   Commonwealth of Kentucky's belief that he gave truthful

23   information to Detective Ruoff in January of 2015 about the

24   source of the gun.

25      If the police believe that my client was involved in the

```
1    home invasion, which this witness is claiming why he told the

2    police -- why he worked with the police in this case, my client

3    would be indicted, as opposed to being a witness.

4            THE COURT:  I'm not sure I'm following all of that.

5    Again, I don't know anything at all about the home invasion

6    case.  You're saying it's an active case in state court?

7            MR. SIMON:  Yes.

8            THE COURT:  Yeah.  I don't know anything at all about

9    that.  And the fact that this witness might have a beef against

10   your client relating to that, I don't see how that's relevant

11   here, unless -- well, first of all, the gun at issue is not

12   relevant here.  We've clarified that.  So I don't -- I don't

13   think that it makes sense at all for us to open up a whole can

14   of worms about an unrelated dispute in state court.

15    I mean, I suppose you can ask him if he dislikes your

16   client, if he has a grudge against him, but beyond that, we're

17   not going to go into a collateral issue, which is this other

18   trial.  But I think we need to tread very carefully here,

19   because I do not want this to devolve into a he said/she said

20   about a whole other trial.  That would just serve to do nothing

21   but confuse the jury.  We need to stick to the facts that are

22   relevant to the charges in issue.

23           MR. SIMON:  I understand the court's ruling.  I would

24   just state for the record that I think it's relevant as to the

25   second tape-recorded statement.  It's definitely relevant to the
```

1    facts in this case, which, you know, the court's heard that.

2              THE COURT:  Is there an objection to playing the whole

3    second tape?

4              MS. LAWLESS:  I would object to it, Your Honor,

5    because it's -- there's no relevance in there.  They don't

6    really ask him any questions about the search warrant or --

7              THE COURT:  We're going to have to talk about that,

8    because I don't want this jury confused about -- I mean, we've

9    heard in the opening and we've -- about the pink gun and the

10   black and silver gun.  We've now had testimony about Exhibit 1,

11   which is the black and silver gun.

12      To the extent that that refers to yet a different gun and

13   those questions relating to -- related to it a different

14   investigation, then we're going to need to parse through that

15   before that goes in front of a jury.  I don't want to pull the

16   commonwealth's case into this one.

17             MR. SIMON:  Well, we'll talk about it later, but, I

18   mean, I would -- I'd say the Court's listened to the second

19   statement.  There's no question they're asking about his offense

20   conduct in these -- in the indictment before this court and

21   before this jury.

22             THE COURT:  Well, yes, but to the extent that they're

23   asking him about a gun that is not the subject of a charge that

24   is before this jury and that is not necessarily relevant.

25             MR. SIMON:  Maybe that one topic, but to exclude --

 1    we'll deal with it later, I assume.  But, you know, to exclude

 2    the entire second statement --

 3            THE COURT:  I didn't say I was going to exclude the

 4    entire second statement.  I didn't say that.

 5            MR. SIMON:  I know, I know.

 6            THE COURT:  But if there is -- if that part of the

 7    discussion is identified as unrelated to the issues before this

 8    jury, then that's something that we would need to review for

 9    relevance purposes.  And under 403, if you're -- if you have

10    discussion going on about a gun and it isn't clear from the

11    discussion -- it certainly wasn't clear to me -- that it's a

12    different gun than the gun -- the guns that are at issue here,

13    that has a very serious likelihood that it would confuse the

14    jury.  And that's a collateral issue, extraneous issue,

15    extraneous to the issues before this jury and that concerns me.

16       And so this area of questioning concerns me, because I don't

17    want to -- I don't want to pull that case into this one.  So

18    let's --

19            MR. SIMON:  Okay.  I understand the court's ruling.

20            THE COURT:  So let's see if we can get past this.

21       (End of bench conference.)

22            MR. SIMON:  That's all the questions I have.

23            MS. LAWLESS:  Nothing further, Your Honor.

24            THE COURT:  May the witness be excused?

25            MS. LAWLESS:  Yes, Your Honor.

Walker - Direct

```
 1              THE COURT:  Mr. LaGantta, you may step down.
 2         Are you ready to call your next witness?
 3              MS. LAWLESS:  I am, Your Honor.  The United States
 4    calls Special Agent Erik Walker.
 5         (SPECIAL AGENT ERIK WALKER, called by the Government,
 6    sworn.)
 7              MS. LAWLESS:  If I could have just one moment, Your
 8    Honor, to pull my computer up.
 9                          DIRECT EXAMINATION
10    BY MS. LAWLESS:
11    Q.  Would you please state your name for the record and spell
12    your last name.
13    A.  Erik Walker, W-A-L-K-E-R.
14    Q.  And please tell the ladies and gentlemen of the jury, by
15    whom are you employed?
16    A.  I'm a special agent with ATF.
17    Q.  And what does that involve?
18    A.  Investigating mostly gun and drug crimes.
19    Q.  Okay.  Could you tell us a little bit about your educational
20    background.
21    A.  Yes.  I graduated college with a degree in agribusiness
22    management and a minor in communication studies.
23    Q.  All right.  And where was that from?
24    A.  West Virginia University.
25    Q.  Have you had any law enforcement experience before you
```

1    joined -- I'm going to say ATF.

2    A.  Yes, ma'am.

3    Q.  And please tell them what that was.

4    A.  I was employed by the United States Secret Service as both

5    the uniform division officer and as a special agent since 2004.

6    Q.  How long have you been with ATF?

7    A.  Since December of 2014.

8    Q.  Okay.  So just a little over three years with ATF and six

9    years with Secret Service before that?  Does that sound about

10   right?

11   A.  As an agent with Secret Service, yes.

12   Q.  As an agent, okay.  What are your current duties within ATF?

13   And let's start with where are you assigned?

14   A.  I'm assigned to group one, which handles primarily

15   Louisville Metro area, and we investigate gun crimes and

16   violence in the city.

17   Q.  Okay.  Where's your office?

18   A.  600 Dr. Martin Luther King, Jr. Boulevard, downtown.

19   Q.  Right behind us?

20   A.  Right behind us.

21   Q.  On the other side of the parking lot?  Okay.  Now, in 2015,

22   could you tell the ladies and gentlemen of the jury what was

23   going on and specifically tell them about an operation that ATF

24   and LMPD were working together.  What was that?

25   A.  That was a joint operation to combat the drugs and the

1    violence in the Louisville Metro area.  It was called Operation

2    Hover.

3    Q.  Okay.  Were you a part of that operation?

4    A.  Yes, ma'am.

5    Q.  All right.  Were other people in your office part of that

6    operation as well?

7    A.  Yes, ma'am.

8    Q.  Who did you-all primarily work with within LMPD?

9    A.  Ninth Mobile.

10   Q.  And more specifically, from November of 2015, November 16th

11   of 2015, the date that's relevant in this particular case,

12   please tell the members of the jury how it is that you became

13   involved in the investigation.

14   A.  I was -- we were out on the streets, and I was contacted

15   that LMPD Detective Carroll had a confidential informant that

16   could make a purchase.  And I was going to be the assigned

17   special agent with ATF that would accompany the investigation.

18   Q.  Okay.  So you have LMPD working it.  Were you the only ATF

19   agent that worked on this particular transaction or deal, if you

20   will?

21   A.  No, there were other ATF agents.

22   Q.  About how many other people?

23   A.  Five or six.

24   Q.  Okay.

25   A.  Approximately.

1    Q.  But you were supposed to be the point person.  Did I

2    understand that correctly?

3    A.  Yes, ma'am.

4    Q.  Okay.  And your understanding going in, you said, was that

5    she had a confidential informant that could make a controlled

6    purchase.  Did you-all have any information about the

7    possibility of guns being involved?

8    A.  Yes.  Once I was -- I arrived at Ninth Mobile when the CI

9    was there and Detective Carroll was there, I found out who the

10   target was and the fact that there were allegedly guns and drugs

11   involved.

12   Q.  All right.  Now, you just mentioned "the CI."  And I'm going

13   to back up just a little bit.  So in law enforcement, when

14   you're trained about doing investigations and you're working

15   with a confidential informant, do you ever really talk -- say

16   their names during that part of your case?

17   A.  No, no, I'm sorry.  Yes.

18   Q.  That's all right.  You just need to explain it.  So how do

19   you refer to that confidential informant?

20   A.  We identify them as a "CI" and usually by a number.  It

21   stands for confidential informant.  And in this case it would be

22   Mr. Edward LaGantta.

23   Q.  Okay.  So at this point in time, he's not really

24   confidential anymore, is he?

25   A.  Right.

Walker - Direct

1    Q.   Okay.  So but if you slip in to saying "CI," who are you

2    referring to?

3    A.   Mr. LaGantta.

4    Q.   Okay.  So on November 16th, 2015, where did you go to meet

5    up with the Louisville Metro Police Department people involved

6    in this investigation?

7    A.   The Ninth Mobile office at Seventh and Industry.

8    Q.   Okay.  And when you got there, just tell us generally how it

9    works when you're putting together an operation like this.

10   Well, you don't have to do generally.  Just tell us what

11   happened during the course of this one.

12   A.   At this point, I showed up.  Like I said, the CI was there.

13   The LMPD officers were already there from their previous

14   interactions with him.  And what happens is we brief the

15   confidential informant as to what we want to happen, the

16   information we have and the information he's given us.  And from

17   that point, we move forward with the investigation.

18         MS. LAWLESS:  Okay.  Your Honor, may I approach the

19   witness?

20         THE COURT:  Yes.

21   BY MS. LAWLESS:

22   Q.   Special Agent Walker, will you take just a minute and look

23   through the items that I've handed you that are marked for

24   identification as exhibits -- United States Exhibits 2, 3, 4, 5,

25   6, 7, 8, and 9.

1    A.   Yes, ma'am.

2    Q.   We're going to talk about them one at a time, but do you

3    recognize these items?

4    A.   I do.

5    Q.   And have you seen them before?

6    A.   Yes, I have.

7    Q.   Do they fairly and accurately depict the pictures, the

8    things that were photographed and the other items here?  You're

9    familiar with the fact that these are what they pretend to be,

10   what they say on there, what they look like?  You know that

11   that's true?

12   A.   Yes, ma'am.

13   Q.   Okay.  All right.  So let's start then -- we're back at the

14   Mobile Ninth Unit, and you said everybody is there.  You've made

15   arrangements to make a controlled purchase.  You said the

16   confidential informant, Mr. LaGantta, is there.  Walk us through

17   how the controlled purchase occurs.  What exactly did you-all

18   do?

19   A.   We brief Mr. LaGantta as to what we expected to happen.  At

20   that point, once everything timing-wise worked out, we left

21   there.  He got into the vehicle with myself, another special

22   agent, and I believe just one LMPD officer.  And we drove to the

23   designated location that we were going to drop him off, at which

24   point I hadn't given him money yet.  So right before he got out

25   of the vehicle, I had money as ATF cashier funds, which is what

1    we have to take out and document for the purchase, a controlled

2    purchase.  At which point we -- I --

3    Q.  Let me stop you right there, because I want to back up just

4    a little bit.

5    A.  Yes, ma'am.

6    Q.  You said you talked to the confidential informant.  Were you

7    there -- were there any telephone calls made?  How did the

8    actual agreement to buy a half ounce of crack cocaine with

9    Mr. Charlton happen?

10   A.  He advised that he would -- from previous deals, he would

11   just call him within 15 minutes of the deal and set it up.

12   Q.  And was there a phone call made?

13   A.  Yes, ma'am.

14   Q.  Were you present when that phone call was made?

15   A.  Yes.

16   Q.  And you heard just Mr. LaGantta's end of the conversation;

17   right?

18   A.  Yes.

19   Q.  And he ordered up what?

20   A.  A half ounce of crack cocaine.

21   Q.  Okay.  And what was the agreed upon price?

22   A.  $700.

23   Q.  All right.  And so -- I'm sorry.  Now we're at the point

24   where we have everybody in the vehicle and you're going there.

25   Before we talk about the money though, did anybody in law

1    enforcement give Mr. LaGantta anything that would allow you to

2    monitor what was going on while the deal was happening?

3    A.   Yes.   It was -- at the time, because of the nature of the

4    event and how fast it transpired, we gave him what was a

5    cigarette pack that had a transmitting device, not a recording

6    device, so that we could hear for safety purposes what was

7    happening in case something were to happen --

8    Q.   Okay.

9    A.   -- during the investigation.

10   Q.   Did you tell Mr. LaGantta that what he had was essentially a

11   bug that would allow you to listen to what was going on or did

12   you just give it to him and he didn't know?

13   A.   I did not give it to him personally.   I believe my

14   supervisor at the time gave it to him.   So in his -- in his

15   interaction with him and description of what that was or what it

16   was for, I can't say for sure.

17   Q.   Does it really make any difference?   Do you have to have

18   Mr. LaGantta's permission?

19   A.   No.

20   Q.   Okay.   All right.   So you've given him -- somebody's given

21   him what looks like a cigarette pack.   You can -- it's a

22   transmitting device but not a recording device so you can listen

23   to what's going on.

24       I think you were talking about having the cashier's funds so

25   tell us how that works, please.   And while we're doing that, if

Walker - Direct

1    we could take a look at United States Exhibit 2, hopefully on

2    your computer screens.

3    A.   Yes.   Prior to a deal, we have to request funds through our

4    office.   In our office each group is designated a certain amount

5    of funds in which we are allocated for situations like this.

6         So we requested the funds and gave a description as to what

7    they were going to be used for, at which time they were given to

8    us.   And then, of course, I gave that in turn to the

9    confidential informant.

10   Q.   And what do we see here in United States Exhibit 2?

11   A.   You see approximately -- it is $700.   I can't see it all,

12   but the serial numbers of the --

13   Q.   Of a good number of them, yeah.

14   A.   -- the bills, yes, $100 and up to $700.

15   Q.   Okay.   So you give this to Mr. LaGantta.   And you said that

16   you were in the car with him, another agent, and a couple of

17   detectives.   Where did you drop him off?

18   A.   We dropped him off, as he described, at that Third Street by

19   the volleyball --

20   Q.   All right.

21   A.   -- arena.

22   Q.   And about how far away was it to get -- for him to get from

23   where you dropped him to get to Mr. Charlton's house?

24   A.   Three blocks maybe, three or four blocks.

25   Q.   All right.   Now, did any of you go with him?

1    A.  No, ma'am.

2    Q.  Would you go with him?

3    A.  No.

4    Q.  All right.  Why?

5    A.  For safety reasons.

6    Q.  Okay.

7    A.  And investigative reasons.

8    Q.  Because the whole idea is that Mr. Charlton shouldn't know

9    that law enforcement is involved; right?

10   A.  Yes, ma'am.

11   Q.  All right.  Were there other people with law enforcement

12   though in the area trying to keep an eye on, listening to, and

13   generally keep track of Mr. LaGantta and where he was going,

14   what was going on?

15   A.  Yes.  There were multiple detectives in cars around the area

16   with eyes on different parts of the area to capture the entire

17   event.

18   Q.  Okay.  So he has to go about three blocks.  What are you

19   doing while he's making that walk?

20   A.  When we drop him off, we keep an eye on him until the next

21   person picks him up.  And we relocated because we had the

22   transmitting device that picked up the signal.  So we had to try

23   to get as close as possible in order to maintain that signal so

24   that we could hear what was going on.

25   Q.  All right.  And could you hear what was going on?

1    A.   Yes.

2    Q.   Could you hear specifically what people were saying or just

3    tell us kind of what the quality of the sound is that you could

4    hear.

5    A.   It was a little bit muffled.  We could hear -- and when he

6    was walking, he was talking to himself a little bit.  Couldn't

7    always make out what he was saying, but he -- he did notice one

8    of the police cars.  I guess they had their lights on or

9    something at one point, and he made a comment and he walked up

10   to the house.

11   Q.   Could you hear what happened when he walked up to the house?

12   A.   Yes, ma'am.

13              MR. SIMON:  Objection.  May we approach?

14              THE COURT:  Yes.

15      (Bench conference on the record outside the hearing of the

16   jury.)

17              MR. SIMON:  I object to the officer testifying about

18   what he heard on the transmitting device.

19              THE COURT:  Of your client?

20              MR. SIMON:  I object to anything because he wasn't

21   there.  It's in the nature of hearsay.

22              THE COURT:  All right.

23              MS. LAWLESS:  I don't think that's hearsay.  It's not

24   a statement -- I mean, if there's any statements, it's going to

25   be the defendant -- I mean, that they could generally hear

```
 1    what's was going on.  It's not being offered for the truth of

 2    the matter asserted, just that they can follow the things that

 3    are going along.  Now, they can hear some things that happen

 4    inside the house, but what they hear isn't going to be hearsay

 5    either.  It's not a statement.

 6              MR. SIMON:  Well, it is an event.  It is something

 7    that he did not personally witness.  So the basis of his

 8    knowledge --

 9              THE COURT:  He didn't personally witness it?

10              MR. SIMON:  No.

11              THE COURT:  By virtue of the listening device?

12              MR. SIMON:  No, but not being there.

13              THE COURT:  Well, I'm going to overrule the objection.

14    I think you can make those points on cross.  But we might have a

15    hearsay issue with respect to LaGantta, but I don't -- you

16    haven't elicited that at this point.

17              MS. LAWLESS:  Thank you.

18        (End of bench conference.)

19    BY MS. LAWLESS:

20    Q.  Special Agent Walker, we're back to your -- were you in a

21    van?  A car?  What were you in?

22    A.  I believe it was a Suburban.

23    Q.  Okay.  So you're there and you're listening to what's going

24    on.  You said you could hear Mr. LaGantta kind of talking to

25    himself.  At some point in time what happens?
```

Walker - Direct

1    A.   Once he's -- the detectives call out his location.   They

2    identify he's going between the houses and going to the back

3    door.

4              MR. SIMON:   Objection.   Object to what the other

5    detective said.

6              THE COURT:   Overruled.

7    BY MS. LAWLESS:

8    Q.   All right.   So now we have Mr. LaGantta going to the back of

9    the house up toward the back door.   What could you hear from the

10   listening device at that point?

11   A.   One of the detectives in the back of the vehicle pointed out

12   what was like the sound of a spoon hitting a pan.

13   Q.   Before we get to that, so is he on the back porch?   Can

14   you --

15             MR. SIMON:   Judge, I object to that.

16             THE COURT:   Please approach.

17        (Bench conference on the record outside the hearing of the

18   jury.)

19             MR. SIMON:   I think that's definitely hearsay, if he's

20   saying he heard that from another detective and he didn't hear

21   it himself.

22             MS. LAWLESS:   I didn't ask him that.   I will rein it

23   in.   I'm trying to keep him on what he heard going on.

24             MR. SIMON:   I get it.   I get it, but I do object to

25   that and I ask the court to strike his answer.

Walker - Direct

1          THE COURT:  I don't think that's necessary.  I don't

2     think there's any reason to further underscore the issue by

3     striking it in front of the jury.  You can just go back and fix

4     it.

5          (End of bench conference.)

6     BY MS. LAWLESS:

7     Q.  Special Agent Walker, I don't want you to say what you hear

8     other detectives or law enforcement in the car with you.  I'm

9     just asking you kind of what you heard.  So could you tell --

10    you said you could hear Mr. LaGantta walking.  It's fine to say

11    that you knew from radio transmissions that he's at the back of

12    the house.  Could you hear any -- you heard his voice before it

13    was just one on there.  Was there any point in time when you

14    heard more than one voice?

15    A.  Yes.

16    Q.  Okay.  How many different people could you hear talking?

17    A.  Two.

18    Q.  Okay.  Did they -- what did they say to each other?

19    A.  I couldn't make out what they were saying because of the

20    background noise.  There was an echo.

21    Q.  All right.  Did you have any idea where Mr. LaGantta was at

22    that point in time?  Could you even tell from what you were

23    overhearing whether they were outside, inside, any -- anything

24    on that topic?

25    A.  Yes, that he had entered the house.

Walker - Direct

1    Q.   Okay.  How did you know that?

2    A.   From the detectives.

3    Q.   Okay.  When they were inside, you could hear two people

4    talking to each other.  Was there ever any more people that were

5    involved in that?

6    A.   No, ma'am.

7    Q.   Did you ever hear any other sounds that were going on, you

8    personally, or have any idea of what was happening?

9    A.   Yes.  I heard the sound of like a spoon or something --

10   metal objects hitting each other.

11   Q.   Okay.  About how long was Mr. LaGantta in with Mr. Charlton?

12   A.   Approximately five minutes.

13   Q.   Okay.  After -- could you hear them finish up their

14   business?

15   A.   Just -- I didn't hear any cordial remarks as to see you

16   later, no.

17   Q.   Okay.  Did they -- were they cordial with each other as far

18   as you could tell when they were inside?  Were there any

19   problems?

20   A.   Yes -- no, no problems.

21   Q.   No problems, okay.  So after the deal is over, what happened

22   at that point?

23   A.   The detectives called out his location.  They advised that

24   he was leaving the residence, at which point we started working

25   our way slowly, so we could maintain transmission, back to the

1    designated meet location.

2    Q.  And did you see Mr. LaGantta again?

3    A.  Yes, we picked him up.

4    Q.  Okay.  Where did you -- what did you do with Mr. LaGantta

5    when you picked him up?

6    A.  As soon as we picked him up, we recovered the crack cocaine

7    that he had purchased.

8    Q.  Okay.

9    A.  And we drove him back to Seventh and Industry, where we

10   debriefed him.

11   Q.  Okay.  So let's take a look then at United States Exhibit 3.

12   Can you tell us what that is a picture of, please.

13   A.  Excuse me.  That is a picture of the crack cocaine that the

14   confidential informant purchased.

15   Q.  All right.  So when he comes out and you pick him up and you

16   say you got it from him, that's what it looked like in that

17   little baggie?

18   A.  Yes, ma'am.

19   Q.  And he gave that to you?

20   A.  Yes.

21   Q.  Now, when he went in, he was supposed to purchase about a

22   half an ounce of crack cocaine; correct?

23   A.  Correct.

24   Q.  Mr. LaGantta talked about 14.  Fourteen what?

25   A.  Fourteen grams.  That would be --

1    Q.   And what is that?

2    A.   That would be half an ounce.

3    Q.   Okay.  How many grams are there in an ounce approximately?

4    A.   28.35.

5    Q.   Okay.  And after you recovered it from -- the crack cocaine

6    or suspected crack cocaine from Mr. LaGantta, if you would take

7    a look now at what's United States Exhibit 4.  What does that

8    show us?  What happened at that point in time?

9    A.   That is showing the results of a field test that was

10   conducted by Special Agent Leveritt.

11   Q.   Okay.  Have you conducted field tests?

12   A.   Yes, ma'am.

13   Q.   Could you just explain to the ladies and gentlemen of the

14   jury how that works.

15   A.   In the field test kit you're given a very, very small like a

16   straw.  You just use the straw to get a very small sample of the

17   product that you suspect, whether it be heroin, or cocaine, or

18   anything else, and you add just a tiny bit of that.  There's a

19   sequence in which you break the vials in that container that mix

20   with the substance and will turn the appropriate color if it is

21   actually designated to be that substance.

22   Q.   So why do you do this?

23   A.   To confirm whether or not we had actually purchased cocaine.

24   Q.   Okay.  Does it happen sometimes in the drug business where

25   people sell things that aren't really what they say they are?

1    A.   Yes, ma'am.

2    Q.   Is that the reason that you do it as well?

3    A.   Yes, ma'am.

4    Q.   You don't want to pay for crack cocaine and it be baking

5    soda?

6    A.   Right.

7    Q.   Okay.  Aside from taking the picture, did you recover -- now

8    I'll ask you to take a look at your screen again.  And you had

9    this earlier, United States Exhibit 5.  Can you tell us what

10   that is?

11   A.   That is the crack cocaine that the confidential informant

12   purchased.

13   Q.   Okay.  Now, we see down here.  Tell us the difference,

14   because we're looking at really kind of two different things,

15   where that little white arrow is.  What does that look like to

16   you?

17   A.   Those are rocks.  Since we obtained this evidence, it has

18   been in LMPD's custody and it was sent to the DEA lab for

19   testing.  And I'm -- you know, it probably -- a lot of that rock

20   substance, the hard substance in the beginning probably was

21   smashed in one way, shape, or form.

22   Q.   Okay.  So is that how you explain that we've got some rocks

23   here and then some of it has broken down into more powder form?

24   A.   Yes, ma'am.

25   Q.   All right.  There are a number of things on this packet, and

1    we're not going to go through every single one of them, but

2    would you just please tell us why there are all of these seals

3    and labels and things of that?  Why do you do that?

4    A.   That's evidence labels in order to keep track of the

5    evidence as to whose hands it's in at certain times and make

6    sure we keep the chain of custody.

7    Q.   All right.  And so, for example -- you mentioned this just a

8    minute ago.  I'm going to zoom in a little bit.  Like right here

9    on this part, can you see that?  That tells us what?  Who had it

10   at this point right here?

11   A.   The Drug Enforcement Administration, DEA.

12   Q.   So the chemist there.  So other places we're going to see

13   initials and dates from other people in law enforcement over the

14   course of the chain of custody?

15   A.   Yes, ma'am.

16   Q.   Okay.  So you said, after this was all completed, you took

17   Mr. LaGantta where?

18   A.   Back to Seventh and Industry, the Ninth Mobile office.

19   Q.   All right.  And at that point in time what happens?

20   A.   We debriefed him and once we confirmed through the field

21   tests that we did actually purchase crack cocaine.

22   Q.   Okay.  Would you tell the ladies and gentlemen of the jury,

23   what do you mean by you debriefed him?

24   A.   We just get a summary of events as to what happened.  We

25   talked to him about what he saw, what he witnessed, that we can

1    capture all the -- all the circumstances surrounding the event.

2    Q.   Okay.  So after you did that and you gathered that

3    information, how was that information used in the next step of

4    the investigation, not by you necessarily personally but the

5    next step that happened?

6              THE COURT:  Before the witness answers, I think this

7    might be a good spot for our break.  We've been going now for

8    about an hour and 10 minutes.

9        So members of the jury, we will now take about a 10- or

10   15-minute break.  Remember my admonition not to discuss the

11   case.

12       (Jury out 9:56 a.m.)

13             THE COURT:  All right.  You may be seated.  The jury

14   has left the courtroom.  We'll be back in about 10 minutes.

15       (Recess at 9:57 a.m. until 10:19 a.m.  Jury out.)

16             THE COURT:  We ready for the jury?

17             MR. SIMON:  Yes.

18       (Jury in 10:19 a.m.)

19             MS. LAWLESS:  May I proceed?

20             THE COURT:  Proceed.

21             MS. LAWLESS:  Thank you, Your Honor.

22   BY MS. LAWLESS:

23   Q.   Special Agent Walker, right before we took the break, I

24   think we had stopped at the point where you were telling the

25   ladies and gentlemen of the jury about debriefing Mr. LaGantta,

```
 1    asking him what had happened, collecting information from him,

 2    aside from recovering the crack cocaine and things of that

 3    nature.  And what I was going to talk to you about next is,

 4    based on that information, what was the next step of the

 5    investigation plan?

 6    A.  The next step is to conduct a search warrant, which that

 7    information was used in preparation of the search warrant.

 8    Q.  All right.  And I'm going to ask you to take a look -- I'm

 9    not sure we can --

10              MR. SIMON:  May we approach?

11              THE COURT:  Yes.

12        (Bench conference on the record outside the hearing of the

13    jury.)

14              MR. SIMON:  I object to introducing the search warrant

15    or portions of the search warrant.  I mean, he could testify

16    that he received information and put together a search warrant,

17    but to say -- to introduce the search warrant in this trial that

18    contains statements from -- you know, that are other people in

19    their investigation -- let him testify to it, but I object to

20    introduction of the search warrant.

21              MS. LAWLESS:  Your Honor, it's only the search

22    warrant, which is a court document that legally authorized them

23    to go into Mr. Charlton's house.  I didn't include the

24    affidavit.  It's only the actual search warrant itself signed by

25    a judge that says that they can legally go into that house and
```

1    search.

2              MR. SIMON:  I object to the introduction.

3              THE COURT:  The basis for your objection is what?

4              MR. SIMON:  I think it's prejudicial.

5              THE COURT:  The court process is prejudicial?

6              MR. SIMON:  No, no.  The information contained on the

7    search warrant is prejudicial to my client.  It exceeds whatever

8    -- it exceeds what he's charged with in the case.  When it talks

9    about --

10             THE COURT:  Let me see it.

11             MS. LAWLESS:  All right.  I redacted the personal

12   identifiers.

13             THE COURT:  Tell me what's prejudicial in this what's

14   been marked as Government's Exhibit 6.  It's a two-page search

15   warrant.

16             MR. SIMON:  All right.  Withdrawn.

17        (End of bench conference.)

18   BY MS. LAWLESS:

19   Q.  All right.  Special Agent Walker, we were getting ready to

20   talk about -- I'll have to move this up and down -- a state

21   search warrant.  Was there a state search warrant issued by a

22   Jefferson Circuit judge here in Louisville?

23   A.  Yes, ma'am.

24   Q.  Okay.  And did you take a look at it earlier?  And it's on

25   the screen here now marked as United States Exhibit 6.

Walker - Direct

1    A.   Yes.

2    Q.   Okay.  And it's a two-page document.  Right?

3    A.   Yes.

4    Q.   Okay.  And just briefly tell the ladies and gentlemen of the

5    jury what this allows you to do, you and other law enforcement

6    officials.

7    A.   It allows us to enter the residence listed in the search

8    warrant and to search the premises for the things specified.

9    Q.   Okay.  And those things that are specified are set out on

10   the second page.  Would you agree with me there?  Toward the

11   top, can you see that?

12   A.   Yes.

13   Q.   Drug paraphernalia, drugs, money, currency, drug trafficking

14   items, papers, things of that nature.

15   A.   Correct.

16   Q.   Now, you didn't get this, but you knew it was being worked

17   on?

18   A.   Yes.

19   Q.   Is that right?  Okay.  And someone else on the investigative

20   team -- I think it's -- you can tell us who that is.  Who is it

21   that obtained the search warrant?

22   A.   That is LMPD Detective Hannah Carroll.

23   Q.   All right.  After that search warrant was obtained, which it

24   tells us happened on November 16th of 2015 -- that reminds me,

25   can you help us with the time frame here.  About what time of

1   day did you and the other members of law enforcement work with

2   Mr. LaGantta on the controlled purchase?

3   A.  It was after dark when we conducted the controlled purchase.

4   So 7:00 or so, 7:00, 8:00.

5   Q.  Okay.  And you've already walked us through that.  It didn't

6   take a really long time to carry out.  Would you agree with

7   that?

8   A.  Yes.

9   Q.  Okay.  And once that was finished or actually while it was

10  going on even, do you know when Detective Carroll was working on

11  getting the search warrant?  Was it around the same time or at

12  the same time?

13  A.  Yes, it was.

14  Q.  And after that happened and she obtained the search warrant,

15  what did you do next?

16  A.  We met at Ninth Mobile.  We remained at Ninth Mobile,

17  Seventh and Industry, where we waited for S.W.A.T. to convene

18  and discuss their entry plan.

19  Q.  Okay.  So we have people from LMPD.  You just mentioned

20  S.W.A.T., the Ninth Mobile; correct?

21  A.  Yes, ma'am.

22  Q.  And then you have ATF agents?

23  A.  Yes, ma'am.

24  Q.  Anybody else with law enforcement or does that generally

25  cover everybody that's involved?

1    A.   That covers everyone, yes.

2    Q.   Okay.  So at this point in time, when you have the search

3    warrant in hand, tell us how that gets carried out.   What

4    happens?

5    A.   LMPD and Hannah Carroll in this instance, she would brief

6    S.W.A.T. as to the circumstances leading up to the search

7    warrant.  And based on the facts given, they come up with a game

8    plan.

9    Q.   Okay.  So once you have your game plan, tell us about

10   actually carrying out the search warrant.

11   A.   After they came up with their game plan, we -- as other

12   officers and agents acted as outer security, outer perimeter

13   security as they conducted their entry in securing the

14   residence.

15   Q.   Okay.  Did you take part in the search warrant or what was

16   your role?

17   A.   I did not take part in searching the home.  I was designated

18   to assist Hannah Carroll in interviewing the target of the

19   investigation.

20   Q.   Which would be who?

21   A.   Mr. Charlton.

22   Q.   Okay.  Now, during the execution of the -- walk us through.

23   I know you weren't right there on the door, but could you see

24   and did you know what was going on?

25   A.   Yes.  They were -- once they made entry, they secured

1    everyone in the home.

2    Q.   And who was in the house?

3    A.   It was Mr. Charlton, his wife, girlfriend at the time, and

4    his two children, two daughters.

5    Q.   Okay.  And about how old were the children?

6    A.   Young teens.

7    Q.   Okay.  So four people in the house when you-all executed the

8    warrant?

9    A.   Yes, ma'am.

10   Q.   All right.  What happens once law enforcement goes in?  And

11   you said there were four people that gets secured.  What does

12   that mean?

