1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF KENTUCKY
2                         LOUISVILLE DIVISION

3
UNITED STATES OF AMERICA,        )      Case No. 3:16-CR-00033-DJH
4                                )
          Plaintiff,             )
5                                )
     VS.                         )
6                                )
LOUIS CHARLTON,                  )
7                                )      March 31, 2017
          Defendant.             )      Louisville, Kentucky
8

9                              *  *  *  *  *

10                              VOLUME 3
                      TRANSCRIPT OF JURY TRIAL
11             BEFORE HONORABLE DAVID J. HALE
                 UNITED STATES DISTRICT JUDGE
12
                              *  *  *  *  *
13
APPEARANCES:
14
For United States:        Jo E. Lawless
15                        U.S. Attorney's Office
                          717 West Broadway
16                        Louisville, KY 40202

17   For Defendant:       Larry D. Simon
                          239 South Fifth Street, Suite 1700
18                        Louisville, KY 40202

19

20   [Defendant present.]

21

22                    Dena Legg, RDR, CRR, CCR-KY
                      Official Court Reporter
23                    232 U.S. Courthouse
                      Louisville, KY 40202
24                         (502) 625-3778

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

```
1        (Begin proceedings in open court at 9:00 a.m.  Jury out.)
2              THE COURT:  Are we ready?
3              MS. LAWLESS:  Yes, sir.
4              MR. SIMON:  Yes.
5              THE COURT:  All right.  They are lining up our jury.
6    This will be your last witness; is that correct?
7              MS. LAWLESS:  Yes, sir, yes.
8              THE COURT:  Do you-all have the stipulation?
9              MS. LAWLESS:  Yes, sir.
10             THE COURT:  Why don't you pass that up and I can maybe
11   take a glance at that.
12        All right.  And you're okay with me reading this as is to
13   the jury at the conclusion of this witness's testimony?  Is that
14   your --
15             MS. LAWLESS:  If you want to, Your Honor, or I can,
16   whatever your preference is.
17             MR. SIMON:  I have no objection to the court reading
18   in the stipulation.  It is an agreement between both parties so
19   I would prefer the court.
20             THE COURT:  My preference would be to read it, given
21   that the instructions contemplate me informing the jury of any
22   stipulation of a disputed fact, otherwise disputed fact.
23        (Jury in 9:01 a.m.)
24             THE COURT:  Good morning, members of the jury.  We are
25   ready to continue the trial.  You may call your next witness.
```

Holbrook - Direct

```
 1            MS. LAWLESS:  Thank you, Your Honor.
 2        The United States calls -- I picked up the wrong one --
 3   Robert Holbrook, please.
 4        (ROBERT HOLBROOK, called by the Government, sworn.)
 5                        DIRECT EXAMINATION
 6   BY MS. LAWLESS:
 7   Q.  Will you state your name for the record please and spell
 8   your last name.
 9   A.  My name is Robert Holbrook, spelled H-O-L-B-R-O-O-K.
10   Q.  By whom are you employed, Mr. Holbrook?
11   A.  I'm employed by the Drug Enforcement Administration.
12   Q.  And what's your position with the Drug Enforcement
13   Administration?
14   A.  I am a forensic chemist.
15   Q.  Okay.  Could you tell the ladies and gentlemen of the jury a
16   little bit about your educational background.
17   A.  So my education, I started with a Bachelor's of Science in
18   Chemistry at Duke University, which I received in 2010.  I
19   received -- went on to graduate school to receive a Doctorate in
20   Chemistry at Northwestern University in 2015.
21   Q.  All right.  How long have you been with -- I'm going to say
22   DEA.  How long have you been with DEA?
23   A.  Fourteen months, so just over a year.
24   Q.  All right.  Is this your first job in -- acting as a chemist
25   or working as a chemist or did you have any employment during
```

Holbrook - Direct

1    the education time?

2    A.   So I had employment between Northwestern and working for the

3    DEA.   I was at Abbott Laboratories for four months as a

4    contractor.

5            MS. LAWLESS:   Okay.   Your Honor, may I approach the

6    witness?

7            THE COURT:   Yes.

8    MS. LAWLESS:

9    Q.   Mr. Holbrook, I'm going to give you what's previously been

10   marked as United States Exhibit 49 and 62.   Take just a second

11   and look at those.

12   A.   Okay.   Yes.

13   Q.   Do you recognize those two items?

14   A.   I do.

15   Q.   All right.   Let's talk about United States Exhibit 49 first.

16   Can you tell us how it is that you recognize United States

17   Exhibit 49.

18   A.   Well, you can see that my initials are on this plastic bag,

19   RJH.   You can see my name is written down when I sealed the

20   evidence after analysis on the sticker of that bottom of the

21   screen.

22   Q.   Okay.   And tell us about inside here.   And the ladies and

23   gentlemen of the jury have heard evidence already about handling

24   of drug evidence and how it goes to your lab.   Can you tell us

25   how this came to you, not specifically, but how things get

1   assigned to you.

2   A.   Okay.  So drug evidence is either sent to our lab via FedEx

3   or brought in person by the law enforcement officer.  That is

4   processed and put into our vault, and then it's ready to be

5   assigned.  So my supervisor assigned me this evidence, and I

6   take over custody from the vault after it's assigned.

