<pre>
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,     )    Case No. 3:16-CR-00033-DJH
 4                                 )
             Plaintiff,            )
 5                                 )
        VS.                        )
 6                                 )
     LOUIS CHARLTON,               )
 7                                 )    July 24, 2017
             Defendant.            )    Louisville, Kentucky
 8

 9                           *  *  *  *  *

10                 TRANSCRIPT OF SENTENCING HEARING
                   BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                           *  *  *  *  *

13   APPEARANCES:

14   For United States:      Jo E. Lawless
                             U.S. Attorney's Office
15                           717 West Broadway
                             Louisville, KY 40202
16
     For Defendant:          Larry D. Simon
17                           239 South Fifth Street, Suite 1700
                             Louisville, KY 40202
18

19
     [Defendant present.]
20

21
                        Dena Legg, RDR, CRR, CCR-KY
22                         Official Court Reporter
                           232 U.S. Courthouse
23                        Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
</pre>

1          (Begin proceedings in open court at 4:24 p.m.)

2               DEPUTY CLERK:  3:16-CR-33, *United States of America v.*

3     *Louis Charlton.*

4               MS. LAWLESS:  Good afternoon, Your Honor.  Jo Lawless

5     on behalf of the United States.

6               MR. SIMON:  Good afternoon, Your Honor.  Larry Simon.

7     I'm here with Mr. Charlton.

8               THE COURT:  So we are set today for a sentencing

9     hearing.  It was continued from -- most recently from last week.

10    And I believe at that time, Mr. Simon, you wanted to obtain some

11    additional information.  Is that correct?

12              MR. SIMON:  I did, Your Honor.  I sent away for some

13    medical records from Seven Counties Services -- it's under a

14    different name now -- to confirm some facts regarding my

15    client's previous mental health history.  I did obtain those

16    documents prior to today.

17       In that regard, my sentencing memorandum that I filed with

18    the court should be amended to reflect the fact that

19    Mr. Charlton had been receiving Seroquel, 200 milligrams, as

20    prescription medication for his psychological condition while he

21    was being treated by Seven Counties Services.  The records from

22    them go up to about three months prior to the offense date.

23       Mr. Charlton has advised me, as he did in paragraph 68 in

24    the report, that that -- his prescription medication has changed

25    where he has not being given Seroquel since he's been

1    incarcerated.  He was given another type of medication that I'm

2    not familiar with.

3        However, I did ask Mr. Charlton today, you know, do you

4    understand what's going on?  Any difficulty in understanding the

5    proceedings?  And he indicated that, you know, he understands

6    what's going on.

7            THE COURT:  Mr. Charlton, is that correct?  You

8    understand we're here for a sentencing hearing today?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  And so, Mr. Simon, have you and

11   Mr. Charlton had ample opportunity to review the presentence

12   investigation report?

13           MR. SIMON:  Yes, sir.

14           THE COURT:  And I've reviewed the objections that you

15   provided directly to the U.S. Probation Office.  I've also

16   reviewed the presentence memorandum that you just referenced, I

17   believe you filed recently.  I read that as well.  I'll give you

18   an opportunity, of course, here in a minute to talk at length

19   about any of those issues that you've already raised, but in

20   addition to those that have been raised in your objections and

21   in your memorandum, anything else that I need to be prepared to

22   talk with you about today?

23           MR. SIMON:  No, sir.  I think we're confined to

24   those -- the objection that I set forth in the -- to the

25   presentence report and the request for the downward adjustment

1    for acceptance of responsibility that I've set out in my

2    memorandum.

3          THE COURT:  Let's talk then about what the PSR --

4    where it comes out.  It comes out at a total offense level of 24

5    against a Criminal History Category of V.

6       And let me make sure that we're all operating here on the

7    same page.  The defendant went to trial and was convicted on

8    five of the seven counts contained in the superseding

9    indictment.  He was acquitted on Counts 2 and 6.

10      The calculations start with Section 2D1.1 and results in a

11   base offense level of 20.  The calculations as provided by --

12   I'm sorry -- as provided in the PSR include a two-level

13   enhancement for possession of a dangerous weapon.  That's under

14   2D1.1(b)(1).  And then a two-level enhancement for maintaining a

15   premises for purposes of manufacturing or distributing.  That

16   gets to a 24 that we talked about.  And the criminal history is

17   calculated at a V, and that results in a guideline range for

18   imprisonment purposes at 92 to 115 months.

19      Have I stated correctly what the calculations are in the

20   PSR, Ms. Lawless?

21          MS. LAWLESS:  Yes, you have, Your Honor.

22          THE COURT:  No quibble with that, Mr. Simon?

23          MR. SIMON:  No, sir.

24          THE COURT:  And so if I understand it then, what has

25   been submitted thus far is the United States has objected to the

1    calculations insofar as they do not include a two-level

2    enhancement for obstruction under guideline 3C1.1, and the

3    defense has asked for application of a two-level reduction for

4    acceptance of responsibility under 3E1.1.

