```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:16-CR-00033-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
        VS.                         )
 6                                  )
     LOUIS CHARLTON,                )
 7                                  )    March 31, 2017
             Defendant.             )    Louisville, Kentucky
 8
 9                            * * * * *

10          TRANSCRIPT OF DEFENDANT'S CLOSING STATEMENT
                          AT JURY TRIAL
11              BEFORE HONORABLE DAVID J. HALE
                  UNITED STATES DISTRICT JUDGE
12
                              * * * * *
13
     APPEARANCES:
14
     For United States:      Jo E. Lawless
15                           U.S. Attorney's Office
                             717 West Broadway
16                           Louisville, KY 40202

17   For Defendant:          Larry D. Simon
                             239 South Fifth Street, Suite 1700
18                           Louisville, KY 40202

19

20   [Defendant present.]

21

22                   Dena Legg, RDR, CRR, CCR-KY
                        Official Court Reporter
23                       232 U.S. Courthouse
                         Louisville, KY 40202
24                        (502) 625-3778

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

1      (Begin proceedings in open court at 2:14 p.m.  Jury in.)
2            MR. SIMON:  May it please the Court.
3      Ms. Lawless.
4            MS. LAWLESS:  Mr. Simon.
5            MR. SIMON:  Mr. Charlton.
6      And ladies and gentlemen of the jury, I've been spinning
7  this table around for three days this week.  I'll stand over
8  here, if that's all right.
9            THE REPORTER:  Mr. Simon, will you pull the microphone
10 closer to you, please.
11           MR. SIMON:  I'll do that.  Both these?
12           THE REPORTER:  Just that one.
13           MR. SIMON:  All right.  Try to accommodate everybody.
14     The first thing I'd like to do is thank you-all for your
15 patience and attention during this trial.  I'm sure on behalf of
16 the Government we feel the same way.  You've been a very
17 attentive jury, and we appreciate your attentiveness.  And I'm
18 sure your devotion to that and to getting things right in this
19 case will follow you back to the jury room when you do your
20 deliberations.  Even attentive when I played this hour,
21 hour-and-15-minute statement.
22     And, obviously, the last thing I want to do is to bore
23 anybody, but I would submit that the interaction between the
24 people that you heard, the voices of those people on that tape
25 give you a pretty good insight about just the relationship of

1   the parties and what the police officers thought about my
2   client, what you think my client's motivation was during that
3   period of time.
4       I'm going to ask you to think about that, think about those
5   motivations, think about how my client was treated during that
6   period of time, and what he had to say, and what those officers
7   had to say.  Like I said, last thing I want to do is bore you as
8   witnesses -- as jurors.  You're the trier of the facts and what
9   was said, how it was said, and the relationship between the
10  parties is a huge factor in your deliberations.
11      I would be -- I think I'd be at fault if I didn't mention
12  the importance of juries to the process.  It may seem pretty
13  trite, but to say that you're the most important people in the
14  courthouse, that is absolutely true.  The system couldn't work
15  without you.
16      Judge Hale talked about the history of his position with
17  this court, going back to the Founding Fathers and George
18  Washington.  And to really think about it and to stand here and
19  to think about your responsibility as jurors, my responsibility
20  as an advocate is just really awesome.
21      But what's most important, when you talk about history of
22  this country, the Sixth Amendment guarantees everybody in this
23  room, everybody that's a citizen the right to have a jury of
24  their peers make a determination in the case.  The police don't
25  determine whether somebody's guilty or not.  They can put

1  together evidence.  The United States attorney, they can be an
2  advocate for the Government.  I can be an advocate for my
3  client.  But it's up to you, real people, everyday people that
4  will decide whether another citizen up here is guilty beyond a
5  reasonable doubt with the other Constitutional protections that
6  Mr. Charlton has, to be considered innocent until he's proven
7  guilty, to have no inference of guilt by virtue of the fact that
8  he elected not to testify.