13   A.   Well, once the house is secure, then at that point, because

14   we had a K-9 available -- K-9 is the next step to search -- the

15   dog to search for evidence of a crime.

16   Q.   All right.  What does "secured" mean?  Maybe I'm not being

17   cleared.  What does that mean?

18   A.   I'm sorry.  "Secured" meaning everyone is out of the house,

19   any threats out of the house as deemed safe by law enforcement.

20   Q.   Okay.  So the four people that were there, Mr. Charlton, his

21   wife and two children, where were they?  If they're not in the

22   house, where are they?

23   A.   They were brought out to the front porch in restraints.

24   Q.   Okay.  Did they stay out there?

25   A.   Yes.

1   Q.   Okay.  Did Mr. Charlton stay there the whole time?

2   A.   Not the whole time.

3   Q.   Okay.  Where did Mr. Charlton go?

4   A.   Myself and Hannah Carroll took him to the basement of his

5   house to be interviewed.

6   Q.   Okay.  Did you ask him if he was willing to talk to you?

7   A.   Yes.

8   Q.   And what did he say?

9   A.   He said he would.

10  Q.   All right.  Walk us through that.  After you asked him if he

11  was willing to talk to you, tell us what happened.

12  A.   We took him downstairs.  We Mirandized him.

13  Q.   What does that mean?

14  A.   That means he's read his rights and he has the right to an

15  attorney.  He can --

16  Q.   Just tell us what the rights are.

17  A.   He has a right to an attorney.  He has a right to speak with

18  law enforcement or he has the right to not speak with law

19  enforcement.

20  Q.   Is that what you say or do you say, "You have the right

21  to" --

22  A.   Remain silent.  Anything you say can be used against you in

23  a court of law.  I have to -- I read it verbatim by a card.

24  Q.   Okay.  And we're getting there.  We're just not all the way

25  there yet.  You have the right to remain silent.  You have the

Walker - Direct

1    right to an attorney.

2    A.   Anything you say be can be used against you in a court of

3    law.

4    Q.   Okay.  Do you ask people if they understand?

5    A.   Yes.

6    Q.   All right.  And what did Mr. Charlton say in response after

7    you advised him of his constitutional rights?

8    A.   He advised that he understood his rights and he was waiving

9    his rights to speak with us.

10   Q.   Okay.  Did you record this interview with Mr. Charlton?

11   A.   Not in the basement, no.

12   Q.   Okay.  So talk us through this then.  So you're there,

13   Detective Carroll is there, and Mr. Charlton is there.  What did

14   Mr. Charlton tell you while you were in the basement?

15   A.   We advised him while we were there -- Mr. Charlton initially

16   freely spoke to us about his prior involvement with law

17   enforcement, specifically Special Agent Funke and Detective

18   Ruoff and their ongoing investigation and how he was cooperating

19   with them.  And then he continued to explain to us who he -- who

20   he purchased drugs from, who he purchased the guns from, who he

21   sold drugs to, and gave up other individuals who he had dealings

22   with in the past.

23   Q.   All right.  Let's break that down.  Did you prepare a

24   written report after this all happened and summarize the things

25   that you talked to Mr. Charlton about?

Walker - Direct

1   A.  Yes.

2   Q.  Okay.  So he's being interviewed.  You advise him of his

3   rights.  You said he talked to you that he had been cooperative

4   with law enforcement before.  Did you ask him where he got the

5   drugs that he was selling?

6   A.  Yes.

7   Q.  And what did he say?

8   A.  He mentioned an individual by their street name as "Syl."

9   Q.  All right.  And how does he get the drugs from Syl?

10  A.  Syl would deliver the drugs to his house.

11  Q.  All right.  Does he pay them for them or does he get it

12  without money?

13  A.  He's fronted the drugs initially and from -- after he sells

14  the drugs, the profits he makes, the money he makes from that,

15  he will turn around and pay Syl.

16  Q.  All right.  So there's a price for the product.  It's just

17  sometimes you pay in front and sometimes you pay later?

18  A.  Correct.

19  Q.  Is that right?  So if you don't have to pay up front -- it's

20  kind of weird because you call it fronting.  Right?

21  A.  Correct.

22  Q.  You get the drugs.  They're fronted to you and then you pay

23  later on.

24      So he told you that he had been getting what he was selling

25  from Syl.  Sometimes he would front but not always.  Syl would

1    front them to Mr. Charlton; correct?

2    A.   Correct.

3    Q.   Okay.  And you were starting to talk about -- how is it that

4    Mr. Charlton got the actual drugs from Syl?

5    A.   Syl would deliver them to his house.

6    Q.   All right.  Did he tell you anything about Syl?

7    A.   He gave a descriptor of Syl.

8    Q.   Did he give you an idea of where he thought Syl lived?

9    A.   Yes, he did.

10   Q.   So you-all were asking information about his source of

11   supply; correct?

12   A.   Correct.

13   Q.   Okay.  Did you talk to Mr. Charlton about how much drugs he

14   was getting from Syl at that time or did it come later or do you

15   remember?

16   A.   Yes, he did.  It was between 9 and 10 ounces at a time.

17   Q.   Did he tell you how often he was getting that quantity?

18   A.   I believe it was once -- once a week, once every couple of

19   weeks.

20   Q.   All right.  So he's getting 9 or 10 ounces every week or so.

21   What did he tell you he did with those drugs?  And what's the

22   drug that he's getting from Syl?

23   A.   Cocaine.

24   Q.   Okay.

25   A.   Powder cocaine.

1    Q.  We've heard "soft" and we've heard "powder" and "hard."

2    Tell us the difference.  What's soft?

3    A.  Soft is powder cocaine.

4    Q.  Okay.  And what is hard?

5    A.  Crack cocaine.

6    Q.  After the cooking process that Mr. LaGantta told us about?

7    A.  Correct.

8    Q.  Right?  So Mr. Charlton is getting 8 or 9 ounces from Syl

9    every week or so in a soft form.  What was Mr. Charlton doing

10   with it, according to what he told you in his basement?

11   A.  He would cook it up.  He would add other substances to it to

12   cook it up to make it crack cocaine, and he was selling it to

13   regular customers.

14   Q.  Did he give you some idea of how many people he was selling

15   to?

16   A.  Yes, he named several individuals.

17   Q.  What did he tell you about who he would sell to?

18   A.  They were a regular customer base of his.

19   Q.  Okay.  So he had people that he was regularly working with

20   but -- and he gave you a number of names; correct?

21   A.  Correct.

22   Q.  All right.  Did he tell you about people while you were

23   there in the basement that he had sold to that day?

24   A.  Yes.

25   Q.  And was Mr. LaGantta one of those people?

Walker - Direct

1    A.   Yes, it was.

2    Q.   How did he identify him?

3    A.   "Little Edward."

4    Q.   All right.  And you learned and we heard Mr. LaGantta say

5    that's a nickname or street name for him; correct?

6    A.   Correct.

7    Q.   Okay.  And Mr. Charlton talked about other people that he

8    had sold to during the course of the day as well?

9    A.   Yes.

10   Q.   All right.  Now, while you are in the basement talking to

11   Mr. Charlton, do you learn anything about what's going on

12   upstairs as the course of the search is carried out?  Are people

13   telling you about anything they found or didn't find?

14   A.   Not until afterwards, no.

15   Q.   Okay.  Did you talk to Mr. Charlton -- aside from his drug

16   trafficking, did you talk to him about any firearms?

17   A.   Yes.

18   Q.   Okay.  What did he tell you about his firearms?

19   A.   He had mentioned that he purchased a firearm, specifically a

20   firearm from an individual he identified as "Silk."

21   Q.   Okay.  And what firearm was he talking about?  What kind of

22   firearm was he talking about?

23   A.   It was a .40 caliber firearm that he purchased.

24   Q.   A .40 or a .45?

25   A.   I'm sorry, a .45.  It was .45.

Walker - Direct

1    Q.   All right.  And did he tell you when he had purchased it?

2    A.   He said -- I believe he said within the past few weeks.

3    Q.   Okay.  Did he tell you how much he paid for it?

4    A.   Yes, $300.

5    Q.   All right.  Did you talk to Mr. Charlton about whether he

6    uses drugs at all?

7    A.   No, he said he did not use drugs.

8    Q.   Okay.  So this -- everything that he's talking to you about

9    to do with drugs has to do with him selling drugs?

10   A.   Correct.

11   Q.   Okay.  At some point in time did you finish the interview

12   with Mr. Charlton there in the basement?

13   A.   Yes.

14   Q.   Okay.  And did you help with finishing up the search there

15   at the house?

16   A.   No, I did not do any searching at the home, but I -- we

17   stayed until the search was --

18   Q.   Completely finished?

19   A.   -- completed, yes.

20   Q.   One of the things that I showed you before that you took a

21   look at and identified is marked as United States Exhibit 7

22   and --

23          MS. LAWLESS:  Ms. Legg, will this go up any higher or

24   is this as far out as it will go?

25          THE REPORTER:  That's as far as it will go.

1        MS. LAWLESS:  Thank you.

2   BY MS. LAWLESS:

3   Q.  So we'll move this up and down a little bit.  Can you tell

4   us what is in Government Exhibit 7?  What is that?

5   A.  Those are $100 bills.

6   Q.  Okay.  Who took this picture?

7   A.  I did.

8   Q.  And where did you -- what's this picture taken of?

9   A.  $100 bills.  Those are matching serial numbers to the ones I

10  took prior to the purchase that I gave the confidential

11  informant.

12  Q.  Okay.  Where did this money come from?

13  A.  Mr. Charlton's pocket.

14  Q.  Okay.  So this was seized from Mr. Charlton before -- he was

15  searched before you talked to him?

16  A.  Yes.

17  Q.  Okay.  You didn't search him though?

18  A.  Correct.

19  Q.  No.  But this money was taken from him.  And then after you

20  finished talking to him, when you're kind of finishing things

21  up, if you will, you took this photograph?

22  A.  Correct.

23  Q.  Okay.  Now, after the search is kind of concluding there,

24  did you have an occasion to talk to or take Mr. Charlton

25  anywhere else, besides his house or the basement?

1    A.  Yes.  The interview in the basement was not recorded.  I did

2    not have a recorder on me at the time and Detective Carroll did

3    not have her body camera on at the time, so we took him to Ninth

4    Mobile, Seventh and Industry, to recap and re-interview him on a

5    recorded statement.

6    Q.  Okay.  And did Mr. Charlton agree to talk to you again?

7    A.  Yes, he did.

8             MS. LAWLESS:  Your Honor, at this time I would ask if

9    the jurors, if they'd like to use some headphones.  Just the way

10   the recording is, you can hear people, but some sounds are

11   higher than others.  But you have some headphones there.

12   Q.  Special Agent Walker, we were talking about that you did a

13   recorded interview.  I have a disk that's been marked as United

14   States Exhibit 8.  Have we listened to this before?

15   A.  Yes, ma'am.

16   Q.  And did you provide it actually to me during the course of

17   your investigation to prepare the case?

18   A.  Yes, I did.

19   Q.  Is it a fair and accurate recording?  Does it completely

20   cover what you talked to Mr. Charlton about after you left his

21   house?  I think it was probably going into November 17th now

22   about -- because of the timing.

23   A.  Yes.

24   Q.  Okay.

25            (Government playing audio.)

Walker - Direct

1    Q.  All right.  Special Agent Walker, I just paused it there for

2    just a moment.  It's 0-8.  Are those the rights -- the same

3    rights that you had read to Mr. Charlton in the basement?

4    A.  Yes, they are.

5    Q.  Okay.  And we can hear some things.  Did he acknowledge to

6    you that he understood?

7    A.  Yes, he did.

8    Q.  Okay.

9        (Government playing audio.)

10   Q.  I'm sorry, but, Special Agent Walker, I'm going to stop us

11   there just very briefly as well.  We hear your voice.  There's a

12   male voice.  Who is that?

13   A.  Mr. Charlton.

14   Q.  All right.  And then it sounded like there was a third voice

15   that we just heard there.  Who was that?

16   A.  It would have been Detective Carroll.

17   Q.  Okay.  Thank you.

18       (Government playing audio.)

19   Q.  All right.  Special Agent Walker, at some point in time did

20   you circle back around with law enforcement?  We heard some

21   other voices in the background.  Who were those people?  Not by

22   name, but just what was it?

23   A.  Other detectives.

24   Q.  Okay.  Because you guys were where?

25   A.  In the office, Ninth Mobile office.

1    Q.  All right.  I'm going to ask you to take a look at United

2    States Exhibit 9 that you looked at before.  It's got the number

3    there at the bottom.  Did you take this picture?

4    A.  Yes, I did.

5    Q.  Okay.  And would you tell the ladies and gentlemen of the

6    jury what is shown in the picture.

7    A.  That is what we seized from Mr. Charlton's house pursuant to

8    the search warrant.

9    Q.  Okay.  So we have what?

10   A.  Two firearms.

11   Q.  Two firearms, okay.

12   A.  Marijuana, crack cocaine, cocaine.

13   Q.  And was there powder as well?

14   A.  Yes.

15   Q.  Okay.  So you have powder cocaine, crack cocaine, marijuana,

16   and then --

17   A.  A large amount of U.S. currency.

18   Q.  Okay.  Let me ask you this question:  Do you count money out

19   while you're there at the scene?

20   A.  No, we don't.

21   Q.  Okay.  How do you handle that?

22   A.  The LMPD collects the money as a sum and put in a bag and

23   then they'll take it to the bank.

24   Q.  These different bags that we see here?

25   A.  Yes.

Walker - Direct

```
1    Q.  And then they take it and it gets counted at the bank and

2    recorded in a different way?

3    A.  Yes.

4    Q.  All of the things that you've testified about that went on

5    in this investigation, the controlled purchase, the search

6    warrant, the interview, all of that, where did that happen?

7    What county did it happen in?

8    A.  In Jefferson County.

9    Q.  So where we are now; right?

10   A.  Yes.

11   Q.  Is Jefferson County in the Western District of Kentucky?

12   A.  Yes, it is.

13            MS. LAWLESS:  Your Honor, may we approach?

14            THE COURT:  Yes.

15       (Bench conference on the record outside the hearing of the

16   jury.)

17            MS. LAWLESS:  I just wanted to -- this is the witness

18   that I would ordinarily -- where do we stand on the stipulation?

19   Does he still not want to do a stipulation?

20            MR. SIMON:  I haven't spoken to him about that.

21            MS. LAWLESS:  Okay.  I just may need to recall him

22   later, but ordinarily I would do it through the case agent

23   because he's the one who gathered the certified copies.  But if

24   it's still an issue -- I'm willing to wait and see how this

25   shakes out, but I just wanted to touch base.
```

1              THE COURT:  What's your preference on that, Mr. Simon?

2     Is he just being difficult or --

3              MR. SIMON:  Yeah, on that issue he is.  So I don't

4     have an objection to -- if you need to.  I mean, I'll revisit it

5     with him later, but I haven't yet.

6              THE COURT:  That's fine.

7              MR. SIMON:  But I don't have an objection if you want

8     to recall this witness for the sole purpose of establishing

9     prior convictions.

10             MS. LAWLESS:  Okay.  Thank you.

11        (End of bench conference.)

12             MS. LAWLESS:  Your Honor, those are all the questions

13    that I have for Special Agent Walker.

14             THE COURT:  All right.  Mr. Simon.

15             MR. SIMON:  Thank you.

16                         CROSS-EXAMINATION

17    BY MR. SIMON:

18    Q.  Agent Walker -- excuse me -- your interview with

19    Mr. Charlton in the basement of his residence, as well as the

20    tape-recorded statement that we listened to, your statements

21    made to Mr. Walker were designed to elicit truthful responses

22    from him?

23    A.  Correct.

24    Q.  All right.  Because it would be in his interest to give you

25    truthful responses.  Would that be correct?

1    A.  Correct.

2    Q.  You were aware of the fact that he was an informant working

3    for other police officers during this same time period?

4    A.  I was informed between the controlled purchase and the

5    search warrant, yes.

6    Q.  And he was, in fact, working with a Louisville police

7    officer named Jeremy Ruoff?

8    A.  Jeremy Ruoff, yes.

9    Q.  Ruoff, okay.  Spelled R-U-O-F-F?

10   A.  Correct.

11   Q.  But pronounced "roof."  And he was working with a federal

12   agent.  His last name is Funke, like F-U-N-K-E?

13   A.  Correct.

14   Q.  What's his first name?

15   A.  Kevin Funke.

16   Q.  Which agency was he with?

17   A.  Bureau of Alcohol, Tobacco, Firearms & Explosives.

18   Q.  Okay.  And as indicated, they had an ongoing investigation

19   utilizing Mr. Charlton?

20   A.  Correct.

21   Q.  Now, among the statements that we listened to that were

22   designed to elicit truthful responses from my client is that he

23   was told, Mr. Charlton was told, that you-all, the officers that

24   were interviewing him, would do what you could to get him out so

25   he could work with you?

1   A.   Correct.

2   Q.   And Mr. Charlton is -- excuse me.  Strike that.

3        And it was Charlton's understanding, as a result of those

4   interviews, that the more good information that he gave you, the

5   more that you'd be able to help him in the future?

6            MS. LAWLESS:  Objection, Your Honor.  I don't think

7   Special Agent Walker can talk about what Mr. Charlton's

8   understanding was.  It calls for speculation.

9            MR. SIMON:  I'll rephrase it.

10  BY MR. SIMON:

11  Q.   The statements you and Detective Carroll made to

12  Mr. Charlton were designed to give Mr. Charlton the

13  understanding that the more good information that he gave you,

14  the more he would be able to help himself down the road;

15  correct?

16  A.   Correct.  He was given the option to cooperate.

17  Q.   And he took that option; correct?

18  A.   Yes.

19  Q.   He didn't do anything adverse to taking that option, did he?

20  A.   No.

21  Q.   "No" is your answer.  He complied with everything you asked

22  him to do?

23  A.   Yes, at the time, yes.

24  Q.   Okay.  In addition to telling you specific details about

25  this person named Syl or Sylvester, he told you about Syl

1    or Sylvester.  That's who fronted Mr. Charlton the drugs.

2    A.  Correct.

3    Q.  All right.  And there was an effort by you and Detective

4    Carroll to get more information about this individual Syl or

5    Sylvester; correct?

6    A.  Correct.

7    Q.  Because that would imply -- basically, that information

8    indicated that he was -- that person was a bigger fish --

9    A.  Possibly.

10   Q.  -- as the terminology goes.

11   A.  Possibly.

12   Q.  Okay.  So you -- as members of law enforcement, you had an

13   interest in developing that information.

14   A.  Correct.

15   Q.  And isn't it a fact that two days later, on the 20th -- now,

16   this happened on the early morning -- the tape-recorded

17   statement was, what, on the early morning of the 17th of

18   November?

19   A.  Correct.

20   Q.  Following the search of the residence later in the evening

21   on the 16th?

22   A.  Yes.

23   Q.  All right.  So there was a second interview of Mr. Charlton

24   in the Corrections Department, in the jail down the street.

25   A.  Correct.

1    Q.  And he was Mirandized then, was he not?

2    A.  Yes, he was.

3    Q.  And during the course of the second interview, many of the

4    same things that were discussed in this interview that the jury

5    has heard and that was played for the jury were discussed with

6    Mr. Charlton at that time; right?

7    A.  Yes.

8    Q.  And you were joined in that interview by Jeremy Ruoff, the

9    ATF detective -- no, he's LMPD detective; right?

10   A.  Correct.

11   Q.  He's task force officer.  I think that's his title.

12   A.  Yes.  He's assigned to our office as a task force officer.

13   Q.  Okay.  So you've worked -- have you worked previously with

14   Detective Ruoff?

15   A.  Not on any specific case, no.

16   Q.  But he's in your office?

17   A.  Yes.

18   Q.  All right.  So Detective Ruoff was brought in for the

19   purpose of assisting you and Detective Carroll for, would it be

20   a fair statement to say, debriefing Mr. Charlton?

21   A.  Yes.

22   Q.  Okay.  And like you indicated, Mr. Charlton gave you the

23   names of a multitude of individuals to whom he had sold drugs?

24   A.  Yes.

25   Q.  All right.  And as far as you know, the information that he

1    gave you was accurate and truthful?

2    A.   Yes.

3    Q.   All right.  And under that situation there wouldn't have

4    been any reason for Mr. Charlton to give you any inaccurate or

5    false information, would there?

6    A.   No.

7    Q.   All right.  Because you had continued to tell him, as did

8    Detective Carroll and Detective Ruoff, or Ruoff, that it would

9    be in his interest to cooperate with you?

10   A.   Correct.

11   Q.   All right.  And to give you good information?

12   A.   Yes.

13   Q.   And that he could help himself down the road by doing that?

14   A.   Possibly.

15   Q.   Let me ask you this:  When you say "possibly," I'm referring

16   to page 16 on the second -- excuse me --

17          MS. LAWLESS:  Judge, may we approach?

18          THE COURT:  Yes.

19      (Bench conference on the record outside the hearing of the

20   jury.)

21          MS. LAWLESS:  I think, if you're going to try and

22   impeach somebody, you have to give them the material.  He

23   doesn't have that transcript with him.

24          MR. SIMON:  Yeah, he does.

25          THE COURT:  The witness?

Walker - Cross

```
 1              MS. LAWLESS:  The witness doesn't have it.
 2              MR. SIMON:  I'll hand it to the witness.
 3              THE COURT:  What transcript are you talking about?
 4              MR. SIMON:  The transcript of the tape-recorded
 5     statement on November 17th, 2015.
 6              THE COURT:  The one that you just played?
 7              MS. LAWLESS:  The one that we just played.
 8              MR. SIMON:  Right, right.
 9              THE COURT:  All right.
10          (End of bench conference.)
11              MR. SIMON:  May I approach the witness?
12              THE COURT:  Yes.
13     BY MR. SIMON:
14     Q.  Detective Walker, I'm going to hand you a copy of the
15     transcript of the tape recording that the jury just heard.  If
16     you would, turn to page 16 and on line 24 and 25.
17     A.  Yes.
18     Q.  All right.  And during the course of that interview with
19     Mr. Charlton, you told him, "We'll do what we can to get you
20     out," being get out of jail; right?
21     A.  Correct.
22     Q.  And try to work with you; right?
23     A.  Try, correct.
24     Q.  And on the very next page, you're present when Detective
25     Carroll tells him the following:  "I'm going to give you my
```

1    phone number."  This is from Detective Carroll.  "I'll give you

2    his.  Your girlfriend or your wife, Misty, she has my phone

3    number.  When you get out, call me and I'm going to give you

4    your cell phones and everything back."  Is that what she said?

5    A.  Yes, it is.

6    Q.  And you're telling this jury that it's just possible that

7    you might work with him in the future?

8    A.  That's correct.  We never made any promises to Mr. Charlton.

9    Q.  No promises whatsoever?

10   A.  There was never a promise that if you do this we'll do that.

11   Q.  Page nine of that same transcription.  At the top of the

12   page, the first four lines, when Detective -- excuse me.  Who is

13   this?

14       I'm sorry.  Starting on page eight at the bottom of the

15   page, on line 24 and 25, this statement is attributed to you:

16   "Well, obviously, the more information we have about this guy"

17   -- talking about Syl -- "the more we can help you down the road.

18   Okay?  We don't want to see anything happen to your family so

19   whatever we need to do to help you out and try to help them out,

20   make sure they're safe."  Are you saying that's not a promise?

21   A.  No, that was attributed to his family and helping his family

22   to make sure they're safe.

23   Q.  That's not a promise to Mr. Charlton that you will keep his

24   family safe?  Do you see a distinction?

25   A.  We told him that we would assist his family if that --

1    something were to arise --

2    Q.   Absolutely.

3    A.   -- keep them safe.

4    Q.   Absolutely.  And you don't consider that a promise?

5    A.   That's a promise.

6    Q.   Your testimony was, "We didn't make him any promises."

7            MS. LAWLESS:  Objection, Your Honor.  Argumentative.

8            MR. SIMON:  Withdrawn.

9    BY MR. SIMON:

10   Q.   On page 13 on lines 8 and 9, Detective Carroll says to

11   Charlton in your presence, "We let her [being Misty] stay

12   there."  In other words, he told Charlton that he didn't arrest

13   his wife Misty.  Right?

14   A.   Correct.

15   Q.   She was never arrested; correct?

16   A.   Correct.

17   Q.   That was a promise, was it not?

18   A.   Promise?

19           MS. LAWLESS:  Objection, Your Honor.

20   A.   I don't understand.

21           MS. LAWLESS:  May we approach?

22           THE COURT:  Yes.

23       (Bench conference on the record outside the hearing of the

24   jury.)

25           MS. LAWLESS:  Your Honor, this isn't really

1   impeachment because they're not making promises here.  They're

2   just saying, "We let her stay out."  I mean, this back and

3   forth, isn't that a promise, isn't that a promise really isn't

4   impeaching with what the recorded statement is.  And I'm going

5   to object to the argumentative nature.

6       I want to apologize to the court.  That beep that you heard

7   was my laptop going to sleep.  It's not a cell phone.

8           THE COURT:  We wondered what that beeping was.

9           MS. LAWLESS:  I'm sorry.  It's the laptop.  I'll pull

10  the audio cord out.

11          THE COURT:  All right.  Your response to that?

12          MR. SIMON:  Whether some of it is impeachment, some of

13  it is bringing home the fact that they made promises.  The court

14  has indicated that my client's understanding of what agreement

15  he believed he had with law enforcement would be a relative and

16  a probative -- would be relative and probative evidence in this

17  case.  And I am trying to establish the fact that he relied upon

18  the promises and the promise not to arrest his wife and not to

19  lock her up and to let him keep his cars.  Those were promises

20  that these officers made to him.

21          THE COURT:  Well, I think you can ask him if he

22  considers them promises, but there's no reason to belabor it.  I

23  mean, I think you can ask the question, "Is this a promise?"

24  and then move on to the next question.

25      (End of bench conference.)

1    BY MR. SIMON:

2    Q.  Do you remember telling Mr. Charlton two days later during

3    your conversation with him, Detective Carroll, and Detective

4    Ruoff at corrections, on the 20th of November, that if he needed

5    assistance, if Mr. Charlton needed assistance in getting out of

6    jail, that he should call you?

7    A.  I may have said something to the effect of that, yes.

8    Q.  All right.  And you were willing to make that statement to

9    him at that time because he was cooperative in giving you

10   accurate information?

11   A.  Yes.

12   Q.  And that was in conjunction with the fact that you knew at

13   that time, particularly on the date of the second statement that

14   you took from him, that he had been cooperative with Detective

15   Ruoff and Funke; right?

16   A.  To some point, yes.

17   Q.  All right.  And that he was still involved with them with a

18   current investigation; is that correct?

19   A.  He was not actively involved at that point.

20   Q.  Okay.  But he had been?

21   A.  He had been.

22   Q.  Was there any doubt in your mind that Mr. Charlton was

23   committed to working with you, the police, on November the 17th?

24   A.  At the time, no.

25   Q.  And was there any doubt in your mind that Mr. Charlton was

Walker - Redirect

```
 1   committed to working with you and the other police officers in

 2   this case on the 20th of November?

 3   A.  No.

 4   Q.  There's no doubt he was committed to working with you-all;

 5   right?

 6   A.  He was willing to work with us, yes.

 7              MR. SIMON:  May I have a moment?

 8              THE COURT:  Yes.

 9              MR. SIMON:  Thank you.

10        (Mr. Simon conferring with defendant off the record.)

11              MR. SIMON:  That's all at this time.  Thank you.

12              THE COURT:  Any redirect?

13              MS. LAWLESS:  Yes, Your Honor.

14                        REDIRECT EXAMINATION

15   BY MS. LAWLESS:

16   Q.  Special Agent Walker, do you have control over whether

17   Mr. Charlton stays in jail November 17th, November 20th, or

18   whether he gets released?

19   A.  No, I don't.

20   Q.  All right.  And you've been a special agent with ATF for a

21   while.  Mr. Simon asked you some questions about Mr. Charlton

22   working as a confidential informant for ATF.  He was at that

23   time; correct?

24   A.  Correct.

25   Q.  And that's what you said earlier.  Based on your
```

1   understanding of how confidential informants, CIs, are supposed

2   to be handled, do they sign paperwork with ATF?

3   A.  Yes, they do.

4   Q.  All right.  And does that paperwork specifically tell them

5   that they are not allowed to engage in criminal conduct?

6   A.  Yes, it does.

7   Q.  Unless they have permission or working with you and you are

8   telling them what to do or guiding them?

9   A.  Correct.

10  Q.  Sort of like what we talked about with Mr. LaGantta earlier;

11  right?

12  A.  Yes.

13  Q.  Okay.  Had anyone given Mr. Charlton authority from law

14  enforcement to engage in this criminal conduct?

15  A.  No.

16  Q.  Did Detective Ruoff come in and tell you -- or Detective

17  Ruoff to get Mr. Charlton out?

18  A.  No.

19  Q.  Could he get him out?

20  A.  No.

21  Q.  Because you don't have that authority, do you?

22  A.  Correct.

23          MS. LAWLESS:  That's all I have, Your Honor.

24          MR. SIMON:  May I have a few?

25          THE COURT:  Yes.

1                         RECROSS-EXAMINATION

2    BY MR. SIMON:

3    Q.  You don't wear a robe; right?  You're not a judge?

4    A.  Correct.

5    Q.  Right.  All right.  But when you tell someone that you'll

6    help them get them out of jail, do you think a person in

7    Mr. Charlton's position would rely on that representation that

8    you would help them?

9    A.  He may.

10   Q.  When an individual has been charged with a criminal offense,

11   a felony offense, and the police officer that is charging them

12   with a felony offense says, "It's okay.  I'm not going to lock

13   you up," wouldn't you think the person that's locked up would

14   have the belief that the officer can control whether or not they

15   go to jail?

16   A.  At that point, yes.

17   Q.  Sure.  And you're aware of the fact that that happened to

18   Mr. Charlton on a previous occasion, are you not?

19   A.  Yes.

20   Q.  All right.  Just like it happened to Mr. LaGantta on

21   November 4th of 2015, from what you heard here in court.

22   A.  From what I've heard, yes.

23   Q.  Okay.  When you had the telephone -- strike that.

24       When you have the conversation, conversations with

25   Mr. Charlton in the basement of his house, on the first

1    tape-recorded statement later at Seventh and Industry, and two

2    days later in the basement of the jail, did you, Detective

3    Ruoff, or Detective Carroll ever go to Charlton and say, "Look,

4    you screwed up.  Look at this agreement that you signed that you

5    won't engage in other criminal conduct."  Did you ever tell him,

6    "Hey, you got a problem here.  You didn't -- you violated the

7    terms of that agreement."  Did you tell him about that and

8    confront him with it?

9    A.  No, but he signed the paperwork himself.

10   Q.  He signed the paperwork, that's fine.  That's not my

11   question.  My question is did you confront him then with the

12   paperwork and say, "Louis, you screwed up.  You committed other

13   crimes that you were not authorized to do."

14   A.  No, I did not.

15   Q.  Okay.  And you didn't tell him they were going to prosecute

16   the crap out of you for that?  You didn't tell him that?

17             MS. LAWLESS:  Objection, Your Honor.  Argumentative.

18             THE COURT:  Sustained.

19   BY MR. SIMON:

20   Q.  You led him to believe that he should cooperate with you,

21   tell you truthful information, and that you would work with him

22   down the road; right?

23   A.  We had to corroborate his information to determine whether

24   it was reliable and whether we wanted to move forward with our

25   investigation, which we chose not to use any of the information

```
 1    he divulged to us.
 2    Q.  So you made a unilateral decision not to use Mr. Charlton's
 3    information?
 4    A.  There were several parties involved.  Yes, we decided not to
 5    use that.
 6    Q.  But police officers, your superiors; correct?
 7    A.  Correct.
 8    Q.  Made the decision, after taking these three recorded -- two
 9    recorded statements and one statement in the basement, you-all
10    made a unilateral decision saying, you know what, we're not
11    going to use Charlton; right?
12    A.  Correct.
13            THE COURT:  Are you finished, Mr. Simon?
14            MR. SIMON:  No, I'm thinking.  I apologize.  Give me a
15    moment.
16       (Mr. Simon conferring with defendant off the record.)
17    BY MR. SIMON:
18    Q.  Did it come to your attention later that at least some of
19    the individuals that Mr. Charlton talked about in those
20    statements became disseminated to other people?
21            MS. LAWLESS:  Objection, Your Honor.  May we approach?
22            THE COURT:  Yes, please approach.
23       (Bench conference on the record outside the hearing of the
24    jury..
25            MS. LAWLESS:  We are now back to the home invasion.
```

 1              MR. SIMON:  Not specifically, but it does involve that

 2      but not specifically.

 3              THE COURT:  Why is that relevant here?

 4              MS. LAWLESS:  Yes, and you --

 5              MR. SIMON:  It just shows that he -- Mr. Charlton had

 6      the understanding that he was going to be assisted or not

 7      prosecuted, and he relied to his detriment on those

 8      representations.