7   Q.   And the things that you talked about before where we saw

8   your name and the sealing and all of that, that's how you keep

9   track of it as well; right?

10   A.   Yes, ma'am.

11   Q.   Okay.  Now, United States Exhibit 62 -- tell us what you do

12   with this evidence once it comes to the lab.

13   A.   Once it comes into my possession?

14   Q.   Yes, sir.

15   A.   Okay.  So I make sure that all the numbers, the lab numbers,

16   exhibit numbers are correct, are consistent with my paperwork

17   that I receive.  And then I also check to see if the seals are

18   still intact and the evidence has not been tampered with.  In

19   this case this evidence was sealed once I received it.  And then

20   I take a gross weight of the evidence.  That's going to be the

21   weight of the entire package.

22   Q.   Is that what we see?  What do we have here?  What is United

23   States Exhibit 62, the document that you looked at?

24   A.   So this is the lab report that's generated after the

25   analysis of the exhibit and sent to the law enforcement officer.

1   Q.   Okay.  So you talked about gross weight.  Is that sort of in

2   the middle there of the document?

3   A.   Yes, ma'am.

4   Q.   All right.  So once you weigh that gross weight, what's the

5   next step of your analysis?

6   A.   The next step is to open the package.  We try not -- we try

7   not to disturb or destroy the agent's seal.  We cut around that.

8   We initial, date the piece of the packaging that we cut off, and

9   then we take inventory of the contents of the bag.

10  Q.   All right.  Now, your colleague, Mr. Krefft, was here

11  yesterday and talked about a couple of the different testing

12  mechanisms that you use.  Can you tell us here on your report

13  under summary of tests, what were the processes that you went

14  through with regard to United States Exhibit 49?

15  A.   Sure.  Well, before we do any testing we take a weight,

16  because we have to take samples from the material to do the

17  testing.  So we take the weight first.  But in terms of the

18  analysis, I did a Duquenois-Levine color test.

19  Q.   And what is that?

20  A.   It's a color test to give the presence -- or give the

21  indication of the presence of cannabinoids.

22  Q.   And tell us all what that -- what's the significance of

23  whether there's a canna -- I can never say that right --

24  cannabinoid?

25  A.   So the active ingredient in marijuana is THC or delta-9-

1   tetrahydrocannabinol, which falls under the class of compounds

2   referred to as cannabinoids.  These are present in marijuana and

3   so it's the first initial test that we do just to see if there's

4   a presence of cannabinoids.

5   Q.  And is that what actually makes marijuana illegal under

6   scheduling purposes for federal law, as opposed to, say,

7   industrial hemp or something like that?

8   A.  Yes, ma'am.  It's the presence of the THC or delta-9-

9   tetrahydrocannabinol.

10  Q.  So here we see -- the visual microscopic examination, what

11  does that involve?

12  A.  The visual microscopic examination of plant material is to

13  confirm that the plant, material has characteristics of

14  marijuana.  One of the indicative things that marijuana has are

15  these features called cystolithic hairs.  These are indicative

16  of the marijuana plant and their morphology is very distinctive.

17  They kind of have a bear claw shape hair to them because at the

18  base of them there's a deposit of calcium carbonate.

19      And to further confirm that this is a cystolithic hair, once

20  they're identified we put a solution of hydrochloric acid, much

21  like mixing baking soda and vinegar makes kind of a volcano as a

22  science fair project, the same phenomenon happens here where we

23  can see bubbles form and the presence of acid on these

24  cystolithic hairs.

25  Q.  And did you go through that process with regard to United

1   States Exhibit 49?

2   A.  Yes, ma'am, I did.

3   Q.  As well as the gas chromatography and mass spectometry that

4   we could talk about but they heard from Mr. Krefft yesterday how

5   that all happens.

6   A.  Okay.

7   Q.  So the things listed here on your lab report, you went

8   through those processes; correct?

9   A.  Yes, ma'am.

10  Q.  And what was your conclusion?

11  A.  My conclusion was the substance was in fact marijuana with a

12  net weight of 40.3 grams, plus/minus 0.4 grams.

13          MS. LAWLESS:  All right.  Thank you.  Those are all

14  the questions I have.

15          THE COURT:  Mr. Simon.

16          MR. SIMON:  Just a few.

17                      CROSS-EXAMINATION

18  BY MR. SIMON:

19  Q.  Actually, we should address you as Dr. Holbrook; correct?

20  A.  Yeah, that's --

21  Q.  You have a PhD.

22  A.  That's fine.

23  Q.  You have a Doctorate in Philosophy and Chemistry?

24  A.  Yes, sir.

25  Q.  How do you have a doctorate in philosophy interacting with

1   chemistry?

2   A.   That's the title of the degree.  My training has been in

3   chemistry so working in a lab.

4   Q.   Okay.  We'll address you as Dr. Holbrook.  You've given your

5   results of your examination.  The classification of marijuana is

6   what, Schedule I hallucinogen?

7   A.   I believe so, sir.

8   Q.   And that's in the same category as LSD and PCP?

9   A.   I can't speak on the schedule of PCP or LSD off the top of

10  my head.