5        Are those the only two issues remaining to be resolved with

6    respect to objections?

7            MR. SIMON:  Yes, sir.

8            MS. LAWLESS:  Yes, sir.

9            THE COURT:  Let's start with yours first, Mr. Simon.

10   I've read your objections as submitted to the court and, again,

11   I've read your sentencing memorandum.  Anything else that you

12   would like to add?

13           MR. SIMON:  Only this, that it would appear that the

14   Application Note 2 to Section 3E1.1 of the guidelines, it's very

15   case specific and requires a determination by the court as to

16   what -- you know, what exactly was going on in this particular

17   case.

18       I've cited Sixth Circuit cases, the *Hollis* case that quotes

19   from the *Kumar* case saying that the paramount factor in

20   determining eligibility for this credit is whether or not the

21   defendant truthfully admits his conduct comprising the offense

22   or offenses of conviction.  And an important consideration of

23   that is the timing.

24       And I'm sure the court remembers from the proof in this case

25   that on the day and almost simultaneously with the search being

1  conducted at my client's premises, my client was taken to the

2  basement, had Detectives Walker and Carroll Mirandize him, and

3  at that time he gave an oral statement basically inculpating

4  himself to a high degree.  He admitted the conduct.  He said

5  that he was possessing the cocaine that was found at the house

6  for the purpose of resale, that he bought it from others.

7      He made other statements about other people too, which at

8  the time the agents believe was valuable enough to tape-record

9  them, because he was rattling off so many names, they couldn't

10 write fast enough.

11     So he did incriminate himself to a great degree.  And I

12 would submit to the court that notwithstanding the fact that he

13 exercised his right to assert a defense in the form of a

14 pretrial motion, both a motion to dismiss based on what was

15 claimed to be a cooperation in return for immunity agreement and

16 also a motion to suppress those statements as being coerced,

17 that's the type of fact situation that is addressed in

18 Application Note 2.

19     I would submit to the court it's a rare occasion, but he

20 stood on his constitutional rights.  The court decided adversely

21 against him, obviously, but there was nothing that Mr. Charlton

22 did from -- or said from, simultaneously with the search being

23 conducted throughout the course of these proceedings,

24 inconsistent with his admitting the facts which comprise the

25 elements of the offenses for which he was convicted.

1          THE COURT:  Ms. Lawless.

2          MS. LAWLESS:  Yes, Your Honor.  We do not believe that

3     Mr. Charlton qualifies for an acceptance of responsibility

4     adjustment in this case for several reasons, not the least of

5     which is the obstruction, and we'll talk about that later.

6          But it's true that when he was interviewed he gave

7     information about his involvement in criminal activities.

8     However, offsetting that is the fact that we did in fact go to

9     trial that lasted pretty much a whole week, and Mr. Charlton did

10    not limit -- although he didn't testify during that trial, the

11    defense was not this notion of some sort of government

12    entrapment, although those things were raised beforehand and the

13    court denied those.

14         As best as I could determine, it was a general defense of

15    Mr. Charlton's been treated differently than other people who

16    have cooperated with law enforcement in the past.

17         He importantly was given an opportunity on several

18    occasions, extended by the United States, to enter conditional

19    pleas.  He could have pled guilty to the drug charges, to the

20    possession of the firearm charge and maintained his right to

21    appeal the adverse decision that the court made with regard to

22    the motion to dismiss and to suppress and he rejected that.

23         As I'm sure the court remembers, even when we were here

24    during the course of the trial, Mr. Charlton went so far as to

25    sign a plea agreement, which is in the record of this case.  But

then when we got to the colloquy about did you do the things
that the Government says they can prove, he backed out and said
no, at which point we went to trial on all of the charges.
Everything was presented to the jury with an opportunity for
them to acquit or to convict.

And we do not believe that that behavior, when you take his
conduct in total, including the testimony during the evidentiary
hearing that we'll talk about again here in a few minutes, that
does not demonstrate acceptance of responsibility.  Taking into
account -- and the United States acknowledges that just because
a person goes to trial, it doesn't automatically disqualify
them, but it's a rare case, according to the Sixth Circuit,
where you can basically have your cake and eat it too.  And we
don't think that that rare type of situation is met by the facts
and circumstances in this case.

MR. SIMON:  In response, a couple of things.  The
important part of the application note, as I read it, is whether
or not my client denied the essential elements of the offenses
for which he was convicted.  There's never been a denial on my
client's part of those essential evidence, that he possessed
controlled substances for the purpose of resale to others and
that he had guns in his possession at the house, never denied
that.  That's number one.