9       I mean, back in those days, the British that were
10 controlling the colonies started taking away different causes of
11 action from the trial courts, put them in the maritime courts,
12 and there were less and less causes of actions for the colonists
13 to enjoy and to employ the right of a trial by jury, and that's
14 why we have it as one of the Bill of Rights, the Sixth
15 Amendment.  So I would be remiss if I didn't talk about that.
16      So let's talk about the case.  In this case, I would submit
17 to you the biggest issue and the biggest problem with the
18 Government's case is Count 2 of the indictment.  And you'll get
19 a copy of the indictment to go back with you to the jury room
20 and you'll also get a copy of the instructions.
21      Now, Instruction Number 13 in your packet deals with Count 2
22 of the indictment.  Now, in contrast, Instruction Number 17
23 deals with Count 6.
24      So Count 2 of the indictment is whether or not Mr. Charlton
25 was carrying a weapon, carrying a firearm in furtherance of a

1   drug trafficking crime.  That is to be contrasted with Count
2   Number 6 of the indictment, where he's charged with possessing a
3   firearm in furtherance of drug trafficking crime.
4       The differences in possessing a firearm and carrying a
5   firearm are huge, very important, and they're distinguished by
6   the judge's instructions in the definitions in the instructions.
7       So you will see in Instruction Number 13 the definition of
8   carrying.  One of the elements of carrying a firearm during and
9   in relation to a drug trafficking crime is that the carrying of
10  the firearm was during and in relation to the crime charged in
11  Count 1, and carrying a firearm includes carrying it on or about
12  one's person.
13      The only evidence that the Government has in this case that
14  my client is alleged to have carried a firearm on or about his
15  person is Mr. LaGantta, Little Edward -- I call people by their
16  last name -- Mr. LaGantta.  That's the only evidence in this
17  case that you have to show that he, my client, carried a
18  firearm.  And the issue is whether or not you're going to
19  believe the testimony of Mr. LaGantta beyond a reasonable doubt.
20  That's the real question.  That's one of the real questions in
21  this case.
22      So when you evaluate the testimony of Mr. LaGantta, remember
23  what the evidence in this case showed.  He got on the witness
24  stand and said, "No, I have no agreements with the Government.
25  Nobody's made me any promises.  Nobody's paid me any money."

1    Well, in fact, we know that isn't the case, because as was
2    demonstrated, he got a deal.  He got a great deal.  He was
3    charged with trafficking in cocaine because Detective Carroll
4    and I think it's Detective Moseley both stopped him 11 days
5    before he was utilized -- "he" being Mr. LaGantta -- as an
6    informant by the same detectives involved in this case to go in
7    and do a controlled buy from my client.
8    And as you remember, Detective Moseley told us in direct
9    contradiction to Mr. LaGantta, who would have you believe that
10   after he's stopped the police say, "Okay.  Good-bye.  Nice to
11   see you.  We're just going to take your cocaine, and your
12   bouillon cubes, and your synthetic drugs, and your marijuana and
13   we'll see you later.  And by the way, if you're really
14   interested in helping the police, why don't you come into
15   headquarters some day and we'll set you up with a drug
16   transaction that you can help us all out."  What a bunch of
17   junk.
18   The testimony at trial showed that he was aware of what he
19   was looking at.  Possession of cocaine is only one to five years
20   in the state system.  Trafficking is five to 10 years.  This is
21   a man who has felony convictions.  He's looking at being a
22   persistent felony offender.  He can go to the penitentiary for
23   20 years.
24           MS. LAWLESS:  Objection, Your Honor.
25           THE COURT:  Please approach.

1	(Bench conference on the record outside the hearing of the
2	jury.)
3	             MS. LAWLESS:  It is very rare that I will object
4	during a closing, but Mr. Simon is arguing facts not in
5	evidence.
6	             MR. SIMON:  That was in evidence, I believe.
7	             THE COURT:  There's nothing about him being a
8	persistent felony offender, from my recollection.  I think you
9	need to stay away from those potential penalties.