 9              THE COURT:  I'm not sure how getting into that other

10      case is going to accomplish that.  And I think this is also -- I

11      think our redirects and recrosses need to remain on point with

12      what preceded them.  We're getting far afield.

13         All right.  I think we need to move on from that.

14         (End of bench conference.)

15              MR. SIMON:  No more questions.

16              MS. LAWLESS:  One final, Your Honor.

17                          REDIRECT EXAMINATION

18      BY MS. LAWLESS:

19      Q.  Special Agent Walker, at any time did you ever promise

20      Mr. Charlton in his basement, at the property -- or at the

21      property room that he wasn't going to be arrested?

22      A.  No, I did not.

23      Q.  Did you ever -- compound question.  Did you ever promise him

24      he wouldn't be prosecuted?

25      A.  No.

```
 1              MS. LAWLESS:  Thank you.

 2              THE COURT:  All right.  Agent Walker, you may step

 3    down.

 4        You ready with your next witness?

 5              MS. LAWLESS:  Yes, sir.  Your Honor, the United States

 6    would call Detective Moseley.

 7        (OFFICER JASON MOSELEY, called by the Government, sworn.)

 8                       DIRECT EXAMINATION

 9    BY MS. LAWLESS:

10    Q.  Would you please state your name for the record and spell

11    your last name.

12    A.  Jason Moseley, M-O-S-E-L-E-Y.

13    Q.  By whom are you employed?

14    A.  The Louisville Metro Police Department.

15    Q.  And what's your position with the Louisville Metro Police

16    Department?

17    A.  I'm a police officer at Louisville Metro Police Department.

18    Q.  Okay.  What is your current assignment?

19    A.  Current assignment, I'm with the Community Policing Unit.

20    We basically go out and do work with the community, just kind of

21    reach out and bridge the gap between the community and the

22    police department.

23    Q.  How long have you been on with the LMPD?

24    A.  Since 2011.

25    Q.  So you're working on your sixth year?
```

Moseley - Direct

1    A.   Yes, ma'am.

2    Q.   Is that right?   Did you have any law enforcement experience

3    before that?

4    A.   No, ma'am.

5    Q.   During the time that you've been with the police department,

6    just give us a rough rundown of what your assignments have been.

7    A.   My assignments, I started off in the First Division, which

8    is downtown Louisville, leading over where the hospitals are

9    downtown over to Beecher Terrace, over to Portland-Russell

10   neighborhood.   I worked for about three-and-a-half years in

11   Beecher Terrace, and downtown Louisville area was my main focus,

12   my beat.

13       From there I moved to what was called the VIPER Unit, which

14   is a violent crimes unit where we went all over the city trying

15   to basically reduce high-crime areas.   And switched over from

16   there -- it changed to the Ninth Mobile Unit, applied with those

17   guys.   We kind of switched over to where we kindly had the same

18   tasks to where we focused on violent crime in areas that need

19   more attention.

20       And from there I moved on and wanted to do something

21   different to give back and moved to the Community Policing Unit,

22   where I basically go out and mentor young children, teens,

23   things like that.   And I'm also, for about two-and-a-half years,

24   been on the S.W.A.T team as well.

25   Q.   Okay.   So let's go back in time to November of 2015.   Were

1    you involved in the investigation that concerned Louis Charlton?

2    A.  I was.

3    Q.  All right.  Would you tell the ladies and gentlemen of the

4    jury what your involvement in the investigation, specifically on

5    November 16th, what your involvement was.

6    A.  Detective Carroll and I were partners.  We were working on a

7    case where it involved a gentleman that we had gotten with some

8    narcotics.  What we try to do is try to get as much drugs and

9    guns and things off the street as we can.  That affects our

10   community, of course.  We had had him cooperate with us on

11   apprehending Mr. Carlton -- Charlton.

12   Q.  Let me stop you there.  So the person that you're talking

13   about, is that Mr. -- who?

14   A.  Mr. LaGantta.

15   Q.  Okay.  Mr. LaGantta.  So you were familiar with

16   Mr. LaGantta?

17   A.  Yes.

18   Q.  All right.  So you knew about him coming in to this

19   controlled purchase?

20   A.  Yes.

21   Q.  On November 16th?

22   A.  Yes.

23   Q.  All right.  So on November 16th, what was your role with the

24   controlled purchase?

25   A.  Well, what we like to do is we bring them up to our office,

1    standard procedure for us.  We try to pat everybody down before

2    we bring them up into our office.  We sit them down and we kind

3    of brief you.

4        With the Mr. Walker here, we did what was called a

5    controlled buy to where we kind of brief him and kind of go over

6    everything before then.  They're monitored by us to make sure

7    they're protected and safe.  We have safe words we use in case

8    there's a problem, they're in danger while they're in the home,

9    and where we have basically like rescue teams set up around for

10   this.  We gave him --

11   Q.  What exactly was your role --

12   A.  My role was --

13   Q.  -- with the controlled purchase?

14   A.  -- basically there for support.

15   Q.  Support, okay.

16   A.  That was it.

17   Q.  So what did you do?  Were you there when Mr. LaGantta came

18   in for the meeting with law enforcement before the buy ever

19   occurred?

20   A.  Yes.

21   Q.  Okay.  Were you there when the phone call was made to order

22   up the drugs?

23   A.  Yes.

24   Q.  Okay.  Where were you when he was being taken to a drop-off

25   point for the controlled purchase?

1    A.  We were all in the vehicle together.

2    Q.  Okay.  When you say -- when we say "we," who was there?

3    A.  I'm sorry.  Mr. Walker was there, myself.  There was several

4    other agents as well and Mr. LaGantta.

5    Q.  Was in the car.  So you were in the car riding with him?

6    A.  Yes.

7    Q.  Okay.  And what happened when you -- well, what did you-all

8    do when you were driving?

9    A.  We did a couple of tests to make sure -- and this is to the

10   best of my knowledge.  It's been several years -- did a couple

11   of tests to make sure the microphones worked and everything so

12   we could hear and listen in and monitor him.

13   Q.  All right.  Did you tell -- did you put a microphone on

14   Mr. LaGantta?

15   A.  No, no, I did not.

16   Q.  Could he have not even known that he had something that was

17   transmitting?  Is it possible that he didn't even know that he

18   had something that was transmitting?

19   A.  As far as know as if we had a signal or not?

20   Q.  Yes.

21   A.  I mean, I guess that's possible, yeah.

22   Q.  Okay.  I mean, did you say to him, "We're going to listen to

23   everything we do," or did you just give him something and

24   you-all were monitoring?

25   A.  No, we were monitoring.  Mr. Walker set it all up to where

1    we put the device on him.  I mean, I'm just more or less there

2    for support.

3    Q.   That's why I just want you to tell them what you did.  Okay?

4    A.   Nothing, really.

5    Q.   You're in the car?

6    A.   I mean, I'm just in the car.  We're listening.  That's it.

7    Q.   You're listening and --

8    A.   We're listening.

9    Q.   -- you-all drop him off?

10   A.   Uh-huh.

11   Q.   What did he do?

12   A.   He got out of the car, watched him walk up, entered the --

13   Q.   Did you-all stay in one place or did you drive around a

14   little bit?

15   A.   We moved around.

16   Q.   Okay.  Could you hear what was going on?

17   A.   Faintly from where I was at.

18   Q.   All right.  What, if anything, did you hear?

19   A.   Just small conversation.

20   Q.   Okay.  What did you do afterwards or during the time --

21   could you hear anything that was going on during the course of

22   the controlled purchase?

23   A.   Not where I was sitting, not really.  I mean, I could hear

24   conversation, but I couldn't really make out -- make it out.

25   Q.   Do you remember hearing any noises that you made any

1    comments about?

2    A.   No.

3    Q.   Okay.  After the controlled purchase was over, was there a

4    search warrant that was executed?

5    A.   Yes.

6    Q.   Okay.  And were you part of the search warrant execution

7    team?

8    A.   I was.

9    Q.   What was your role with that?

10   A.   From what I can recall, it was just basic entry with the

11   S.W.A.T team.

12   Q.   Okay.  And when -- we've met before and talked about what

13   went on.  Did you draw kind of a layout of the house --

14   A.   I did.

15   Q.   -- because you were with S.W.A.T and went in initially?

16   A.   I did.

17   Q.   If you could just take a look at --

18           MR. SIMON:  Do you have that marked as an exhibit?

19           THE DEFENDANT:  What is that?

20           MS. LAWLESS:  All right.

21   BY MS. LAWLESS:

22   Q.   So can you tell us --

23           MR. SIMON:  Is it 10?

24           MS. LAWLESS:  I'm sorry?

25           MR. SIMON:  Is it number 10?

Moseley - Direct

1          MS. LAWLESS:  Is what number 10?

2          MR. SIMON:  What you're displaying.

3          MS. LAWLESS:  It's just a demonstrative aid.

4          MR. SIMON:  Okay.  But it's not marked as an exhibit?

5          MS. LAWLESS:  No.

6          THE COURT:  All right.

7    BY MS. LAWLESS:

8    Q.  Can you tell us, did you draw this?

9    A.  I did.

10   Q.  Okay.  And what is it, just to --

11   A.  It's just a rough layout from what I can remember from the

12   home, making entry that day.

13   Q.  So what we see right here that you've got marked, what is

14   that?

15   A.  That's going to be the front door.

16   Q.  All right.  And when you made the entry, where did you go

17   into the house?

18   A.  Basically, all over the home, as far back as I was in what

19   we call the stick, which is a line of guys that go in.  As we

20   flow into the home, we'll break off different room to room to

21   everyone covers a certain portion of the house and --

22   Q.  Right.  But how did you get in the house?

23   A.  Through the front door.

24   Q.  Okay.  All right.  And when you come in the front door, what

25   do you walk into?

1    A.  You walk into -- you see what appears to be just an open

2    area where you've got a -- it looks like a TV to my right, your

3    left, if you're looking on this.  The "LR" is the living room

4    area.  It's all open across to the dining room.  It looks like a

5    few couches were there as well, a door to the rear.

6    Q.  And what's this in the back corner?

7    A.  The kitchen.  The kitchen area you kind of flow through.

8    You could see where I put "door" on each one.  It's kind of --

9    flows through the back bedroom over to a kitchen, and then

10   there's stairs on the far left side of the house to go up or

11   down.

12   Q.  Okay.  And back here that you have "BR," what is that?

13   A.  That's a bedroom.

14   Q.  So everything that you have where these little black arrows

15   are, is that on the first floor or is it on different levels?

16   A.  First floor.

17   Q.  Okay.  So you've got a living room kind of dining area,

18   kitchen, and bedroom on the first floor?

19   A.  Yes.

20   Q.  And you entered the house through the front door; correct?

21   A.  Yes, ma'am.

22   Q.  Okay.  Did it have a back door?

23   A.  I believe so off the kitchen.

24   Q.  Okay.  Is this the back door that you're talking about

25   here --

1    A.   Yes, ma'am.

2    Q.   -- or is it somewhere else?  During the course of the search

3    warrant, Detective, did you personally seize any of the items

4    that were there?

5    A.   No.

6    Q.   Okay.  And getting ready for -- and I'm sorry.  I'm going to

7    back up just a little bit because I remembered something.  Is it

8    you search Mr. LaGantta before you-all started the exercise, the

9    controlled purchase?  You talked about searching people when

10   they come up --

11   A.   When they come up to the room, that I can recall.  We always

12   do it before we come up there because it's an open area where

13   our offices are and all of our officers are.  So it's just a

14   general pat-down just for weapons.

15   Q.   Okay.

16   A.   Just to make sure and then he came in.

17   Q.   Did you check to see if he had any drugs?  If you're going

18   to send him in for a drug purchase, you want to make sure he

19   doesn't have any before he goes in; right?

20   A.   I personally didn't, no.

21   Q.   You didn't?

22   A.   I mean, I patted him down, but I mean, I didn't go through

23   every little piece.

24   Q.   Okay.

25   A.   To my knowledge there was nothing on him.

1          MS. LAWLESS:  Okay.  That's all I have.

2          THE WITNESS:  Okay.

3          THE COURT:  Mr. Simon.

4          MR. SIMON:  Thank you.

5                    CROSS-EXAMINATION

6    BY MR. SIMON:

7    Q.  I apologize, but what is your rank?  Are you an officer or a

8    detective?

9    A.  Right now I'm an officer position.  So I mean --

10   Q.  Nothing wrong with that.

11   A.  -- they're pretty much the same rank.  They're just a

12   different role.

13   Q.  Okay.  I just wanted to address you properly.  But it's

14   Officer Moseley?

15   A.  Either way is fine with me.

16   Q.  Okay.  And how long have you been on the Louisville Metro

17   Police Department?

18   A.  Since 2011.

19   Q.  Okay.  Did you have law enforcement experience prior to

20   that?

21   A.  No, sir.

22   Q.  Okay.  And so you had an assignment at that point in time,

23   November of 2015, to what unit?

24   A.  With the Ninth Mobile Division.

25   Q.  All right.  And did you work on occasion during that time

1    period with Detective Hannah Carroll?

2    A.   I did.

3    Q.   All right.  And do you remember being with Detective Carroll

4    on November the 4th, 2015, when you and her conducted a search

5    of a person named Edward LaGantta?

6    A.   If that was the day, November 4th.  I do remember her and I

7    with Mr. LaGantta, yes.

8    Q.   Tell us -- tell us, how did that go down?  How did that

9    result in criminal charges being placed against Mr. LaGantta?

10   A.   Mr. LaGantta was -- we had gotten some information that he

11   was going to be coming up to a gas station and selling some

12   narcotics.  We had information from another informant.  I don't

13   know their name.  I honestly don't.

14   Q.   That's okay.

15   A.   From there they said what he was going to be driving, what

16   he was going to be wearing, what he looked like, that he would

17   have drugs on him, and that he was supposed to meet someone up

18   there to sell some narcotics.

19        We staged our vehicles -- we were in unmarked vehicles at

20   the time -- staged our vehicles in the area.  And once we seen

21   the car matching that description, that exact person and the

22   exact -- everything that matched, we knew that was our guy.  We

23   approached the vehicle and then addressed him from there.

24   Q.   All right.  Now, was Mr. LaGantta by himself?

25   A.   To my knowledge he was.

Moseley - Cross

1    Q.   All right.

2    A.   That I can recall.

3    Q.   And so you first dealt with him while he was in his car?

4    A.   Yes, sir.

5    Q.   LaGantta was in his car?  All right.  And so tell us, if you

6    remember, what did you find in terms of contraband?  What did

7    you find on Mr. LaGantta?

8    A.   I believe it was crack cocaine.  It was -- the way it's

9    baggied up, I mean, it could have been something else, but I

10   believe it was crack cocaine.

11   Q.   Let me show you a citation --

12   A.   Sure.

13   Q.   -- and see if this refreshes your memory as to that event.

14   Go ahead and review that.

15   A.   Yes, sir, I remember.

16   Q.   All right.  Does that help?

17   A.   Yeah, it does.

18   Q.   Okay.  So tell us, does that refresh your memory enough to

19   give you a memory of the details about either going to the

20   passenger door, to the driver's door, what you did?

21   A.   When we do these, we have so many detectives that are with

22   us.  I mean, everybody's kind of doing a little bit of

23   everything.  I just know that for me personally, my role was I

24   actually patted Mr. LaGantta down.  And as patting him down and

25   as -- because from my experience, I have found a gun in

1    someone's crotch area that they said wasn't there that we found.

2    So we do search high as we can.  It's not a body cavity search.

3    It's not within their clothing, but you could feel a hard

4    substance kind of up between and around his buttocks area that

5    you know is not something normal.

6        From there, of course, we shake it loose and we get all that

7    stuff out.  There was the marijuana and, of course, there was

8    pieces of crack.  As far as the bouillon cubes, as he said that

9    one of them were, you know, I don't know.  I don't remember who

10   got that out, but I remember hearing him say that.

11   Q.  Okay.  So Mr. LaGantta said, "Okay.  Well, this brown stuff

12   are bouillon cubes," or like food seasoning or something like

13   that?  You remember him saying that?

14   A.  Yes, sir.

15   Q.  Okay.  But what you're also telling us for sure, you found

16   suspected crack cocaine?

17   A.  Yes, sir.

18   Q.  Okay.  And that was in like -- say between the cracks of his

19   rear end?

20   A.  Yes, sir.

21   Q.  Okay.  But it was kind of being hidden from you.

22       All right.  And as a result of that, he was charged with

23   trafficking in controlled substance, cocaine, possession of

24   marijuana, trafficking in a synthetic drug, and tampering with

25   physical evidence.  Correct?

1    A.  Yes, sir.

2    Q.  And the first and fourth of those charges are Class D

3    felonies under the Kentucky Revised Statutes.  They have a

4    penalty range of one to five years in the penitentiary if a

5    person gets convicted of that; right?

6    A.  Yes, sir.

7    Q.  Now, Mr. LaGantta, he wasn't arrested, was he, when taken

8    into custody?

9    A.  No, not -- no, he was not right away.

10   Q.  Now, after you -- you personally did the search and you

11   found these items on him, the best of your memory?

12   A.  Yes, sir.

13   Q.  Do you remember, after that, either at the scene or

14   somewhere else the same evening -- okay.  This happened at like,

15   what, 10:00 p.m. at night, according to the citation?

16   A.  Yes, sir, according to the citation.

17   Q.  All right.  Do you remember having like a little

18   conversation with Mr. LaGantta, you and Detective Carroll?

19   A.  Yes.

20   Q.  All right.  And during the course of that conversation, did

21   you or Detective Carroll, or both, propose to Mr. LaGantta that

22   he might want to work with you-all, work with the police down

23   the road to his advantage?

24   A.  Well, what we always do is we -- in certain circumstances

25   we'll give them that option.  We don't force you in any way to

Moseley - Cross

1    say, hey, you need to do this, you should do this, you will do

2    this.  We just say, hey, the offer's on the table.  You know,

3    sometimes if we catch someone -- the whole goal for us is to

4    catch someone that's more violent.  Who is supplying these

5    dealers?  Where is this stuff coming from?

6        So if we feel, you know, based on our experience he's a

7    small-time dealer, we might talk to them personally one-on-one

8    and say, you know, maybe we can work something out with these

9    charges.  We can't make any promises, but maybe we can work

10   something out if you can give us some information on somebody

11   that is obviously selling a large amount of cocaine, or crack,

12   or has stolen guns or things of that nature.

13   Q.  And I forgot to ask, but before talking to them like that,

14   you would give that person, as you did Mr. LaGantta, his Miranda

15   rights; correct?

16   A.  I don't recall.  It's not necessary to do it for something

17   like that, only when you're questioning somebody once they're

18   detained for arrest.

19   Q.  So you have this -- you have this conversation with

20   Mr. LaGantta and you say, "You ought to think about doing this,

21   because if you do cooperate, it might be -- it might be a good

22   thing for you in the long run."  Right?

23              MS. LAWLESS:  Objection.  May we approach?

24              THE COURT:  Yes.

25        (Bench conference on the record outside the hearing of the

1    jury.)

2           MS. LAWLESS:  I mean, I understand that it's cross,

3    Your Honor, but could Mr. -- you're testifying.  My objection is

4    that Mr. Simon is testifying.  Could he ask him, "What did you

5    say to him?"  Rather than suggesting could you have said this or

6    could you have said that.  So that's my objection.

7           MR. SIMON:  It's cross-examination.  I'm entitled to

8    lead a witness, ask leading questions of the witness.

9           THE COURT:  That's right.  You'll have a chance to

10   clarify what he said and didn't say.

11      (End of bench conference.)

12   BY MR. SIMON:

13   Q.  Now, if you have a memory of this, when you are having this

14   little conversation with Mr. LaGantta, did he say anything to

15   you, like I might want to do this, but I'm a little concerned

16   for my safety if I do?

17          MS. LAWLESS:  Objection, Your Honor.  Hearsay.

18          THE COURT:  Why don't you approach again.

19      (Bench conference on the record outside the hearing of the

20   jury.)

21          MR. SIMON:  I believe I asked Mr. LaGantta that and he

22   denied it.  So impeaching him -- I'm impeaching Mr. LaGantta

23   with this officer.

24          MS. LAWLESS:  I don't think you're entitled to do

25   that.

 1              MR. SIMON:  Why not?

 2              MS. LAWLESS:  Because you're asking this witness --

 3    it's absolute hearsay.

 4              MR. SIMON:  I asked Mr. LaGantta if he had made a

 5    statement to that effect and he denied it.  He actually denied

 6    having any conversation at all that night.

 7              THE COURT:  Yeah, and I think you've already made that

 8    point.  Yeah, I think it is potentially a question that requests

 9    a hearsay response.  I'm not sure that it's being asked for the

10    truth of the matter asserted but --

11              MS. LAWLESS:  I think that's his whole point though,

12    Your Honor.  That would be my objection.  He wants to elicit

13    something supposedly that Mr. LaGantta said for the truth,

14    according to this witness, as opposed to what Mr. LaGantta said.

15              THE COURT:  I think to the extent that -- we need to

16    stay on track and asking him what he said and what he observed.

17              MR. SIMON:  I'll do that.  I'll do that.

18         (End of bench conference.)

19    BY MR. SIMON:

20    Q.  When you were and Detective Carroll were there on the scene

21    with Mr. LaGantta, did you exchange cell phone numbers?

22    A.  I'm sorry.  Could you repeat that.

23    Q.  Did you exchange cell phone numbers with Mr. LaGantta so he

24    could get in touch with you if he made a decision --

25    A.  We did.

Moseley - Cross

1  Q.  -- to work with you?

2  A.  We did.

3  Q.  Okay.  And that's pretty standard in a situation like that;

4  right?

5  A.  Yes, sir.

6  Q.  All right.  Was Mr. LaGantta given a copy of this citation

7  when you were finished?

8  A.  I don't recall.

9  Q.  All right.  Now, let me ask you this, just in terms of

10  habit, what you do -- what you as a police officer would do on a

11  normal basis.  A person that's charged with felonies or

12  misdemeanors -- all right -- you're going to turn in the

13  citation; right?  You're turning in the citation?

14  A.  Not always.

15  Q.  Okay.  Well, what happens to the citation?

16  A.  With a written citation, on some occasions, due to our

17  discretion, some occasions, yes, we'll turn them in at the end

18  of the evening.

19  Q.  Do you remember this being turned in?

20  A.  I do not recall.  Detective Carroll wrote the citation so I

21  don't remember.

22  Q.  Okay.  Well, let's just talk in general.  If you turn in the

23  citation -- by saying "turn in the citation," you're saying,

24  okay, this is going to go to the court system and charges,

25  formal charges are going to be developed, instituted against

Moseley - Cross

1    that defendant; right?

2    A.   Uh-huh.

3    Q.   Okay.  Because it gets processed --

4    A.   Sure.

5    Q.   -- and a case develops in court, Commonwealth of Kentucky,

6    in this case, versus that suspect?

7    A.   Uh-huh.

8    Q.   In this case Mr. LaGantta.  All right?  So if a court case

9    ultimately developed against Mr. LaGantta, by implication this

10   citation would have been turned in?

11   A.   It would have to be, yes.

12   Q.   Okay.  And if the citation is turned in by the police

13   officer, it would be standard operating procedure for either you

14   or Detective Carroll, if your name is on the bottom of here as

15   the -- under officer's signature, to give Mr. LaGantta a copy of

16   the citation; right?

17   A.   Sometimes.  I mean, it depends upon if it's turned in.

18   Q.   Okay.  Well, let me ask you this:  If you don't give

19   Mr. LaGantta a copy of the citation and you turn in the citation

20   so it's processed through the court system, what would happen?

21   A.   It's more or less to tell them what day they're going to

22   court.

23   Q.   Right.

24   A.   We tell them their charges.  So if it's not, I mean, it's

25   not the end of the world.  They can still -- they still get

Moseley - Cross

1    something in the mail being subpoenaed for court.

2    Q.   Okay.  But there's a date on the citation --

3    A.   Uh-huh.

4    Q.   -- where the person is supposed to show up in court; right?

5    A.   Yes, sir.

6    Q.   Okay.  And that's part of the information that they get when

7    they get the citation; right?

8    A.   It is.

9    Q.   Now, if they don't get the citation and they don't show up

10   in court on the date that their case is called, which would be

11   their arraignment, right, their first court appearance?

12   A.   Uh-huh.

13   Q.   Right?  What happens?  They get a warrant for their arrest

14   if they don't show up; right?

15   A.   They do.

16   Q.   Huh?

17   A.   I mean, they could.  I mean, I'm not a judge so I really

18   don't know.

19   Q.   Okay.

20   A.   Sometimes they do, sometimes they don't.

21   Q.   All right.  Well, it wouldn't be a good thing if you didn't

22   show up in court and they issued a warrant for your arrest,

23   would it, not for that person?

24   A.   Not normally, no, that's not a good thing.

25   Q.   All right.  And did you make any of the court appearances

Moseley - Cross

1    regarding Mr. LaGantta?  Did you go to court to your knowledge?

2    A.   Not to my knowledge, no.

3    Q.   Okay.  And if there was in fact a case in court, would

4    normally Officer Carroll receive a citation from the court,

5    since she's listed as the first officer on this case?

6    A.   Would she receive -- I'm sorry?

7    Q.   Subpoena.  I'm sorry.

8    A.   Oh, a subpoena?

9    Q.   Yes.

10   A.   Yes, she would have.

11   Q.   Okay.  And that would order her to come to court when the

12   case was called and would be conferenced with a prosecuting

13   attorney?

14   A.   Yes, sir.

15   Q.   Okay.  So what -- let me ask you, did you also serve like on

16   the S.W.A.T team during this time period in November of 2015?

17   A.   I did.

18   Q.   Okay.  And so that was your role, from what you're telling

19   us, when the search warrant was served on the address on South

20   Fifth Street on the 16th of November, 2015?

21   A.   Yes, that was my role.

22   Q.   Okay.  And so what you-all do is go in quickly and secure

23   the premises?

24   A.   Yes, sir.

25   Q.   Okay.  And by securing the premises, you also basically kind

Moseley - Cross

1    of -- for lack of a better term, kind of either grab/secure

2    people that are inside the residence?

3    A.   Yes, sir.  I'm playing two different -- I have two different

4    hats I'm wearing that day.  So this is also my unit that I work

5    in on a day-to-day basis.  Basically, my 40-hour-a-week job.  As

6    a part-time job to be on the S.W.A.T team, when you get paged,

7    get called, that's when you respond.

8         S.W.A.T warrants are basically deemed -- if it's a violent

9    person, then the S.W.A.T team would actually go in.  Our job is

10   to -- on the S.W.A.T side is just secure, secure people.  We

11   don't deal with collecting evidence, things of that nature, just

12   specifically secure folks and make sure everything's rendered

13   safe.

14   Q.   I got it.  And part of your job or part of effectuating what

15   you want to do, you want to go in there quickly; right?

16   A.   Not always.

17   Q.   Okay.  Well, in this case, do you remember, was the -- like

18   the front door kicked in?

19   A.   Was it kicked in?  No.

20   Q.   Or in other words, in serving this search warrant -- you're

21   on the S.W.A.T team.  You didn't go up and knock on the door and

22   say.  It's the police.  We'd like to serve the search warrant,

23   did you?

24   A.   To be honest, I don't recall that.  I was not in the front,

25   but we do.  Typically we will have -- it's called a knock

Moseley - Cross

1    warrant where we knock and announce and say, "police with a

2    warrant, police with a warrant," very loud verbally.

3        If the door is not open then it is what we call breached

4    where it's hit with a ram and then the door comes open.  I was

5    not a part of that so I don't really recall --

6    Q.   Okay.

7    A.   -- if any of that was said or done.

8    Q.   That's okay.  Somebody might recall it, you know, another

9    witness in the case.

10       Now, the last thing, I think, that I want to ask you about

11   is the transmitting device that you would put on -- that you put

12   on Mr. LaGantta or that was put on him.

13   A.   Uh-huh.

14   Q.   Okay.  Now, in standard operating procedure, when you have a

15   controlled buy situation and you or other officers are using a

16   person in the capacity of a confidential informant to make the

17   buy, it's on many occasions, just like that one, you would put a

18   transmitting device on that individual.

19   A.   What are you -- as in somewhere on their person?

20   Q.   Well, in Mr. LaGantta's case it was like, what, enclosed in

21   a pack of cigarettes?

22   A.   To the best of my knowledge, yes.

23   Q.   Okay.  And so Mr. LaGantta would have been given this pack

24   of cigarettes by one of the officers prior to him going to the

25   location?

1    A.   Yes.

2    Q.   All right.  And are you telling us that you do or you don't

3    tell the person who's the informant that he has a transmitting

4    device on his person?

5    A.   They absolutely know.

6    Q.   They absolutely.  Because --

7    A.   Everyone that --

8    Q.   -- if they brought it out, like if it's in a pack of

9    cigarettes and they brought it out and it fell on the floor,

10   that would be bad, wouldn't it?

11   A.   On this specific one he knew.

12   Q.   Okay.  For sure he knew?

13   A.   One hundred percent he knew.

14            MR. SIMON:  May I have a moment?

15            THE COURT:  Yes.

16      (Mr. Simon conferring with defendant off the record.)

17            MR. SIMON:  No more questions at this time.

18            THE COURT:  Redirect?

19            MS. LAWLESS:  Yes, Your Honor.

20                        REDIRECT EXAMINATION

21   BY MS. LAWLESS:

22   Q.   Did you give Mr. LaGantta the pack of cigarettes?

23   A.   No.

24   Q.   Did you talk to him about the pack of cigarettes?

25   A.   No.

```
1   Q.  Did you tell him that there was a device in there?

2   A.  No.

3   Q.  So you don't know whether he knew or not?  You weren't in

4   his head.  Do you?

5   A.  I wasn't --

6   Q.  If he told them he didn't, do you have any reason not to --

7           MR. SIMON:  Excuse me.  Objection.  One question at a

8   time.  He hasn't been able to answer all those.

9           MS. LAWLESS:  I'm sorry.

10          THE COURT:  All right.

11  A.  Can you repeat the question.

12  Q.  Were you in Mr. LaGantta's head?

13  A.  No.

14  Q.  You don't know what he knew or didn't know, do you?

15  A.  No.

16          MS. LAWLESS:  Thank you.

17          THE COURT:  May the witness be excused?

18      All right.  Thank you, Officer.  You may step down.

19      Members of the jury, we are now going to take our lunch

20  break.  And it is just a couple of minutes past noon.  We're

21  going to try and restart our -- with the next witness at 10 till

22  1:00.  Remember not to speak about the case with each other or

23  with anyone else.

24      (Jury out 12:02 p.m.)

25          THE COURT:  The jury -- you may be seated.  The jury
```

Moseley - Redirect

```
 1    has now left the courtroom.  Will you be ready with the next
 2    witness at ten till 1:00?
 3              MS. LAWLESS:  Yes, sir.
 4              THE COURT:  Any housekeeping matters or issues that we
 5    need to discuss at this time?
 6              MR. SIMON:  No.  I'll discuss the stipulation again
 7    and see if I have something for us when we come back.  1:00
 8    p.m.?
 9              THE COURT:  Well, 10 till.
10              MR. SIMON:  Very good.
11       (Recess at 12:03 p.m. until 1:06 p.m.  Jury out.)
12              MS. LAWLESS:  Your Honor, there's one housekeeping
13    matter.  Do you mind if we -- thank you, Chris.
14         The chemist is here from Chicago and I was talking to him,
15    and this is completely my oversight.  I have the lab reports.
16    They've been provided to the defense.  Unfortunately, there are
17    two chemists.  They both have the first name but the last name
18    of the second one is different.  I need to just add a witness.
19    I've talked to Mr. Simon about it.  The chemist will be here
20    first thing in the morning.  And I apologize to the court.  I
21    didn't read his name out, but he also lives in Chicago and works
22    at the lab there.
23              THE COURT:  Okay.  So what's the issue?
24              MS. LAWLESS:  Well, you asked for us to give you our
25    witness lists, and I try to be --
```

Adams - Direct

1          THE COURT:  All right.

2          MS. LAWLESS:  I need to add a witness.  It will be a

3    very brief witness, but to --

4          THE COURT:  Okay.  That's fine.

5          MS. LAWLESS:  That's all.  Thank you.  I'm sorry.

6      (Jury in 1:08 p.m.)

7          THE COURT:  Is the United States ready with its next

8    witness?

9          MS. LAWLESS:  We are, Your Honor.  We call Sergeant

10   Jimmy Adams.

11     (SERGEANT JIMMY ADAMS, called by the Government, sworn.)

12                    DIRECT EXAMINATION

13   BY MS. LAWLESS:

14   Q.  State your name for the record please and spell your last

15   name.

16   A.  My name is Sergeant Jimmy Adams.  My last name is spelled

17   A-D-A-M-S.

18   Q.  By whom are you employed, Sergeant Adams?

19   A.  I work with Louisville Metro Police Department, ma'am.

20   Q.  Could you tell the ladies and gentlemen of the jury a little

21   bit about your background, about your professional and

22   educational background.