11  Q.   All right.  And the active ingredient which makes marijuana

12  illegal is THC.  What did you say delta-9, that compound?

13  A.   Yes, sir.

14  Q.   And that is commonly referred to as a cannabinoid?

15  A.   Yes, sir.

16  Q.   Okay.  Or it should be referred to as a cannabinoid in

17  chemistry.  That's what you would refer it to?

18  A.   Yes, sir.

19  Q.   Okay.  And you're aware of the effects of cannabinoids on

20  the body?

21  A.   My training is specifically in the analysis of drug evidence

22  so I can't speak on the effect of marijuana on the body.

23  Q.   But as just a regular member of society, you would know that

24  utilizing -- say utilizing marijuana and driving an automobile

25  at the same time, that would constitute illegal conduct;

1   correct?

2   A.  I believe the consumption of marijuana would be illegal.

3   Q.  Okay.  And it would be common sense that it would be deemed

4   illegal conduct because a person's perception would be changed.

5   Their motor skills would be affected by the use.

6           MS. LAWLESS:  Objection, Your Honor.  May we approach?

7           THE COURT:  Yes.

8     (Bench conference on the record outside the hearing of the

9   jury.)

10          MS. LAWLESS:  Your Honor, I think we're beyond the

11  scope of direct.  This witness was called as an expert on

12  chemical analysis.  He's already said that he is not familiar

13  with and doesn't feel comfortable testifying about the effects

14  or impact of marijuana on the human body, and we're going pretty

15  far astray here.

16          MR. SIMON:  Well, first, it's relevant because a

17  witness of the Government testified that he smokes marijuana

18  every day.  And I'm just eliciting pretty well-known facts of

19  why this would be -- the effects of marijuana on the body.  So I

20  think this person is well equipped to answer those questions.

21          THE COURT:  Well, he said he's not.  Did I

22  misunderstand that?

23          MS. LAWLESS:  No, that's how I understood it as well.

24          THE COURT:  He said that was not his training.  So I

25  think you can establish that -- you can ask him, as you already

1   have, if he can speak to that.  If he can't speak to that, then

2   I don't really see the point of going further with it.

3        (End of bench conference.)

4   BY MR. SIMON:

5   Q.  So, Doctor, what you're saying is you're trained in

6   chemistry in a chemical analysis, and you're unable to give us

7   an opinion about the effects of cannabinoids on the human body?

8   A.  That is correct, sir.

9             MR. SIMON:  All right.  That's all the questions I

10  have.  Thank you.

11            MS. LAWLESS:  I don't have any further questions, Your

12  Honor.

13            THE COURT:  All right.  Thank you, sir.  You may step

14  down.

15            THE WITNESS:  Thank you, Your Honor.

16            THE COURT:  You may call your next witness.

17            MS. LAWLESS:  Your Honor, the United States rests,

18  with the exception of one thing.  At this time I would ask the

19  court for admission of United States Exhibits 1 through 62.

20  We've tendered them as we've gone along, but at this point I

21  would ask that they all be admitted.

22            THE COURT:  Mr. Simon, any objection to the admissions

23  of any of those exhibits?

24            MR. SIMON:  Yes.  May I approach, please?

25            THE COURT:  Yes.

1      (Bench conference on the record outside the hearing of the

2    jury.)

3           MR. SIMON:  Let me see if I can get the right number.

4    I think Government's Exhibit Number 5, Government's Exhibit

5    54 --

6           THE COURT:  Let's take them one at a time.  So what's

7    your objection as to 5?  Remind me which one is 5.

8           MR. SIMON:  Okay.  Five is the packet of drugs that

9    was seized -- not seized, packet of drugs that came from a

10   controlled buy from the informant, Mr. LaGantta.

11      The 54 is the bag of cocaine and crack cocaine that was

12   seized from the defendant's residence.  And then the last

13   exhibit is the marijuana.  I think -- whatever the document was.

14   I think it was 62.

15      Based on a lack of -- failure in the chain of custody as

16   indicated during the cross-examination of Mr. Krefft, who was

17   the chemist, the samples that are attempted to be introduced by

18   the commonwealth -- by the Government today do not contain a

19   complete chain of custody, wherever they went from when they

20   were seized at the residence of my client and were taken from

21   the confidential informant, Mr. LaGantta, when he was debriefed

22   after he came back from being at my client's residence.

23      I mean, there's no testimony that has been introduced about

24   where it went after that other than different envelopes.  So the

25   matter of the custody -- the chain of custody, I believe, has

 1   not been proven up, and I would object to the admission of those

 2   exhibits for that reason.

 3           THE COURT:  Does the Government need to prove chain of

 4   custody in order to properly admit?

 5           MR. SIMON:  I would submit that, yes, they do.

 6           MS. LAWLESS:  No, sir, not unless there is a good

 7   faith basis to question that it was sometime out of law

 8   enforcement custody.  And I think we've established the chain

 9   that, with regard to the controlled purchase, Mr. LaGantta, when

10   he was debriefed immediately turned over.