Number two, when the Government starts saying, well, the
posture of the defense in this case to the jury, as the court is

1  well aware, things that I might have wanted to argue to the jury

2  were -- I was precluded from arguing from and I did not argue

3  those.  I did not argue those points.

4      The only point that I ever argued to this jury as to whether

5  there's a reasonable doubt was on the count involving carrying a

6  firearm during the course of a drug transaction, because the

7  only evidence of that, the firsthand -- first person evidence of

8  that was from the confidential informant utilized by the

9  Government.  And the jury made a determination, I assume, that

10  that person didn't carry any credibility or not enough

11  credibility in which to convict my client.

12      The fact that they found my client not guilty of another

13  count, I'd like to take credit of that, but I didn't even argue

14  that count.  So sometimes juries have a way of evening things

15  up.  But in this case the defense, whatever you want -- whatever

16  I want to say, whether I was hampered or not, those were the

17  rulings of the court and I live with them.  I'll live with them

18  now.

19      But to say my client had an opportunity to plead guilty or

20  take a conditional plea under certain circumstances, there's all

21  kinds of provisions in the numerous plea agreements that were

22  proposed, and they're all on the record because that was made of

23  record in this court at that time.  But to say he had an

24  opportunity to plead guilty and take a conditional plea and

25  secure his rights to appeal, it's like -- it's within his

province to plead guilty under those conditions or not under

those conditions.  And we went a whole day and the court gave us

all the time in the world to try to get this figured out.  And

when it finally came down to it my client made a decision, no,

I'm not going to plead guilty.

The fact that he didn't plead guilty and he exercised his

constitutional right to go to trial, whatever the nature of the

plea bargain would have been, I would submit to the court, is

irrelevant because we stood on that -- we stood on the claim

that we made to the court pretrial.  We lost on it and we'll

litigate that on appeal.  But if the essential part of this

application note and whether or not my client gets a downward

adjustment for acceptance of responsibility is whether or not he

admitted the factual elements of the offenses for which he was

convicted and he surely did that.

THE COURT:  Well, first off, to the extent that you're

arguing against a proposition that is not before me, which is

some measure of fault being attributed to him for going to trial

or penalty, I want to make clear that I do not fault

Mr. Charlton for exercising his right to go to trial.  I said

that to you both on the record before trial.  I'll say it to you

now.  There is no penalty for that.

In fact, as you also pointed out, Mr. Simon, the results of

the trial benefitted him a great deal because the two 924(c)

counts, Counts 2 and 6 in the superseding indictment, were the

most potentially problematic for him with respect to adding a mandatory total of about 30 years to his sentence, and those are no longer in play having been acquitted.

So let's make sure that we clarify at the outset that I do not fault him for going to trial.  There is no penalty for going to trial here.

But as to the discrete issue under 3E1.1, what the Sixth Circuit says -- and I'm looking at a case called *U.S. v. Dempsey*, a 2001 Sixth Circuit case, "that in order to receive the acceptance of responsibility credit, the defendant must clearly demonstrate his acceptance of responsibility for the events of conviction and relevant conduct by a preponderance of the evidence."

And from my vantage point and you've also both pointed out, which is also borne out by our record, which is that we had extensive pretrial hearings.  Mr. Charlton chose to testify during one of those hearings.

There was also extensive interaction when we had the *Missouri v. Frye* pretrial colloquy, and an attempted change of plea colloquy, and then, of course, the trial.  And from my vantage point, presiding over that extensive record in this matter, I did not observe acceptance of responsibility for the offense of conviction and the relevant conduct.  And so I find that Mr. Charlton does not qualify under this standard, and I will not apply the two-level decrease.

1    So let's turn now, Ms. Lawless, to your objection under

2    3C1.1.

3         MS. LAWLESS:  Yes, Your Honor.  The United States

4    would ask the court to increase the base offense level by two

5    points under 3C1.1.

6    What we had provided to the pretrial services or probation

7    officer in preparation of the presentence report, through our

8    objection, outlined from the evidentiary hearing that the court

9    has just referenced that went on for quite a while.  And as the

10   court noted, Mr. Charlton chose to testify.  He did not have to

11   testify.  He could have advanced his motions through cross-

12   examination of witnesses or what have you, but he did choose to

13   testify.

14   We highlighted in our objections the portion that we think

15   is most directly indicative of his perjurious statements.  And

16   specifically, he was asked by his counsel about what Detective

17   Carroll had said.  And he said that she said, "You know how this

18   goes.  You know, you help us, us help you, and if you work for

19   us, then things will disappear."

20   His lawyer clarified:  "Okay.  And do you remember her

21   telling you those exact words, 'the case will disappear'?"  To

22   which Mr. Charlton responded, "Yes, sir."

23   And in your opinion, you found that -- the court found

24   there's no evidence in the record that the police made such a

25   specific promise of leniency.