10	             MR. SIMON:  I will.
11	        (End of bench conference.)
12	             MR. SIMON:  Mr. LaGantta is an individual with lots to
13	lose based on the cocaine that was seized from him on the 4th of
14	November.
15	       So notwithstanding the fact that he told you under oath --
16	like that wouldn't be a big deal to him.  He told you under oath
17	that, no, I didn't -- I didn't have any reason, you know, to do
18	it.  I did it out of my own goodness of my heart.  I like
19	working with the police.  Do you believe that?
20	       So the only evidence that exists on the Government's case to
21	show that my client was carrying, actually carrying a firearm is
22	the testimony of Mr. LaGantta.
23	       And when you look at the court's definition of proof beyond
24	a reasonable doubt, in giving it your most serious
25	consideration, as our prosecutor talked about, "A reasonable

1  doubt is a doubt based on reason and common sense.  It may arise
2  from the evidence, the lack of evidence, or the nature of the
3  evidence.  Proof beyond a reasonable doubt means proof which is
4  so convincing that you would not hesitate to rely and act on it
5  in making the most important decisions in your life."
6      And, obviously, it's an important issue to my client.  But
7  as to that burden, I would submit to you, if Mr. LaGantta came
8  to you and said, "Hey, it's okay.  It's not raining outside.
9  You can go outside without your umbrella," would you have any
10 reservations about going to the window first to see if it was
11 raining?  Would you put your trust in Mr. LaGantta in even
12 thinking about whether or not you should take an umbrella
13 outside, much less determine whether or not my client was
14 actually carrying a firearm on his person?
15     The statement that my client made, which by the way, was a
16 truthful statement that he sold some cocaine to LaGantta earlier
17 that day, if the police really wanted to find out, if the police
18 really wanted to know what Mr. LaGantta told them and see if my
19 client would admit to it, why didn't they ask my client?  "Hey,
20 Mr. Charlton, you're telling us about all this other stuff."  Of
21 course, they're promising what they're going to do for him at
22 the time.  "Why don't you tell us about whether or not the gun
23 was in your pocket or was in your waistband when you sold the
24 cocaine to Mr. LaGantta."  The police didn't ask him that and
25 Mr. Charlton didn't tell them that.

1  So there's only -- the only evidence that you have is
2  LaGantta's testimony from a person that is just a bald-face liar
3  and the oath means absolutely nothing to that person, absolutely
4  nothing.
5  We know how he was treated by the police because he was
6  treated by -- treated initially by the police the same way they
7  treat -- they treated my client and they treat people in the
8  same position.
9  If the police have somebody and they have a situation come
10 up and they're charged with an offense, then the officers are
11 going to give them an opportunity to cooperate. We've heard
12 that from the witness stand and in this trial because that's
13 what they did with Mr. Charlton. That's what they did --
14 contrary to what Mr. LaGantta would tell you. "Oh, no, they
15 didn't talk with me about making any kind of deals. I didn't
16 exchange telephone numbers. They didn't -- you know, they
17 didn't get my number from me." I don't know how in the heck he
18 was supposed to get ahold of them.
19 Mr. LaGantta, we know, because there was testimony of
20 Detective Carroll and I believe also Detective Moseley, the
21 overture was made. "Do you want to cooperate with us?" Okay.
22 He's under their thumb. Of course he's going to cooperate with
23 them and he does cooperate with them. He just won't admit it.
24 He won't admit it to you.
25 The same thing was going on with my client. The police made

1   the same type of overture.  "Do you want to cooperate with us?"
2   Of course, based on the fact of where my client -- what he's
3   been doing for the past few years, "Yes, I want to cooperate."
4   And he gave them statements, but LaGantta's a different kind of
5   case.
6       And that instruction -- I'd ask you to look at it.
7   Instruction Number 13 in Count 2 of carrying a weapon and
8   believing that beyond a reasonable doubt.  At the time I said to
9   Mr. LaGantta, "You're the only person that can establish that."
10  And there was an objection and it was a proper objection,
11  because it was argumentative, but this is final argument.  This
12  is closing argument and that's my argument.