23   A.  Yes, ma'am.  Before I came on the police department, I

24   served 12 years in the military.  But since I've been on the

25   police department, I'm in my 17th year.  I spent most of my time

Adams - Direct

1    working narcotics cases.  I spent about eight years in Metro

2    Narcotics before being promoted to a supervisor.

3         Once I was a supervisor, I went to a patrol unit, late watch

4    patrol around Churchill Downs area.  And then after that I went

5    over to the -- at the time the VIPER Unit, which is now known as

6    the Ninth Mobile.

7    Q.  All right.  The jury's heard a little bit about Ninth

8    Mobile.  You are in a supervisory position there; is that right?

9    A.  Yes, ma'am.

10   Q.  Would you just tell them a little bit about what the unit

11   does.

12   A.  Yes, ma'am.  We do -- we have two primary functions,

13   basically, for the Ninth Mobile.  The first one is saturated

14   policing.  We refer to it as hot spot policing.  And we're given

15   maps on a weekly basis that's analytical maps.  They take all

16   the analytical data from violent crimes, robberies, homicides,

17   car break-ins, burglaries, stuff like that, and then they target

18   those on maps.  And they're in some of the worst or more active

19   neighbors for that type of criminal activity.

20        What we do is we patrol those particular neighborhoods to

21   show a high presence of police activity in an attempt to try and

22   curb some of the violence and some of the criminal activity

23   going on.

24        The second function we have is to apprehend violent criminal

25   offenders and try to get as many guns off the street as we can

1    possibly get off the street to try and help curb some of the

2    guns and violent crimes.

3    Q.  So does LMPD work just by itself or do you have law

4    enforcement partners that you engage in these kinds of

5    activities with?

6    A.  We do.  We have -- and, actually, we refer to it as a team

7    of narcotics -- or excuse me -- law enforcement professionals.

8    And for the average guys that ride around in -- I know on the

9    street they refer to them as the "911 cars," but the marked

10   police cars that you see patrol neighbors, those guys normally

11   pretty much kind of work amongst themselves.  They get into

12   things, they move it up the ladder to like narcotics, ourselves,

13   district detectives, ourselves.

14       Our unit primarily has more, along with narcotics as well

15   and some of the sex crimes unit and other things, are actually

16   partnered with and embedded with some of the federal agencies,

17   like the ATF, the DEA, the FBI, and some of those other groups

18   that we -- we even have IRS agents assigned to Louisville Metro

19   Police that help us out in those cases.  So we have a vast array

20   of resources on both the state, local, and federal level that we

21   have opportunities to work with.

22   Q.  All right.  Now, Sergeant, if you'll think back with us to

23   November of 2015.  The jury's heard a little bit about this

24   Operation Hover.  Was that one of those things that you were

25   just talking about that your unit was working in connection with

Adams - Direct

1    other law enforcement?

2    A.  Yes, ma'am.  And it was primarily with the ATF.  And what we

3    had did is teamed up with some of the detectives.  Myself had

4    worked with a group of ATF agents.  And I believe the term

5    came -- the Operation Hover is something that the ATF, I

6    believe, came up with the operation name.  But we worked that

7    for about a few months right before Christmas of that year.

8    Q.  Okay.  And what just generally were the goals of it?  What

9    were you trying to do?

10   A.  The goals were they wanted us to try and get into executing

11   search warrants and getting more guns off the streets, and

12   trying to find some more violent offenders or definitely it's a

13   gun-based type thing to try and slow some of the violent

14   criminal activity down that involved weapons.

15              MS. LAWLESS:  All right.  Your Honor, may I approach

16   the witness?

17              THE COURT:  Yes.

18              THE WITNESS:  Thank you, ma'am.

19   BY MS. LAWLESS:

20   Q.  Sergeant Adams, I have handed you a stack of photographs

21   that have been premarked that starts with United States Exhibit

22   10 and it goes up to 47.  So if you'll just take a minute and

23   take a look at those.

24   A.  Yes, ma'am.

25   Q.  Actually, we can probably step up just a little bit because

1  over the break --

2  A.  Yes, ma'am.

3  Q.  -- did you and I have a chance to talk and did I show those

4  to you?

5  A.  Yes, ma'am, you did.

6  Q.  You put them back in the right order.  You went through to

7  refresh your memory and --

8  A.  Yes, ma'am, I did.

9  Q.  So you had a chance --

10  A.  Yes, ma'am, I did.  Thank you, ma'am.

11  Q.  Would you please tell the ladies and gentlemen of the

12  jury -- and we're going to go through those -- who took those

13  photographs?

14  A.  I did the photography.  I took the pictures, ma'am.

15  Q.  Okay.  So just get us up to this point.  These have to do

16  with the execution of the search warrant that was done on

17  Mr. Charlton's home?

18  A.  Yes, ma'am.

19  Q.  Okay.  Tell us where -- what your involvement at the search

20  warrant was, please.

21  A.  As one of the supervisors -- I think we had a couple of

22  supervisors on scene that night, both for the ATF and the LMPD.

23  But as a supervisor, I actually photographed all -- took all the

24  pictures of evidence that was recovered or found by the

25  detectives and to and including the K-9 handler and the K-9

1    detection dog.

2        When they would find evidence that they thought would be

3    seizable-type evidence, I would take the picture of the evidence

4    in place, and then I would take that evidence down to a

5    detective who would log that onto an inventory log sheet.

6    Q.  All right.  So let's start with the pictures first.  And

7    then there are some other items of evidence -- actual items that

8    you show up on the log as well, but we'll do these first.

9    A.  Yes, ma'am.

10   Q.  All right.  This is United States Exhibit 10.  Could you

11   tell the ladies and gentlemen of the jury please what that

12   picture is of.

13   A.  That is a picture showing the actual numeric numbers on the

14   house that the -- where the entry team made entry into the

15   search warrant on Fifth Street.

16   Q.  All right.  Would this be the front of the house or the back

17   of the house?

18   A.  That, I believe, is the front of the house.

19   Q.  Okay.  Since we've got the street number there.

20   A.  Yes, ma'am.

21   Q.  Okay.  United States Exhibit 11, can you tell us what we're

22   looking at here, please.

23   A.  That is a back door in the rear of the location of the rear

24   of the residence.

25   Q.  Okay.  And did you have people that were stationed -- well,

```
 1   no.  Tell us where people were stationed before you even go into
 2   the house.
 3   A.  As far as before the team made entry?
 4   Q.  Yes.
 5   A.  We had detectives both in the alley or in the rear of the
 6   location to cover the rear, because in some instances it's been
 7   known for people to run out back doors and stuff like that.  So
 8   we always try to create a 360-type perimeter around the location
 9   to try and secure it for everybody's best benefit and interest
10   so that we don't lose people or evidence or anything like that.
11       So we did have some of -- the S.W.A.T team made entry on
12   this particular location.  So the S.W.A.T team arrived up on the
13   front of the street.  They also had some cover officers from our
14   unit and the ATF that also covered the front of the street as
15   well while they made entry.  And then we had the three or four
16   people in the back of the house, I believe.
17   Q.  Okay.  United States Exhibit 12, if you would take a look at
18   that and tell the ladies and gentlemen of the jury what it
19   shows.
20   A.  Yes, ma'am.  I believe that to be a camera.
21   Q.  Okay.  Is this still from the back door?
22   A.  Yes, ma'am.
23   Q.  Showing Exhibit 11 right there next to it.
24   A.  Yes, ma'am.
25   Q.  So that's just a more close-up shot?
```

1    A.   Yes, ma'am.

2    Q.   Okay.  United States Exhibit 13, could you tell us what this

3    shows?

4    A.   This is actually a picture of the living room facing that

5    door from the original picture that you asked me what the front

6    of it was.  This is kind of standing inside the living room of

7    the house and then facing more towards the front door.

8    Q.   Okay.  And United States Exhibit 14.

9    A.   That's the couch and the coffee table area.  Right there in

10   the initial entryway, I think that's the first thing that

11   everybody came into contact with as they came and made entry

12   into the residence, ma'am.

13   Q.   Okay.  So that's in the living room as well, just some

14   different -- either closer up or --

15   A.   Yes, ma'am.

16   Q.   -- different angles of the --

17   A.   Yes, ma'am.

18   Q.   -- things that are in the living room.  Same question for

19   Exhibit 15.

20   A.   That's the same situation.  That is, I believe, from the --

21   with my -- I believe in this picture that my back from the door,

22   the front door of the residence and with the handgun being in

23   plain view, as we refer to it as, on the coffee table.  So that

24   picture was taken of the pink handgun by the cigarette pack.

25   Q.   All right.  United States Exhibit 16.

1    A.  That actually is a little bit closer to the couch.  And from

2    what you can see -- because all that was taken -- the

3    photographs was taken in place before anything was touched or

4    moved, from the best of my knowledge when I came on scene.  And

5    if you can tell there in the little bit of that brown bag, it

6    appears to be U.S. currency poking out of the brown bag.

7    Q.  All right.  Do you see something over here under the corner

8    of the couch too?  Can you see that?

9    A.  Ma'am, to be honest with you, it's dark.

10   Q.  It's kind of dark?

11   A.  It's dark in that corner and I apologize.  I can't.

12   Q.  All right.  But there are some -- several things here that

13   we'll talk about individually.

14   A.  Can you slide one more time?

15   Q.  I'm sorry.  What?

16   A.  Could you slide that picture just --

17   Q.  This way?

18   A.  There you go.  That kind of changed for me my view of the

19   picture, a little bit more light, and now beside -- behind the

20   bag I could see a black object appearing out from underneath the

21   couch.

22   Q.  Okay.  United States Exhibit 17, just tell us what this is.

23   And I realize that we're just -- are we still in the same room?

24   Are you just taking closer-up views?

25   A.  Yes, ma'am.  Nothing has changed as far as the picture.  I

1   was just trying to get a more detailed -- because from my view,

2   in standing at the front of the couch, that to me looks like it

3   would be a handgun.

4   Q.  Is that what you're talking about?

5   A.  Yes, ma'am.  I'm sorry.  It's right behind the brown bag.

6   Q.  United States Exhibit 18.

7   A.  And I apologize to ask you, but can you slide that -- thank

8   you.  I don't know why it's doing that to me, but it's a little

9   bit more darker for whatever reason on that side.  That's just a

10  more close up picture.  There's a green cloth bag there.  The

11  brown bag, you can now tell the $20 marking on the U.S. currency

12  and the bag and then the handgun behind the brown bag.

13  Q.  Okay.  United States Exhibit 19.

14  A.  That is a pink handgun.

15  Q.  And is this what we have seen in some of the earlier

16  photographs, just a closer --

17  A.  Yes, ma'am, just a closer up picture.

18  Q.  United States Exhibit 20, can you tell us what's in this

19  photograph, please.

20  A.  That is what appears to be narcotics packaged for sale or --

21  whether you're buying it or selling it, it appears to be in a

22  baggie with a knot on the top of it.

23      What appears to be on the left, just from what I can tell on

24  my view of the picture, it looks like possibly suspected crack

25  cocaine to the left and it's a little brown.  The smaller baggie

1   and stuff is a little bit brown, but I would guess that would be

2   some type of narcotics as well, the way it's packaged.

3   Q.  And this goes back to 18, because that was Number 20.  This

4   is what you were talking about before, the green cloth bag.

5   A.  Yes, ma'am.

6   Q.  Do we see a little bit of that?

7   A.  Yes, ma'am.  I apologize.  I do see the green bag in the

8   second picture.

9   Q.  United States Exhibit 21, tell us what we see in that

10  photograph, please.

11  A.  Now you have the green bag, the Mason jar, and I -- from

12  this picture I can't tell what's in there -- the packaged

13  narcotics I earlier described, as well as the brown bag that was

14  laying on the floor in front of the couch where the U.S.

15  currency is sticking out of it.

16  Q.  All right.  United States Exhibit 22, can you tell us what

17  that's a picture of, please.

18  A.  That looks like a close-up picture of possibly a scale in

19  the carpet and like the edge of the couch.

20  Q.  So when we were talking before and you were talking about

21  some dark objects under there --

22  A.  Yes, ma'am.

23  Q.  Okay.

24  A.  Yes, ma'am.

25  Q.  United States Exhibit 23.

1   A.  That is what appears to be U.S. currency out of a brown bag

2   that was on the ground in front of -- excuse me -- on the floor

3   in front of the couch.

4   Q.  So you told the ladies and gentlemen of the jury initially

5   you take pictures of where things are and then now we're seeing

6   a different background.

7   A.  Yes, ma'am.

8   Q.  Had you moved them to get --

9   A.  Yes, ma'am.  And, actually, just to try and get a better --

10  sometimes -- and I apologize.  We don't have the best equipment,

11  but for camera sake, it's a little bit better sometimes to move

12  objects in a little bit lighter background light so we have a

13  better idea what we're looking at.

14  Q.  I'm going to ask you a favor, because we both talk fast and

15  it makes it really hard for the court reporter.  So if I can

16  finish -- that's all right.

17  A.  I apologize.  I'm sorry, ma'am.

18  Q.  United States Exhibit 24, tell us about that, please.

19  A.  That appears to be a spoon with some type of narcotics

20  residue on -- laying on the floor in front of a safety pin also

21  at the base of the couch.

22  Q.  And United States Exhibit 25.

23  A.  That is a more closer picture of what we talked about

24  previously of the handgun sticking out from underneath the

25  couch.

1    Q.  And United States 26, take a look at that and tell us what

2    that is.

3    A.  That is actually the handgun from what we saw underneath the

4    couch when we began to take the pictures.  And as we actually

5    pulled that out, that's actually just so that it shows evidence

6    as it's being moved forward or recovered.

7    Q.  And then the same question please with United States Exhibit

8    27.

9    A.  Yes, ma'am.  That is actually the handgun that we retrieved

10   from underneath the couch with the magazine ejected from the

11   magazine port with one round that was ejected.  And then the

12   weapon was locked back on the slide, placed in a safer manner,

13   and we do that with all the weapons we do.  We try to clear that

14   just for safety.

15   Q.  Okay.  Sergeant Adams, if you would take a look here at

16   United States Exhibit 28 and tell us what we're looking at

17   there.

18   A.  That is a box containing a digital scale, and the white

19   portion of that with the wall in the background is actually a

20   base of a cabinet above a kitchen sink.  And that box we can see

21   from standing on the ground above the cabinet.  And that's where

22   we saw the box -- what we believed to contain a digital scale.

23   Q.  So you mentioned this is in the kitchen now.

24   A.  Yes, ma'am, yes, ma'am.  Sorry.

25   Q.  We've moved from the living room to the kitchen?

Adams - Direct

1    A.   Yes, ma'am.

2    Q.   United States Exhibit 29, tell us what that is.

3    A.   This would be the digital scale that we pulled out of the

4    box that we just previously discussed in the last slide and what

5    appears to have narcotics residue on the top of it.

6    Q.   Still in the kitchen; right?

7    A.   Yes, ma'am, still in the kitchen.

8    Q.   All right.  And United States Exhibit 30.

9    A.   We are still in the kitchen and the K-9, I believe,

10   indicated on a bag inside a pantry closet.  To just give you a

11   better idea of location, if the cabinets were to my right,

12   behind me, this pantry would have been now facing in front me.

13   And it was a plastic Kroger bag with -- which contained

14   suspected marijuana inside a FoodSaver style bag.

15   Q.   All right.

16   A.   Still in the kitchen.

17   Q.   Take a look then at Exhibit 31 and tell us about that.

18   A.   That is a FoodSaver bag.  It's apparent to me from my

19   experience in narcotics that people commonly package narcotics

20   using FoodSaver bags that seal, and that's what I was looking at

21   when I looked inside of the bag.

22   Q.   And tell us what we see please in United States Exhibit 32.

23   A.   Inside that FoodSaver bag is marijuana buds.

24   Q.   All right.  Those were all things that you -- that were

25   located in the kitchen and that you took photographs of?

1    A.  Yes, ma'am.

2    Q.  All right.  Now let's take a look please at United States

3    Exhibit 33.  What can you tell the ladies and gentlemen of the

4    jury about 33?

5    A.  That is U.S. currency that was in a box that one of the

6    detectives had found.  And we took a picture of the U.S.

7    currency as it -- as you can see, both -- it's readily apparent,

8    the $100 bill that's kind of rolled up closest to me, behind the

9    black backdrop at the top by the -- is another $100 bill.  And

10   on the other side of that you can see other types of U.S.

11   currency folded in half.

12   Q.  Do you remember where in the house that was recovered from?

13   A.  I believe that was taken out of a closet.

14   Q.  Okay.

15   A.  And that's -- I believe it was a closet in the second floor,

16   I believe.

17   Q.  If you would tell us what we're looking at here with United

18   States Exhibit 34.

19   A.  This was downstairs into the basement.  As the K-9 was

20   searching the basement, I believe this jacket was hanging in a

21   closet downstairs in the basement.

22   Q.  All right.  And United States Exhibit -- let me get back out

23   here -- 35.  I'll turn it that way.

24   A.  This, when they looked into the closet -- and I believe -- I

25   don't want to speak out of turn by no means, but the K-9 had

1    indicated on the jacket.  And when they unzipped the jacket,

2    that's U.S. currency that we believe we're looking at from

3    inside the pocket.

4    Q.  Okay.  Thirty-Six, is this a jacket that you were talking

5    about as well, just a different angle?

6    A.  Yes, ma'am.

7    Q.  And the same question for United States Exhibit 37.

8    A.  Yes, ma'am.

9    Q.  And those were things that were found in the basement that

10   you photographed?

11   A.  Yes, ma'am, that jacket was in the basement.

12   Q.  Would you take a look please at United States Exhibit 38 and

13   tell the ladies and gentlemen of the jury what that is a

14   photograph of.

15   A.  That is a photograph of a magazine carrier, if somebody was

16   to carry a firearm and had an additional magazine that they

17   would also carry.  And I believe that is a -- it's kind of dark,

18   but if you could tell the butt of it and stuff, the back of it,

19   there's a secondary magazine or an additional magazine inside

20   a -- as I refer to it as a magazine holder.

21   Q.  Where was this found?

22   A.  This was, I believe, recovered underneath a mattress

23   upstairs in a bedroom.  I think, if you come up the stairs to

24   the right, I believe it was in the room to the right.

25   Q.  So now we've moved -- we've been in the living room, the

 1    kitchen, the basement, and now we're moving upstairs?

 2    A.   Yes, ma'am.

 3    Q.   Correct?  Okay.  So tell us about United States Exhibit 39.

 4    A.   This is -- and I believe -- and I apologize.  I might be a

 5    little bit off, but I think this was a room as you come up the

 6    stairs off to the left.  And in this picture you're looking at a

 7    rubber tote that has clothes in it and kind of what you would

 8    expect to see like a clothes basket or a laundry basket.

 9    Q.   All right.  And why are you taking pictures of this?  What

10    prompted you to take the pictures?  And we're going to look at

11    some more of them.

12    A.   The K-9 had given a positive indication in that area.

13    Q.   All right.  So what does this show us?  This is United

14    States Exhibit 40.  What's that a photograph of?

15    A.   This is actually a picture of a cargo pocket style or side

16    pocket on a pair of sweat pants that we pulled out of that tote.

17    Q.   Out of this from United States Exhibit 39?

18    A.   Yes, ma'am.  You can kind of see those laying in the corner,

19    ma'am.

20    Q.   Tell us what we're looking at here with United States

21    Exhibit 41.

22    A.   Those are rolls of U.S. currency.

23    Q.   And they were taken from where?

24    A.   Inside the pocket of those gray sweat pants.

25    Q.   And is that what we're looking at here, United States

1   Exhibit 42?

2   A.  Yes, ma'am.

3   Q.  Okay.  And United States Exhibit 43?

4   A.  That is more of the same, same pair of pants removed from

5   the tote, and this was possibly a secondary pocket recovering

6   currency.

7   Q.  Okay.  United States Exhibit 44, tell us what we see in that

8   photo, please.

9   A.  I believe that was after they had pulled all of the U.S.

10  currency out of the sweat pants.  Those were all of the rolls

11  laid on top of the sweat pants still in -- as you can see, is

12  still inside of the tote.

13  Q.  Do you know how much money that was?

14  A.  I believe they said it was $80,000.

15  Q.  So they were bundles of $10,000 each; correct?

16  A.  Yes, ma'am.

17  Q.  Tell us what we're looking at here in United States Exhibit

18  45.

19  A.  That is K-9 Diesel.  He is handled by Detective Tony James.

20  He's a single detection narcotics dog.  The dog works off -- and

21  the K-9 detective will have to get more involved in that -- but

22  the dog works off a ball -- we call it ball drive.  And that's a

23  reward for the dog giving a positive alert or positive

24  indication, whether it be narcotics, currency, whatever it hits

25  on.  So it's a picture of the ball, the dog being rewarded.

1   Q.  All right.  United States 46, does that just show a

2   different angle of Diesel with what he had hit on?

3   A.  Yes, ma'am.

4   Q.  And last, United States Exhibit 47.

5   A.  That is a picture of Diesel with -- the ball is attached to

6   a string, and that's a picture of him facing the handler with

7   the handler holding the string out.

8   Q.  Now, the money that we were talking about just a minute ago

9   -- and I asked you because you could see those specific rolls.

10  Do you count the money while you're there on scene?

11  A.  No, ma'am.

12  Q.  Would you just explain to the jury how that gets handled,

13  because there were a couple of different places that we saw

14  photographs were taken that money had been recovered.  So tell

15  us how you keep it all straight.

16  A.  Yes, ma'am.  What we do is when -- in any type of evidence

17  and stuff is recovered, but in this case we're speaking

18  specifically of the currency, the currency is taken down to a

19  table or an inventory detective or officer that might be

20  conducting the inventory sheet.  And we'll try and give an

21  approximate time it was located and the location that the money

22  was located.

23      We have developed a system a couple of years ago for our

24  department that our federal partners had done for a while as far

25  as seizing U.S. currency, and we now -- we don't count any of

1    the money.  We place that into a bag.  It's a plastic bag.  We

2    fill out a form.  A lot of times we'll have the person we've

3    recovered the money off of, at the time will sign the form and

4    just acknowledging it.  And it's no admission of guilt or

5    anything.  It's just saying that we've taken eight rolls of cash

6    or cash from this pocket or cash from this location.  We've

7    placed it in this bag.

8        What they do then is they seal the bag up, and the top piece

9    has a plastic -- detachable plastic piece with a control number.

10   It's just like anything else.  If you got a ticket somewhere

11   else and you wanted to -- and there was two parts of a ticket,

12   you would have a control number on the top and you also have a

13   control number on the bag.

14       The top of the thing is -- excuse me -- the bag is detached

15   and it's handed to the individual or the people that we are

16   taking the U.S. currency from so they have an actual copy of the

17   control number from the bag.

18       That money or that bag is then taken to the Louisville Metro

19   Police property room.  If it is one of our cases, we'll place

20   that in the property room.  It's not counted there either.  They

21   take the bag.  They do their paperwork and stuff.  We drop that

22   into a safe or a vault, as they refer to it as, and only certain

23   property techs have access to that vault.  I'm not sure at that

24   point whether it's a supervisor who does it, but when they take

25   that money out of the vault, they then take that bag of currency

```
1    and everything together and all the documentation and they take

2    that to a bank.

3       The money is then counted at the bank, and then they'll do

4    an addendment to the property slip.  And that way they'll say

5    this money was taken to the bank and this is how much money they

6    counted.  And then they'll add that into our RMS system for the

7    total dollar amount.  We do not count any money on scene anymore

8    ever.

9    Q.  Okay.  So as people are finding things, you're taking

10   pictures.  Does it get recorded in a log there at the scene?

11   Who --

12   A.  Yes, ma'am.

13   Q.  -- brings it down to a collection point, for lack of a

14   better?

15   A.  Yes, ma'am.

16   Q.  Okay.  And then the money that you just described, there's a

17   separate way that that gets handled.  It still gets put on the

18   log, but there are some additional steps that you take --

19   A.  Yes, ma'am.

20   Q.  -- for money.  Are there additional steps that you take for

21   drugs?  Do they get put into certain bags and things like that

22   too?  Please tell the jury.

23   A.  Yes, ma'am.

24   Q.  Okay.

25   A.  A lot of times money kind of goes in its own individual bag,
```

Adams - Direct

1    and that's just the way we do the currency.  A lot of times

2    they'll have -- you'll always have to have one detective that

3    records the inventory list on property that's taken out of

4    there.

5        And to just give you an idea, when we leave -- when we get

6    completed with a search warrant, we leave a copy of the search

7    warrant executed, but we also leave an inventory list of the

8    property that was taken out of the residence or the automobile,

9    wherever it was searched.

10       So we always assign one person, hopefully somebody with good

11   penmanship, to that particular task.  And as detectives -- and

12   it gets kind of chaotic sometimes because everybody will start

13   finding things because you try to pair people up two to the

14   room, whatever you do.  This detective will sit at normally a

15   coffee table, a dining room table, somewhere where they can

16   write and they can have a little bit of space.

17       When they bring evidence to them, like myself, I would say

18   Sergeant Jimmy Adams, found in this hallway, whatever, and this

19   is what I believe I found, whether it be suspected narcotics, a

20   handgun, U.S. currency, or whatever it may be.  That inventory

21   officer will log a very brief description of what was given to

22   him, a brief location, and a time, and who brought that piece of

23   evidence to him.

24       Now, we try to -- and I apologize.  I have a lot -- well, we

25   have a lot of younger detectives who are pretty new into this,

Adams - Direct

1    and we try to get everybody on the systemic thing.  But what

2    happens a lot of times is that we'll place the narcotics in a

3    brown bag, or a box, or something that we can keep everything in

4    one individual place, and that way everything's in -- kept

5    together in totality of the evidence.  That way when we're done,

6    we double-check, make sure everything on the inventory log is

7    placed in that box, that container, or that bag.  And then once

8    we leave and they close out the log, we have everything go with

9    us.

10   Q.  Okay.  So some of the things I'm going to talk to you about

11   now -- you're listed on the log.  You've taken pictures and

12   recovered -- either been there when they picked it up, but

13   you -- you were part of the process of collecting it?

14   A.  Yes, ma'am.

15   Q.  Okay.  And we're not going to have the money for me to show

16   you now because we've got the pictures but not those physical

17   items, for all the reasons you've just explained; correct?

18   A.  Yes, ma'am.

19   Q.  To be clear, the money from the master bedroom, the shoebox

20   that we saw -- I think there was a flip-flop or something in

21   there -- you recovered that; correct?

22   A.  Yes, ma'am.

23   Q.  Okay.  And then you talked about how Diesel hit on the box.

24   We've got the pictures of the eight rolls of the $10,000 each.

25   You're the person that recovered that?

1    A.  Yes, ma'am.

2            MS. LAWLESS:  Okay.  May I approach the witness, Your

3    Honor?

4            THE COURT:  Yes.

5    BY MS. LAWLESS:

6    Q.  Sergeant Adams, again, we were able to look at evidence

7    before you were on the stand right now, and then you briefly

8    took a look at these things as well.  I'm going to have you

9    identify, when I put these up here, United States Exhibit 48.

10   Can you tell us what this is, please.

11   A.  That is a box containing a digital scale.

12   Q.  All right.  And is this the digital scale that we saw the

13   pictures of that you're listed as recovering from the kitchen

14   area?

15   A.  Yes, ma'am.

16   Q.  Okay.  So we had the pictures in the box and then outside

17   the box as well, but then it was put back in --

18   A.  Yes, ma'am.

19   Q.  -- and marked as one thing.  United States Exhibit 49, tell

20   us, please.

21   A.  That appears to be the marijuana from the picture that we

22   recovered from the pantry.

23   Q.  And we have all these signatures and various things to keep

24   track of it as well; correct?

25   A.  Yes, ma'am.  Chain of custody, yes, ma'am.

1    Q.  So United States Exhibit 49 is the marijuana that was

2    recovered from -- suspected marijuana from the kitchen, and

3    you're listed on the log with that?

4    A.  Yes, ma'am.

5    Q.  And then United States Exhibit 50 -- sorry, turned it the

6    wrong way -- you talked a little bit about this.  We saw a

7    picture of this.  What is this?

8    A.  This is the -- it's a magazine pouch or magazine holder

9    that -- and, basically, the whole function of that is to store

10   additional magazines or spare magazines for handguns,

11   semiautomatic handgun.

12   Q.  What are these things on the side?

13   A.  Those are belt loops so that it may be worn on a belt.

14   Q.  Okay.  So you can put this on your belt and then these --

15   this can come out?

16   A.  Magazine is readily available, yes, ma'am.

17   Q.  Okay.  And when you say "magazine," that's a magazine for

18   what?

19   A.  Yes, ma'am, and I know that it's common knowledge and stuff.

20   A lot of people refer to those as clips, but it's the same

21   thing, magazine/clip.

22   Q.  Okay.  And that came from, if I'm remembering correctly,

23   under a bed upstairs?

24   A.  Yes, ma'am, I believe so.

25   Q.  You recovered it from there.  On November 16th, 2015,

1    Sergeant Adams, did you have any direct involvement with

2    Mr. Charlton at all or have we gone through now what your role

3    and execution of the search warrant and your part in this

4    investigation?

5    A.  Yes, ma'am.  And, no, ma'am, I didn't, other than briefly

6    stepping down and referring to the lead detectives or advising

7    the lead detectives what we found or didn't find.

8    Q.  Okay.  But you didn't take any role in questioning

9    Mr. Charlton or anything --

10   A.  No, ma'am.

11   Q.  -- or anything of that nature?

12   A.  No, ma'am.

13            MS. LAWLESS:  Those are all the questions I have, Your

14   Honor.

15            THE COURT:  Mr. Simon.

16            MR. SIMON:  No questions.  Thank you, Sergeant.

17            THE WITNESS:  Mr. Simon, thank you, sir.

18       Your Honor.

19            THE COURT:  You may step down.  Thank you.

20            THE WITNESS:  Thank you.

21            MS. LAWLESS:  Your Honor, the United States calls

22   Robert Krefft.

23       (ROBERT KREFFT, called by the Government, sworn.)

24                         DIRECT EXAMINATION

25   BY MS. LAWLESS:

1    Q.   Would you state your name for the record, please.

2    A.   Robert H. Krefft, K-R-E-F-F-T.

3    Q.   By whom are you employed, Mr. Krefft?

4    A.   I'm employed by the United States Department of Justice,

5    Drug Enforcement Administration.

6    Q.   And what do you do for the Drug Enforcement Administration?

7    A.   I'm a senior forensic chemist.  I analyze drugs and other

8    materials that are sent into our laboratory in Chicago, and I

9    also testify in court.

10   Q.   Okay.  Would you tell the ladies and gentlemen of the jury a

11   little bit about your educational background.

12   A.   I graduated with a Bachelor of Science degree in Chemistry

13   from the University of Illinois.  And after that I was employed

14   by the DEA, the Drug Enforcement Administration Laboratory in

15   Chicago.  The first six months I underwent a basic training

16   period for forensic chemists where I learned how to use the

17   instrumentation in the lab and how to identify the drugs.  And

18   since that time I've attended various courses and seminars which

19   would pertain to the job that we do.

20   Q.   How long have you been with -- I'm sorry if I'm repeating

21   myself.  I don't think I asked you this though -- how long have

22   you been with the lab at DEA?

23   A.   For 42 years.

24   Q.   All right.  Mr. Krefft, would you explain to the ladies and

25   gentlemen of the jury how it is that substances are submitted to

Krefft - Direct

1    the lab in Chicago for analysis, if you could walk us through

2    that process, please.

3    A.   The materials are either brought in person by a person

4    and/or mailed into our laboratory, and they're logged into our

5    system, placed in the vault, and the paperwork is passed through

6    channels to supervisors who assign it to chemists, such as

7    myself.  So I take the paperwork and get the evidence out of the

8    vault and proceed to analyze it.

9    Q.   Could you tell us -- and I'm certainly not a scientist, but

10   could you explain to us what that analysis involves, the steps

11   that you take for any -- are there different tests for different

12   kinds of controlled substances?  Let's start with that.

13   A.   There are different tests, but there's certain tests that

14   are used for a majority of different drugs, pretty standard

15   tests.  The first thing I do is check the paperwork, make sure

16   it matches the evidence and that the circumstantial evidence is

17   in a sealed condition, which it is in this case.

18       And I first weigh the sample.  It's called a gross weight.

19   I use a balance and I record that weight.  Then I cut the

20   evidence open.  If it's a plastic bag, I take a pair of scissors

21   and cut the bottom of the bag off and take out the contents for

22   analysis.

23       And let's say it's a powder.  I'll weigh the powder.  It

24   comes in a container, let's say a plastic bag, so I'll weigh the

25   bag with the powder on the balance, subtract -- after I take out

1    the powder, I subtract the weight of the plastic bag and that

2    gives the weight of the powder.  That's called the net weight.

3    And then I proceed to run various tests.  Do you want me to

4    describe the types of tests?

5    Q.  Yes.  And, actually, if you would talk about in this

6    particular case --

7              MS. LAWLESS:  May I approach the witness, Your Honor?

8              THE COURT:  Yes.

9    BY MS. LAWLESS:

10   Q.  Let me hand you what's been marked as United States Exhibit

11   5, 54, 60, and 61.  If you could just take a look at those.