11     The drugs that were seized from the house were taken into

12   custody.  We've talked about how everything was put into

13   property, that it was tracked.  Both of the chemists have talked

14   about looking at the documentation, looking at the sealing.

15     You can see on the exhibits where they were taken into

16   custody with law enforcement.  There's no shred of evidence that

17   they were ever outside of law enforcement custody or that they

18   were ever handled in an inappropriate way.  And we do not have

19   an affirmative duty to put on every single person in that chain

20   unless there's a good faith basis to challenge it.

21           THE COURT:  I think that's the law.  I think they've

22   established the proper foundation for the admission of each of

23   those exhibits so I'll overrule the objections.  Anything

24   else --

25           MR. SIMON:  No, sir.

 1            THE COURT:  -- with respect to --

 2            MR. SIMON:  The numbered exhibits?

 3            MS. LAWLESS:  They're 62.  I had marked the

 4    stipulation as 63.

 5            THE COURT:  So while we're up here, at this point you

 6    want me to read the stipulation?

 7            MS. LAWLESS:  Yes, please.

 8            THE COURT:  My practice would simply be to inform the

 9    jury that the parties have agreed to a fact.  It's called a

10    stipulation and I will now read it to them, and it will be

11    included in the exhibits.

12            MR. SIMON:  Very good.  Thank you.

13        (End of bench conference.)

14            (Government Exhibits 1 through 62 admitted in

15    evidence.)

16            THE COURT:  All right.  Members of the jury, at the

17    outset, during preliminary instructions, I told you that you may

18    receive evidence in several different ways, by testimony, by

19    exhibits that are admitted, and also by stipulation.  And now I

20    have a stipulation to read to you.  A stipulation is simply an

21    agreement on a fact.  And so in this case the stipulation that I

22    am about to read to you has been agreed to by both sides, and I

23    will read it to you as follows:

24        The defendant, Louis Charlton, and the United States of

25    America stipulate and agree that prior to November 16, 2015,

1    Louis Charlton had been convicted in a court of a crime

2    punishable by imprisonment for a term exceeding one year.  That

3    is a felony offense.  The parties do not dispute this fact.  And

4    it was agreed to and dated in a signed document yesterday.

5        This will be admitted as Government Exhibit 63.

6                (Government Exhibit 63 admitted in evidence.)

7                THE COURT:  Anything further from the United States?

8                MS. LAWLESS:  No, Your Honor.  That's our case.

9                THE COURT:  All right.  Mr. Simon, do you have --

10   well, I think although we've only been here in the courtroom a

11   little over 20 minutes.

12       The Government has closed their case.  That means they are

13   finished presenting evidence to you.  But before we move on,

14   this occasion calls for the lawyers and I to do some work, so

15   we're going to excuse you for a break now.  And we'll proceed

16   with the trial when we have you return shortly.  Thank you.

17       (Jury out 9:21 a.m.)

18       (Motion for directed verdict, jury instruction conference,

19   and defense opening not requested as part of this transcript.)

20       (Proceedings resumed in open court at 10:28 a.m.  Jury in.)

21           MR. SIMON:  Yes, call Detective Jeremy Ruoff.

22       (SERGEANT JEREMY RUOFF, called by the defendant, sworn.)

23                       DIRECT EXAMINATION

24   BY MR. SIMON:

25   Q.  Good morning, Detective.

Ruoff - Direct

1    A.   Good morning, sir.

2    Q.   Can you state your name for the record and spell your last

3    name.

4    A.   Jeremy Ruoff, R-U-O-F-F.

5    Q.   All right.  We've been butchering your name.  I know I have

6    for a couple of days so I apologize.  But it's "roof," like the

7    ceiling on top of a house.

8    A.   Correct.

9    Q.   Okay.  That's how we pronounce it.  Tell the ladies and

10   gentlemen of the jury what your vocation is.

11   A.   I'm currently employed as a sergeant with the Louisville

12   Metro Police Department's First Division.

13   Q.   And how long have you been in that position?

14   A.   Sergeant for about six months, but I've been on the police

15   department for roughly a little over 10 years.

16   Q.   And previously were you a task force officer?

17   A.   Yes, I was.

18   Q.   Could you explain to the members of the jury what type of

19   officer that is.

20   A.   I was a task force officer for the Alcohol, Tobacco,

21   Firearms & Explosives.  In that position, I was kind of liaison

22   between LMPD and ATF for working firearm and narcotic

23   trafficking cases within mostly Jefferson County.

24   Q.   All right.  So that was the type of crimes that you were

25   concentrating on in that unit, illegal drugs and firearms?

1    A.  Correct.

2    Q.  Okay.  You're familiar with Mr. Charlton?

3    A.  Yes, sir.

4    Q.  About how long have you known Mr. Charlton?

5    A.  In exact time, I don't know.  Probably seven, eight years

6    maybe.

7    Q.  All right.

8    A.  I think, somewhere around there.

9    Q.  And Mr. Charlton has been an informant for Louisville Metro

10   Police and ATF during parts of those periods of time?

11   A.  Yes, sir.

12   Q.  Okay.  And would it be a fair statement that you have been

13   the primary person handling him during that period of time, for

14   lack of a better term?