1      I noticed in the sentencing memo that was filed yesterday by

2   the defense that they're focusing in on -- there's this one

3   statement.  It's that's true that we are pointing to that

4   because we are required to identify in the record a specific

5   area where a defendant testifies untruthfully.

6      Our submission to the court would be the entirety of that

7   demonstrates that he was not being truthful to the court.  But

8   this specific reference in the objections that we filed lays out

9   -- and as this court knows, I'm sure, in order to determine

10   whether on obstruction enhancement based on an argument from the

11   United States stemming from perjury, you have to look at whether

12   the elements of perjury -- whether we have demonstrated those to

13   you.  And I'm referencing a Sixth Circuit case, *United States v.*

14   *Friskey.*  It was decided June 20th of this year, 2017 WL

15   2645297.

16      And the court lays out, citing to earlier case law, what

17   those elements are.  One, that there's a false statement under

18   oath; two, that it concern some material matter; three, with the

19   willful intent to provide false testimony.  We believe that that

20   testimony that we've just outlined for the court, again, clearly

21   meets those elements.

22      If we look at the first one, whether there was a false

23   statement under oath, yes, Mr. Charlton says this is what they

24   promised me.  That is not true.  The court found that there was

25   no evidence to suggest that.

1          Number two, we look at whether it's a material matter and

2     materiality is important.  We have some guidance under 3C1.1 in

3     the application notes.  It's paragraph 4, subsection (B) that

4     talks generally about committing perjury and that that can be a

5     basis for the obstruction enhancement.

6          And then numbered paragraph 6 on page 373, because even

7     under the guideline, as well as case law, it has to be material.

8     And material is defined under "evidence, facts, statement, or

9     information, as used in this section, means evidence, facts,

10    statement, or information that, if believed, would tend to

11    influence or affect the issue under determination."

12         If the court believed what Mr. Charlton had said happened,

13    then that would have a direct impact on the issue that was under

14    the court's consideration.  Had he been promised, if you do this

15    for us, this will all go away.  You will not be prosecuted, that

16    determination was not adverse to him.  And we believe that the

17    second element with regard to materiality has been met.

18         And, finally, with the willful intent to provide false

19    testimony.  And we believe that taken in its entirety from his

20    testimony -- you were here to judge credibility as I was -- that

21    it was very apparent that Mr. Charlton was specifically intent

22    on the court believing that he was led to believe one thing when

23    the evidence actually indicated otherwise.

24         So we think that we have demonstrated the elements of

25    perjury and that for that reason, under 3C1.1, the two-level

1      enhancement for obstruction is appropriate in this case.

2            MR. SIMON:  Your Honor, in response, number one, as to

3      the definition of perjury under the case that Ms. Lawless has

4      cited, I don't have a problem with that.

5         A material statement made under oath with intent to mislead

6      particularly the court, that would qualify, but that's a

7      definition.  And I would submit, in the fact-specific situation

8      in my client's case, this finding of obstruction would be really

9      improper in my opinion.

10        Number two, I guess, is that the Government hasn't

11     challenged any other statement that my client made, either the

12     oral statements attributed to him, which were incorporated into

13     Detective Walker and Detective Carroll's investigative reports

14     that are part of the discovery in the case, the two tape-

15     recorded statements that my client made, and his testimony

16     during this hearing.  The only, only statement that the

17     Government is saying is perjurious is my client's account of

18     Detective Carroll saying, "Your case will disappear."  That's

19     the only assertion that they've made in the whole case.

20        He has been truthful, as I said before, in everything else

21     that he said that was recorded or not recorded.  He gave them

22     detailed statements, details about what he did in satisfying the

23     elements of the offense.

24        However, what's important, I believe, to the court in making

25     this determination is what the Government doesn't get, is that

1    his statements to law enforcement were made in conjunction with

2    a number of promises that were made to him by Detective Carroll,

3    and Detective Walker, and Detective Ruoff.  "We'll see what we

4    can do.  We'll help you get out of jail.  If you cooperate with

5    us, we'll help you."  All right?  They're throughout all the

6    tape-recorded statements.  And thanks goodness they're tape

7    recorded because they're of record and they can be demonstrated.

8       "We're not charging your wife.  We're going to protect your

9    family.  We'll do what we can to help you get out of jail."  All

10   those are promises that were made to my client.

11      The most important thing as to the point that Ms. Lawless is

12   making on her argument about attributing that statement of your

13   case will go away -- your case would disappear to Detective

14   Carroll is that that is what my client recollected of what

15   happened.

16      And what's important is to put into context the other part

17   of the testimony of my client during this same proceeding, and

18   that starts on page 67 in the same evidentiary hearing.

19      Now, Ms. Lawless is cross-examining Mr. Charlton at that

20   point and she's asking about, well -- and this is on page 67,

21   line three.  And I'll highlight some questions and answers of my

22   client.