13      You go back there and believe that this is a person that's
14  worthy of your belief and what he says you're going to take that
15  to the bank?  I submit not.
16      Instruction Number 7 in that regard is the court's
17  instructions on evaluating the testimony of different witnesses
18  as to bias and a lot of other factors.  It talks about the
19  witness's memory.
20      You heard from Mr. LaGantta about him smoking marijuana just
21  about every single day except when he comes to the federal
22  courthouse to testify, you know, since he was -- I don't know --
23  16, 18 years old.  I started to try to elicit testimony from our
24  chemist who testified, but I think it's a matter of common sense
25  or I would submit to you it's a matter of common sense, somebody

1  that is that type of person and a person that abuses drugs that
2  often has some big memory problems, has some believability
3  problems.  And you're just going to have to evaluate that person
4  for yourself.
5      I thought it was interesting that even the detective, I
6  think Detective Walker, said that we put the transmitter on
7  him -- okay.  This wasn't a camera.  This is a transmitter -- we
8  put a transmitter on him and we didn't tell him that it was a
9  transmitter.  And Mr. LaGantta would have us believe that it
10 was -- he didn't know it was a transmitter.  All he knew was
11 they gave him a pack of cigarettes.  I mean, that is just really
12 bizarre.
13     And we heard from Detective Moseley that you would never,
14 ever give an informant who is going into a place to make a drug
15 transaction and tell -- not let that person know that he was
16 wearing a wire.  I mean, that's like television.  Okay?  Think
17 of all the bad things that could happen.  That's why they put a
18 wire on somebody.  In case they have a problem, the police are
19 standing by.  But to tell -- but to pass off on you and have you
20 believe that, oh, no, no, we didn't want LaGantta to know that
21 he had a wire on him, makes absolutely no sense whatsoever,
22 unless they knew that they had the most unreliable person in the
23 world and they -- I don't know.  I don't know what to tell you
24 on that.
25     When I played the second tape for you, again, it was for the

1   purpose of you to evaluate the position of the parties, the
2   position of my client and the three police officers that were
3   interviewing him.  The two police officers, Carroll and Walker,
4   were then in a much different position than Sergeant Ruoff.
5       Ruoff had had a long connection and relationship with my
6   client.  And the way he was treated by Sergeant Ruoff, I think,
7   was a lot different than the way my client was treated by Walker
8   and Carroll, and I'd ask you to use that in your deliberations
9   in this case.  Think how they treated him.  Did they -- were
10  they -- well, just see how they treated him in that case.
11      The advantage that the -- somewhat of an advantage that the
12  Government has, they get to open the case and Ms. Lawless gets
13  to finish it off with the last bit of closing argument.  It's
14  sort of like a baseball game.  You get first ups and you get
15  last at bats, which could be very advantageous in a game of
16  baseball or softball, but that's okay.  I don't have a problem
17  with that because that's the way the system works.  The
18  Government is the moving party.  They're the ones that have to
19  prove their case of all the elements in a case beyond a
20  reasonable doubt.  And you have the right to evaluate the facts
21  without bias, as Instruction Number 2, "without bias or sympathy
22  or favoritism to any party."
23      I know who I represent.  This is Mr. Charlton.  He is not a
24  pillar of the community.  He's not somebody that is going to get
25  a lot of respect from a lot of people.  All right?  But he has

1  the same rights as all of us in this courtroom do and everybody
2  outside that's a citizen of the United States.
3      I ask you to follow the law, to give him the benefit of the
4  law as it pertains to you, the jurors, that are going to decide
5  his fate. Decide the facts the way you see them and apply them
6  to the law and render a fair verdict, that's all we ask in the
7  case. Thank you.
8      (End of transcript.)

9                           C E R T I F I C A T E
10     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
11  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

         s/Dena Legg                              January 26, 2018
14  Certified Court Reporter No. 20042A157        Date
    Official Court Reporter