12   A.  Yes.

13   Q.  Are you familiar with those items, Mr. Krefft?

14   A.  Yes.

15   Q.  If I may have those back.  I'm going to use the overhead

16   here.

17       So we'll start with United States Exhibit 5.  Can you tell

18   us what we see here.  Describe this for us.  First of all, whose

19   seal is that?

20   A.  The seal is -- well, it's a DEA type label, but it was

21   filled out by the ATF, Alcohol, Tobacco & Firearms, because

22   that's their type of case number.  It says case number right

23   underneath where it says evidence.

24   Q.  Okay.  But this indicates to us that it's being sent to

25   which lab?  Is that the DEA seal?

1   A.  Well, the seal above evidence is a Drug Enforcement

2   Administration seal.  So they used our bag to submit evidence.

3   Q.  Okay.  And then can you tell us what we see here at the top?

4   A.  At the top is my sticker.  That's my signature.  When I was

5   done analyzing the evidence, I sealed the bag up and that's my

6   sticker at the top.

7   Q.  Okay.  We're not going to open it up here today, but we

8   can -- it's clear so we can see through there.  Can you tell us

9   what it is that we see in this smaller bag that's inside?

10  A.  There's a Ziploc plastic bag with my sticker on it.  That

11  wasn't an original bag.  The white powder and chunky material

12  came in a different plastic bag.  And when I was done, I put it

13  in this new Ziploc bag and sealed it with my sticker on it.

14  Q.  Okay.  And now, Mr. Krefft, if you would, let's talk about

15  this United States Exhibit 60.  Can you tell us what we're

16  looking at here, please.

17  A.  This is a copy of our lab -- my lab report, which would

18  pertain to that evidence.

19  Q.  Okay.  And can you tell us right there what that tells you,

20  what this part of your report is.

21  A.  Yeah, that's the exhibit number, 15-J-06651.

22  Q.  Okay.  Can we see that -- and is that part of that double-

23  checking that you do right here, the exhibit number?

24  A.  Yes, it's the same exhibit number.

25  Q.  And also on what you wrote on yourself?

Krefft - Direct

1    A.   Yes, I wrote it on my sticker also.

2    Q.   Okay.  So will you tell us the testing process that you

3    would have gone through for United States Exhibit 5 that we have

4    in this culmination of your report, which is United States

5    Exhibit 60.

6    A.   Well, as I said before, I -- the evidence was in a sealed

7    condition when I received it.  And then I obtain a gross weight,

8    which is in the middle of the report, and that is 52.1 grams.

9    And that includes the plastic bag and everything, not just the

10   powder.

11       And then I open up the evidence envelope and took out the

12   contents, obtained a net weight for the material of interest,

13   which was the chunky material, and then that weight was 13.094

14   grams.

15   Q.   All right.  And could you tell us -- you don't have to go

16   through the whole analysis, but generally speaking, what are the

17   steps that you do to test this?

18   A.   On this exhibit, I used two tests.  One was an infrared

19   spectrum.  This is a fingerprint-type test, which it could be

20   used to identify a material.

21       A small amount of this material has infrared radiation

22   impinged on the sample and it gives a spectrum, a line pattern.

23   And from this test I determined that the material was cocaine

24   base.

25       And the other test I ran was gas chromatography/mass

1    spectometry.  This is a two-stage test.  The first part, gas

2    chromatography, is a test which has a thin hollow glass tube

3    inside of an oven.  And the material of interest is dissolved in

4    a solvent -- in this case it was methanol.  That's wood

5    alcohol -- and injected into the instrument.  And different

6    materials pass through this thin glass tube in the oven in

7    different times.  So some things can come out in one minute.

8    Other things can take 10 minutes.

9        And this way you can have a mixture of, let's say, 20 or 30

10   things and they'll separate.  And when they get to the end of

11   the glass tube, they go into another instrument called a mass

12   spectrometer.  And the material is bombarded with electrons and

13   you can get a characteristic pattern for a compound.  So if you

14   had caffeine, it would give a spectrum of caffeine that can be

15   compared to a caffeine standard.

16       And in this case the material contained cocaine and another

17   impurity with a long name.  And these I compared to standards of

18   these two materials, the cocaine and the other material, and

19   that's a conclusive fingerprint-type test that can be used to

20   identify a material.

21   Q.  All right.  Now, before the substance was sent to you, we

22   see some other stamps that are in here.  Is it your

23   understanding that it was also tested by the Kentucky State

24   Police lab, but they don't test for cocaine base like you do at

25   the DEA lab, do they?

1    A.   I don't remember exactly if it was previously tested or not,

2    but that could be true.

3    Q.   Okay.  And would that -- that wouldn't affect your test

4    though, would it, because everything would be on here as to who

5    had taken samples or who had tested materials?

6    A.   Right.  If my supervisor tells me to test it, I test it.

7    Q.   Okay.  And for this Exhibit 5, according to your report,

8    this substance contained cocaine base?

9    A.   Yes.

10   Q.   All right.  Now, United States Exhibit 54 -- and if we look

11   in here, you can see there's a 7.01 -- sorry.  I'm doing it the

12   wrong way.  And then behind it, there's something separate --

13   it's kind of hard to get to -- that has an 02.  So there are --

14   it looks like there are two different samples.  And would that

15   be reflected in United States Exhibit 1, your report?

16   A.   Yes.  At the top there are two different types of cocaine.

17   That's why it was analyzed separately.  They were in separate

18   bags also.

19   Q.   So you had two different things that came in separate bags

20   for your analysis.  Did you go through the same process that we

21   just talked about?

22   A.   Yes.  I obtained a gross weight for the whole package and

23   then I obtained a net weight.  Yes, the gross weight's in the

24   center, 108.1 grams.  So that includes plastic.

25       And then I obtained a net weight for the two different

1    subexhibits.  And the one I call Exhibit 7.01 was 45.876 grams.

2    And the second material, exhibit that I called 7.02, was cocaine

3    base, and it was 2.527 grams of material.

4    Q.  Okay.  So going back to the larger quantity, tell us, what's

5    the difference between cocaine hydrochloride and cocaine base?

6    A.  Cocaine hydrochloride is a type of material that is pressed

7    into a kilo package form from South America and smuggled to

8    other countries, such as the United States.

9        And you can take cocaine hydrochloride, which is abused --

10   can be abused by snorting or by injection.  You can take that

11   and usually with sodium bicarbonate, which is baking soda, you

12   can convert -- take off the hydrochloride and convert it into

13   cocaine base, which on the street is called crack cocaine.  And

14   this material is abused by smoking, not by snorting or

15   injection.  So that's the two different types of cocaine.

16   Q.  So these two different substances, the 7.01 that looks very

17   powdery and then the 02 that's a little harder but is also white

18   that are referred to on here, 7.01 and 02, the 01 was the powder

19   cocaine, correct, the cocaine hydrochloride?  Is that right?

20   A.  That is correct.

21   Q.  And the 7.02 is the cocaine base?

22   A.  That's true.

23       MS. LAWLESS:  All right.  Thank you.  Those are all

24   the questions I have, Your Honor.

25       THE COURT:  Mr. Simon.

```
 1              MR. SIMON:  Thank you.
 2                        CROSS-EXAMINATION
 3    BY MR. SIMON:
 4    Q.  Good afternoon, Mr. Krefft.
 5    A.  Good afternoon, sir.
 6    Q.  You came from Chicago?
 7    A.  Yes.
 8    Q.  I hope you have a safe trip back and you don't have any
 9    storms.
10    A.  Thank you.
11    Q.  So when you do -- the definition of net weight is the
12    substance plus the container it's in when you get it.
13    A.  The gross weight.
14    Q.  That's the gross weight.  I'm sorry.  The gross weight is
15    the substance that you're going to test and the container it
16    comes in; is that right?
17    A.  The gross weight is the entire package as I get it.
18    Q.  Okay.  So when you had Government's Exhibit Number 5, the
19    outside packaging that, you know, contained everything --
20    A.  Yes.
21    Q.  -- did that include that?
22    A.  Yes.
23    Q.  Okay.  So you got to kind of peel back the layers to get to
24    the weight of the substance, which is the net weight?
25    A.  Correct.
```

Krefft - Cross

1    Q.   Okay.  Bear with me.  I'm a lawyer.  I'm not a chemist.

2    When you get finished with your testing, what's left is what is

3    called the reserve weight?

4    A.   That's true.

5    Q.   Okay.  I got that one right.  Now, the cocaine and the other

6    substance that's identified in your report, I think -- I forgot

7    the number, but it's identified in the report, the chemical with

8    the real long name.

9    A.   Yes.

10   Q.   Okay.  Is that the hydrochloride that you talked about

11   that's combined with cocaine, the powder form?

12   A.   The long name, no.  That's another material usually put in

13   in kilos and is from South America.

14   Q.   Okay.  So is that done just to bind it or is that done just

15   to cut it, to make it less pure?

16   A.   I would say as a cutting agent.

17   Q.   Did you do a qualitative analysis of the amount of cut

18   compared to the amount of cocaine hydrochloride?

19   A.   I did not determine -- the cocaine was present in a greater

20   amount than the other material, but I did not determine a

21   percent of either one.

22   Q.   So basically what we have, the net weight -- excuse me --

23   yes, the net weight is the combination of the cocaine

24   hydrochloride and the chemical with the long name, which is the

25   cut?

Krefft - Cross

```
1    A.  Yes.  Part of the weight of that is the other material.

2    Q.  When the evidence -- I don't have my list.

3        (Counsel conferring off the record.)

4    Q.  This is Government's Exhibit 54.  This is one of the two

5    packages that you examined; correct?

6    A.  Yes.

7    Q.  And this, this is your mark of identification?

8    A.  Yes, that's my signature and my sticker.

9    Q.  Okay.  Now, this paper bag inside, do you recognize that?

10   A.  Yes, that was in there when I received the evidence.

11   Q.  Okay.  Do you have a memory of where that came from?

12   A.  I have notes.  I could look that up.

13   Q.  Sure.

14   A.  You want me to read off my total description?

15   Q.  Of the brown paper bag?

16   A.  Okay.  Let's see.  It was cut open, six-and-a-half inch by

17   13-and-a-half inch Louisville Metro Narcotics manilla evidence

18   envelope.

19   Q.  All right.  Do you have to go to another report to -- this

20   is Government's Exhibit 5.  Do you have to go to another report

21   to give a similar description of the brown paper bag inside that

22   exhibit?

23   A.  Yes.

24   Q.  Okay.  Is that too much trouble or can you get to that?

25   A.  No, I have it here.
```

1   Q.   Okay.

2   A.   That other exhibit was one sealed six-and-a-half inch by

3   13-and-a-half inch Louisville Metro Narcotics manilla evidence

4   envelope which contained the rest of the materials.

5   Q.   In Government's Exhibit -- I'm sorry about flipping back and

6   forth a little bit, but in Government's Exhibit 54, there's also

7   a brown paper bag with some, it looks like, kind of evidence

8   tape that's marked Kentucky State -- that's marked Kentucky

9   State Police Kentucky.  Is that consistent with your notes?

10  A.   Yes.  I have some other notes here pertaining to that.

11  Inside of that -- I had already described the manilla evidence

12  envelope.  There was one clear plastic baggie sealed with red

13  Kentucky State Police evidence tape.

14  Q.   Okay.  So that is in 54?

15  A.   Yes.

16  Q.   I may have described it as a manilla envelope, but it's a

17  plastic baggie, according to your notes, marked with the

18  Kentucky State Police Kentucky tape?

19  A.   Yes.

20  Q.   Okay.  And then in Government's Exhibit 5, I see some tape

21  similarly marked Kentucky State Police Kentucky tape.  Is that

22  on plastic -- a plastic bag or on a paper bag?

23  A.   On this one, after the manilla envelope, it contained a

24  three inch by four-and-three-quarter inch Ziploc plastic bag

25  sealed with red Kentucky State Police evidence tape.

1    Q.   Okay.  Another plastic bag.  Thank you.

2         Now, you said a little bit -- talked a little bit about the

3    chemical reaction that happens when cocaine hydrochloride is

4    turned into cocaine base or crack; right?

5    A.   Yes.

6    Q.   Okay.  And for that to happen -- well, how is that normally

7    accomplished by lay people who are not in a laboratory like the

8    one that you work in?

9    A.   Well, I think I mentioned already the hydrochloride can be

10   taken off of cocaine hydrochloride by mixing it with baking

11   soda, sodium bicarbonate, which everybody has in their kitchen.

12   Q.   Okay.  Well, when people say they cook it -- okay -- when

13   they cook powder cocaine and it gets turned into cocaine base,

14   what's the chemical situation there?

15   A.   Well, I think what -- when they combine the cocaine

16   hydrochloride with the sodium bicarbonate, they can add a little

17   water and put it in the microwave oven.  I think that's one way

18   it's done.

19   Q.   Okay.  So the point is that you're going to use the agent,

20   the sodium bicarb -- right -- as an agent to get rid of the

21   hydrochloride?

22   A.   I think that's the most common thing that they use, but you

23   could use a different base, such as sodium bicarbonate.

24   Q.   Okay.  If you use a different base, would it change the time

25   period for that to occur?

1    A.   For the making of the cocaine base --

2    Q.   To change --

3    A.   -- I don't really know, you know, how that would affect it

4    or not.

5    Q.   Okay.  Well, let me ask you this:  If an individual was

6    going to put cocaine hydrochloride in a container and have that

7    container heated by boiling water -- all right -- are you able

8    to estimate the time period it would take to change the -- for

9    the chemical reaction to occur, for the cocaine hydrochloride to

10   be changed into cocaine base?

11   A.   Well, microwaves heat up water pretty fast so I don't think

12   it would take very long to convert the cocaine hydrochloride

13   into cocaine base.  Certainly less than a half hour.

14   Q.   Okay.  And that's with a microwave?

15   A.   Yes.

16   Q.   Okay.  If somebody didn't use a microwave and they used,

17   say, a pot of water heated up on the stove and they put the

18   cocaine into another container, like a Pyrex container, and --

19   A.   Yes.

20   Q.   -- put it inside the water so that it got hot but not wet,

21   that would take substantially longer than using a microwave

22   oven, wouldn't it?

23   A.   I can't really say.  I've never done it like that.

24          MR. SIMON:  Okay.  That's all the questions I have.

25   Thank you.

1          MS. LAWLESS:  Nothing further, Your Honor.

2          THE COURT:  All right.  Thank you, sir.  You may step

3     down.

4          THE WITNESS:  Thank you.

5          THE COURT:  I think at this point we'll take just a

6     very brief 10-minute break.

7        (Jury out 2:02 p.m.)

8          THE COURT:  You may be seated.  The jury has left the

9     courtroom.  Will you have your next witness available in about

10    10 minutes?

11         MS. LAWLESS:  Yes, sir.

12         THE COURT:  And how many -- you don't have to give me

13    an exact number, but in terms of ball park, how many more

14    witnesses do you anticipate?

15         MS. LAWLESS:  Ten.

16         THE COURT:  You anticipate needing all 10?  I was just

17    looking at your list, and that's why I thought I would ask you.

18         MS. LAWLESS:  I may be able to cut a couple, Your

19    Honor.

20         THE COURT:  All right.  Okay.  We'll be back in about

21    10 minutes.

22        (Recess at 2:04 p.m. until 2:22 p.m.  Jury out.)

23         THE COURT:  I think we're ready for the jury, aren't

24    we?

25        (Jury in 2:24 p.m.)

James - Direct

1    THE COURT:  Are you ready to call your next witness?

2    MS. LAWLESS:  Yes, Your Honor.  Detective Tony James.

3    (DETECTIVE TONY JAMES, called by the Government, sworn.)

4    DIRECT EXAMINATION

5    BY MS. LAWLESS:

6    Q.  Would you state your name for record please and spell your

7    last name.

8    A.  Sure.  It's Tony James.  It's J-A-M-E-S.

9    Q.  By whom are you employed?

10   A.  Louisville Metro Police.

11   Q.  And how long have you been with the Louisville Metro Police

12   Department?

13   A.  Approximately about 16 years.

14   Q.  All right.  Did you have any law enforcement experience

15   before that?

16   A.  No, ma'am.

17   Q.  All right.  Any educational training before that?

18   A.  Some college.

19   Q.  Okay.  So when you joined the police department, that was

20   your first time venturing into law enforcement?

21   A.  Yes, ma'am.

22   Q.  All right.  What is your current assignment within LMPD?

23   A.  I am assigned to the Mobile Ninth Unit and I am a K-9

24   handler.

25   Q.  All right.  What is the name of your K-9 companion?

1    A.   K-9 Diesel.

2    Q.   Diesel.

3    A.   Yes, ma'am.

4    Q.   All right.  And how long have you and Diesel been working

5    together?

6    A.   Since 2011.

7    Q.   All right.  And just tell the jury a little bit about the

8    training that goes into getting a K-9 ready.  And let me --

9    before we say that, what is he trained to do?

10   A.   I operate a single-detection K-9 narcotics dog.  This dog is

11   trained to alert on the odor of narcotic substances, such as

12   cocaine, methamphetamine, opiates or heroin, and marijuana, and

13   those are the main drugs that he is trained on.

14   Q.   So he doesn't do bombs or anything like that?

15   A.   No. He is single purpose.  All he does is narcotics.

16   Q.   And just briefly tell us what that training involves for

17   both of you.

18   A.   We both have to go through a training where we do a bonding

19   period with the dog.  Then we start implementing odors to the

20   dog, which is, as I spoke before, the narcotic odors, marijuana,

21   cocaine, methamphetamine, and opiates.  And, basically, we go

22   through a thing where we imprint those dogs where they

23   understand in their mind, when they smell an odor, then they

24   basically give a response and then they are paid for that

25   response.

1    And we go through a series of several weeks of training and

2   ongoing training with this.  And then you just -- you know,

3   basically, the longer that these dogs do this, just like

4   anything else, the better they get at it.

5   Q.   How long has Diesel been actually out working?

6   A.   Since 2011.

7   Q.   Since 2011.

8   A.   Yes, ma'am.

9   Q.   Okay.  And are both of you up on all of your

10  certifications --

11  A.   Yes, ma'am.

12  Q.   -- that are required?

13    All right.  Now, we talked before and you were explaining to

14  me, because I asked you about how it is that -- let's say

15  sometimes dogs -- and in this case we're going to talk about it

16  in just a minute -- hit on money.  Why is that?

17  A.   A lot of times when -- the only way they know to hit on

18  anything or alert on anything is because they smell that odor.

19  They smell an odor.  What that odor is, we don't know, but it's

20  a narcotic odor of some sort what he's imprinted to smell.

21    So when he is setting on currency, he's not set setting on

22  it because it's currency.  He's setting on it because it has the

23  odor of a narcotic that he has been trained to alert on.

24  Q.   Okay.  So that would be somewhere in there or something is

25  telling him in this area I smell drugs?

1  A.  Yes, ma'am, because he doesn't know if it's drugs or if it's

2  U.S. currency.  To him it's only an odor, if that makes sense.

3  Q.  It does.  And when you said then you pay him, tell us a

4  little bit about that.

5  A.  Dogs are rewarded differently sometimes, if you've seen

6  dogs.  He's rewarded with a tennis ball, a yellow tennis ball,

7  not a blue one, not a green one, just a yellow everyday tennis

8  ball.  Some dogs are rewarded with a toy, or a Kong, or like a

9  towel wrapped up.  It depends on just what the dogs like.  And

10  you give them what they tend to like the most, whatever that toy

11  might be.

12  Q.  Okay.  And when you run Diesel or take him through

13  somewhere, how do you know that he smells the scent?

14  A.  His alert -- different dogs do different alerts.  Like a

15  bomb dog might not scratch or anything.  They want them to be

16  very, very passive, you know, in case it is a bomb.

17       So what his alert is, he will smell something and he will

18  sit.  A lot of times he will sit.  He will either smell or he

19  will look in the direction that that odor is coming from or he

20  will actually look there and then look at me and look back, like

21  are you paying attention?  You know, are you seeing -- you know,

22  are you seeing what I'm smelling?

23       And so that's basically what he'll do.  He will sit and then

24  I will reward him, you know, once we look and say, oh, there it

25  is whatever it is, whether it's a narcotic, or drugs, or

1    marijuana, or U.S. currency and, you know, we'll pay him.

2    Q.  Okay.  So we've got his background now.  Let's bring

3    ourselves up to November 16th of 2015.  Were you involved in the

4    execution of the search warrant on Louis Charlton's house here

5    in Louisville?

6    A.  Yes, ma'am, I was.

7    Q.  And did Diesel work with you during carrying out that search

8    warrant?

9    A.  Yes, ma'am, he did.

10   Q.  All right.  So let's, if you would, walk the ladies and

11   gentlemen of the jury through what you did with him at the

12   search warrant.

13   A.  Okay.  Typically what I do, when we go into a place wherever

14   there's a legal search warrant we're doing, I will go in and I

15   will do like a walk-through of that property.  And why I do that

16   is to look for hazards for him, because they are very -- when we

17   let them go, they're chasing after the odor.  And we have to

18   make sure there's no hazards, there's no -- it sounds crazy, but

19   like mouse traps are a big issue for us because they'll be

20   behind doors or be things he can step on them or put his nose in

21   them.  We look for different things that could harm him, knives

22   out or anything sharp to hurt him.

23       So I'll do a quick run-through, you know, through the

24   location and then I will start room by room.  And we'll go in

25   and I'll usually take the lead off of him and let him free

1    search where he runs around.  And that's basically how we do it.

2    Q.  All right.  Let's walk through the search at Mr. Charlton's

3    house.

4    A.  Okay.

5    Q.  So you're there.  You go in and you check for hazards for

6    Diesel, determine that it's okay to take him in?

7    A.  Correct.

8    Q.  Did you guys -- you guys -- did you and Diesel go in the

9    front door or the back door?

10   A.  I believe we went in the front door.

11   Q.  All right.  And when you took him in the front door, what

12   did you do at that point?

13   A.  We went on upstairs because there was a lot of activity

14   downstairs.  And they were actually processing some evidence

15   downstairs.  So we decided to go on upstairs and I started

16   searching with him.  I went into -- I believe the master

17   bedroom, I believe, is the room that I went in.

18   Q.  All right.  Now, the ladies and gentlemen of the jury have

19   heard about from Sergeant James how -- Sergeant Adams.  I'm

20   sorry, looking at you saying his name -- how logs are kept and

21   all of that.  So we're -- I'm going to kind of cut right to the

22   chase with you about the things that you and Diesel with you are

23   attributed to at least identifying and either you collecting or

24   somebody collecting after you pointed out to them.

25       So you mention that you-all went upstairs.  I'm going to

1   have you take a look at United States Exhibit 33.  Can you tell

2   us about this -- what we see in this picture and how it relates

3   to your work there with Diesel.

4   A.  Yes, ma'am.  I believe that was a box that he hit on in the

5   master bedroom.  It was a closet.  Basically, I let him off lead

6   and he runs around.  He had indicated on this box in the closet.

7   I opened it up.  Actually, he actually opened it, some of it up,

8   because he was -- they get excited when they're working.

9   They're very happy to work.  So he went in there and was

10  alerting on it, you know, moving around, smelling, and that's

11  when I saw the U.S. currency.  He sat down and then I paid him.

12  Q.  Okay.

13  A.  A lot of times with that, what happens when I find items,

14  I'll either have a photographer or someone with me because it's

15  very difficult for me to stop what I'm doing, collect evidence

16  and do it, because he's 100 plus pounds.  And he loves to do

17  what he's doing, so he's all the time pulling, you know, or I'm

18  all the time -- you know, I've got to lead -- put his lead back

19  on him and do what I need to do.  So a lot of times there will

20  be somebody assisting me taking photographs and collecting that

21  evidence.

22  Q.  And who was that for this particular search?

23  A.  I believe that was -- Sergeant Adams was there.

24  Q.  All right.  So we're still upstairs.  And if you would, take

25  a look at United States Exhibit 45.  And the jury has seen these

```
 1    things before, but will you -- this isn't what it looked like

 2    when you first started out; right?

 3    A.   No, ma'am.

 4    Q.   So explain to us what was going on in this room when you and

 5    Diesel went in there.

 6    A.   This was like a secondary room, or what I would maybe

 7    consider like maybe a catchall room, or like I call in my

 8    household like a junk room.  I had put him in there and he was

 9    searching.  And there were some totes in the corner, like those

10    plastic storage totes.  And I think there was two or three high.

11    As he was running around, I was sitting by the doorway.

12    Sergeant Adams was there with me.  He was running in there and,

13    as he was running, he alerted on the bins.

14         So, basically, it was like a process of elimination because

15    they had -- they were -- they had the plastic covering that

16    pops, you know, that pops on the top of them.  So I took one bin

17    off and another bin off so he could get to all of them.  And the

18    bottom bin, I believe, is the one that you're observing.  He

19    went in alerted on it.  So I popped the top off and he dug his

20    nose all the way down in there.  It was full of clothing, like

21    you would store clothes.

22         When he dug his nose around in there, he kept rooting

23    around, and then all of a sudden he backed up and he alerted.

24    That's when I grabbed down in there to see what it is to, you

25    know, verify what he was alerting on, if it was drugs or
```

James - Direct

1    whatever and so it was U.S. currency.

2    Q.  All right.  And was the currency the way we see it here?  It

3    was in these like sweat pants?

4    A.  Yes.  It was actually, I believe, stuffed in the pockets of

5    that fabric or that cloth.

6    Q.  Okay.  After the two of you finished upstairs, then where

7    did you go next?

8    A.  I believe we went downstairs to the kitchen area.

9    Q.  Okay.

10   A.  And I was running the kitchen area, kind of like a kitchen

11   and there's a porch area going out the back door.

12   Q.  And if you would tell us what the significance of what we

13   see here in United States Exhibit 28.

14   A.  I believe that's a digital scale box.

15   Q.  And I'm going to pop 29 up here as well.  So this is what

16   was inside.  Tell us how it is that that came to your attention.

17   A.  He alerted up high.  He was working the area and was

18   alerting high.  And I could tell -- they will throw their head

19   trying to get to that odor that they -- they're trying to hone

20   in that odor.  And so he was alerting high and that's when we

21   observed that, due to the fact that it has narcotic residue.

22   Q.  And United States Exhibit 30, tell us -- that's just one

23   picture -- but what we see there.

24   A.  I believe that was the bag that we found in a closet, like a

25   pantry closet there, and I think it had some marijuana in it.

1  Q.  Okay.  And after you finished in the kitchen, where did you

2  go with Diesel?

3  A.  We went to the basement area.

4  Q.  All right.  And tell us, if you will please, what happened

5  in the basement area.

6  A.  The same.  We went to the basement area.  I kind of did a

7  quick overview of that area -- excuse me -- and I released him

8  and he was running the basement.  There was a lot of clothing

9  that was hanging in the basement area.

10     And what he'll do is they will actually -- you know, he'll

11  hone in on what it is.  So he started working a particular area.

12  And I believe it was a coat or a jacket, and he went to it and

13  they were -- they were actually hanging.  And he went to it and

14  was smelling of it and alerted on the pocket.  And then in the

15  pocket I observed the U.S. currency and called for Sergeant

16  Adams to come down and photograph it.

17  Q.  All right.  Detective James, did you have any interaction

18  directly with Mr. Charlton that day during execution of the

19  search warrant?

20  A.  No, ma'am, I don't believe I did.

21  Q.  So what you've described for the jury about taking Diesel,

22  doing the search, helping find things and in a way collecting

23  evidence but really taking care of the dog, that was your role

24  that day?

25  A.  That's pretty much it, yes, ma'am.

Carroll - Direct

 1          MS. LAWLESS:  Thank you.  Those are all the questions

 2     I have, Your Honor.

 3          MR. SIMON:  No questions.  Thank you, Detective.

 4          THE COURT:  Thank you, sir.  You may step down.

 5          THE WITNESS:  Thank you, Your Honor.

 6          THE COURT:  You may call your next witness.

 7          MS. LAWLESS:  Yes, sir.  Detective Hannah Carroll.

 8     (DETECTIVE HANNAH CARROLL, called by the Government, sworn.)

 9                          DIRECT EXAMINATION

10     BY MS. LAWLESS:

11     Q.  Detective, would you please state your name for the record

12     and spell your last name.

13     A.  Hannah Carroll, C-A-R-R-O-L-L.

14     Q.  By whom are you employed?

15     A.  Louisville Metro Police Department.

16     Q.  How long have you been with LMPD?

17     A.  Around six years.

18     Q.  All right.  And did you have any law enforcement experience

19     before that?

20     A.  No, ma'am.

21     Q.  What about an educational background?

22     A.  Yes, ma'am.  I have a bachelor's degree from the University

23     of Kentucky.

24     Q.  In what?

25     A.  Communications and political science.

1  Q.  All right.  So for the last several years though you've been

2  with LMPD.  What were your assignments with LMPD?

3  A.  My first assignment, I was assigned to the First Division

4  where I was training in Portland.  I was then assigned to the

5  Third Division, which was Dixie Highway area.  And then

6  recently, within the past two years, I've been assigned to the

7  Ninth Mobile Division as a detective.

8  Q.  All right.  And during the course of your responsibilities

9  with the Ninth Mobile -- you said it's been for about the last

10  two years; is that right?

11  A.  Yes, ma'am.

12  Q.  So thinking back about eight -- around 18 months ago, you

13  hadn't been on the unit too terribly long at that point, had

14  you, November of 2015?

15  A.  No, ma'am.

16  Q.  Okay.  Were you -- did you become involved in an

17  investigation directed toward Mr. Charlton, Louis Charlton?

18  A.  Yes, ma'am.

19  Q.  Okay.  And tell us how it is that you became involved in

20  that.

21  A.  I became involved in the investigation.  I had an informant

22  who had provided me with information that Mr. Charlton was

23  selling narcotics out of his residence at 3937 South Fifth

24  Street.

25  Q.  And who was that confidential informant?

Carroll - Direct

1    A.   Edward LaGantta.

2    Q.   Okay.  How long had Mr. LaGantta been working for you?

3    A.   I couldn't give you an exact.

4    Q.   Had it been a long time?

5    A.   It hadn't been a long time, no.

6    Q.   Maybe within a week or two, a couple weeks, something like

7    that?

8    A.   Maybe around there, maybe -- I would say two to a month,

9    month and a half, somewhere in there.

10   Q.   All right.

11   A.   If I recall.

12   Q.   How is it that you first became in contact with

13   Mr. LaGantta?

14   A.   The first time I came in contact with him is I had someone

15   else who had information about LaGantta, said that he had tried

16   to sell him drugs at a gas station.  And I had got this person

17   with some other narcotics, and he said I could set him up so I

18   said okay.

19        And he had arranged for LaGantta to meet him with some

20   heroin at a gas -- or at a location.  LaGantta kept changing it

21   and we met him at a gas station.  He said he's driving this car

22   and this is what he's wearing.  We went to the gas station, saw

23   him there, and that's where we stopped him.

24   Q.   Okay.  So you stopped Mr. LaGantta.  And did you have any

25   interaction with him?

Carroll - Direct

1    A.  Yes, we stopped him.  I can't remember if he was inside of

2    his car or right outside of his car.  We stopped him right there

3    on the gas station lot at Speedway over in Shively.  And at that

4    point, he had some crack on him, some marijuana, and some beef

5    bouillon cubes, which he intended to disguise to sell to my

6    other informant.

7    Q.  Okay.  Did he have any heroin?  Because did I hear you say

8    you thought he was coming to sell heroin?

9    A.  I did but that was the beef bouillon cubes.

10   Q.  There was no heroin?

11   A.  No, ma'am.

12   Q.  Just so we're all clear.

13   A.  No heroin.

14   Q.  So you encounter Mr. LaGantta.  Did he give you permission

15   to search his car or how is it that you found all this stuff?

16   A.  He gave permission to search.  I did not search him.  He

17   gave permission to search and that's when my partner found the

18   crack and marijuana on him.

19   Q.  All right.

20   A.  The beef bouillon cubes were just laying there in the car.

21   Q.  Did you arrest Mr. LaGantta that day?

22   A.  He was not -- no, he was not arrested.

23   Q.  Okay.  And we've heard testimony before about this, that it

24   happened around November 4th of 2015.  You wouldn't disagree

25   with that if that's what --

Carroll - Direct

1    A.   No, ma'am.

2    Q.   -- some of the paperwork showed; right?

3    A.   Correct.

4    Q.   Okay.  Had you had any dealings with him before then?

5    A.   Before November 4th?

6    Q.   Uh-huh.

7    A.   No, ma'am.

8    Q.   Okay.  So if you start dealing with him on November 4th and

9    this deal happens on November 15th, he hadn't been working for

10   you for a couple of months.  It had been a couple of weeks.

11   A.   Yes, ma'am.

12   Q.   Right?

13   A.   That would be right.

14   Q.   Okay.  Now, after you had this encounter with Mr. LaGantta,

15   did you -- you said you didn't arrest him.  What did you do?