15   A.  Yes.

16   Q.  When you became involved in this case, was it Detective

17   Carroll or Detective Walker, or both, that contacted you?

18   A.  I believe initially Detective Carroll, but then I worked

19   directly with Erik so --

20   Q.  All right.  One way or another, either Detectives Carroll or

21   Walker contacted you.  And, ultimately, you met with them and

22   Mr. Charlton in the Metro Corrections and interviewed them?

23   A.  Yes, sir.

24   Q.  All right.  And I'm going to play the audio of that

25   interview.  Have you listened to that any time recently?

1   A.  Not the full audio, no, sir, not recently.

2   Q.  All right.  And then today, I think today was the first time

3   that we had ever met; is that right?

4   A.  Correct.

5   Q.  Okay.  I may have had a case with you before, but I just

6   don't --

7   A.  Yeah, I don't recall.

8   Q.  Okay.  And just to assist, I'm going to give you a

9   transcript of this so you can read along with that.

10      So in terms of a foundation on November 20th of 2015, in a

11   room in the Kentucky -- Louisville Metro Department of

12   Corrections, you, Detective Carroll, Detective Walker and

13   Mr. Charlton did a tape-recorded interview with his --

14   Mr. Charlton's consent?

15  A.  Correct.

16          MR. SIMON:  All right.  And if I may, Your Honor, I'd

17   like to play that now.

18          THE COURT:  Any objection?

19          MS. LAWLESS:  No, sir.

20          THE COURT:  You may proceed.

21      (Defense playing audio.)

22          THE COURT:  Can you pause it for just one second.

23      Let me just remind you, members of the jury, as Mr. Simon

24   said, this recording will be about an hour, I think.

25      Is that --

 1              MR. SIMON:  About an hour and 15 minutes or so.

 2              THE COURT:  Yes.  So we will take a break at the end

 3     of the recording.  But as I said to you-all a couple of days ago

 4     now, if you find that you need a break before that, please just

 5     raise your hand.  It's not a problem.  It's just the end of the

 6     recording would be sort of the next natural spot for a break.

 7        If while you're listening to the tape, if you find that you

 8     just need to stand for a second, as some of us do, that's

 9     perfectly fine.  But otherwise, unless you raise your hand and

10     ask for a break, we will take one at the conclusion of the

11     playing of the tape.

12        Go ahead, Mr. Simon.  I'm sorry for the interruption.

13              MR. SIMON:  There's just basically a little noise at

14     the beginning, but I'll go back to the very beginning.

15        (Defense playing audio.)

16              THE COURT:  Members of the jury, as I said at the

17     outset, we'll take about a 10-minute break at this point.

18        (Jury out 11:40 a.m.)

19              THE COURT:  All right.  The jury is now outside the

20     courtroom.  I think we'll try and get them back in here fairly

21     quickly.  Did you say at one point how long you thought --

22              MR. SIMON:  I don't believe my direct will be more

23     than maybe 15 minutes or so.  It should be short.

24              THE COURT:  All right.  We'll be in recess for about

25     10 minutes.

 1        (Recess at 11:41 a.m. until 12:07 p.m.  Jury out.)

 2              THE COURT:  All right.  Before we bring the jury in --

 3   Mike, you can go ahead and get them lined up -- you-all got the

 4   revised instructions?

 5              MS. LAWLESS:  Yes, sir.

 6              MR. SIMON:  Yes.

 7              THE COURT:  I think included with that is a copy of

 8   the indictment that would go back.  No penalty page is attached.

 9   And, yes, I think we passed along a verdict form.  We'll talk

10   about those later.

11        (Jury in 12:09 p.m.)

12              THE COURT:  Mr. Simon, you want to continue your

13   direct.

14              MR. SIMON:  Thank you, Your Honor.

15   BY MR. SIMON:

16   Q.  Detective Ruoff, the audio that we heard, is that consistent

17   with your memory of what took place November 20th, 2015?

18   A.  Yes.

19   Q.  In your previous position as a task force officer with ATF

20   but also a member of Louisville Metro Police Department, the use

21   of confidential informants, is that a strategy that is in large

22   part used to combat the use of -- well, the transfer of illegal

23   drugs and the transfer and the buying of guns by people that

24   shouldn't have them in their possession?

25   A.  Yes.

1    Q.   All right.   In what capacity do confidential informants work

2    for local law enforcement?   What are some of the things that

3    they do that are helpful?

4    A.   Typically they'll provide superseding information on

5    different organizations or groups.

6    Q.   Okay.   So they can give you the names, their knowledge of

7    what type of drugs they might be dealing in, where they live,

8    for example, who they associate with?

9    A.   Correct.

10   Q.   All right.   They can give -- informants can give information

11   upon -- if they have access to their homes or maybe their

12   businesses, seeing different drugs at that location, guns, other

13   contraband; right?

14   A.   Yes.

15   Q.   Okay.   And that can be used by law enforcement to put

16   together search warrants to go into those businesses or a home

17   and recover drugs and guns and make a case against someone?

18   A.   Correct.

19   Q.   Is that a fair statement?

20        Okay.   And on occasion an informant can be used to make a

21   controlled buy by providing that individual with money to

22   purchase drugs from a suspect, and that individual could be

23   monitored.   They make the transaction and a charge and arrest

24   can be made as a result of that cooperation by an informant?