23            "Q.  All right.  Now, before what happened and while

24            you were working with Mr. Rouff, what specific

25            statements were made by Mr. Rouff saying -- to you

1          saying, [quote] 'This is how you're going to work off

2          your charges,' [end quote] or [quote] 'This is going

3          to be the result of your cooperation' [end quote]?

4          What did he tell you?"

5    My client's answer:  "Well, he said -- basically, he just

6    said you work -- you work your case off, you know."

7          "Q.  Okay.  Well, did you discuss how many defendants

8          you were going to make buys from?

9          A.  It was three.

10         Q.  Okay.  So you had a discussion you'd do three

11         buys.  Okay?

12         A.  Well, I did more than three buys.  It was three

13         different defendants.

14         Q.  Okay.  One buy from three different defendants.

15         So this is something that you discussed on the front

16         end?

17         A.  It was more than one buy from each defendant.  It

18         was three buys from each defendant.

19         Q.  Okay.  What I'm trying to get at, Mr. Charlton, is

20         this:  Did you have a discussion with Mr. Rouff

21         about [or Rouff] talking about how your case would be

22         resolved -- what the end result of your case would be

23         as long as you did certain tasks for them?

24         A.  He just said he'll handle it.

25         What's that?  [That was a question.]

```
 1              A.  He just said he'll handle it.
 2              Q.  Okay.  So did you know from the front end going in
 3              specifically what you're expected to do?
 4              A.  As far as making buys?"
 5         Let me drop down a little bit to question on line 13:
 6              "Q.  All right.  So you didn't know the specifics of
 7              what was exactly going to happen to you?
 8              A.  No.
 9              Okay.  You just knew you were -- your case was going
10              to get taken care of?
11              A.  Yes, sir."
12         So to say your case is going to get taken care of -- in one
13    instance that happened before -- my client has the perception
14    that he's being treated the same way.  All right?  And to say my
15    case is being taken care of or it's going to disappear, I mean,
16    what's the difference?  What's the difference?
17         And, I mean, I understand the important -- what the
18    Government is saying.  That's a central part of the motion to
19    dismiss in return -- immunity in terms -- in return for
20    cooperation.
21         But in the grand scheme of things to Mr. Charlton, in the
22    position that he's in, I would submit to the court, to say
23    that's a willful misrepresentation made under oath for the
24    purpose of persuading the court as to that point, a willfulness,
25    as opposed to an inaccuracy of what he remembered Detective
```

1    Carroll telling him, with all those promises being made, that

2    would be -- in my opinion, my humble opinion, that would be

3    unfair to stick him, to apply obstruction of justice in a

4    two-point higher adjustment to my client under that set of

5    facts.

6            MS. LAWLESS:  Your Honor, words matter and you

7    probably recall the hearing.  And I went through a lot of

8    different things with Mr. Charlton giving him the opportunity to

9    clarify.  And, in fact, he didn't even make this statement to

10   me.  He made it to Mr. Simon, because Mr. Simon did know the

11   importance of what these words were, and Mr. Charlton agreed

12   with him when, in fact, that had not happened.

13      Talking about what had gone on with Detective Ruoff from

14   earlier that year in a completely different case doesn't have to

15   do with a material representation to this court in this case

16   about whether he was promised leniency in exchange for his

17   cooperation.

18      We believe that if you recall back to the hearing, his

19   overall demeanor and specifically this particular response,

20   because this was the key to their motion to dismiss/suppress, he

21   wanted you to believe that this promise was made to him when, in

22   fact, it had not been.  That is perjury and that should be the

23   form of a two-level enhancement for obstruction.

24           THE COURT:  Well, here's how I look at this:  The

25   Sixth Circuit standard that Ms. Lawless cites is correct.

1    To apply this enhancement on the basis of perjury -- and I'm

2    looking at a case issued by the Sixth Circuit just recently on

3    June 21st, *U.S. v. Schwartz*.  The court says, "The district

4    court must find that the defendant testified falsely concerning

5    a material matter with the willful intent" -- we all seem to be

6    in agreement that that's the standard -- "with the willful

7    intent to provide false testimony rather than as a result of

8    confusion, mistake, or faulty memory."  And the quote ends with

9    "memory."  And that is a preponderance of the evidence standard.

10    And I think it's a close call here, but I find that I cannot

11    make such a finding based on Charlton's testimony at the

12    hearing.

13    I did find that there was no evidence that the police made

14    the specific promises of leniency that Mr. Charlton described in

15    his testimony, that's true.  But in that same order I also

16    acknowledge that Mr. Charlton likely expected leniency based on

17    the officer's statements regarding cooperation and his past

18    experience working as an informant.