16   A.   At that point he provided us with information other than

17   Mr. Charlton.  We went to some places.  We talked about

18   different people.  We looked at addresses, just kind of went

19   through what he might know that could help us.  We went through

20   all this.

21   Q.   I'm going to time-out for you there, and we'll come back to

22   that.  Help us get from you approach him at the gas station.  He

23   gives you consent to search him, and now you-all are out talking

24   or looking for other people that he can help you with.  Did you

25   give him the opportunity to work with you?  Did you ask him if

Carroll - Direct

1    he wanted to help himself out or work with you?

2    A.   Yes, ma'am.

3    Q.   And what did he say?

4    A.   He said he did.

5    Q.   Okay.  When he agreed to do that, that's when information

6    was provided; correct?

7    A.   Yes, ma'am.

8    Q.   All right.  Did anything happen with regard to that right

9    that day?

10   A.   Do you mean as far --

11   Q.   Did you make any other arrests that day?

12   A.   Not that particular day.

13   Q.   Okay.  When you talked to him and he agreed to work with

14   you, tell us, what do you do when you're finished with that

15   person for that day?  So you've had your interaction.  You

16   haven't arrested him.  There's a citation.  Did you give him the

17   citation or do you know?

18   A.   Yes, ma'am.

19   Q.   Okay.

20   A.   I wrote the citation and I gave him the citation.

21   Q.   All right.  And after that happens, you ask him if he wants

22   to help himself out or work with you or whatever.

23   A.   Yes, ma'am.

24   Q.   Right?  So you made that offer to him or did he ask to do

25   it?

1    A.   I asked.

2    Q.   I'm sorry?

3    A.   I asked.

4    Q.   You asked him?

5    A.   Yes, ma'am.

6    Q.   You go through that process.  What do you tell people at

7    that point in time?

8    A.   I basically tell them that, you know, this is what we have.

9    You know, he had some narcotics on him.  I asked if he wanted to

10   maybe do something in favor for him, if he wanted to give us

11   some information that we could try and help him with court or

12   that aspect.  Usually I tell them that, you know, I can't

13   promise anything.  I have to talk to a prosecutor, that sort of

14   thing, but I give them the opportunity that they can work and

15   then we can discuss that with a prosecutor in court.

16   Q.   How do you -- after that initial discussion with him, how do

17   you keep in contact?  How did you keep in contact with

18   Mr. LaGantta?

19   A.   I have a phone number that I gave him and he gave me his

20   phone number.

21   Q.   Okay.  And did you talk to him after that time?

22   A.   Yes, ma'am.

23   Q.   All right.  At what point in time did Mr. Charlton come up?

24   A.   He came up that night.

25   Q.   Okay.  Was that -- how?

1    A.  He said that he could purchase narcotics from him.  We drove

2    by the address and that's how -- that's how it came up.  He told

3    us his name and showed us the address.

4    Q.  So after Mr. LaGantta gives you-all information, you didn't

5    do any deals right that minute; right?

6    A.  No, ma'am.

7    Q.  What did you do after that?  Do you do some further

8    investigation, try to figure out if this is worth your time, or

9    tell us how that works.

10   A.  Yes, ma'am.  At that point I had to make sure the

11   information he was giving me was correct so I would --

12   Q.  And we don't have to get into every little detail.  Just do

13   you try to follow up and confirm who people are, like who lives

14   at that place, what their names are, that kind of thing?

15   A.  Yes, ma'am.

16   Q.  So you're trying to confirm basic information that you've

17   been given by a confidential informant?

18   A.  Yes, ma'am.

19   Q.  Did you do that in this case?

20   A.  Yes.

21   Q.  All right.  So we come forward a couple of weeks and now

22   we're on November 16th of 2015.  Tell us about the controlled

23   purchase that was set up.  Were you involved directly with that?

24   A.  I was involved with it some parts.

25   Q.  Okay.  Tell us what your role in that was.

1    A.  My role is myself and another -- one of my partners, we went

2    and met LaGantta, brought him back to the office.  He stated

3    that he could do a buy from Charlton for narcotics, and we went

4    back to the office.  We were there for a little bit of time.

5    There was some other things going on.  Some people had brought

6    money for him.

7    Q.  Some people?

8    A.  Well, we had some money -- I can't say for sure if the ATF

9    brought some money, but we used a large amount of money to

10   purchase the narcotics.

11   Q.  Okay.  I don't think I'm asking my question very well.  Were

12   you involved in providing purchase money to Mr. LaGantta?

13   A.  No.

14   Q.  Okay.  I just want to know what your job was during the

15   course of all this.

16   A.  Basically, I talked to him, kind of set up what would

17   happen, and then some other detectives did the rest of -- kind

18   of everything else, because at that point I was working on the

19   search warrant.

20   Q.  Okay.  So you weren't direct -- were you out with them when

21   the controlled purchase happened?

22   A.  No, ma'am.  I stayed back at the office.

23   Q.  Okay.  All right.  And while you're there, you're pulling

24   together all the things that we've talked up to this point;

25   right?

1   A.   Yes, ma'am.

2   Q.   Okay.  Did a controlled purchase of a half ounce of crack

3   cocaine happen between Mr. LaGantta from Mr. Charlton?

4   A.   Yes, ma'am.

5   Q.   And how did you find out about that?

6   A.   I keep my radio on me, so I was listening to the

7   transactions, what people were saying.  They were relaying it

8   back to me while I was at the office trying to prepare the

9   search warrant.

10  Q.   Okay.  Once that was all confirmed that the controlled

11  purchase had happened, that you had the drugs and all that kind

12  of stuff, that information is relayed to you, did you put that

13  in your application as well for the search warrant?

14  A.   Yes, ma'am.

15  Q.   So after that is pulled together there, tell us how it is

16  that you get a search warrant.

17  A.   I'm not sure if -- I'll write the affidavit, which is very

18  detailed, and then I'll write a search warrant for the

19  residence.  At that point, I wrote the information --

20  Q.   Okay.  We know about that.  So you've got your documents.

21  What do you do once you have everything written up?

22  A.   I take that to a judge to have them sign it, and then I'll

23  bring it back to the office.  I briefed S.W.A.T.

24  Q.   Okay.  So in this particular case did you get a search

25  warrant?  And we've seen it earlier.

1    A.   Okay.

2    Q.   All right.

3    A.   Yes, ma'am, I did.

4    Q.   Okay.  And you got it from a state judge; correct?

5    A.   Circuit court, circuit court judge.

6    Q.   For the Commonwealth of Kentucky?

7    A.   Yes, ma'am.

8    Q.   It's a state search warrant.

9    A.   Yes, ma'am.

10   Q.   All right.  So after you got the search warrant, tell us

11   what happened at that point for your involvement.

12   A.   After I got the search warrant signed, I went back to the

13   office, to our office.  The S.W.A.T team was there.  They were

14   going to make entry.  So I briefed them, explained to them --

15   you know, we kind of did logistics, like if there's a dog, or

16   cameras, or guns, or that sort of thing inside the residence.  I

17   briefed them.

18       At that point we left.  I rode with S.W.A.T to show them

19   which house that they were going to.  So I visually show them

20   usually with a laser.  And then they made entry into the

21   residence.

22   Q.   Okay.  Were you part of that entry team?

23   A.   No, ma'am.

24   Q.   What was your role at the search warrant?

25   A.   My role at the search warrant was to interview, debrief,

1    kind of talk to Mr. Charlton.

2    Q.  Okay.  And did you do that by yourself or with somebody

3    else?

4    A.  Special Agent Walker was with me.

5    Q.  Okay.  So the two of you are talking to Mr. Charlton.  Where

6    did that interview take place?

7    A.  We had a couple different places that we were out -- that we

8    talked to him.  One of those was in the basement.  Another one

9    was in a bedroom.

10   Q.  Okay.

11   A.  This is at his house.

12   Q.  At his house, all right.  And we're going to come back to

13   that here in just a minute.  Did you collect any specific things

14   during the course of the search warrant?

15   A.  No, ma'am.

16   Q.  Okay.  Did you help with sort of the wrap-up at the end,

17   because you would be considered the lead for LMPD's purposes on

18   the case; right?

19   A.  What was your question again?  I'm sorry.

20   Q.  Did you help with the wrap-up at the end when things are

21   getting sorted out, and evidence is being logged, and that type

22   of thing?

23   A.  Yes, when we were leaving, you know, moving stuff.

24        MS. LAWLESS:  Your Honor, may I approach the witness?

25        THE COURT:  Yes.

1          (Counsel conferring off the record.)

2     BY MS. LAWLESS:

3     Q.   Detective Carroll, the jury members have already heard about

4     how your department and ATF handles the collection of money and

5     that things aren't counted there at the scene, but -- and they

6     know about how it's put into different little bags.

7          At that time that night, were you involved actually though

8     in creating like a report that I just handed you that talks

9     about the evidence that's pulled out?

10    A.   I'm sorry.  I'm still not sure what your question is.

11    Q.   Were you involved in the finalizing of gathering the

12    evidence there for purposes of logging it?  For example, in

13    talking to Mr. Charlton about the currency seizure forms and

14    signing them with him.  Have you seen the document that I just

15    handed you before?

16    A.   Yes.

17    Q.   Okay.  What I want you to focus on, the things that have to

18    do with the money.

19    A.   Uh-huh.

20    Q.   All right?

21    A.   Yes, ma'am.

22    Q.   So tell us please, based on -- this is all your case and

23    this is all put together ultimately by you -- where the

24    different amounts of currency and how much was collected in each

25    place, because you didn't know that night exactly how much was

1    collected.

2    A.  Right.

3    Q.  Okay.  Let's do it that way.

4    A.  I was talking to him and they had advised me they found

5    money different places.  Do you want me to go into detail about

6    how it was --

7    Q.  No.  They already know that.  I just need you to tell them

8    -- let's say, for example, in the living room --

9    A.  Okay.

10   Q.  -- living room floor, how much money was ultimately counted

11   that was seized from the living room floor?

12   A.  In the living room floor, there was $7,100.  Downstairs in

13   the basement -- that's where we were talking to him at first --

14   there was $4,641.  In the upstairs -- the upstairs of the house,

15   there was a laundry basket and it had $80,000 in it.  In the

16   master bedroom, there was a shoebox that had $27,000 on it -- or

17   in it.  I'm sorry.  And then on his person, there was $1,563.

18   Q.  So there were one, two, three, four, five different places

19   that cash was collected from?

20   A.  Yes, ma'am.

21   Q.  Okay.  And while you may not have taken that, ultimately --

22   A.  Right.

23   Q.  -- it all ends up, the paperwork comes through you for your

24   report; correct?

25   A.  Yes, ma'am.

1    Q.   Okay.  Now, let's go back to the basement where you and

2    Special Agent Walker are talking to Mr. Charlton.  How is it

3    that you went to the basement with Mr. Charlton?

4    A.   People were searching the upstairs, so we were just trying

5    to find someplace that was a little bit more calm and not as

6    chaotic, and we went downstairs to the basement to talk to him

7    where no one was at at that time.

8    Q.   Did you ask him if he wanted to talk to you?

9    A.   Yes, ma'am.  He was Mirandized and we asked if he wanted to

10   talk.

11   Q.   What did he say?

12   A.   He said yes.

13   Q.   Okay.  And while you were in the basement with Mr. Charlton,

14   did you and Special Agent Walker ask him some questions about

15   what had been going on?

16   A.   About --

17   Q.   About his involvement in drug trafficking?

18   A.   Yes, ma'am.

19   Q.   Okay.  Would you tell the ladies and gentlemen of the jury

20   what it is that he told you about that.

21   A.   He told us about some of the money that he had in the house.

22   He told us about how much narcotics he had in the house.  He

23   told us that he had been selling narcotics.  I mean, he went

24   into some detail that I can't remember exactly with other

25   people, went into some names and that sort of thing, but the

1    first part of the interview was about why we were there, why

2    we're here at your residence, because of the narcotics

3    trafficking.

4    Q.  Okay.  And he admitted to you that he was involved in

5    trafficking?

6    A.  Yes, ma'am.

7    Q.  Did he tell you what he sold?

8    A.  He said he sold crack cocaine and cocaine.

9    Q.  All right.

10   A.  Mainly.

11   Q.  How did he get it?

12   A.  He would get it from other people on the street.

13   Q.  Who would he get it from?

14   A.  He told us that he got some of it from a gentleman named

15   Syl.

16   Q.  Was he getting -- what kind of quantities was he getting?

17   A.  He was -- if I remember correctly, he said he would get

18   between -- around roughly 9 ounces.

19   Q.  How often?

20   A.  I remember him saying that he got -- when we did the search

21   warrant, the guy had came last week and he was supposed to pick

22   up his money the next day.

23   Q.  Okay.  So did you and Special Agent Walker go through and

24   ask him about those kinds of things?  Who's your source of

25   supply?  How much are you getting?  How much are you paying for

1    it?  Did you ask him those kinds of questions?

2    A.   Yes, ma'am.

3    Q.   And was Mr. Charlton agreeable with that in talking to you?

4    A.   Yes, ma'am.

5    Q.   Did you make him any promises at that time?

6    A.   No, ma'am.

7    Q.   What did he think was going on as far as what you -- from

8    what you told him?  What did you tell him?

9            MR. SIMON:  Two questions.

10           MS. LAWLESS:  I'm sorry.

11   BY MS. LAWLESS:

12   Q.   I'll just rephrase it.  What did you tell Mr. Charlton?

13   A.   Like in the basement what did we tell him?

14   Q.   Yes.  Why would he talk to you?  Why is he talking to you?

15   A.   He told us that he -- we asked him -- we told him kind of

16   why we were there, just like we did with the first informant.

17   We told him that we are here for the narcotics trafficking.  He

18   had narcotics in his house, firearms.  And asked him if he was

19   interested in being an informant, and he informed us that he was

20   previously an informant and said that he was.  So then he

21   provided us with some information.

22   Q.   Okay.  So you knew at that point in time that he had been an

23   informant before?

24   A.   Yes, ma'am.

25   Q.   Did you talk about any of the details about that?

1   A.   I knew --

2   Q.   No.  Did you talk to him about any of the details of his

3   prior work as an informant?

4   A.   Not that I recall.

5   Q.   Okay.  But he tells you -- he offers up, "I've done this

6   before"?

7   A.   Yes, ma'am.

8   Q.   Okay.  At that point in time, when you're talking to him and

9   asking him for any information, did you promise him that he

10  wouldn't go to jail?

11  A.   No, ma'am.

12  Q.   Did you promise him he wouldn't get charged?

13  A.   No, ma'am.

14  Q.   Did you make any promises to him at that point, very

15  specific promises?

16  A.   Not at that point, no, ma'am.

17  Q.   Okay.  What did you say to him about cooperation?

18  A.   I basically tell them all the same thing, that we can talk

19  to prosecutors or judges, defense attorneys, but I can't promise

20  that cases will be dismissed or that charges won't be brought

21  forth.

22  Q.   Okay.  Now, did you stay there the whole night?  You

23  mentioned that you talked to him some other places.  Did you

24  eventually take Mr. Charlton somewhere else?

25  A.   Yes, ma'am, we took him back to the -- we call it the

1    property room, but it's my office on 635 Industry.

2    Q.  All right.  And what happened there?

3    A.  At that point he gave a tape-recorded interview about what

4    happened, about his involvement in selling drugs.

5    Q.  All right.  And so we heard that earlier today.  The female

6    voice that we heard on there was you; is that correct?

7    A.  Yes, ma'am.

8    Q.  Did you have any other interactions with Mr. Charlton in

9    that time frame?  Did you arrest him that night?

10   A.  Yes, ma'am.

11   Q.  Did he go to jail?

12   A.  Yes, ma'am.

13   Q.  Did he get out that night?

14   A.  No, ma'am.

15   Q.  A couple of days later did he want to talk to you at the

16   jail?

17   A.  He had made phone calls multiple times throughout -- I

18   couldn't tell you how long -- maybe a few weeks, and he had

19   called and he had asked to speak with us.  I can't remember

20   exactly at what date and what point in time he asked to speak

21   with us.

22   Q.  Did you say a few weeks?

23   A.  Maybe a week and a half.

24   Q.  Okay.  We're talking about between November 16th and the

25   20th.

Carroll - Direct

```
 1   A.  Yes, ma'am.

 2   Q.  Okay.  So that's not a week-and-a-half time period.  Right?

 3   A.  Yes.

 4   Q.  It's --

 5   A.  Well, I meant he made phone calls from the time that he was

 6   arrested until about a week and a half or so.

 7   Q.  Did he indicate that he wanted to talk to you again at the

 8   jail?

 9   A.  He had indicated that he wanted to talk to us.  I can't

10   remember if it was before the second interview or after.

11   Q.  Why did you go talk to him -- why was there another

12   interview then?

13   A.  The interview was strictly to see -- the information that he

14   provided that night, we wanted to make sure that -- we had

15   talked to the other detective who was his handler, and we wanted

16   to see if this information was credible.  Some of it we found

17   the information was old, and we just wanted to talk and make

18   sure that what information he gave us we would proceed with

19   using him as an informant or not.  It was strictly an interview

20   to learn more about what he could do.

21   Q.  About working toward the future?

22   A.  Yes.

23   Q.  Okay.  So you interview him in his home November 16th and

24   then later that night, going into the morning, at your office;

25   right?  And that one's recorded?
```

1    A.  Yes, ma'am.

2    Q.  And then three days later at the jail as a follow-up?

3    A.  Yes, ma'am.

4    Q.  Who was involved in that interview at the jail?

5    A.  Special Agent Walker and Jeremy Ruoff, who was on their

6    force at the time.

7    Q.  And had Detective Ruoff had any prior experience with

8    Mr. Charlton?

9    A.  Yes, he was -- Mr. Charlton had worked for Mr. Ruoff.

10   Q.  Okay.  So when you met with him that second time, did you

11   get any more details about the controlled delivery or did

12   you-all really only talk about things going into the future?

13   A.  No, ma'am.  The only thing that we talked about in that

14   interview was -- were people, places.  Nothing was asked about

15   him selling narcotics or what happened at that night that we

16   were at his house.  It was strictly just kind of informal -- or

17   us to learn more information.

18   Q.  Okay.  And that's because the information you got initially,

19   you had found out some of it was stale.  Some of it was fresh.

20   You're trying to figure out if there's anything you can do.

21   A.  Yes, ma'am.

22   Q.  During that -- what is actually the third interview but the

23   second one that's recorded, during that did you promise

24   Mr. Charlton that you could get him out of jail?

25   A.  No, ma'am.

Carroll - Cross

1    Q.  Or that he wouldn't be charged or his charges would be

2    dropped?

3    A.  No, ma'am.

4    Q.  Okay.  What did you tell him?

5    A.  At the second tape-recorded interview?

6    Q.  Yes.

7    A.  Okay.  I told him that I had talked to a prosecutor.  I told

8    him that it was mainly up to his attorney and the judge and that

9    was it.

10           MS. LAWLESS:  Okay.  That's all I have, Your Honor.

11           THE COURT:  Mr. Simon.

12           MR. SIMON:  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. SIMON:

15   Q.  Okay.  On the amount of money in the shoebox, what was the

16   amount of money in the shoebox?

17   A.  $2,700.

18   Q.  All right.  Did you say 27,000?

19   A.  If I did, I said it incorrectly.

20   Q.  Detective, even though your assignments have been in the

21   Third Division cross-training and in the Ninth Mobile Unit,

22   you're aware of investigations by the police department in

23   different kinds of crimes.

24   A.  Yes, sir.

25   Q.  Okay.  At least in your training and in your association

Carroll - Cross

1    with other officers, you got a pretty good understanding what

2    homicide detectives do, what robbery detectives do?

3    A.   I have an understanding, yes, sir.

4    Q.   Okay.  And, of course, in the Ninth Mobile Unit to which

5    you've been assigned now for about two years, the point of that

6    unit is to combat offenses that involve illegal drugs and guns

7    and sometimes pointed in certain parts of the community; is that

8    right?

9    A.   Yes, sir, yes, sir.

10   Q.   So when an officer, a police officer is going to interview a

11   suspect in an offense for something that might involve a

12   homicide, something that might involve a robbery, would it be a

13   fair statement to say that that type of interview is going to be

14   very different than an interview of a suspect who would be

15   involved in the drug trade?

16   A.   I guess the goal of the interviews would be different --

17   Q.   Yes.

18   A.   -- if that's what you're asking.

19   Q.   So your interview techniques would be different too.  Would

20   that be a fair statement?

21   A.   It could be.  I've never gave a homicide interview or a

22   robbery interview.

23   Q.   Okay.  But let's say -- let's say hypothetically, based upon

24   your training and the experience that you do have, you're

25   working a homicide case.  And you have a suspect and you talk to

1    that suspect -- well, if they're in a custodial situation,

2    you're going to give them their Miranda rights first; right?

3    A.   Yes, sir.

4    Q.   Okay.  And then you're going to ask that individual, well,

5    questions about the offense as you understand them, find out

6    whether or not that person is going to make an admission to that

7    offense or whether or not they're going to tell you they have an

8    alibi or some other type of defense; right?

9    A.   Yes, sir.

10   Q.   Okay.  You're not interested in developing information on

11   other suspects of other crimes, are you?  Not in that

12   hypothetical situation, are you?

13   A.   I'm sorry.  I'm kind of confused at your question.

14   Q.   Okay.  Again, continuing with the hypothetical, if you're a

15   detective and you're working a homicide, you have a suspect in a

16   homicide that you're investigating, you want to find out what

17   that individual suspect's story is about what happened?

18   A.   Yes, sir.

19   Q.   Okay.  And whether or not they are going to make an

20   admission to committing that offense, engaging in the conduct

21   that resulted in the death of another human being, or whether or

22   not they have an alibi where they say they're not there, or

23   whether or not they said, well, I did it but it was an accident.

24   There's a lot of different ways it could go; right?

25   A.   Yes.

1    Q.  But one way it wouldn't go -- and correct me if I'm wrong --

2    would be you're interviewing a homicide suspect about a homicide

3    and you would say, oh, yeah, by the way, tell me about some

4    people in the drug trade that you might have some information

5    on.

6    A.  Right, but that would be a homicide interview.

7    Q.  Yeah.  Okay.  Same thing.  If you're trying to solve a

8    robbery and you have a person of interest or suspect, you're

9    going to ask some stuff about the robbery.  You're not going to

10   ask them about people selling drugs in other parts of the

11   community, generally not.

12   A.  Right.

13   Q.  Okay.  But because you're in that unit -- all right -- the

14   point of your investigation in talking to a suspect that has

15   recently been charged or getting ready to be formally charged

16   with an offense involving guns and illegal drugs, well, that's

17   the time when it's ripe to ask that person about things that

18   they know going on in the community, other drug transactions

19   being made by other individuals; right?

20   A.  Yes, sir.

21   Q.  Okay.  So in the situation involving Mr. LaGantta -- all

22   right -- when you and Officer Moseley stopped him at the

23   Speedway on, what, Cane Run Road on November the 4th of 2015,

24   when that situation presented itself to you, he had suspected

25   cocaine on him and he had marijuana on him, you gave him the

1  opportunity to work with you and give you information?

2  A.  Yes, sir.

3  Q.  Okay.  And as a matter of fact, what you told us today is

4  that another individual working in the capacity of a

5  confidential informant essentially set up Mr. LaGantta?

6  A.  Yes, sir.

7  Q.  All right.  Because he gave you details of information that

8  LaGantta was going to be at that gas station around -- right at

9  that point in time, driving this type of car, and he's going to

10 have these kind of drugs on him; right?

11 A.  Yes, sir.

12 Q.  Okay.  And that came out to be true; right?

13 A.  Partially.

14 Q.  Okay.  So in Mr. LaGantta's situation, you and Officer

15 Moseley had a conversation with him after you had -- not you

16 personally, but Officer Moseley had recovered contraband off

17 this person; right?

18 A.  Yes, sir.

19 Q.  All right.  And you proposed to Mr. LaGantta about working

20 with you or law enforcement down the road and that you could all

21 help him down the road with his charges.

22 A.  Potentially, yes, sir.

23 Q.  Excuse me?

24 A.  Potentially, yes, sir.

25 Q.  Okay.  And that was that same evening that you stopped him

Carroll - Cross

1    about 10:00, sometime after --

2    A.   That we talked to him?

3    Q.   Yeah.

4    A.   Yes, sir.

5    Q.   All right.  And that you didn't arrest him; correct?

6    A.   No, sir.

7    Q.   You didn't take him into custody?

8    A.   He didn't go to jail, no, sir.

9    Q.   He what?

10   A.   He did not go to jail.  I gave him a citation.

11   Q.   Correct.  And you gave him a citation and -- but before

12   doing so, you exchanged phone numbers so you knew how to get

13   ahold of him?

14   A.   Yes, sir.

15   Q.   Okay.  And we've heard testimony about what happened after

16   that, but eventually when Mr. LaGantta's case came up in

17   Jefferson District Court, right down the street, his trafficking

18   in cocaine charge was dismissed; correct?

19   A.   Yes.

20   Q.   All right.  He did plead guilty to a misdemeanor charge that

21   was suspended or probated?

22   A.   The trafficking synthetic, the trafficking of synthetic

23   drugs.

24   Q.   In the synthetic substances?

25   A.   Yes, sir.

1   Q.  That's what he pled guilty to?

2   A.  Yes.

3   Q.  And you were there that day?

4   A.  Yes.

5   Q.  In court?

6   A.  Uh-huh.

7   Q.  Correct?

8   A.  Yes, sir.

9   Q.  All right.

10  A.  I was in court that day and talked to the prosecutor.

11  Q.  Excuse me?

12  A.  I was in court the day -- our last court date and talked to

13  the prosecutor.

14  Q.  Right.  You talked to the prosecutor and the case wound up

15  being resolved in that manner?

16  A.  Yes, sir.

17  Q.  And did I catch your testimony on direct when Ms. Lawless

18  was asking you questions that Mr. LaGantta provided you

19  information about other people, not just Mr. Charlton?

20  A.  Yes, sir.

21  Q.  And had he set up anybody else besides Mr. Charlton when he

22  was working for you?

23          MS. LAWLESS:  Objection, Your Honor.

24          THE COURT:  Please approach.

25      (Bench conference on the record outside the hearing of the

 1    jury.)

 2           MS. LAWLESS:  I object to this line of inquiry as it

 3    deals with other criminal investigations that are not relevant

 4    to this case.

 5           MR. SIMON:  It's impeachment of Mr. LaGantta when he

 6    says, "I've never done anything like this other than the one

 7    time with Charlton."  She testified on direct that he gave her

 8    information on other information -- other individuals.  I'm just

 9    trying to see if he worked an active case against somebody else.

10    That's direct impeachment of their witness.

11           THE COURT:  Through a different witness though.

12           MR. SIMON:  Well, who would have personal knowledge.

13           THE COURT:  You can ask her the question, but then

14    let's move on from there.

15           MR. SIMON:  Okay.

16       (End of bench conference.)

17    BY MR. SIMON:

18    Q.  Detective, did Mr. LaGantta in fact set up anybody else

19    besides Louis Charlton?

20    A.  He had done other work, not necessarily just -- like a

21    setup, but he had done some other work for me, yes.

22    Q.  As you indicated on direct, you and Detective Walker, your

23    assignment on the day -- part of your assignment on the day of

24    the search warrant being executed at my client's residence was

25    to talk to Mr. Charlton; right?

1    A.   Yes, sir.

2    Q.   Okay.  And you did that.  You basically got him away from

3    all the activity where the search was going on.

4    A.   Yes, sir.

5    Q.   And it was basically the three of you talking at one or two

6    locations inside the house.

7    A.   Yes, sir.

8    Q.   All right.  And while you're in the house, you did with

9    Mr. Charlton the same thing you did with Mr. LaGantta.  You

10   proposed working -- him working with the police and somewhere

11   down the road you-all being able to help him; right?

12   A.   Possibly.

13   Q.   Okay.  But, I mean, the language that you used was you can

14   work for us -- you can work for law enforcement, and if you do,

15   we'll help you out down the road with your charges?

16   A.   I said -- I gave him the opportunity to provide us with

17   information, much like I did LaGantta.  I also didn't promise

18   him anything that day.  I told him that we would have to see,

19   you know, at a later date.  And he did provide -- and both of

20   them did provide us with information.

21   Q.   Now, are you saying that you did not make any specific

22   promises to him?  I thought --

23   A.   No, I did talk to him about -- I'm sorry?

24   Q.   I thought I heard you say that on direct.  Did you make him

25   any specific promises?

Carroll - Cross

1    A.  I did.

2    Q.  Okay.

3    A.  I promised --

4    Q.  What --

5    A.  -- him that I would watch out for his family.  I gave them

6    my phone number.  He was worried about his family, so I gave his

7    wife my phone number.  I said, if she needs anything, call 911

8    first, but she can call me because, I mean, I work lot.

9    Q.  Okay.  What else?

10   A.  That was the only promise that I made.

11   Q.  All right.  When you said, "I'm not arresting Misty, your

12   wife, although I could," was that a promise?

13   A.  No.  I'm not -- I'm not sure what you -- what you mean.

14   Q.  Okay.  Well, his wife was there at the residence when the

15   warrant was executed.

16   A.  Correct.

17   Q.  Correct.  All right.  And do you remember making a statement

18   to Louis during the first tape-recorded statement that you could

19   have arrested Misty for trafficking in marijuana but you didn't

20   do that?

21   A.  Yes, sir, I do remember.

22   Q.  Do you remember saying that?

23   A.  I do.

24   Q.  You did not in fact arrest Misty for that?

25   A.  No, sir.  He took --

1    Q.   Or anything else?

2    A.   I'm sorry?

3    Q.   You didn't arrest her for anything?

4    A.   No, sir.

5    Q.   Okay.  And you told him that you weren't taking their cars,

6    because they have two vehicles that were at the scene.

7    A.   Yes, sir.

8    Q.   And you said that you would help Louis get out of jail.  You

9    told him that.

10   A.   That I would try.

11   Q.   That you would try to help him get out of jail.  Right?

12   A.   Yes, sir.

13   Q.   Okay.  And in response to that, Mr. Charlton said, "Sure.

14   I'll work with you."  He was more than willing to; correct?

15   A.   Yes, sir.

16   Q.   Okay.

17   A.   This was --

18   Q.   And previous to that, it was your understanding and he

19   confirmed to you in the conversation in both the basement and

20   later on at the property room on Industrial Boulevard that he

21   had worked in the capacity of a confidential informant for

22   Detective Ruoff; correct?

23   A.   Yes, sir.

24   Q.   And an ATF officer, Special Agent Funke; correct?

25   A.   Yes, sir.

Carroll - Cross

1    Q.  All right.  And that that type of association that

2    Mr. Charlton had with those two officers wasn't ongoing.  It was

3    very, very recent to the time that you popped up.

4    A.  Sir, I couldn't -- I couldn't answer.  I don't know when

5    their time began and ended.

6    Q.  But for sure Mr. Charlton brought up their two names, you

7    know, when you were at the scene doing the search in his house,

8    like in the basement when you first started talking to him?

9    A.  Yes, sir.

10   Q.  And you remember making a specific statement to Mr. Charlton

11   that when you get out of custody -- basically, when you get out

12   of custody on my charge that came about from the result of the

13   search, you told him to call you and we'll get together and

14   we'll talk about working -- getting this all worked out.

15   A.  I think I believe I said we'll see what we can do.  Is that

16   correct?

17   Q.  You said call me and, what, I'll give you your cell phones

18   back?  Do you remember making that statement to him?

19   A.  Yes, sir.  About giving the cell phones, I can't remember

20   who I referred to giving them back to, but I remember something

21   along --

22   Q.  Okay.  But whole purpose was, when you get out, you need to

23   get ahold of me so we can work -- we can start talking about

24   working; right?

25   A.  Yes, sir.  This was the night of the search warrant.

1   Q.   Yeah, the first taped statement.

2   A.   Yes, sir.

3   Q.   Okay.  Now, the thing was that two days later Mr. Charlton

4   was still in jail; right?

5   A.   Yes, sir.

6   Q.   Okay.  And he called you from jail because he had your cell

7   phone number.

8   A.   Yes, sir.

9   Q.   And when he called you, you told him, "Let me see what I can

10  do"?

11  A.   Yes, sir.

12  Q.   All right.  And then did that phone call -- well, strike

13  that.  You decided to meet with him at the jail and record that

14  conversation as well?

15  A.   Yes, sir.

16  Q.   And you were accompanied by Detective Walker and Detective

17  Ruoff?

18  A.   Yes, sir.

19  Q.   And many of those same things that were discussed in the

20  first two conversations, the first one that was not recorded and

21  the second one that was recorded at the -- your office on

22  Industry came up in that second statement as well; correct?

23  A.   I'm not sure if anything in the second -- or in the first

24  recorded interview came up in the second recorded interview.

25  The names that he gave us from when we were at the residence

Carroll - Cross

1     came up in the second recorded interview.

2     Q.   Okay.

3     A.   Or nicknames.

4     Q.   In the second recorded interview, you remember having a

5     discussion about his concern about his wife's safety?  You

6     talked about that in the second recorded interview.  Remember

7     that?