25   A.   Yes.

1   Q.  Now, during the time period that we're talking about, let's

2   just say from 2010 to the present, the problems and the issues

3   involving crack cocaine and cocaine, do you find that in your

4   experience that's been confined mainly to segments of the

5   African-American community in Louisville?

6           MS. LAWLESS:  Your Honor, may we approach?

7           THE COURT:  Yes.

8      (Bench conference on the record outside the hearing of the

9   jury.)

10          MS. LAWLESS:  My objection would be relevance, Your

11  Honor.

12          MR. SIMON:  It's relevant because I think the answer

13  to that question is obviously yes.  And I think there's a -- not

14  very many, if any -- none is shown in this case -- African-

15  American police officers to serve as undercover agents.  So I

16  think what I'm trying to establish through the witness is that

17  they utilize -- the only way that they can have informants with

18  any credibility to make contact with targets is to use African-

19  Americans in that capacity.

20          MS. LAWLESS:  My objection is relevance.  I don't see

21  how that tends to prove or disprove any of the issues or

22  evidence in this case.  They're irrelevant to the elements.

23          THE COURT:  Does that go to the elements or does that

24  go to a defense?

25          MR. SIMON:  Well, it goes to the defense that -- well,

 1    it goes to what I'm -- I've been allowed to go into, which is my

 2    client's understanding of the -- you know, of any agreement that

 3    he was proposed.  I think it's relevant to this discussion of

 4    why they use informants.

 5              THE COURT:  I'm going to give you some leeway, I mean,

 6    to establish I think what's already been established, which is

 7    that he's worked as a CI.  If this witness wants to say that he

 8    was more or not more valuable because he's African-American --

 9    I'm not sure it's relevant -- but I don't really see any harm

10    one way or another, as long as we leave it at that and move on.

11              MR. SIMON:  No.

12              MS. LAWLESS:  I raise the issue, Your Honor, because

13    when you start asking questions based on race, then I become

14    concerned that we're going to start talking about racially-

15    driven law enforcement practices or just try to bring some sort

16    of a race card in that context in this case.

17              THE COURT:  We're not going to get that far afield.

18              MR. SIMON:  I wasn't planning on it.

19              THE COURT:  We're not going to get that far afield.  I

20    said this when we spoke yesterday about the instructions.  We

21    talked about the order on your motion regarding jury

22    nullification.  His understanding of an arrangement, or a deal,

23    or agreement, or whatever, however you want to characterize it,

24    is relevant but only to -- as I said in that order, only to

25    establish or to argue that the jury should -- how the jury

```
 1   should treat his inculpatory statements.

 2            MR. SIMON:  Right.

 3            THE COURT:  It is not there for a wide open

 4   nullification argument.

 5            MR. SIMON:  Believe me, I know the court's ruling.

 6            THE COURT:  Okay.  So I'm just giving context to this

 7   consideration of whether getting into his usefulness to the

 8   police on the basis of race is relevant.

 9            MR. SIMON:  Okay.

10            THE COURT:  All right.

11            MR. SIMON:  I'm sorry, Jo.

12       But if he remembers it, it's okay for this officer to answer

13   that one question and then I'll move on?

14            THE COURT:  Yes.

15            MR. SIMON:  Okay.

16       (End of bench conference.)

17   BY MR. SIMON:

18   Q.  Detective Ruoff, do you remember the question I asked you

19   just now before there was an objection?

20   A.  I believe so, but if you can repeat it again, that way --

21   Q.  That's hard to do, but it was basically, in your experience

22   in law enforcement, have you found that the -- and I'll try my

23   best to repeat it -- found that the current problem involving

24   crack cocaine and cocaine is prevalent more among certain

25   segments of the African-American community in Louisville?
```

1    A.  My experience has been more in poverty areas.  And I've only

2    worked in one part of the city so it's -- you know, that's all I

3    know.  That's all my enforcement has been.

4    Q.  What part of the city has that been?

5    A.  The west end of Louisville.

6    Q.  Okay.  So like you said, the informants that are different

7    categories can be used for those purposes.  And is that in your

8    estimation -- and now you're in a supervisory position with

9    Louisville Metro?

10   A.  Correct.

11   Q.  All right.  Is that an effective arm of law enforcement for

12   the utilization of informants?

13   A.  Yes.

14   Q.  Just as an aside, there was some discussion of a .45 caliber

15   weapon during the tape-recorded statement that we listened to.

16   Mr. Charlton had talked about obtaining that from a person he

17   called "Iguana."  Do you remember that portion of the audio?

18   A.  I do.

19   Q.  Okay.  So there's no confusion, that firearm had nothing to

20   do with the firearm involved in this present case?

21   A.  Not in this case, no.

22   Q.  Okay.  Now, your association and knowledge of Mr. Charlton

23   was a result of previous investigations involving Mr. Charlton.

24   Would that be a fair statement?

25   A.  Yes.

1    Q.  All right.  And do you remember, back in 2011, being at his

2    residence on Burton Avenue?