19    So I think as a result of that and as a result of the

20    testimony that came out regarding the discussions, the various

21    discussions that the law enforcement officers, primarily the

22    local law enforcement officers, had with Mr. Charlton, I think

23    it's -- I think while it's a close call, I think it's too

24    difficult to sort through that and make such a finding in the

25    context, the greater context in which it was -- in which it was

1    made.  So I'm going to overrule the U.S. objection regarding

2    3C1.1 two-level enhancement.

3         That gets us right back where we started.  So are there any

4    other motions to consider at this point, Mr. Simon, first, for

5    departure?  I think we should always consider departure first.

6              MR. SIMON:  No, sir.

7              THE COURT:  And how about any motion for variance?

8              MR. SIMON:  No, sir.  I'd ask the court to impose a

9    sentence that's reasonable under the circumstances in this case.

10             THE COURT:  Any further argument under 3553 and the

11   factors there?

12             MS. LAWLESS:  One very quick one, Your Honor.  We

13   would ask the court, within the recommended guideline range as

14   it's been established through the court's rulings that we're now

15   at a range of 92 to 115 months, we would ask the court to impose

16   a sentence at the high end of that guideline range for a couple

17   of reasons.

18        Number one, Mr. Charlton's criminal history score is a V.

19   He has 11 criminal history points.  He's got a very long and

20   storied criminal record, and so we don't believe that a sentence

21   at the low end of the guideline range is appropriate.

22        And while the 11 points is in the middle of 10 to 12, the

23   other reason that we would ask the court to consider a high-end

24   range sentence is based on something that is contained in the

25   presentence report.  And I had looked at this long and hard but

1    essentially had given everything to the probation that we could

2    give.  And I'm specifically referencing numbered paragraph 27,

3    wherein the presentence report talks about the drug quantity

4    that is involved here.

5        There is a bracket of information there that law enforcement

6    also found $96,004 in United States currency, but the probation

7    officer didn't think they had enough information available to

8    accurately convert that to narcotics.

9        We gave them everything we had about the kinds of drugs he

10   was selling, the quantities of drugs that he was selling.  But

11   clearly, based on other testimony that came in during the trial,

12   namely Mr. Charlton's statement about the fact that he hadn't

13   had a legitimate job for the 10 years prior to when he was

14   arrested, the United States believed strongly that that is

15   clearly attributable to illicit drug trafficking.  That was his

16   job.  It's what he did.

17       And we would ask the court, in light of that, the fact that

18   it wasn't taken into account -- and I acknowledge that we didn't

19   file an objection because I can't make more things appear than

20   what we have with regard, like I said, to the type of drugs, the

21   quantities, and what have you.  But in light of that clear

22   evidence of long-standing, very active drug trafficking and the

23   high criminal history score, we would ask the court to impose at

24   the high end of that sentencing range, which would be 115

25   months.

1    THE COURT:  Anything further with respect to that

2  argument, Mr. Simon?

3    MR. SIMON:  I guess there's some things I would say,

4  but I'll leave that in the court's discretion to fashion a

5  reasonable sentence in Mr. Charlton's case.

6    THE COURT:  Does Mr. Charlton wish to address the

7  court as is his right?

8    MR. SIMON:  Did you want to say anything?

9    THE DEFENDANT:  Yeah, I do.  Your Honor, the reason

10  why I went to trial is because I didn't want to commit perjury

11  as far as having the gun in my possession so that's the reason

12  why I went to trial.  So I don't see why I would stand on the

13  stand and commit perjury for nothing and then take it to trial,

14  because I didn't want to commit perjury.

15    THE COURT:  That's fine, Mr. Charlton.  You understand

16  we've already resolved that issue --

17    THE DEFENDANT:  I was just --

18    THE COURT:  -- in your favor with respect to the

19  perjury argument.  Is there anything else that you would like to

20  bring to the court's attention?

21    THE DEFENDANT:  No, sir.

22    THE COURT:  Any other information or witnesses,

23  Mr. Simon, that you'd like to bring to the court's attention?

24    MR. SIMON:  Only that present in the courtroom today

25  are my client's grandmother, his daughter, his nephew, his

```
 1    son-in-law and his wife.

 2            THE DEFENDANT:  That's my mom.

 3            MR. SIMON:  Oh, your mom.  I'm sorry.  And his mom.

 4            THE COURT:  Thank you.  Anything further?

 5            MS. LAWLESS:  No, sir.

 6            THE COURT:  Are the parties ready for me to announce

 7    the sentence?

 8            MS. LAWLESS:  Yes, sir.

 9            MR. SIMON:  Yes.

10            THE COURT:  I will do so now.  The court, having

11    considered the advisory sentencing guidelines and 18 U.S.C.

12    3553(a), I will now impose the following sentence:

13        It is the judgment of the court that the defendant is

14    committed to the custody of the Bureau of Prisons for a term of

15    108 months as to each of Counts 1, 3, 5, and 7, and a term of 60

16    months as to Count 4 in the second superseding indictment, all

17    of which shall be served concurrently for a total term of 108

18    months imprisonment.

19        Upon release from imprisonment, the defendant shall be

20    placed on supervised release for a term of three years as to

21    each of Counts 1, 3, 4, 5, and 7, which shall run concurrently

22    for a total term of three years.

23        The defendant shall abide by the standard conditions of

24    supervision adopted by the court, as well as the special

25    conditions, a copy of which has been provided to the defendant
```

1    and counsel.