8     A.   Yes.

9     Q.   Okay.  In the second recorded interview, do you remember

10    having a discussion with Mr. Charlton about the possibility of

11    him getting his television set returned to him?

12    A.   Yes, sir.

13    Q.   Okay.  You said you'd talk to your sergeant and the

14    prosecutor and see what you could do about that?

15    A.   I don't remember exactly who I said I would talk to, but I

16    did say --

17    Q.   Okay.  But there was some discussion --

18    A.   Talk about seeing.

19    Q.   -- with Mr. Charlton --

20    A.   Yes.

21    Q.   -- about getting his television back?

22    A.   Yes, sir.

23    Q.   Do you remember a statement being made to him to the effect

24    of we'll do what we can to get you out, get you out of custody?

25    A.   I remember saying we'll do -- we'll try and see what -- do

1   what we can.  I don't remember the exact quotes.

2   Q.  That's accurate.  And Mr. Charlton, on his behalf, in the

3   second recorded interview, he said that he was committed -- he

4   may not have used the words committed -- but essentially, his

5   statement to you, to Detective Ruoff and Detective Walker was

6   that I'm committed to work with the police?

7   A.  He wanted to work, yes, sir.

8   Q.  Right.  And when we talked about a specific individual to

9   work with, this man named Syl or Sylvester came up again in the

10  second recorded interview, did he not?

11  A.  Yes, sir.

12  Q.  Okay.  And from your understanding of what Mr. Charlton said

13  in the two preceding interviews was that Syl was his main

14  supplier?

15  A.  That's what I understood, yes, sir.

16  Q.  Okay.  So Syl was a source of the cocaine that Mr. Charlton

17  had in his house and had sold to others previously; right?

18  A.  Yes, sir.

19  Q.  And there was a discussion during that second recorded

20  interview of Mr. Charlton working some kind of deal involving

21  Syl that would be on the level of kilograms of cocaine; right?

22  Do you remember that part?

23  A.  I can't remember exactly who he said.  I do remember talking

24  about kilograms and Syl, but I can't remember if that's the

25  exact name he used.

1    Q.   Okay.  Well, you wouldn't -- let me ask it this way:  You

2    wouldn't disagree with me if the topic of Syl or Sylvester and

3    kilograms and working a case kind of came together in that?

4    A.   Correct.

5    Q.   Okay.  The information that Mr. Charlton gave you during the

6    first unrecorded interview, the second interview, and the third

7    interview, the second recorded interview, was that accurate as

8    far as you know?

9    A.   We never opened any investigations into any of the people

10   that he told us.

11   Q.   So you didn't try to substantiate what he was telling you?

12   A.   Some of the information that he had given us was my

13   understanding that the TFO at the time, Ruoff, some of this

14   information he had already been provided and it was stale

15   information.  So I did not open any other investigations into

16   the information he provided us.

17   Q.   The information he told you about his wife purchasing the

18   pistol, which was the pink pistol that was found at his

19   residence, I believe he said that she had bought that at

20   Stewart's Pawn Shop.

21   A.   I recall that, yes, sir.

22   Q.   You remember that?

23   A.   Uh-huh.

24   Q.   Okay.  Did you try to corroborate that information?

25   A.   I did not.

1   Q.  And would it seem -- from your knowledge of people that are

2   eligible to purchase firearms, would it seem unlikely for

3   Mr. Charlton to walk into Stewart's Pawn Shop and purchase a

4   firearm because of his status as a convicted felon?

5         MS. LAWLESS:  Objection, Your Honor.  May we approach?

6         THE COURT:  Yes.

7     (Bench conference on the record outside the hearing of the

8   jury.)

9         MS. LAWLESS:  I'm going to object on relevance and I'm

10  extremely confused.  Mr. Charlton's wife bought the gun at

11  Stewart's, and there's no evidence that she's prohibited from

12  purchasing firearms.  I'm not --

13        MR. SIMON:  I didn't say that she was.  All I was

14  saying --

15        MS. LAWLESS:  I'm going to object on relevance.

16        THE COURT:  I guess his question was that it would be

17  unlikely for Mr. Charlton to be able to walk in there.

18    I guess are you making the point that she bought it for him?

19        MR. SIMON:  No.

20        THE COURT:  Because he couldn't buy it himself?

21        MR. SIMON:  Well, the point is, what I was trying to

22  demonstrate is the information that he gave them about her

23  purchasing the gun would be likely true even though she didn't

24  even take any steps to corroborate it, because he couldn't walk

25  into a store -- I don't even know if she's capable of answering

 1    it from what her perplexed look was.  But he couldn't go into a

 2    store like Stewart's and legally buy a gun because he'd have to

 3    fill out federal forms and he'd never get one.

 4        So I was going to see whether or not she was going to try to

 5    determine whether or not the gun, the pink gun, was in fact

 6    purchased at Stewart's and follow up on it.

 7            MS. LAWLESS:  My point is it's irrelevant because

 8    there would no reason to follow up on it.  His wife is not a

 9    prohibited person.

10            THE COURT:  Well, I think you can address that on

11    redirect.  I mean, to the extent that you asked her did she

12    follow up on it to corroborate his information, I guess that's

13    fine, but I don't want to belabor that, since it's potentially

14    corroborating a legal act.  I mean, his wife -- you're not going

15    to suggest that his wife is a prohibited person?

16            MR. SIMON:  No, no, she's not.

17            THE COURT:  Okay.

18        (End of bench conference.)

19    BY MR. SIMON:

20    Q.  Let me ask, because on direct you seem -- by your answers to

21    Ms. Lawless's questions whether or not you had any conversations

22    with Mr. Charlton after the date of the second tape-recorded

23    statement that was on the 20th of November -- do you remember

24    speaking to Mr. Charlton after that day?

25    A.  No, sir.

Carroll - Redirect

```
 1    Q.  Okay.  You're saying you don't remember?  You just -- maybe

 2    you did or maybe you didn't or what?

 3    A.  No, I received phone calls, but I didn't -- I didn't speak

 4    to him.

 5    Q.  Okay.  So he continued to call you, but you didn't answer?

 6    A.  Yes, sir.

 7              MR. SIMON:  May I have a moment, Your Honor?

 8              THE COURT:  Yes.

 9              MR. SIMON:  Thank you.

10        (Mr. Simon conferring with defendant off the record.)

11              MR. SIMON:  No more questions on direct.  Thank you.

12                        REDIRECT EXAMINATION

13    BY MS. LAWLESS:

14    Q.  Detective Carroll, as far as you know, would it be illegal

15    for Mr. Charlton's wife to go to Stewart's and buy a gun?

16    A.  Not that I know of.

17    Q.  Pardon me?

18    A.  Not that I know of.

19    Q.  She's not a convicted felon, is she?

20    A.  Correct.

21    Q.  Okay.  So she could go to Stewart's and she could buy a gun?

22    A.  Yes, ma'am.

23    Q.  So do you usually go and try to investigate legal activity?

24    Would there be any reason to go check and see if she actually

25    bought the gun there?
```

1    A.   No, ma'am.

2            MS. LAWLESS:   Thank you.

3            THE COURT:   May the witness be excused?

4            MR. SIMON:   Just one question.

5                        RECROSS-EXAMINATION

6    BY MR. SIMON:

7    Q.   Would you think it would be a proper investigative act in

8    this situation to corroborate a statement made to you by an

9    individual like Mr. Charlton in that situation by going to

10   Stewart's and finding out if his wife in fact bought the gun at

11   that shop?

12   A.   What was your question again?  If it would be --

13   Q.   Would it be a reasonable thing for a police officer to do,

14   who was evaluating an individual for truthfulness and accuracy

15   in a statement that they gave to you, to go to corroborate the

16   information he gave you?

17   A.   I mean, I guess it could be, but at that point we -- the gun

18   was in his residence with the narcotics and that's kind of where

19   we ended it there.

20           MR. SIMON:   No more questions.

21           MS. LAWLESS:   Nothing further, Your Honor.

22           THE COURT:   Thank you.  You may step down.

23       I think at this point we'll take our last break for the day.

24   It is about a little past 3:30.  So we'll take about a 10- or

25   12-minute break at this point.  Remember the ongoing admonition

Frisby - Direct

```
 1    not to discuss the case.

 2         (Jury out 3:32 p.m.)

 3            THE COURT:  The jury is now outside the courtroom.

 4    Will you be ready with your next witness?

 5            MS. LAWLESS:  Yes, sir.

 6            THE COURT:  All right.  Thank you.  We'll be on a

 7    brief recess.

 8         (Recess at 3:33 p.m. until 4:01 p.m.  Jury out.)

 9            THE COURT:  All right.  I think we're ready for the

10    jury.

11            MS. LAWLESS:  Yes, sir.

12         (Jury in 4:02 p.m.)

13            THE COURT:  You may call your next witness.

14            MS. LAWLESS:  Thank you, Your Honor.  United States

15    calls Detective Chris Frisby.

16         (DETECTIVE CHRIS FRISBY, called by the Government, sworn.)

17                        DIRECT EXAMINATION

18    BY MS. LAWLESS:

19    Q.  Would you state your name for the record please and spell

20    your last name.

21    A.  Chris Frisby, F-R-I-S-B-Y.

22    Q.  By whom are you employed?

23    A.  Louisville Metro Police Department.

24    Q.  How long have you been with the Louisville Metro Police

25    Department?
```

1    A.   I was hired in 2010.

2    Q.   All right.  And did you have any law enforcement experience

3    or anything before that?

4    A.   No, ma'am.

5    Q.   What about your educational background?

6    A.   I graduated from Morehead State University with two

7    bachelor's degrees.

8    Q.   And what are they in?

9    A.   Political science and philosophy.

10   Q.   All right.  So for about the last seven years, is that about

11   right?

12   A.   Yes.

13   Q.   That you've been on.  We talked about this.  You joined in

14   2010, that you graduated maybe and were sworn --

15   A.   Yes, I was hired in 2010, and actually, my sworn date was

16   January 2011.

17   Q.   So six years, just a little over six years?

18   A.   Correct.

19   Q.   Okay.  Would you just briefly tell the ladies and gentlemen

20   of the jury what your positions or assignments at LMPD have

21   been.

22   A.   Yes.  Graduating the academy, I was a PTO, where I worked in

23   the Sixth Division in the --

24   Q.   What does that mean?

25   A.   Training -- I was a training officer.  That's basically when

1    you're out of academy, you're new and you got to learn the job,

2    so you have an officer that trains you.  I was in the Sixth and

3    the Second Division, and you're on probation for a year.  So

4    after the year you go solo, which means you ride a beat.

5        And I was in the Second Division until 2014, and I applied

6    for VIPER for a detective position.  I was granted that.  I

7    became a detective in December 2014 and was in the same unit

8    since then.  We have been renamed Ninth Mobile Division.

9    Q.  Okay.  Do you have any other duties other than being a

10   detective with the Ninth Mobile?

11   A.  No, just a detective with Ninth Mobile.

12   Q.  Okay.  All right.  I think I was mistaken.  I thought maybe

13   you did -- you don't do S.W.A.T?

14   A.  No, ma'am.

15   Q.  Okay.  Sorry about that.  All right.  So you've been with

16   Ninth Mobile since -- or S.W.A.T -- or not S.W.A.T.

17   A.  VIPER.

18   Q.  Let me get my acronyms right, VIPER and Ninth Mobile, which

19   is essentially the same thing, for how long?

20   A.  I believe it was December of 2014.

21   Q.  Okay.  So if you can come forward from there with us to

22   November of 2015.  You were assigned to the Ninth Mobile at that

23   point; correct?

24   A.  Yes, yes.

25   Q.  And were you involved in the execution of a search warrant

Frisby - Direct

1    at the home of the defendant, Louis Charlton?

2    A.   Yes.

3    Q.   Okay.  Would you tell the ladies and gentlemen of the jury

4    please what your responsibilities were that evening.

5    A.   Yes.  As S.W.A.T executed the warrant, my responsibility was

6    I was in the rear alley of the house, just in case there was

7    anybody that ran from the location, just to cover the back.

8    Q.   All right.  And after you knew that entry had been made,

9    what did you do at that point in time?

10   A.   Once the house was secure, I went into the living room

11   through the front door.  And at that point I noticed in plain

12   view some evidence.

13   Q.   All right.  And they've heard some testimony from other

14   people about how items are logged and things of that nature.  So

15   we're going to go through some items here that indicate on the

16   log that you were responsible for recovering them.  And we've

17   talked before to go over these items as well, haven't we?

18   A.   Yes.

19          MS. LAWLESS:  Your Honor, may I approach the witness?

20          THE COURT:  Yes.

21   BY MS. LAWLESS:

22   Q.   We'll start with those.  Detective, if you would please take

23   a look at the exhibits that I just laid up there.  They've been

24   previously marked as Exhibits 1 and -- I think it says 51.  Do

25   you see those items?

1    A.  Yes, I do.

2    Q.  How do you recognize them?

3    A.  I observed both handguns as I entered the living room of the

4    house.

5    Q.  And are you the person that recovered these items?

6    A.  I was.

7    Q.  Okay.  All right.  And we've looked at pictures before

8    together as well.  So I'm going to ask you to take a look at

9    these and have you explain to the ladies and gentlemen of the

10   jury where it is maybe.  This is United States Exhibit 18.  Can

11   you tell us what we see?

12   A.  Yes.  When you walk in the front door, directly in the door

13   there was a table and to the left there was a couch.  And to the

14   left is -- there was baggies, sandwich baggies, the brown bag

15   which had money, U.S. currency in it.  And then to the right of

16   that is the handgun, the black and silver handgun that was

17   underneath the couch.

18   Q.  Okay.

19   A.  Along with the green --

20   Q.  I'm sorry.

21   A.  -- yes, the green Crown Royal bag that had cocaine or crack

22   in it.

23   Q.  Okay.  This is a different -- it's a little farther out.  I

24   think I messed up and should have started with United States

25   Exhibit 14.  That gives us a little view farther out.

1      So this is that living room area that you were just talking

2   about and some of the items that we're going to discuss with the

3   jury that you were responsible for.  You mentioned this --

4   that's not a good color.  That's so dark -- right there and that

5   was in the other picture.  Is that what has been marked as

6   United States Exhibit 1?

7   A.  Yes, that is the gun.

8   Q.  Okay.  And then what was marked as United States Exhibit

9   51 -- let's take a look at United States Exhibit 16 that was

10  previously introduced.  What do we see there in the middle of

11  that table?

12  A.  Yes, that is the pink and black 9mm handgun on the living

13  room table.

14  Q.  And was that United States Exhibit 51 that you looked at a

15  few minutes ago when you were on the witness stand?

16  A.  Yes, it's the exact same gun.

17  Q.  Going back to United States Exhibit 16, you talked about

18  what you saw there.  You can see this from here, can't you?

19  A.  Yes.

20  Q.  Okay.  Can you tell us what this is, please.

21  A.  That is a green Crown Royal bag.

22  Q.  All right.  And that's marked as United States Exhibit 53.

23  Can you just point -- I think if you just tap with your

24  finger -- tell us if you see that in the picture, where we see

25  that in the picture.

Frisby - Direct

1    A.  Yes, it's to the left -- by the -- between the coffee table

2    and the couch.  It's right beside of the chip bag, just --

3    Q.  Is that where you're talking about, right there, where I

4    just put those two pink arrows?

5    A.  Yes, right in front of the brown bag with the money inside.

6    Q.  Okay.  And the jury's also heard evidence about how money is

7    handled and that we don't have it here today.  So we've got

8    United States Exhibit 16 there.

9         And you talked about a paper bag.  This is United States

10   Exhibit 23.  Can you tell us where in this -- in the first

11   picture do we see the bag that is closer up?

12   A.  Yes, it's right there beside of the couch.

13   Q.  All right.  And you were responsible for recovering that as

14   well?

15   A.  Yes.

16   Q.  Okay.  Going back to the wider out view in United States

17   Exhibit 14 --

18        MS. LAWLESS:  May I approach again, Your Honor?

19        THE COURT:  Yes.

20   BY MS. LAWLESS:

21   Q.  You want to hold them?

22   A.  Okay.

23   Q.  Talking back just a second again about the Crown Royal bag,

24   could you tell the ladies and gentlemen of the jury what was

25   inside the Crown Royal bag?

1    A.  U.S. currency.

2    Q.  The Crown Royal bag?

3    A.  Oh, no.  I'm sorry.  The Crown Royal bag had cocaine inside.

4    Q.  Okay.  Were there a couple of different things in there?

5    A.  I believe there were.  There was a bigger bag of crack or

6    cocaine and some smaller.

7    Q.  Okay.  So there were two -- actually two things that were in

8    there that were submitted to the lab for testing?

9    A.  I believe so, yes.

10   Q.  Is that right?  Okay.  And that's United States Exhibit 54

11   that you found in this Crown Royal bag?

12   A.  Yes.

13   Q.  Right?  And in the picture that was there just a minute

14   ago -- again, sorry, United States Exhibit 14 -- we see

15   something here at the end.  Is that what you just looked at as

16   United States Exhibit 52, you were responsible for recovering

17   that item as well?

18   A.  Yes.

19   Q.  Okay.  And it's what?  Do you remember how it was described?

20   A.  It had marijuana inside.

21   Q.  Just a jar that had some shake or residue, is that right,

22   inside of it?

23   A.  Yeah, it had, yeah, marijuana inside, yes, ma'am.

24   Q.  Okay.  And the other two things that I asked you about,

25   Detective, we don't really see in the pictures here but you're

Frisby - Direct

```
 1    listed on there as recovering.  One is United States Exhibit 55,
 2    a Motorola cellular telephone, and 56 is the ZTE.  Did you
 3    recover these items during the search of the living room that
 4    evening as well?
 5    A.  The two phones there in the living room, I would need to
 6    check the log to make sure.  I can't recall exactly.
 7    Q.  Do you want to see the log?
 8    A.  Yes.
 9    Q.  If it says you --
10    A.  Yes.
11    Q.  -- on the log --
12    A.  Yes.
13    Q.  -- then you were the person who collected them?
14    A.  Absolutely.
15    Q.  And they came from where?
16    A.  It would be in the living room.
17    Q.  Okay.  Now, during the execution of the search warrant, did
18    you have any direct contact with Mr. Charlton?
19    A.  I did not.
20    Q.  So you weren't involved in his interview or anything like
21    that?
22    A.  No.
23    Q.  And were you involved with the controlled purchase earlier
24    that evening?
25    A.  No.
```

1     MS. LAWLESS:  Those are all the questions I have, Your

2  Honor.

3          THE COURT:  Mr. Simon.

4          MR. SIMON:  No questions.  Thank you, Detective.

5          THE COURT:  All right.  Thank you.  You may step down.

6     Are you ready with your next witness?

7          MS. LAWLESS:  Yes, sir.  Detective Chad Stewart.

8     (DETECTIVE CHAD STEWART, called by the Government, sworn.)

9                     DIRECT EXAMINATION

10  BY MS. LAWLESS:

11  Q.  Would you state your name for the record please and spell

12  your last name.

13  A.  Detective Chad Stewart, S-T-E-W-A-R-T.

14  Q.  By whom are you employed?

15  A.  Louisville Metro Police Department.

16  Q.  And what's your position with LMPD?

17  A.  I'm a detective with the Ninth Mobile Division.

18  Q.  How long have you been on with LMPD?

19  A.  I've been with LMPD since 2008.

20  Q.  Okay.  So did you have any law enforcement experience before

21  that or is this your first law enforcement job?

22  A.  I was a corrections officer with Kentucky Department of

23  Corrections.

24  Q.  Okay.  And how long were you with them?

25  A.  Approximately two-and-a-half years, I believe.

Stewart - Direct

1    Q.   Okay.  Now, Detective Stewart, how long -- what is your

2    current assignment?

3    A.   Currently I'm a major case detective with the Ninth Mobile

4    Division.

5    Q.   All right.  And they've heard about that.  How long have you

6    been in the Ninth Mobile Unit?

7    A.   I've been in the Ninth Mobile -- it transferred to the Ninth

8    Mobile, I believe, two years.  It was VIPER before that.

9    Q.   Were you in VIPER before it was --

10   A.   I was.  Since 2012, yes, ma'am.

11   Q.   Okay.  Since 2012?

12   A.   Correct, ma'am.

13   Q.   All right.  So you've been working in that major crimes unit

14   for now about five years?

15   A.   Correct, ma'am.

16   Q.   Right around there.  Okay.  And what did you do before that

17   with LMPD?

18   A.   I was a patrol officer in Louisville -- in LMPD's First

19   Division.  I rode the Portland area.

20   Q.   Now, Detective Stewart, I'm going to ask you to think back

21   with us back to November 16th of 2015.  Were you involved in the

22   execution of a search warrant at Louis Charlton's home?

23   A.   Yes, ma'am.

24   Q.   Okay.  And what was your responsibility that evening in

25   executing the warrant?

1   A.   Mainly what I did, initially I stood out on the front porch

2   with Mr. Charlton and his family.  At one point I searched

3   Mr. Charlton outside on the porch, and then there were other

4   detectives that took him in the house.  I then came in and

5   assisted with filling out things on the log and trying to

6   organize some property.

7   Q.   Okay.  When you conducted the search of Mr. Charlton, did

8   you find anything on him that you-all seized as evidence?

9   A.   Yes, ma'am, we found a large amount of U.S. currency.

10  Q.   And the jury's already heard about how money gets handled.

11  You didn't count it that night, did you?

12  A.   No, ma'am, I did not.

13  Q.   But tell us what you did.

14  A.   I would have -- I took the money out of his -- out of his

15  pocket and then took it to our log person and made sure that it

16  was put into an evidence bag and sealed.

17  Q.   Okay.  And when you took it out of his pockets, just can you

18  tell us where on his body?  What kind of pockets are we talking

19  about?

20  A.   I believe it was pants pockets.  I believe there was money

21  in each side.

22  Q.   Okay.  And you mentioned that you also helped with the

23  search inside the house?

24  A.   Yes, ma'am.

25  Q.   In the living room area; is that right?

1   A.  Yes, ma'am.

2   Q.  Or was it somewhere else?

3          MS. LAWLESS:  Your Honor, may I approach?

4          THE COURT:  Yes.

5   BY MS. LAWLESS:

6   Q.  Detective, you talked a little bit about how the logs are

7   kept.  What is that that you have there in your hand?

8   A.  This is a small Samsung cellular phone.

9   Q.  And do you recognize that?

10  A.  Yes, ma'am.

11  Q.  Can you tell us where -- how it is that you recognize it?

12  A.  This is one of the phones that I found that was in the

13  living room area.

14  Q.  All right.  And you seized that at the time of the search

15  warrant?

16  A.  Yes, ma'am.

17  Q.  Okay.  Were you involved at all, other than when you were

18  with Mr. Charlton and you said his family out on the front

19  porch?  Is that right?

20  A.  Yes, ma'am.

21  Q.  Did you interview him at that time or ask him any

22  questions --

23  A.  No, ma'am.

24  Q.  -- or anything?  And we know that he was interviewed a

25  little bit later on.  Were you involved in that at all?

 1   A.   No, ma'am.

 2          MS. LAWLESS:  Okay.  Those are all the questions I

 3   have, Your Honor.

 4          THE COURT:  Mr. Simon.

 5          MR. SIMON:  No questions.  Thank you, Detective.

 6      By the way, what number was that phone?

 7          MS. LAWLESS:  Fifty-seven.

 8          THE COURT:  Thank you.  You may step down.

 9          THE WITNESS:  Thank you.

10          THE COURT:  You may call your next witness.

11          MS. LAWLESS:  Yes, sir.  Detective Tyler Holland.

12      (DETECTIVE TYLER HOLLAND, called by the Government, sworn.)

13                      DIRECT EXAMINATION

14   BY MS. LAWLESS:

15   Q.   Would you please state your name for the record and spell

16   your last name.

17   A.   Robert Tyler Holland, H-O-L-L-A-N-D.

18   Q.   And by whom are you employed?

19   A.   Louisville Metro Police.

20   Q.   How long have you been with the Louisville Metro Police?

21   A.   Six years.

22   Q.   Did you have any law enforcement experience or special

23   training with law enforcement before that?

24   A.   No, ma'am.

25   Q.   Okay.  This is your first law enforcement job?

Holland - Direct

1    A.  Yes.

2    Q.  All right.  Do you have any educational background with

3    regard to criminal justice or anything like that?

4    A.  Yes.

5    Q.  Would you tell the jury about that.

6    A.  Sure.  An associate's degree from Jefferson Community

7    College in law enforcement.

8    Q.  Okay.  When you got hired on with LMPD, what was your

9    initial assignment?

10   A.  I was in patrol in the Fourth Division.

11   Q.  How long did you stay there?

12   A.  Three years.

13   Q.  Okay.  And after you left that what did you do?

14   A.  Now with the Ninth Mobile, which is a violent crimes unit,

15   and I've currently been there for three years as well.

16   Q.  So were you there -- and they've heard the acronym before

17   about VIPER.  Was it still VIPER when you started?

18   A.  Yes.

19   Q.  But you've stayed on and it's been renamed; correct?

20   A.  Yes, now it's Ninth Mobile, yes, ma'am.

21   Q.  Detective Holland, if you would, think back with us please

22   to November 16th, 2015.  Were you involved in helping execute a

23   search warrant with the Mobile Ninth Unit?

24   A.  Yes.

25   Q.  All right.  And on Mr. Charlton's home?

1    A.  Yes.

2    Q.  Tell us, would you, what your responsibilities were with

3    regard to carrying out that search warrant.

4    A.  Sure.  My responsibilities were to find evidence and search

5    the residence.

6    Q.  Okay.  And were you on the entry team or tell us how -- when

7    did you go in?  Were you right when they hit the door?

8    A.  So after the S.W.A.T team executed the search warrant, we

9    came in after and -- after everybody was secure and we searched

10   the house.

11           MS. LAWLESS:  Okay.  Your Honor, may I approach?

12           THE COURT:  Yes.

13           THE WITNESS:  Yes, ma'am.

14   BY MS. LAWLESS:

15   Q.  The jury's heard testimony about logs and gathering of

16   evidence and what have you, and I just handed you four things,

17   two pictures and two items.  Have you seen those before,

18   Detective?

19   A.  Yes.

20   Q.  All right.  Let's look at this first one, United States

21   Exhibit 24.  Can you tell us what we're looking at there, what

22   that's a photo of?

23   A.  Sure.  It's a spoon with cocaine residue on it.

24   Q.  Okay.  And United States Exhibit 58 -- there's a --

25   A.  Yes, that's also --

1   Q.  -- there's a glare.  I think that's what was causing that.

2   Is that actually the spoon that's wrapped up --

3   A.  Yes, ma'am.

4   Q.  -- picture was taken of?  Why would you seize this?  What's

5   the significance of a spoon?

6   A.  In my training and experience, seeing that, commonly people

7   will -- drug users will melt down the cocaine substance before

8   they inject it to be used, but a spoon is used to actually cook

9   the cocaine or the narcotic on the spoon.

10  Q.  Okay.  So you can actually cook powder into crack, is that

11  what you're saying?

12  A.  Yes.

13  Q.  Is part of it?

14  A.  Yes.

15  Q.  And then other uses have to do with use of narcotics, not

16  necessarily preparation?

17  A.  Right.

18  Q.  Okay.  If you'll take a look at United States Exhibit 22 and

19  then tell us what that is with United States Exhibit 59.

20  A.  It's a digital scale.

21  Q.  Where did you recover the digital scale?

22  A.  It was on the floor in the living room.

23  Q.  Okay.  So you pulled it out?

24  A.  Yes.

25  Q.  This come out?  I don't want to break it.  It slides.

1      Okay.  I can't get it to open.  You found this -- it looks

2   like it was that way up.  So what would we see here if it was

3   actually turned on, right there?

4   A.   Like numbers and the measurements and things like that?

5   Q.   So you put things on it, press buttons, and it tells you how

6   much stuff weighs; correct?

7   A.   Yes.

8   Q.   And these were items that you recovered also from the living

9   room?

10  A.   Yes, ma'am.

11  Q.   Detective Holland, did you have any direct dealing with

12  Mr. Charlton at all during the execution of the warrant?

13  A.   No.

14          MS. LAWLESS:  Those are all the questions I have, Your

15  Honor.

16          THE COURT:  Any questions, Mr. Simon?

17          MR. SIMON:  Just a minute, please.

18     (Mr. Simon conferring with defendant off the record.)

19                       CROSS-EXAMINATION

20  BY MR. SIMON:

21  Q.   Detective Holland, just a question or two.

22  A.   Sure.

23  Q.   Had you ever had any contact with Mr. Charlton prior to

24  November 16th, 2015 --

25  A.   No.

1    Q.  -- to your memory?

2    A.  No, sir.

3    Q.  You don't remember him at all?

4    A.  I rode that area.  That was the area I patrolled when I was

5    in patrol, but, no, I don't recall him.  I mean, it's possible

6    we made runs.  That area is very, very busy.  But, no, not to my

7    recollection, no, sir.

8              MR. SIMON:  That's all I have.  Thank you.

9              THE WITNESS:  Thank you, sir.

10             MS. LAWLESS:  No further questions, Your Honor.

11             THE COURT:  Thank you.  You may step down.

12             MS. LAWLESS:  Special Agent Brad Leveritt.

13        (SPECIAL AGENT BRAD LEVERITT, called by the Government,

14   sworn.)

15                       DIRECT EXAMINATION

16   BY MS. LAWLESS:

17   Q.  Would you state your name for the record please and spell

18   your last name.

19   A.  It's Bradley Leveritt.  That's L-E-V, as in Victor,

20   E-R-I-T-T.

21   Q.  By whom are you employed?

22   A.  I'm a supervisory special agent for the Bureau of Alcohol,

23   Tobacco, Firearms.  I'm stationed here at the Louisville Four

24   Field Office.

25   Q.  Tell us a little bit about your educational and professional

1    background, Special Agent Leveritt.

2    A.  I have a Bachelor's Degree in Russian Language and

3    Literature from Ohio State University.  I attended the ATF

4    National Academy basic training course in 1999.  I've been

5    employed and worked in the Louisville field office since then.

6        And some of my other duties also include determinations of

7    firearms.  So I've been to the interstate nexus course, the

8    advanced interstate nexus and ammunition course, and I've also

9    toured some of the factories for ammunition and firearms

10   throughout the country.

11   Q.  Okay.  Let's talk about that a little bit.  So you have --

12   you went to college.  Did you work any law enforcement before

13   you got hired on with ATF?

14   A.  Yes.  I was a special agent for the Ohio Attorney General's

15   Office prior to becoming a special agent with ATF.

16   Q.  So you had some law enforcement experience before coming on

17   with the federal agency?

18   A.  Yes, I did.

19   Q.  All right.  And you talked about a basic agent training.

20   About how long does that take, your basic agent training class?

21   A.  The basic agent training from start to finish is

22   approximately six months.

23   Q.  All right.  And that teaches you about enforcing the --

24   what?

25   A.  Enforcing criminal laws mainly regarding firearms, but we

1   also -- it also encompasses arson, explosives, and some of

2   the -- like the tax and trading bureau information for like

3   cigarettes and alcohol, things like that, but primarily we focus

4   in ATF as a special agent dealing with firearms-related crimes.

5   Q.  And then you mentioned something in there as well about even

6   more specialized training that has to do with interstate nexus.

7   Would you tell the ladies and gentlemen of the jury what that

8   involves.  Well, first of all, what does "interstate nexus"

9   mean?

10  A.  Well, the interstate -- nexus, basically, is just -- in

11  layman's terms is it's going to have to affect one state or one

12  country.  So in the United States, interstate would be a

13  commodity or good that's either taxed or tariffed coming in the

14  United States that's manufactured here or from outside of the

15  United States.  So it could be originated in one state and then

16  moved into another state.  So it would have crossed state lines.

17      And then as far as the -- what you're saying the nexus, the

18  nexus just basically means how it ties together.  So in some

19  way, shape, or form, it's going to affect commerce or money,

20  which the government has a regulation and congressional

21  authority over.

22  Q.  Okay.  Now, this isn't just something that ATF trains you on

23  about how everything moves from state to state.  Is it a more

24  focused kind of training that you learn about?

25  A.  No, in the academy they do -- they do touch on certain

1    things and they try to make you a generalist.

2         Later in your career you can choose to become an interstate

3    nexus examiner, which I did in 2006, which really focuses more

4    on specifically being able to identify firearms based on

5    manufacturers, how they're built, where they're made,

6    specifically identifying serial numbers, make, model, caliber,

7    the determinations as far as it actually defining -- is it a

8    long gun?  Is it a handgun?  Is it an explosive device?  Is it a

9    machine gun?  Things like that.  So that course runs about a

10   week long at our National Tracing Center in West Virginia.

11        Then to build upon the basic course, as I said earlier, they

12   have follow-on courses to really hone you in further.  So you

13   can take the factory tours and actually build upon your platform

14   to go to the manufacturer itself and see how each one of the --

15   each one of the manufacturers makes their firearms.  And there

16   are differences and similarities in regards to -- depending on

17   like -- if it's, like, a Smith & Wesson or a Glock,

18   manufacture -- how they do it, where these plants are located.