3    A.  Yes.

4    Q.  All right.  And what occurred on that occasion?

5    A.  Basically, at that time was --

6             MS. LAWLESS:  Objection, Your Honor.

7             THE COURT:  Please approach.

8       (Bench conference on the record outside the hearing of the

9    jury.)

10            MS. LAWLESS:  It's the same objection, relevance.  How

11   he may have met him in 2011 on another investigation, I think,

12   is irrelevant to the charges in this case.  We're talking about

13   something from four years before.

14            MR. SIMON:  Well, what it was from four years before,

15   he had a consent search at his residence.  They found cocaine,

16   and guns, and money, and paraphernalia, and my client was

17   arrested.  He was utilized as a confidential informant, handled

18   by Detective Ruoff.  And ultimately his charges, his felony

19   trafficking charges were amended to misdemeanors, and he got

20   like a two-day sentence, credit time served.

21       What I'd also seek to elicit from the officer is, in January

22   of 2011, he served a search warrant at the same residence on

23   Fifth Street where this -- the offenses alleged in this

24   indictment took place.  And there was a recovery of cocaine, and

25   guns, and paraphernalia, and also money, although there's

1   some -- I'll have to ask the officer whether or not he was

2   allowed to keep the money.  He was signed up again as a

3   confidential informant with Louisville Metro and ATF, and my

4   client was not arrested on that occasion but did agree to work

5   with law enforcement in that capacity.

6       So that's Detective Ruoff's association with my client.  I

7   submit that that evidence is relevant by showing what I'm

8   allowed to show, what was my client's understanding of what was

9   said to him by the law enforcement officers when he was arrested

10  on this last occasion, which are for the offenses in the

11  indictment and would have a bearing on whether or not the

12  statements he made to them were valid.  There's reason to

13  believe that he was truthful in the statements that he made.

14          MS. LAWLESS:  The search warrant was from 2015.  The

15  January search warrant was from 2015, Your Honor, not 10 months,

16  I guess, before this.  And, again, he hasn't been charged with

17  anything in that case yet.  It hasn't been completely closed.

18      I don't know why we need to go down all of these extraneous

19  avenues, other than to try and argue to the jury that in the

20  past he cooperated and he didn't get charged, and this time he

21  did and he shouldn't be.

22          THE COURT:  Well, here's how I look at this:  I think

23  it's a dangerous path.  I don't think that the jury

24  nullification argument is necessarily well served by it, even

25  though that's off the table.

1      I think you risk the other side of that coin, which is a

2  jury concluding, my goodness, this fellow has been given every

3  opportunity in the past and enough is enough.  And so that's the

4  other possible conclusion that they reach by putting in front of

5  them the fact that he arguably, not to put words in the mouth of

6  the United States, but arguably for purposes of fleshing out

7  this analysis, arguably abused their trust.

8      So I'm going to let you establish the basics of the prior

9  relationship and the fact of a prior relationship, but I'm not

10  interested in fleshing out all of the facts of the prior --

11  whether they were cases or potential cases.  I'm not interested

12  in fleshing out all of those collateral issues.

13          MR. SIMON:  Okay.  I understand the court's ruling.

14      (End of bench conference.)

15  BY MR. SIMON:

16  Q.  Let me ask you this question:  You've known Mr. Charlton

17  since approximately 2010, 2011?

18  A.  Around that time, yes.

19  Q.  Around that period of time, okay.  And he previously had

20  worked with you as -- in the capacity as a confidential

21  informant?

22  A.  Yes.

23  Q.  And there's another -- or an ATF officer named Kevin Funke.

24  Is it "funk" or "funky"?

25  A.  "Funky."

1   Q.   Okay.  That you work with at that point in time going back a

2   couple of years?

3   A.   Yes.

4   Q.   Okay.  And in the tape-recorded statement there are

5   numerous, it seems, indications that you and Mr. Charlton had a

6   pretty long history in terms of him cooperating with you.

7   A.   Correct.

8   Q.   In other words, you talked about people that he had

9   basically given up for you or gave you information on.  Would

10  that be a fair statement?

11  A.   Yes.

12  Q.   Okay.  And it was like you're kind of going over and talking

13  about investigations or -- investigations that were either

14  ongoing or were accomplished previously with the assistance of

15  Mr. Charlton.

16  A.   Correct.

17          MR. SIMON:  Okay.  And if I can have a moment.

18      If I can have a moment, Your Honor.

19          THE COURT:  Yes.

20      (Mr. Simon conferring with the defendant off the record.)

21          MR. SIMON:  That's all the questions I have at this

22  time.  Thank you, Detective.

23          THE COURT:  Ms. Lawless.

24          MS. LAWLESS:  Yes, Your Honor.

25                      CROSS-EXAMINATION

Ruoff - Cross/Redirect

1    BY MS. LAWLESS:

2    Q.  Sergeant Ruoff, were you involved at all in the controlled

3    purchase investigation of Louis Charlton on November 16th, 2015?

4    A.  No.

5    Q.  Were you involved at all in the execution of the search

6    warrant at Mr. Charlton's house on November 16th, 2015?

7    A.  No.

8    Q.  So you had nothing to do with the case that we're here to

9    try today?