2        These special conditions include drug aftercare, mental

3    health aftercare, and being subject to searches, all of which

4    will be explained to the defendant by the U.S. Probation Office.

5    The defendant shall pay a special penalty assessment fee of $100

6    as to each count of conviction, for a total of $500.  Any

7    financial sanctions imposed shall be paid in accordance with the

8    schedule of payments page, which will be contained in the

9    judgment.

10        Restitution is not an issue in this case.  A fine and the

11    cost of incarceration and supervision are waived due to the

12    defendant's inability to pay.

13        And I have here in my notes, Ms. Lawless, that the United

14    States is likely to move at this point to dismiss the original

15    indictment and the first superseding indictment.  Is that

16    correct?

17            MS. LAWLESS:  That's correct, Your Honor.  We so move.

18            THE COURT:  So without objection, at this point I will

19    grant that motion and dismiss those first two indictments.

20        Having considered 18 U.S.C. 3553(a) and the advisory

21    sentencing guidelines, which produce a total offense level of 24

22    against a Criminal History Category of V, the resulting advisory

23    guideline ranges are 92 to 115 months custody, a fine range of

24    20,000 to $3 million, and a supervised release term of three

25    years.

1    I've concluded a sentence of 108 months' custody, followed

2  by three years of supervised release, falls within the advisory

3  guideline ranges, each of those does, and is sufficient but not

4  greater than necessary to comply with the purposes set forth in

5  3553(a)(2), and it satisfies all applicable statutory

6  provisions.

7    Mr. Simon, are there any objections to the sentence

8  pronounced or the special conditions, other than what we've

9  already talked about and have not been previously raised?

10    MR. SIMON:  Correct, none other than what we've

11  already discussed.

12    THE COURT:  Same question, Ms. Lawless.

13    MS. LAWLESS:  Yes, Your Honor.  No further objections,

14  other than what's been already raised.

15    THE COURT:  And before we talk about your client's

16  appeal rights under Rule 32, Mr. Simon, anything else with

17  respect to the judgment that the court will enter?  Any requests

18  to be considered?

19    MR. SIMON:  My client asked me to request the court to

20  make a recommendation, which we understand it's a recommendation

21  to the Bureau of Prisons, if he would be placed in an

22  institution close to Louisville where his family is located as

23  much as possible.

24    THE COURT:  Let me address that.  It sounds like

25  you've probably informed Mr. Charlton that I can only make a

1    recommendation.

2        And so I want to emphasize that to you, Mr. Charlton, as

3    well as to your family, who is here on what I know is a

4    difficult day for them as well as you.

5        The way that the law is written, Mr. Charlton -- and I say

6    this also to your family -- I do not have the ability to order

7    the Bureau of Prisons to place you in any specific institution.

8    If I did, I would consider placing you in one of the Kentucky-

9    based institutions that is near to Louisville.

10       I can only recommend, however, under the law.  Now, I will

11   say that the Bureau of Prisons by their policy does attempt,

12   whenever possible, to follow that recommendation.  And given

13   that you have substantial family support -- and the court takes

14   note of that.  That's very important going forward -- I will

15   make that recommendation and I will make it clear in the

16   judgment that the court prefers that you be placed as close to

17   your home here as possible in order to facilitate ongoing visits

18   and support.

19       I'm not required to say anything further about it than that,

20   but I am going to take a minute and address your family,

21   Mr. Charlton.

22       I'm going to tell you that Mr. Charlton has had a long

23   history, as you've heard discussed here, of interaction with the

24   criminal justice system.  That's contributed to the nine-year

25   sentence that he just received.  But that doesn't mean that I

1   view or that anyone else in this courtroom for that matter views

2   Mr. Charlton as a lost cause.  I certainly do not believe that

3   you do or you wouldn't be here, and so I commend you for being

4   here.

5       I ask you to keep that in mind over the next eight years or

6   so that he can be expected to serve his sentence, because it's

7   the court's intention that at the end of his sentence when he

8   returns that he be given every opportunity to return as a

9   law-abiding citizen and return to his family and to his

10  community with no further problems.

11      And it's my judgment, it's my observation that that only

12  happens when a person in his position has the support of his

13  family, as well as his community, but first and foremost his

14  family.  And so I ask you all to keep that in mind going

15  forward.