19        And then the same thing, the training is also follow-on.  We

20   go into ammunition.  So we visit, like, Winchester, Speer to see

21   how they make theirs, look at their headstamps, and get a better

22   understanding of not just here's an item.  In many cases, now I

23   can say I've been to the actual plant where that item was

24   manufactured.  So I know a lot more about it than a normal agent

25   would.

1   Q.   Okay.  You mentioned that you are an interstate nexus,

2   you've been specially trained for that within ATF.  What does --

3   what does that help you or what does that allow you to do within

4   your agency?

5   A.   Interstate nexus examiners are the only individuals in ATF

6   that are actually able to write a completed report for the

7   agency or case specific that is accepted by the court and that

8   the court has due diligence to show you that you're an expert in

9   that particular field.

10      So a regular agent can't just take a look at a firearm and

11  make a determination and say, well, here's where it's made.

12  They don't have that specialized training.  An interstate nexus

13  examiner actually has to do it, such as myself, to determine all

14  these factors to complete a record for the court to be presented

15  to the U.S. Attorney's Office.

16  Q.   Did you do that in this case?

17  A.   Yes, I did.

18           MS. LAWLESS:  May I approach, Your Honor?

19           THE COURT:  Yes.

20  BY MS. LAWLESS:

21  Q.   Special Agent Leveritt, if you would take first what's been

22  marked United States Exhibit 1.  It's the .45.  Have you seen

23  that before?

24  A.   Yes, I have.

25  Q.   And did you examine that firearm before and do the research

1   and render an opinion about where it was manufactured?

2   A.  Yes.  Specifically I can't remember the date, but it wasn't

3   long after it was brought into evidence at the ATF office that I

4   examined Exhibit Number 1, which is the Springfield Armory XD

5   .45 caliber pistol.

6   Q.  Okay.  What can you tell us about that?  Is that a firearm

7   under federal law?

8   A.  Yes.  Under federal law that this is a firearm, which the

9   definition federally for a firearm is that any weapon that can,

10  will, or can be readily converted to expel a projectile, which

11  would be a bullet, through the means of an explosive, or the

12  frame or receiver of that particular weapon.

13     So in all reality, if I were to take the slide off of this

14  particular weapon, it would still be considered a firearm,

15  because all of the working mechanism is actually on the inside

16  of the frame.

17  Q.  But you have an intact firearm, basically?

18  A.  But I have a complete firearm here as Exhibit 1, yes.

19  Q.  Was Exhibit 1 manufactured here in the Commonwealth of

20  Kentucky?

21  A.  No, this firearm was not manufactured in the Commonwealth of

22  Kentucky.  This firearm was actually manufactured in Croatia, a

23  country in Eastern Europe.

24  Q.  Okay.  And if you would please take a look at -- I think I

25  wrote down the wrong number -- the 9mm.  Can you tell me what

1    exhibit number is on that one?

2    A.   It appears to be Exhibit 51.

3    Q.   Thank you.  And tell us about that firearm, please.

4    A.   Yes.  This firearm, the manufacturer is called SCCY and it

5    is a 9mm.  And this firearm was also determined -- well, not

6    also.  It was determined that this was manufactured in Florida,

7    Daytona Beach, Florida.

8    Q.   So it was not manufactured in the Commonwealth of Kentucky?

9    A.   It was not manufactured in the Commonwealth of Kentucky.

10   Q.   And for the reasons that you talked about before, the

11   definition under federal law of a firearm, is that, what you

12   have in your hand with the pink handle, a firearm?

13   A.   Yes.  Exhibit 51, the pink-handled firearm or Exhibit 51

14   would also meet the definition of a firearm federally.

15   Q.   All right.  Special Agent Leveritt, you mentioned earlier

16   that you recently became a supervisor; is that right?

17   A.   Yes, January I was promoted to the group supervisor in group

18   four.

19   Q.   What's group four?

20   A.   We have two criminal groups and an intelligence group, and

21   then we have a regulatory group.  So they're just broken down as

22   far as -- the criminal groups are broken down number-wise as one

23   and four, the intelligence group is number three, and the

24   regulatory group is two.

25   Q.   All right.

1    A.  So it just all kind of depends on how they morph into

2    existence.  Group four was actually the last group to come into

3    existence here in Louisville.

4    Q.  Before you were promoted to your supervisory position, what

5    were your responsibilities -- we don't have to talk about the

6    interstate nexus -- but what were you doing before your

7    promotion?

8    A.  I was doing basic criminal investigations within Louisville,

9    specializing in violent crime and narcotics cases.  And then as

10   this interstate nexus -- as far that is -- as far as my duties

11   with the interstate nexus, that is not a full-time duty.  I'm

12   actually an investigator full-time and this is just a

13   supplemental duty.

14       So as the firearms come in for other agents or maybe other

15   offices throughout the field division, which we cover Kentucky

16   and West Virginia, I may be asked to look at their firearms for

17   them and make a determination for the court.

18   Q.  November of 2015, what kinds of things were you working on

19   in the office?  And specifically did you become involved in an

20   investigation that concerns Louis Charlton?

21   A.  Yes.  During the fall of -- I'm sorry.  Fall of --

22   Q.  2015.

23   A.  -- 2015, majority of the special agents in both groups,

24   Louisville group one and four, which are the criminal

25   enforcement groups, were working a detail within the city with

1    the police department on trying to combat violent crime.  So

2    there was 30-day period where we were working jointly together

3    on the streets every day and every night trying to get firearms

4    off the streets or locate narcotics dealers and try to make some

5    arrests.

6    Q.  Have you been involved in investigations that concern

7    controlled substances as well or do you only do firearms?

8    A.  No, I have -- I have a pretty good background in narcotics

9    investigations related to violent crime and firearms.

10   Q.  So in the fall -- you're talking about being -- working real

11   closely with LMPD.  What was the name of that operation that

12   you-all were involved in?

13   A.  That operation was called Operation Hover.  I'm trying to

14   remember the exact acronym, but I think it was --

15   Q.  That's okay.  We've heard about Hover before, unless you

16   just want to tell us.

17   A.  No, no.  If you've heard it, that's fine.

18   Q.  And did you become involved specifically in that bigger

19   investigation -- or operation with the investigation of

20   Mr. Charlton?

21   A.  Yes, I did.  I was involved with the police department and

22   other agents from my office regarding the search warrant that

23   evening.

24   Q.  Okay.  Tell us what your involvement with the specific

25   investigation with Mr. Charlton was.

1    A.  Well, specifically, I was asked to make the determinations

2    on the firearms, which I did.  But during that time, I was

3    essentially the second in charge, because I actually had a

4    supervisor at the time, but I was the senior agent that was

5    responsible for maintaining the management of the other agents

6    that were working with the police department.

7        So I was overseeing several of the other things that were

8    going on that day, that evening, or during that 30-day period

9    for these types of activities.  So, in essence, I was in charge

10   of Operation Hover on the street level, just not managerially in

11   charge of it.

12   Q.  But with regard to Mr. Charlton, did you go out with any law

13   enforcement on that particular investigation?

14   A.  Yes.  I was involved with the original -- the original

15   surveillance, the identification, the purchase of some

16   narcotics.

17   Q.  Okay.

18   A.  And then the subsequent --

19   Q.  That's where I was trying to get us.

20   A.  And the subsequent search warrant, yes.

21   Q.  Were you part of the team involved with the controlled

22   purchase from Mr. Charlton?

23   A.  In surveillance role only, but, yes, I was out there with

24   the team.

25   Q.  Okay.  After the controlled -- could you hear what was going

1   on?

2   A.  Yes, I could hear what was going on on the radio.

3   Q.  All right.  So you were aware of the fact that a

4   confidential informant, Mr. LaGantta, bought a half ounce of

5   what was supposed to be crack cocaine?

6   A.  Yes.

7           MS. LAWLESS:  Okay.  May I approach, Your Honor?

8           THE COURT:  Yes.

9   BY MS. LAWLESS:

10  Q.  Do you recognize that?

11  A.  I do recognize Exhibit 4.

12          MR. SIMON:  What's the number, please?

13  Q.  And the ladies and --

14          THE COURT:  He said it was 4.

15          MS. LAWLESS:  I'm sorry.

16  BY MS. LAWLESS:

17  Q.  With regard to United States Exhibit 4 -- and the jury has

18  heard a little bit about this earlier about how field tests are

19  conducted or what have you -- could you tell -- were you

20  involved in the field testing of the controlled substance that

21  was purchased?

22  A.  Yes, I was involved with the field testing, which is what

23  you would see, the blue packet off to the right side there,

24  which is the blue color which indicated that it was positive for

25  controlled substance for cocaine.  And, actually, that is my

 1   handwriting in regards to the address of where the purchase took

 2   place, the date, what the substance that was tested for, and who

 3   the subject was that we purchased the narcotics from.

 4          MS. LAWLESS:  I don't have any further questions, Your

 5   Honor.

 6          THE COURT:  Mr. Simon.

 7          MR. SIMON:  No questions.  Thank you.

 8          THE COURT:  Thank you.  You may step down.

 9          MS. LAWLESS:  Your Honor, I have two more witnesses

10   that are not terribly long.  I have one here and then I will ask

11   the court's indulgence, for the reasons that I explained

12   earlier, to put on our last witness in the morning.

13          THE COURT:  All right.

14          MS. LAWLESS:  Would you like me to go ahead at this

15   point?

16          THE COURT:  Yes.

17          MS. LAWLESS:  Special Agent Hayes, please.

18          THE COURT:  While Special Agent Hayes is coming in, if

19   I could see the lawyers at the bench just for a minute.

20      (Bench conference on the record outside the hearing of the

21   jury.)

22          THE COURT:  Where are we on the stipulation?

23          MS. LAWLESS:  He signed it.

24          MR. SIMON:  He signed it.

25          THE COURT:  He signed it.  So at what point do you

Hayes - Direct

```
 1    want to address that with the jury?
 2              MS. LAWLESS:  I usually --
 3              THE COURT:  Do you-all have an agreement on that?
 4              MS. LAWLESS:  I usually do it at the very, very end.
 5    I usually do it at the very last thing.
 6              THE COURT:  That's fine with me.
 7              MR. SIMON:  I have no problem with that.  That's fine.
 8         (End of bench conference.)
 9         (SPECIAL AGENT DAVID HAYES, called by the Government,
10    sworn.)
11                        DIRECT EXAMINATION
12    BY MS. LAWLESS:
13    Q.  Would you state your name for the record please and spell
14    your last name.
15    A.  Yes, ma'am.  My name is David Hayes, H-A-Y-E-S.
16    Q.  By whom are you employed?
17    A.  I'm employed as a special agent with the Bureau of Alcohol,
18    Tobacco, Firearms & Explosives in Bowling Green, Kentucky.
19    Q.  Special Agent Hayes, would you tell the ladies and
20    gentlemen -- first of all, did you have any personal, direct
21    involvement in the investigation of Mr. Charlton?
22    A.  No, ma'am, I didn't.
23    Q.  Okay.  So let's talk about your background.  Would you tell
24    us a little bit about your educational background, please.
25    A.  My educational background, I have Bachelor of Arts from
```

1    Western Kentucky University.  I graduated in 1987 and then have

2    some continuing college hours after that.

3    Q.  All right.  What was your job initially after college?

4    A.  Initially after college, I was a police officer in

5    Owensboro, Kentucky, started in 1989 and was there approximately

6    three years.

7    Q.  From Owensboro Police Department, what was your next career

8    step?

9    A.  My next career, I became a special agent with the Bureau of

10   Alcohol, Tobacco & Firearms, and I was assigned to the office in

11   Cleveland, Ohio.

12   Q.  How long have you been with ATF?  I was trying to do the

13   math in my head and I lost count.

14   A.  I've been with ATF for 26 years.

15   Q.  Okay.  During the course of the time that you've been with

16   ATF and actually going back to when you were on the Owensboro

17   Police Department, what kinds of investigations were you

18   involved with in Owensboro?

19   A.  Actually, I was in patrol.  We did a little bit of

20   everything.  Routine patrol was the assignment that we did.

21   Q.  Okay.  And then when you got hired on with ATF -- and you

22   said you were originally in Cleveland --

23   A.  Yes, ma'am.

24   Q.  -- is that correct?  Would you tell us about your experience

25   there.  How did you start out with ATF and the kinds of things

 1    that you were working on.

 2    A.  When I started in Cleveland, we were actually in a group

 3    that did a little bit of everything, but primarily our group

 4    focused on the firearms trafficking and narcotics as it relates

 5    to firearms trafficking.  So in that group, I began doing

 6    undercover work with that group and working, basically,

 7    narcotics cases that had firearms associated with them.

 8    Q.  So give us an idea of how long within this law enforcement

 9    career you've been working on drugs and gun cases.

10    A.  For, basically, the last 26 years.  My entire time with ATF

11    has been spent with narcotics and firearms investigations.

12    Q.  And you said that you're in the Bowling Green office, but

13    it's here in the Western District of Kentucky; is that right?

14    A.  That's correct.

15    Q.  Are you part of the same Kentucky bigger ATF field office?

16    Is that what it's called?

17    A.  The field office, yes, we're in the Louisville field office.

18    Q.  Would you tell the ladies and gentlemen of the jury the

19    kinds of investigations that you've been involved in

20    specifically in Bowling Green.

21    A.  For the last -- basically, for the last 12 years, I've been

22    assigned to the Bowling Green-Warren County Drug Task Force.

23    It's based in Warren County in Bowling Green, Kentucky.

24         During that time, it's basically I'm assigned to that task

25    force, which is a HIDTA task force, which is a federally-funded

1    task force.  And in that task force, basically, we work on drug

2    and gun cases in that area.

3    Q.  What are the kinds of drugs that you investigate in the

4    Bowling Green area?

5    A.  Well, unfortunately, like every other city, we see basically

6    the same thing.  The four main ones are the marijuana, cocaine,

7    crack cocaine, and methamphetamine that we deal with on a more

8    frequent basis.

9    Q.  Can you give a ball park to the jury about how many of those

10   kinds of investigations you've been involved in in the last 12

11   years?

12   A.  I would say -- I mean, probably well over 1,000 of those

13   cases within that time period.

14   Q.  Okay.  Let's talk about the things that you see in the

15   course of those investigations.  And I want to ask you -- you

16   mentioned two particular drugs.  What's the difference between

17   cocaine and crack cocaine?

18   A.  Well, crack -- or cocaine is actually -- more typically it's

19   seen in a powder form and that's how it's sold.  That's

20   typically how it's used.

21       Crack cocaine is a derivative of powder cocaine.  There's a

22   process involved where it's actually cooked into a firmer

23   substance, if you will.

24   Q.  Do people use it different ways?

25   A.  Yes, they do.

1    Q.  Do different things, even though you have to have the powder

2    to get to the crack?

3    A.  Yes.

4    Q.  Okay.  Thinking about those kinds of investigations first

5    with regard to the powder and the crack cocaine, what would you

6    typically see with regard to quantities for somebody who is like

7    a user?  If somebody's going to use crack cocaine, what kind of

8    quantities would we expect to see?

9    A.  On a typical user of crack cocaine, you see the person that

10    goes in and buys what's typically called "a rock" of cocaine.

11    And that is a -- after it's been -- the cocaine itself has been

12    cooked into the firmer substance, it's typically sold in what's

13    called a rock.  Typically that goes for anywhere from 20 to $40,

14    depending on the size of the rock they do.  But it's typically

15    an amount that a user buys that they can put in a pipe and they

16    use it.

17    Q.  Are we talking about -- well, first, let me ask you this:

18    How many grams are in an ounce?

19    A.  There are 28.35 grams in an ounce.

20    Q.  So when you're talking about these rocks, are we talking --

21    are they ounces or are they smaller than that?

22    A.  No, no.  The rocks are typically smaller, usually anywhere

23    from probably .5 grams up to a gram would be your typical size.

24    Q.  Okay.  And so if you have someone who's involved with higher

25    quantities than that, would that in your professional

1    experience, and training, and opinion be consistent with

2    somebody who's using it or dealing in it?

3    A.  If you have higher quantities of that, then that's probably

4    not associated with your user amount.  And typically we see

5    people that are dealing having higher quantities.

6    Q.  All right.  And if somebody's going to be dealing in it --

7    would the same thing hold true for cocaine or is it different?

8    A.  No, that would be the same.

9    Q.  So the different rational analysis, if you have more, it's

10   more indicative of trafficking and lower quantities are personal

11   use?

12   A.  Absolutely.

13   Q.  Could you have -- what if you go in and you see you have a

14   larger quantity but then you have like little smaller amounts,

15   or bags, or scales, or things like that, what would that be

16   indicative of?

17   A.  Obviously, that's indicative of trafficking.  I mean, very,

18   very seldom does somebody buy a user amount and then go weigh it

19   because, basically, they're trying to get an amount to go use

20   typically as fast as they can and they get that.  So whenever

21   you find scales in a situation like that, it's more for the

22   trafficking aspect of that.

23   Q.  Okay.  And what are the kinds of things -- do you have to

24   have any special tools or anything in particular to cook crack

25   cocaine, to take the powder and cook it into the crack?

1    A.   No.

2    Q.   What are the common ways that you see or have learned from

3    your investigations that people actually do that?

4    A.   Typically in a pan on the stove.  A typical ingredient

5    that's used to facilitate that is baking soda that they would

6    kind of use with that to make that process cook into the harder

7    rock form.

8    Q.   Okay.  Do you just dump it all in there or is -- I mean, is

9    it a complicated process or does it take a little time to

10   actually do it?

11   A.   It's not a complicated process.  It doesn't take very long

12   if you know what you're doing.  And there's a couple different

13   methods to do it.  But typically they run through it and can

14   cook out, depending on how much they're trying to cook at a

15   time.

16   Q.   Let's switch gears just a little bit from the powder and the

17   crack cocaine to marijuana, because you've mentioned that you've

18   been involved in a number of marijuana investigations as well.

19   Can you talk to the jury about that same thing with regard to

20   quantity.

21       If you have someone who is a user compared to someone who's

22   dealing, what kind of quantities are we talking about?

23   A.   Again, typically with a user, you're talking about somebody

24   who will go and buy a baggie of marijuana or a sack.  Typically

25   they will take that and buy -- and you're usually talking, for a

 1   user amount, maybe up to a quarter ounce of quantity that they

 2   would buy.

 3        Typically, other than that, you'll see people that have a

 4   larger amount.  And then, you know, basically, they do the same

 5   thing.  They weigh that out.  They package it up and they sell

 6   it in smaller amounts.

 7   Q.  Okay.  And you talked a little bit before on the crack

 8   cocaine.  Do you have communications back and forth with your

 9   office here in Louisville about the trends that are going on in

10   both parts of the state?

11   A.  Yes, we do.

12   Q.  I don't know how to ask this.  You can have different prices

13   in different places for drugs; right?

14   A.  Yes, you can.

15   Q.  What's one of the things that would drive a price no matter

16   where you are?

17   A.  Basically, the availability in that area.  It dictates

18   what -- basically, what your price is going to be.  And

19   typically, especially in Bowling Green, we see that fluctuate

20   with basically supply and demand on how much they can actually

21   get to sell in that area.

22   Q.  So thinking about that and realizing that you can have

23   fluctuations in prices -- you've talked about some of the things

24   that when you go in in investigations, if you see scales or

25   other items indicative of packaging quantities, what are some of

 1   the other things that you see that would be indicative to you

 2   with regard to trafficking, as opposed to a personal user?  And

 3   one of the things I want to ask you about is money.

 4   A.   That's what I was going to say, typically we find money.

 5   Usually it's large amounts.  We typically find several

 6   denominations.  And that's also driven by what they're selling

 7   as to what -- you know, what amounts they're typically selling.

 8   But, you know, it's not uncommon to go in and find, you know,

 9   bags of $20 bills, for example.

10       But typically, whenever you find a person who is trafficking

11   and not a person that is using, you're going to find a large

12   amount of currency in that situation.  Typically your users,

13   your people that are addicted to drugs, they're trying to get

14   money to go buy in order to use that amount of drugs.  And

15   that's -- you don't usually find people that are using drugs

16   with a lot of money on them for that reason.

17   Q.   What is another thing -- and you talked about this starting

18   back with your first experience with ATF up in Cleveland and in

19   coming along as well.  And we often couple things together,

20   drugs and --

21   A.   Guns.

22   Q.   -- and guns.  Tell the ladies and gentlemen of the jury

23   about your experience with that connection of those two things,

24   and then I'm going ask you a couple of follow-up questions about

25   specific types of guns.

1   A.  Typically with the people that are selling the -- are

2   selling drugs, you will find guns with them.  Especially a

3   person selling a larger amount of drugs, you're going to find

4   weapons available.

5   Q.  Why is that?

6   A.  Basically, it's their business.  I mean --

7            MR. SIMON:  Excuse me, Your Honor.  May we approach?

8            THE COURT:  Yes.

9       (Bench conference on the record outside the hearing of the

10  jury.)

11           MR. SIMON:  I mean, I understand what the Government's

12  trying to do with this witness, but I think we've reached a

13  point where it's like this isn't an expert witness testimony

14  anymore.  It's more like anybody could come to this conclusion.

15  You don't need an expert to tell a jury things that are that

16  straightforward.

17      I mean, it comes to a point where it's like, okay, I don't

18  have a problem with the Government using this person as a

19  so-called expert to talk about, you know, the difference in

20  users and traffickers and so forth, but when it comes to this

21  point, I think it's just too much.  I mean, it comes to a point

22  where it just gets to a tipping point and it's more prejudicial

23  than probative.

24           MS. LAWLESS:  And I'm wrapping up, Your Honor.  I'm

25  almost finished, but the notice that was given though is that

 1   Special Agent Hayes would talk about controlled substances and

 2   the things that we've gone through and the things that are

 3   affiliated with --

 4           THE COURT:  The indicia?

 5           MS. LAWLESS:  The indicia.  The last part is that the

 6   firearms are there to protect the business, and that they are

 7   commonly referred to as tools of the trade, and it's often

 8   handguns and then I'm finished.

 9           THE COURT:  So your specific objection is to this last

10   bit of testimony?

11           MR. SIMON:  Yes, and it's -- I'm saying to a certain

12   extent it's cumulative, but it's not outside the common

13   knowledge of the jury to say that, you know, people that deal in

14   drugs would have firearms with them.  I mean, it's just kind of

15   common knowledge to me.  It would seem common knowledge to a

16   group of jurors.  Okay?

17           MS. LAWLESS:  Except that I can't argue common

18   knowledge.  I can only argue facts that are in evidence.

19           THE COURT:  Yes.

20           MS. LAWLESS:  And I'm almost finished.

21           THE COURT:  Perhaps, but I think given that we're, I

22   guess, nine-tenths of the way through this testimony and you're

23   going to wrap this part up, I don't think there's much harm

24   done.  If it is common knowledge, then the jurors can roll their

25   eyes at it and move on.

Hayes - Direct

```
 1              MR. SIMON:  Thank you.

 2         (End of bench conference.)

 3    BY MS. LAWLESS:

 4    Q.  Special Agent Hayes, I think the last question I asked you

 5    was something along the lines of why do you often see guns with

 6    people who are trafficking in narcotics.

 7    A.  Yes, ma'am.

 8    Q.  What's the point of them?

 9    A.  Yes.  The point is, basically, to protect their investment.

10    They're dealing in a commodity that's -- they get a lot of money

11    for, to protect their money.

12         It's a business for them.  They are in the process of

13    selling narcotics.  They get a lot of people.  They get a lot of

14    money in.  They have different types of people that they're

15    dealing with, maybe some that they don't know very well.  So if

16    you're dealing with large amounts of drugs and you're bringing

17    in a lot of money, you're going to have to protect that

18    investment.  And that's typically what they look at, as an

19    investment.

20    Q.  I'm sorry.

21    A.  I'm sorry.  Go ahead.

22    Q.  Do you see any distinction or any difference in the kinds of

23    firearms often affiliated, particularly in urban areas -- let's

24    talk about that, because you were in Cleveland.  Now you're in a

25    more rural area.  What do you typically see or is there anything
```

1    that's more indicative?

2    A.   Yes, there is.  You typically see small guns.  You see the

3    small handguns that can be put in the pants pocket, that can be

4    put in a coat pocket.  They could be concealed easily.

5        Again, if they're dealing with some people they don't know,

6    I mean, they're -- they are going to protect that investment.

7    So instead of carrying like a rifle, or a shotgun, or large

8    caliber handgun, it's going to be something that is easily

9    concealed on their person.

10   Q.   All right.  Pulling that together, do you -- especially in

11   ATF or in law enforcement specializing in guns and drugs

12   investigations, do you have a term that you refer to those guns

13   or the use of firearms in this context?

14   A.   Yes, they are -- they're referred to as "tools of the

15   trade," because you see it with that type of dealer.

16            MS. LAWLESS:  Those are all the questions I have, Your

17   Honor.

18            THE COURT:  Mr. Simon.

19            MR. SIMON:  No questions.

20            THE COURT:  All right.  Thank you, Special Agent

21   Hayes.  You may step down.

22       Let me see the lawyers back at the bench, please.

23       (Bench conference on the record outside the hearing of the

24   jury.)

25            THE COURT:  I'm sorry.  Did I understand you that you

 1    have no more now?

 2            MS. LAWLESS:  I have the chemist in the morning and

 3    then I'm finished.

 4            THE COURT:  Okay.  But other than the chemist, you're

 5    done?

 6            MS. LAWLESS:  Yes, sir, that will be the case.

 7            THE COURT:  So we need to break now?

 8            MS. LAWLESS:  Yes, sir.

 9            THE COURT:  Well, it's 5:00 so -- they were all on

10    board to stay until 5:30 so that's sort of a bonus for them.

11            MS. LAWLESS:  I'm very sorry.

12            THE COURT:  No, that's fine.

13            MR. SIMON:  No, it's like -- it's better to be done --

14            MS. LAWLESS:  It's completely my error.

15            MR. SIMON:  No.  How can you --

16            THE COURT:  Within 30 minutes is -- that's pretty

17    good.

18            MR. SIMON:  That's pretty darn good.  I'd rather be

19    earlier than later.

20            THE COURT:  Yes.  Well, especially since this jury has

21    had to wait at other times so this will be good.  All right.

22    Thank you.

23        (End of bench conference.)

24            THE COURT:  Well, members of the jury, that's going to

25    conclude the testimony for today.  And we thought we might go as

1    late as 5:30 today, but as it works out, this is a good stopping

2    point, rather than start with the next witness and get only a

3    little bit into their testimony.  So we will break now for the

4    evening.

5        Remember what I've said repeatedly.  I know it sounds like a

6    broken record or for those of you too young to remember records,

7    a broken CD perhaps, but you cannot talk about the case with

8    each other or with anyone else, whether in person or by any

9    device.  You can't comment on the case.  And should you be made

10   aware of anyone talking about the case, you need to turn and

11   walk away from them.

12       So if somebody comes up to you and asks you about the case,

13   you need to just say, "I can't talk about it."  I don't think

14   that there will be any media coverage of the case.  We haven't

15   seen any reporters in the courtroom.  But if something flashes

16   on the TV, or on your computer screen, or your phone screen that

17   references what may be a court case here, you need to avoid

18   that.  All right?

19       And we will see you at 8:30 in the morning.  Thank you all

20   very much.  Have a good evening.

21       (Jury out 5:04 p.m.)

22           THE COURT:  You may be seated.  The jury is now

23   outside the courtroom.  So we anticipate one more witness from

24   the United States?

25           MS. LAWLESS:  Yes, sir.

1          THE COURT:  And because the stipulation has been

2    agreed to, it will not be necessary to recall Special Agent

3    Walker with regard to the defendant's record; is that correct?

4          MS. LAWLESS:  That's correct, Your Honor.

5          THE COURT:  So you propose reading the stipulation to

6    the jury at the conclusion of the Government's case?

7          MS. LAWLESS:  Yes, sir.  I'd like to put on Mr. Ludlow

8    and then read the stipulation.  At that point, I would move to

9    introduce all of our exhibits -- this is just for the game plan

10   -- and we'll rest.

11         THE COURT:  All right.  And then I suspect the thing

12   to do at that point is to take a brief break.  That probably

13   won't take a full hour in the morning, but I think we'll take a

14   break at that point to listen to any motion that the defense has

15   to make.  Without prejudging that motion, if we were to proceed,

16   you would anticipate making your opening statement at that time?

17         MR. SIMON:  Yes, sir.

18         THE COURT:  And I'm not putting you on the spot, nor

19   am I holding you to it, but if you were to predict the number of

20   witnesses that you might have, would it be more than one?

21         MR. SIMON:  Probably not, Your Honor.

22         THE COURT:  All right.  So you anticipate calling

23   Detective Ruoff?

24         MR. SIMON:  Yes.

25         THE COURT:  I think we've now determined that he

1   pronounces his name "roof" and not "ru-off."  Is that right?

2           MR. SIMON:  Right.  And, you know, I probably

3   butchered it as much as anybody else.  I'm just trying to work

4   it out in my mind.  I started out one way and now I can't go

5   back.

6       But, no, I would -- I would propose calling him as a defense

7   witness.  And I know he's essentially on call, if the

8   Government -- you have his contact information.  If you want to

9   have him here at -- I guess no later than 9:00 would be -- or

10  whatever time the court directs.

11          THE COURT:  Well --

12          MS. LAWLESS:  We'll ask him to be here at 8:30, Your

13  Honor.

14          THE COURT:  Yeah, I think that's fine.  You're going

15  to have a witness, and then we're going to have a stipulation,

16  and then we're going to have a motion to hear and then an

17  opening statement.  So I don't think there's any way we'll get

18  that done by nine.  But just to be on the safe side, if he were

19  to be up here for your colleagues to eyeball by 9:00 or 9:15,

20  that's probably a safe time frame.

21      And then -- let's see.  We passed out drafts of the

22  instructions this morning.

23          MS. LAWLESS:  Yes, sir.

24          THE COURT:  I would ask for you-all to take -- I know

25  you haven't had time during the day today, but if you would take

1   some time through the course of the rest of the afternoon and

2   this evening to review those.  We now have the benefit, of

3   course, of pattern jury instructions from the Sixth Circuit.

4   These track those pattern jury instructions.  So to the extent

5   that you're going to have objections or whatever, obviously, we

6   need to set aside some time to get those in the record at some

7   point tomorrow.

8        All right.  Anything else we need to talk about?

9            MS. LAWLESS:  I can't think of anything, Your Honor.

10           THE COURT:  Mr. Simon?

11           MR. SIMON:  No, sir.

12           THE COURT:  All right.  We'll see you tomorrow at

13  about 8:30.

14           MR. SIMON:  Very good.  Thank you.

15       (Proceedings concluded at 5:09 p.m.)

16                       C E R T I F I C A T E

17       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

18  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

19

20
         _____          September 27, 2017
21        s/Dena Legg                             _____
         Certified Court Reporter No. 20042A157   Date
22       Official Court Reporter

23

24

25

1                                    INDEX
GOVERNMENT WITNESSES:
2   EDWARD LAGANTTA
        Cross-Examination by Mr. Simon (Continuing)      4
3       Redirect Examination by Ms. Lawless             29
        Recross-Examination by Mr. Simon                33
4
    SPECIAL AGENT ERIK WALKER
5       Direct Examination by Ms. Lawless               42
        Cross-Examination by Mr. Simon                  80
6       Redirect Examination by Ms. Lawless             91
        Recross-Examination by Mr. Simon                93
7       Redirect Examination by Ms. Lawless             96

8   OFFICER JASON MOSELEY
        Direct Examination by Ms. Lawless               97
9       Cross-Examination by Mr. Simon                 107
        Redirect Examination by Ms. Lawless            121
10
    SERGEANT JIMMY ADAMS
11      Direct Examination by Ms. Lawless              124

12  ROBERT KREFFT
        Direct Examination by Ms. Lawless              149
13      Cross-Examination by Mr. Simon                 158

14  DETECTIVE TONY JAMES
        Direct Examination by Ms. Lawless              165
15
    DETECTIVE HANNAH CARROLL
16      Direct Examination by Ms. Lawless              175
        Cross-Examination by Mr. Simon                 196
17      Redirect Examination by Ms. Lawless            214
        Recross-Examination by Mr. Simon               215
18
    DETECTIVE CHRIS FRISBY
19      Direct Examination by Ms. Lawless              216

20  DETECTIVE CHAD STEWART
        Direct Examination by Ms. Lawless              225
21
    DETECTIVE TYLER HOLLAND
22      Direct Examination by Ms. Lawless              229
        Cross-Examination by Mr. Simon                 233
23
    SPECIAL AGENT BRAD LEVERITT
24      Direct Examination by Ms. Lawless              234

25  SPECIAL AGENT DAVID HAYES
        Direct Examination by Ms. Lawless              246

1                                    EXHIBITS

2      GOVERNMENT:
       No exhibits
3

4      DEFENDANT:
       No exhibits
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25