10   A.  Correct.

11        MS. LAWLESS:  Thank you.

12        THE COURT:  Any redirect, Mr. Simon?

13        MR. SIMON:  If I can have a moment.

14      (Mr. Simon conferring with defendant off the record.)

15                    REDIRECT EXAMINATION

16   BY MR. SIMON:

17   Q.  Sergeant, but you were asked by Detective Carroll or

18   Detective Walker to come and participate in another interview?

19   A.  Yes.

20   Q.  And they were aware of your previous association with

21   Mr. Charlton?

22   A.  Yes.

23   Q.  And did they have an interest in gaining information from

24   him at that time about other individuals?

25   A.  You would have to ask them, but that's probably why you do a

Ruoff - Redirect

1   follow-up interview.

2   Q.   Okay.  Because that's what they -- that's what you-all

3   talked about --

4   A.   Correct.

5   Q.   -- in large part, about other individuals, people that could

6   be investigated; right?

7   A.   Yes.

8   Q.   And specifically the person that my client identified as Syl

9   or Sylvester, who is his main supplier; right?

10  A.   Correct.

11              MR. SIMON:  That's all.  Thank you.

12              MS. LAWLESS:  No further questions, Your Honor.

13              THE COURT:  Thank you.  You may step down.

14       (Testimony concluded at 12:30 p.m.)

15       (End of transcript.)

16                    C E R T I F I C A T E

17       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

18  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

19

20
        _____        September 27, 2017
21          s/Dena Legg                     _____
    Certified Court Reporter No. 20042A157  Date
22  Official Court Reporter

23

24

25

1                                 INDEX

2      GOVERNMENT WITNESS:

3      ROBERT HOLBROOK
            Direct Examination by Ms. Lawless          3
4           Cross-Examination by Mr. Simon             8

5      DEFENSE WITNESS:

6      SERGEANT JEREMY RUOFF
            Direct Examination by Mr. Simon            15
7           Cross-Examination by Ms. Lawless           29
            Redirect Examination by Mr. Simon          30
8


9                                EXHIBITS

10
       GOVERNMENT:
11     Exhibit 1 - gun (retained by Government)        14
       Exhibit 2 - photo                               14
12     Exhibit 3 - photo                               14
       Exhibit 4 - photo                               14
13     Exhibit 5 - drugs (retained by Government)      14
       Exhibit 6 - search warrant                      14
14     Exhibit 7 - photo                               14
       Exhibit 8 - CD                                  14
15     Exhibit 9 - photo                               14
       Exhibit 10 - photo                              14
16     Exhibit 11 - photo                              14
       Exhibit 12 - photo                              14
17     Exhibit 13 - photo                              14
       Exhibit 14 - photo                              14
18     Exhibit 15 - photo                              14
       Exhibit 16 - photo                              14
19     Exhibit 17 - photo                              14
       Exhibit 18 - photo                              14
20     Exhibit 19 - photo                              14
       Exhibit 20 - photo                              14
21     Exhibit 21 - photo                              14
       Exhibit 22 - photo                              14
22     Exhibit 23 - photo                              14
       Exhibit 24 - photo                              14
23     Exhibit 25 - photo                              14
       Exhibit 26 - photo                              14
24     Exhibit 27 - photo                              14
       Exhibit 28 - photo                              14
25     Exhibit 29 - photo                              14
       Exhibit 30 - photo                              14

```
 1    Exhibit 31 - photo                                  14
      Exhibit 32 - photo                                  14
 2    Exhibit 33 - photo                                  14
      Exhibit 34 - photo                                  14
 3    Exhibit 35 - photo                                  14
      Exhibit 36 - photo                                  14
 4    Exhibit 37 - photo                                  14
      Exhibit 38 - photo                                  14
 5    Exhibit 39 - photo                                  14
      Exhibit 40 - photo                                  14
 6    Exhibit 41 - photo                                  14
      Exhibit 42 - photo                                  14
 7    Exhibit 43 - photo                                  14
      Exhibit 44 - photo                                  14
 8    Exhibit 45 - photo                                  14
      Exhibit 46 - photo                                  14
 9    Exhibit 47 - photo                                  14
      Exhibit 48 - digital scale (retained by Government) 14
10    Exhibit 49 - drugs (retained by Government)         14
      Exhibit 50 - magazine - ammo (retained by          14
11    Government)
      Exhibit 51 - gun (retained by Government)           14
12    Exhibit 52 - jar (retained by Government)           14
      Exhibit 53 - Crown Royal bag (retained by          14
13    Government)
      Exhibit 54 - drugs (retained by Government)         14
14    Exhibit 55 - cell phone (retained by Government)    14
      Exhibit 56 - cell phone (retained by Government)    14
15    Exhibit 57 - cell phone (retained by Government)    14
      Exhibit 58 - spoon (retained by Government)         14
16    Exhibit 59 - scales (retained by Government)        14
      Exhibit 60 - lab report                             14
17    Exhibit 61 - lab report                             14
      Exhibit 62 - lab report                             14
18    Exhibit 63- stipulation                             15

19
       DEFENDANT:
20    No exhibits

21

22

23

24

25
```