16      Anything further, Mr. Simon?

17          MR. SIMON:  No, sir.

18          THE COURT:  Mr. Charlton, let me tell you about your

19  appeal rights.  Under Rule 32 of the Rules of Criminal

20  Procedure, you have the right to appeal your conviction and you

21  have the right to appeal the sentence that I just handed down if

22  you believe that it was illegally or incorrectly imposed.

23      I need to tell you that any notice of appeal must be filed

24  within 14 days of the entry of judgment or within 14 days of a

25  notice of appeal filed by the Government.

1      If you need the assistance of the court clerk in filing your

2  notice of appeal, the clerk's office will prepare and file that

3  notice on your behalf.

4      If you cannot afford to pay the costs of appeal or if you

5  cannot afford to pay the cost of appellate counsel, you have the

6  right to apply to receive -- to proceed, as it's called, in

7  forma pauperis.  That means without paying for the appellate fee

8  and to have that fee waived, in essence, and to have appellate

9  counsel appointed for you.

10      Anything else with respect to Mr. Charlton's appeal rights

11  that need to be addressed, Mr. Simon?

12         MR. SIMON:  Got any other questions?  Okay.  If you

13  would acknowledge that.

14      I've explained to Mr. Charlton -- this is just saying you've

15  been advised as to your right to file an appeal.

16      I've told Mr. Charlton that I would ensure that his notice

17  of appeal would be filed in a timely manner.  I'll check with

18  the court staff whether you need another affidavit.  He's

19  determined to be indigent and that's why I was appointed, but

20  we'll deal with that.

21         THE COURT:  All right.  Thank you.

22      Anything further, Ms. Lawless?

23         MS. LAWLESS:  No, sir.

24         THE COURT:  Anything further, Mr. Simon?

25         MR. SIMON:  Just one matter, Judge.  I have filed, on

1    Document 130 on June 22nd, a motion to complete the record of

2    the trial and the pretrial proceedings in this case, motion to

3    file unredacted transcripts of the two tape-recorded statements.

4    I don't believe they were ever transcribed by the Government.  I

5    did transcribe them.  I provided a corrected copy to

6    Ms. Lawless, which I believe you've had an opportunity to look

7    at.  There are like two small corrections about zips.  I've

8    changed those and emailed those back to the Government.  So I

9    believe that the transcripts, as they exist now, the corrected

10   transcripts are accurate.

11           THE COURT:  Are these the transcripts that your

12   contractor provided?

13           MR. SIMON:  Yes.

14           THE COURT:  And were they submitted as exhibits during

15   the trial?

16           MR. SIMON:  I don't believe we ever -- I don't think

17   we ever tendered them as exhibits, but both the Government and

18   the defendant had these transcripts available.  I think

19   witnesses were questioned about them.

20      I did provide the transcripts, particularly the corrected

21   ones, to Ms. Lawless.  And I believe in an email communication

22   she indicated that they are accurate, with one or two

23   corrections that I made.

24           MS. LAWLESS:  They were not introduced, Your Honor,

25   because it would be inappropriate to do so.  The jury is asked

1    to rely on their memory based on hearing the recordings played.

2    So they are not --

3          THE COURT:  So the only way they would be introduced

4    would be in the form of a proffer; is that right?

5          MR. SIMON:  Well, the actual statements attributed to

6    the detectives and my client on the tapes, on the two tape-

7    recorded statements were of evidence because they were -- both

8    tapes were played for the jury.  We both agreed with the court

9    that we would not provide a transcript to the jurors because it

10   would give undue substance to parts of them, but the tape

11   recordings themselves were Government exhibits in the pretrial

12   hearing on my motion.  And the court had the opportunity to

13   listen to the tapes, although they were not transcribed.

14     So in order to complete the record of the case -- I don't

15   know if -- I don't see an appeals court listening to an hour and

16   20 minutes of recorded testimony so I prepared these

17   transcripts, both because they were useful as a tool to counsel

18   at trial but also to complete the record in the case and to file

19   them under seal and unredacted.

20         THE COURT:  The United States has not responded to

21   that motion.  Can you do that?

22         MS. LAWLESS:  I will, Your Honor.  I'm sorry.  It

23   slipped my...

24         THE COURT:  Why don't you -- can you file a response,

25   say, within seven days?

1          MS. LAWLESS:  Yes, sir.

2          THE COURT:  And I will attempt to rule on that as

3     quickly as possible, Mr. Simon.

4          MR. SIMON:  Thank you.

5          THE COURT:  Anything further?

6          MR. SIMON:  No, sir.

7          MS. LAWLESS:  No, sir.

8          THE COURT:  We'll be adjourned.

9        (Proceedings concluded at 4:13 p.m.)

10                 C E R T I F I C A T E

11       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

12    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

13

14
         _____s/Dena Legg_____          September 27, 2017
15    Certified Court Reporter No. 20042A157     Date
      Official Court Reporter
16

17

18

19

20

21

22

23

24

25